# Exhibit 35

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ROBYN ABRAHAM,

 4                   Plaintiff,

 5           v.                              17 Civ. 5429 (KPF)

 6   ABBY LEIGH, et al.,

 7                   Defendants.
                                            Conference
 8   ------------------------------x
                                            New York, N.Y.
 9                                          December 18, 2018
                                            11:10 a.m.
10
     Before:
11
                        HON. KATHERINE POLK FAILLA,
12
                                            District Judge
13

14                              APPEARANCES

15   ARNOLD & PORTER KAYE SCHOLER LLP
          Attorneys for Plaintiff
16   BY:  SUSAN S. HU
          SUSAN L. SHIN (by telephone)
17
     COZEN O'CONNOR
18        Attorneys for Defendant Abby Leigh
     BY:  MICHAEL BROADBENT (by telephone)
19
     AKERMAN LLP
20        Attorneys for Defendants Martha Wasserman and Alan Honig
     BY:  IRA S. SACKS
21        JAMIE B. SHYMAN
          MARK S. LAFAYETTE
22

23

24

25
```

1              (Case called)

2              MS. HU:  Susan Hu from the law firm of Arnold & Porter

3    questioner on behalf of the plaintiff, Robyn Abraham.

4              MR. SACHS:  Ira Sachs, Jamie Shyman, and Mark

5    Lafayette on behalf of defendants Martha Wasserman, as

6    executrix of the Estate of Dale Wasserman and Alan Honig.

7              THE COURT:  Thank you.

8              MS. SHIN:  Susan Shin from Arnold & Porter on behalf

9    of plaintiffs.

10             MR. BROADBENT:  Your Honor, good morning.  This is

11   Michael Broadbent of the law firm Cozen O'Connor appearing on

12   behalf of defendant Abby Leigh and in her capacity as the

13   executrix of the Estate of Mitch Leigh.

14             THE COURT:  Thank you very much.

15             I have your 13 letters regarding discovery disputes,

16   including the one that inexplicably was submitted at 8:37 last

17   night.

18             Mr. Sachs, I am beginning with you, sir.  I am going

19   to try to address these in some semblance of order.

20             Sir, you have argued to me that there is spoliation in

21   this case.  I know that you know that those are very, very

22   serious allegations.  I want to make sure what your position is

23   in light of the explanation provided by Ms. Abraham and her

24   attorneys, which is, as I understand it, that in or about 2014,

25   as things were looking less like the performance was going to

1  happen, that Ms. Abraham began preserving relevant materials,

2  and she did so by sending those materials to her attorneys and

3  by printing them out and saving them as PDF documents.

4        I will tell you that perhaps in 2014 I might have done

5  the very same thing.  But is it that you believe it's

6  incorrect, the recitation of the timeline, or do you believe

7  that it is correct, but that it hides the ulterior motive of

8  destroying the native formats of these documents?

9        MR. SACHS:  The actual answer to that, your Honor, is

10  neither.  What I believe -- and it's triggered by the three

11  documents that, as I've called it, have indicia of fraud, which

12  are Exhibits 1, 2, and 3 of my November 30 letter to your

13  Honor.

14        The fact that 50 e-mails, according to plaintiff's

15  counsel, and I have absolutely no quarrel with her recitation

16  of that, I have not counted them, but that 50 e-mails are no

17  longer on servers and that they believe that it's because of a

18  GoDaddy server crash and some e-mails may have been lost, that

19  was the reason why we have not made a Rule 37 motion.  It is

20  why I have not said that there has been spoliation, but I want

21  to look into the reason why there are 50 e-mails missing.

22        I served a document discovery subpoena on GoDaddy to

23  find that out.  And if GoDaddy comes back and tells me that

24  there was a server crash and some number of e-mails are

25  missing, and it might be 50 or something like that, then I have

1    no issue with spoliation at all.  But if they come back and

2    say, and we don't know this, and I have not seen any documents

3    relating to it, that there wasn't a server crash or there was a

4    server crash but no e-mails were lost, then we have an issue

5    still with how did 50 documents, which were on servers at some

6    point, disappear.

7            But the overarching issue that triggered this was

8    Exhibits 1, 2, 3, and the combined Exhibit 4 of my November 30

9    letter.

10           THE COURT:  Which is on my screen right now.

11           MR. SACHS:  If you look at Exhibit 1 and if you look

12   at the top e-mail, there is no open quote next to from R.

13   Abraham, close quote.  I have looked at all 492 e-mails that

14   were produced in e-mail format rather than document or PDF

15   format in plaintiff's production.  None of the e-mail format

16   documents are missing that open quote.  Every one of the e-mail

17   format documents either have no quotation marks around R.

18   Abraham or both quotation marks around R. Abraham.

19           The same anomaly, and I'll call it an anomaly, because

20   I don't know how it happened, the same anomaly appears on

21   Exhibit 2 on the top e-mail and the same anomaly appears on

22   Exhibit 3 in the top e-mail.

23           The other anomaly is that these e-mails are in -- the

24   oldest e-mail is on top.  That's not the way e-mail chains are.

25   And I do have, and it's one of the things I circulated, a

1    packet of selected e-mails, if I may pass up, your Honor.

2          THE COURT:  You may.  You have a copy for Ms. Hu.

3          MR. SACHS:  This is also part of what we circulated

4    for counsel who would not be present in court when I sent the

5    additional e-mails to your Honor and to all counsel yesterday.

6          THE COURT:  I received that as well, but I will have

7    the hard copies.  Thank you.

8          MR. SACHS:  And these are e-mails that I just printed

9    out as I was going through the production.  But if you turn to

10   page ABR001112, which is an e-mail.  The e-mails are in

11   chronological order.  The top e-mail on that one is June 24,

12   2013.

13         THE COURT:  Yes.

14         MR. SACHS:  You'll see there, your Honor, that, first,

15   in the front line there is no quotation marks around R. Abraham

16   and in the second e-mail there are two quotation marks around

17   R. Abraham.

18         You will also see, your Honor, that as with e-mail

19   chains that we are all familiar with, the top e-mail is the

20   latest e-mail in the sequence and the second e-mail in the

21   chain is the earliest e-mail in the sequence.

22         I don't know how this happened, but I think that the

23   only way we can find out -- and this is what triggered my

24   curiosity, if that's the right word, to why there are 50

25   missing e-mails.

1          Because in terms of what Arnold & Porter has

2     represented as officers of this court, I believe that they

3     believe that.  I believe they were told that.  I don't know

4     that they know that unless they have communicated with GoDaddy,

5     but no one has said that to me, and I'd like to find out from

6     GoDaddy.

7          But with respect to the documents that have indicia of

8     fraud, Exhibits 1, 2, and 3, I think we have to find out why

9     these documents have that indicia and the only way I know how

10    to do it is to have a forensic examination of the e-mail

11    account, and it's actually one of the three e-mail accounts.

12    Not all three e-mail accounts.  And plaintiff's computer.

13          There is one other --

14          THE COURT:  Sir, one moment, please.

15          MR. SACHS:  Surely, your Honor.

16          THE COURT:  I want to make sure I understand all of

17    the bases you have for seeking forensic examination of the one

18    e-mail account.  And it sounds like it is this quotation

19    anomaly and then the sorting anomaly in terms of the

20    chronological order, whether it be a regular or reverse of what

21    is usual.

22          Are there other bases that you have --

23          MR. SACHS:  One other, your Honor, which is that these

24    are among the documents missing from the server.  And one other

25    that I will say could be a tactical choice, but it struck me as

1    odd, the substance of the January 10 e-mail with the anomalies

2    and the January 20 e-mail with the anomalies are substantively

3    the type of document that I can't imagine would not have been,

4    given everything else that was attached to the amended

5    complaint, attached to the amended complaint with respect to

6    what Mrs. Wasserman is claimed to have done because this has

7    the statement, you have my MOLM vote for London and Broadway,

8    no conditions.  The second one says something similar:  Yes,

9    Robyn, you have my MOLM vote for Broadway and London.

10            It is surprising to me that these documents, if

11   counsel believed them to be accurate and not suspicious or with

12   anomalies, would have been raised either as an attachment to

13   the amended complaint or in opposition to Mrs. Wasserman's

14   motion to dismiss.

15            That's not the same level of anomaly.

16            THE COURT:  I am not giving a forensic exam based on

17   the selection of exhibits for the complaint.

18            MR. SACHS:  I will also say as another reason that

19   these e-mails not only do not appear in e-mail format in

20   Ms. Abraham's production, they also do not appear in

21   Ms. Wasserman's production.  That's not the principal basis.

22   The principal basis are the two that you mentioned, your Honor.

23            THE COURT:  One moment, please.  What you are saying

24   is that Ms. Wasserman has a complete collection of documents

25   related to this case.  She herself did not delete any documents

1    for any number of reasons, none of which nefarious, and you

2    can't find its match in her e-mail accounts?

3            MR. SACHS:  As to the first portion of what you asked

4    me, your Honor, I don't know, and that's because I've been

5    doing this since 1974.  One thing I learned fairly early on was

6    only swear for yourself.  Don't swear for anyone else.

7            I will also observe that there are documents that I

8    believe once existed that are no longer in Ms. Wasserman's

9    e-mail account either, server based or printed out.  I will

10   say, having spoken to Ms. Wasserman, these are the types of

11   e-mails that she would have printed out and would not have

12   deleted if they had in fact existed.

13           But I cannot answer your Honor to say that she has

14   kept everything because I do not believe she has kept

15   everything until she was sold to start saving things.

16           THE COURT:  You are asking for a forensic examination

17   of the e-mail account?

18           MR. SACHS:  There is one other thing that I would want

19   to mention, your Honor, which is Exhibit 4 and the two

20   documents that comprise Exhibit 4, which are from the same

21   e-mail account.  There are two documents with the same re.

22           The document, which is the second document in Exhibit

23   4, ABR001251, was an e-mail format in plaintiff's production.

24   The first document in Exhibit 4, which is ABR002853, was not in

25   e-mail format.  It was only in document/PDF format.  They are

1    both the same date.  They are both from Ms. Wasserman to

2    plaintiff.  They both have the same re.  One of them has a

3    single sentence, as your Honor can see.  The other has five

4    additional sentences plus a postscript.

5          And the reason for the forensic examination, your

6    Honor, and the reason for the subpoena on GoDaddy all go

7    together.  There are at least 50 e-mails missing from servers

8    and there are three e-mails with what I consider there to be

9    significant anomalies, plus the other pair of e-mails that make

10   no sense to have been sent on the same day by the same person

11   with the same re and repeating a portion of it and then earlier

12   adding additional text.

13         Quite frankly, I'm willing to use plaintiff's ESI

14   vendor to do the forensic examination, and we are willing to

15   pay for it.  But I think the only way to find out, and maybe it

16   won't even be a way to find it out.  The only way to find out

17   why these anomalies appear is to do a forensic examination.

18   The only way to find out whether a GoDaddy server crash caused

19   50 e-mails to disappear is to get documents from GoDaddy.  That

20   burdens nobody in the slightest.

21         THE COURT:  Wait.  By the way, none of this should be

22   taken as a decision that I have made because I haven't.  But if

23   it turns out that GoDaddy acknowledges server crashes and, by

24   some miracle, has a cache of documents that it can retrieve.

25   You want the documents themselves.  What if they include

1    privileged materials?  What if they include irrelevant

2    documents?  What if they include highly personal, sensitive

3    materials?

4         My point is, I understand why you want substantiation

5    for the crash and for the possibility that e-mails were lost.

6    But I'm extremely concerned about you getting the returns the

7    of the subpoena without any opportunity for Ms. Abraham to

8    review it first.

9         MR. SACHS:  I'm happy to have them look at it first,

10   your Honor.  What we asked for in the subpoena, though, were

11   documents referring, relating to, or concerning or comprising a

12   server crash, a determination of which e-mails were lost, and

13   documents sufficient to identify.  Not all the e-mails, but

14   documents sufficient to identify all e-mails that were lost,

15   which, from my standpoint, I was looking for.  It's why we

16   asked for documents sufficient rather than all documents, a

17   schedule.

18        THE COURT:  If I am GoDaddy, the easiest way to show

19   you documents that were lost and the evidence of same is to

20   give you the documents themselves.  That's my concern.

21        MR. SACHS:  I'm happy to have GoDaddy provide the

22   documents if they are planning on providing the documents to

23   plaintiff's counsel first.

24        THE COURT:  There are so many steps in this discussion

25   that require GoDaddy to have remarkable preservation abilities,

1    because I am not sure that any of this was preserved, but

2    that's a different issue.

3          Let me understand, so I can speak meaningfully to the

4    issue with your adversary, what is this forensic examination

5    going to do?  It's not going to be limited to the e-mails

6    you've identified, or is it?

7          MR. SACHS:  It really is a cart and a horse issue with

8    GoDaddy.

9          The issue with the forensic examination that I'm

10   asking is focused at this point on four documents.  I'm happy

11   to have them only look for those four documents and for the

12   backup or the original files relating to these three e-mails

13   with anomalies, plus the other pair or the other non e-mail

14   version of that document.  That's all I want.  As I said, I'm

15   happy to have plaintiff's ESI vendor do it rather than my

16   hiring my own.  I'm happy to hire my own.  I'm happy to have

17   their vendor do it if they trust their vendor more than they

18   trust mine.

19         THE COURT:  Let me hear from the other side.

20         Ms. Hu, is it you or Ms. Shin that I'll be hearing

21   from this morning?

22         MS. SHIN:  Your Honor, I would like to start, if

23   that's OK.  And if I have left anything out, I'm sure Ms. Hu

24   will be happy to add.

25         THE COURT:  Certainly.

1          MS. SHIN:  First of all, your Honor, our position is

2     that this kind of inquiry is completely improper under the

3     circumstances.  Perhaps Ms. Hu can do a better job of kind of

4     explaining all these quote/unquote anomalies, but none of them,

5     from what I can understand, is a basis for indicia of fraud.

6          I understand why they have picked out these documents

7     because they pertain to Ms. Wasserman and they are not

8     particularly great documents for them, but there are several

9     documents that have been preserved this way and that, from what

10    we can tell, no longer existed on Ms. Abraham's server.  With

11    further review we have determined that it's not 50.  It's more

12    like 36.  I am not sure how many instances this anomaly, or

13    whatever we want to call it, with the quotations Mr. Sachs has

14    pointed out, I am not sure how many times throughout the

15    production, the documented printed out that way.  One thing we

16    can do is do an analysis to figure out whether it is an anomaly

17    or whether it appeared that way every time it was printed on a

18    certain computer.  I am not sure.

19         THE COURT:  Ms. Shin, one moment, please.  You knew

20    prior to this phone conference that one of the bases for the

21    request for a forensic examination was the placement or the

22    absence of quotation marks.  Is that not correct?

23         MS. SHIN:  That appeared in Mr. Sachs' letter of, I

24    believe, November 30.

25         THE COURT:  So the answer to my question is yes?

1        MS. SHIN:  Yes.

2        THE COURT:  Did you have occasion to speak with your

3   ESI vendor about the circumstances that might cause that to

4   happen?

5        Here is what I'm getting at.  It's not that tough.  He

6   has identified things for me that are, as he says, anomalous.

7   You can come here today and tell me why they are not anomalies

8   by explaining how they happened.  It's much less helpful to say

9   that there may be other alternate reasons.  I need to have a

10  sense of what those reasons are.

11       Have you had occasion to speak to anyone about whether

12  printing in a certain way or saving in a certain way amounts or

13  would cause the issues that Mr. Sachs has identified?

14       MS. SHIN:  Your Honor, these PDFs appeared as is in

15  Ms. Abraham's server when she received documents from her

16  attorneys in 2016 and '15.  I asked Ms. Abraham and she said,

17  absolutely not.  All I did was print them.  All I did was print

18  them.

19       THE COURT:  We are speaking now about Exhibits 1, 2,

20  and 3 to Mr. Sachs' letter of November 30.  You are saying that

21  each of these three exhibits and perhaps -- not the fourth one,

22  but each of these three exhibits exists now only in PDF form

23  and that is what the PDF looks like.  Is that correct?

24       MS. SHIN:  Yes, your Honor.

25       THE COURT:  Please continue.

1          MS. SHIN:  I think on both the issues all we have here

2    is Mr. Sachs' assertion of that indicia of fraud.  We disagree.

3    I understand that these were just printed and they were printed

4    in different forms.  The same e-mail appears different times,

5    whether it was printed by Ms. Abraham or one of her counsel.

6    Sometimes they were printed landscaped.  Sometimes they were

7    printed from a different computers.  Sometimes they appear

8    differently.  But the substance remains the same.  Sometimes

9    these documents appear in the server and in the small instances

10   they don't.

11         We tried to tell Mr. Sachs that one explanation is

12   that from, what we understand, there was trouble with the

13   servers that Ms. Abraham used, the GoDaddy.com, to explain why

14   some of these do not exist anymore, but they did exist in 2014,

15   when they were preserved and printed.

16         Your Honor, pointing out these anomalous that occur is

17   not indicia of fraud.  I think to be able to assert fraud with

18   any basis, there has to be more.

19         Mr. Sachs has indicated already that he is not seeking

20   any relief under Rule 37 and, therefore, this is outside the

21   scope of what is appropriate in normal discovery, in what can

22   be sought through a subpoena unless your Honor permits it.

23         But, your Honor, to the extent that Mr. Sachs is also

24   raising question as to why certain documents were selected, I

25   will tell you that when we were accepting this case and

drafting the complaint, we only had a small subset of documents
that were provided to us.  Through the discovery we obtained
additional documents from both the prior law firm, and
Ms. Abraham provided the full set she printed on PDF.

There is no basis.  There is no showing here that
there were documents deleted.  There is no demonstration here
that documents were manipulated.  There is just absolutely no
basis at all.

I think Mr. Sachs said the right word, that he's
curious, and that's fine.  He has a right to be curious about
things that  -- I am not even sure what the word is.  When he
prints the document, there is lots of things that come up that
don't look the way they do necessarily when they are in their
native form.  That is not a basis enough to start inquiring
outside the claims and defenses of this case to be able to
create a case within a case.  They have just not met their
burden.

THE COURT:  Ms. Shin, let me stop you for a moment,
please.  I want the best and final explanation from you and
your firm as to the manner in which Ms. Abraham preserved
relevant documents upon coming to the realization in 2014 that
there may be a difference of opinion, if not a basis for
litigation.  At that time did she have everything maintained as
e-mails in certain servers?

MS. SHIN:  Yes, your Honor.  At that time everything

1    he had she went through and one by one printed out every e-mail

2    that related to this case, that related to Man of La Mancha and

3    all the players, she printed them out one by one.

4           THE COURT:  This is in or about 2014, is that correct?

5           MS. SHIN:  Correct, your Honor.

6           THE COURT:  Approximately how many e-mails did she

7    print out that she considered relevant to what is now the

8    dispute in this case?

9           MS. SHIN:  I cannot answer that, your Honor.  I didn't

10   go back and count that or ask her.

11          THE COURT:  Can you ballpark it?

12          MS. SHIN:  I can, your Honor.  I can certainly go back

13   and come back and let you know.

14          THE COURT:  That doesn't help me now.

15          When she took these e-mails and printed them out, did

16   she then retain them on their respective e-mail servers?

17          MS. SHIN:  My understanding is she saved them on her

18   computer, and throughout the end of 2014 and '15, she sent

19   them, sometimes as an attachment, sometimes as a zip file, to

20   attorneys that she was consulting with.

21          THE COURT:  As she is saving them, she is saving them

22   in PDF form, is that correct?

23          MS. SHIN:  Correct, your Honor.

24          THE COURT:  She saved the relevant e-mails, what she

25   perceived to be the relevant e-mails, in PDF form.  She printed

1    them out so she would have a hard copy.  Again, just so I'm

2    clear, did she keep them in her e-mail inboxes?

3            MS. SHIN:  I don't know if she kept them in the e-mail

4    inboxes.  They were in her sent boxes.  They were saved in her

5    laptop that she had at the time, after she scanned them in PDF.

6            THE COURT:  I'll ask the question more pointedly.

7    After she saved them and after she printed them, did she delete

8    them?

9            MS. SHIN:  No, your Honor.

10           THE COURT:  So, therefore, to the extent that they do

11   not exist today in native format, and this is approximately 36

12   documents, the only explanation that she has is that there were

13   one or more server crashes that would have caused her to lose

14   these e-mails?

15           MS. SHIN:  Yes, your Honor.  One thing that I would

16   add is, and I did this, if you Google GoDaddy crashes, there

17   are a number of things that come up about a lot of other

18   customers who experienced the same phenomenon.

19           THE COURT:  I just want to make sure I'm hearing this

20   and understanding this correctly.  There is no other reason

21   that Ms. Abraham can think of as to why these documents no

22   longer exist in native format other than the crashes to the

23   server.  Is that correct?

24           MS. SHIN:  Yes, your Honor.  She certainly preserved

25   more than 36 e-mails.  The 36 came up from our ability to match

1    them up with the ones that were pulled from the server itself.

2    It still exists today as well as throughout the production.

3         THE COURT:  And she first learned that these documents

4    no longer existed in native format when?  If it's more than one

5    day, please let me know that.

6         MS. SHIN:  Yes, your Honor.  It was over more than one

7    day and it wasn't any specific document.  She noted that some

8    documents just weren't there anymore.  This was the end of 2014

9    and then again, 2015, I understand she had called GoDaddy.com

10   to find out what happened, and she was told that they were

11   aware of the problem, that it was server wide.

12        THE COURT:  Well before filing this lawsuit she was

13   aware that some of her key documents only existed in PDF form?

14        MS. SHIN:  Yes, your Honor, she was.

15        THE COURT:  Ms. Shin, I want to hear you, if you want

16   to add anything to the subpoena for GoDaddy.  I have already

17   heard you speak about the propriety at this stage of the

18   litigation.  I want to go beyond that.

19        The offer was made that you could have the returns of

20   the documents.  What that means is that the only information

21   that would be obtained prior to your review of these documents

22   would be whether there was a crash, and if so, when?  Is there

23   not utility for both sides in ascertaining whether and when the

24   server crashed?

25        MS. SHIN:  Your Honor, our position only is that it's

1   just really improper.  Mr. Sachs has alleged fraud, in our

2   opinion, very recklessly.  We are very disappointed in that.

3   And I believe that this is just a way to substantiate these

4   statements that he has made in a public filing to the Court

5   without having to amend; only, in our view, trying to

6   substantiate the claims for which there is no basis whatsoever.

7           Having said that, the other concern I had is that I'm

8   just trying to defend from this case just getting bigger and

9   bigger and more burdensome.  I think the cost is one matter.

10  There was also a subpoena to depose that would require us to go

11  out and defend that deposition.

12          THE COURT:  Mr. Sachs walked away from the deposition

13  subpoena of GoDaddy.  It was just this.

14          MS. SHIN:  I understand.

15          THE COURT:  That's not a cost issue.  Again, I'm

16  asking you to confine your answers to the things that exist

17  today, and not things that don't.

18          MS. SHIN:  Your Honor, if you could repeat your

19  question.  I apologize.

20          THE COURT:  It would seem to me that if your client is

21  going to make the argument in litigation in response to the

22  inevitable cross-examination question at trial that she is

23  missing native format versions of some of the key documents in

24  the case that you might want to button up that particular

25  assertion by finding out from GoDaddy yourself and obtaining

1   substantiation that her precise e-mail accounts were the victim

2   of server crashes and not some random documents about random

3   crashes that I am not sure I could take judicial notice of

4   anyway.  I am certainly not surprised that you do not want the

5   contents of these accounts to be produced to Mr. Sachs and his

6   team by way of subpoena.  I am surprised that you are resisting

7   confirmation of the crashes because I would think that only

8   help your client.

9        MS. SHIN:  Your Honor, our position has only been it's

10  improper at this stage.  But if the inquiry is limited to

11  whether there was a crash and whether Ms. Abraham's account

12  were affected, we are OK with that, but with that limitation.

13       THE COURT:  I understand.

14       I am assuming that you are still not OK with a

15  forensic inquiry even limited to the four documents, five

16  documents contained as exhibits to Mr. Sachs' letter of

17  November 30. Am I correct?  I'm fine if you say otherwise, but

18  I assume you're still opposing that.

19       MS. SHIN:  I am opposing that because it is not

20  indicia of fraud.  To be honest, there are a lot of documents

21  that look like that, and those are cherrypicked because they

22  are not documents that they particularly like.

23       THE COURT:  It's also cherrypicked because their

24  client doesn't have the twin of that document or the analogue

25  of that document.  I am trying to minimize the ascription of

1     nefarious motives to both sides in this, so I understand.

2          MS. SHIN:  The only thing I would add, your Honor, if

3     I may is, yes, that is true.  Ms. Wasserman has not produced

4     those documents, nor has she produced many, many documents that

5     were produced by Ms. Abraham that do exist today on the server.

6          THE COURT:  Does that mean you will be asking for your

7     own forensic examination of their files?

8          MS. SHIN:  Not at this time, your Honor.  We have no

9     indication that they were deleted at this point.  But there are

10    documents that we produced that remain on the server that were

11    not produced.  I think any argument that is based on

12    Ms. Wasserman being unable to produce the twin, I think doesn't

13    stand up because she has not produced many, many documents that

14    were produced.

15         THE COURT:  Mr. Sachs, in reply, brief.  Brief reply,

16    sir.

17         MR. SACHS:  Briefly.  In terms to the answer to one of

18    your Honor's questions, Exhibit 9 to my letter has the source

19    path.

20         MS. SHYMAN:  For the record, it's Exhibit 9 to the

21    12/14 letter which we are happy to pass up.

22         THE COURT:  That's fine.  I can pull it up here.

23         MR. SACHS:  It was the letter with the documents I

24    might use today.

25         THE COURT:  Yes.  Thank you.

1          MR. SACHS:  The far right-hand corner shows the source

2     path for the -- starting with document ABR003111 were the

3     documents that were produced only in PDF format, and they were

4     foldered by Ms. Abraham in various folders, so likely the 3111

5     was foldered in an Outlook data file for her HP Global TV

6     server and it was foldered in an MOLM/January 2015 through

7     December 2016 MOLM final Wasserman (book writer widow) e-mails

8     confirming the terms.

9          So they exist either on the server saved that way or

10    on her laptop saved that way.  But that's the answer to where

11    they are now.

12         The answer to how many, out of the slightly under 1500

13    documents that Ms. Abraham has produced, about 960 were

14    produced only in PDF format and about 492 were produced as

15    native e-mails.

16         What I want to say, your Honor, is I have reviewed all

17    of the e-mails, those e-mails in native format.  None of them

18    have the anomaly of missing one of the quotation marks and of

19    being what I have called upside down.

20         I have also reviewed the entire Abraham production by

21    having a search done for Abraham and one or more quotation

22    marks and only these three anomalous documents are missing one

23    of the two quotation marks.  They either all have no quotation

24    marks or two quotation marks.  There weren't other occurrences

25    except that these three anomalous documents appeared three

1   times.  And if you go back to that chart, it's 3111, 12, and

2   13.  3121, 22, and 23, and 6608, 09 and 10.  That's it.

3       These weren't cherrypicked.  These were the only --

4   look.  Could I have missed something?  Yeah.  I know that I'm

5   not perfect.  But I had these searches done and I reviewed the

6   searches personally and I reviewed the e-mails personally.  And

7   I am representing that based on doing that, these are the only

8   three anomalous documents in the entire production and there

9   are no documents like this at all in the native e-mail portion.

10       Lastly, I do not believe we have spread these

11   allegations of fraud in the public record, and I've been very

12   careful to say indicia of fraud.  I've been very careful with

13   what I have said in the letters to your Honor, but those

14   letters to your Honor were not posted to ECF.

15       THE COURT:  I know.  That's a concern of mine.  I

16   wanted the letters to be posted to ECF, even if done in a

17   redacted fashion to remove any scurrilous allegations or any

18   sensitive materials that ought not be produced.  I am not

19   pleased with getting documents only by e-mail and the public

20   not being aware of the nature of the disputes the parties are

21   having.

22       MR. SACHS:  I was merely reacting to one of the two

23   letters last evening which accused me of recklessly making

24   these accusations in public.  That's all I had to add, your

25   Honor.

1              THE COURT:  Thank you.

2              MS. SHIN:  Your Honor, on that point, if I may, it

3    sounds like you prefer these on ECF.  Mr. Sachs did file a

4    letter on ECF last week asking if this conference could be done

5    in person so that he could show documents related to the

6    alleged fraud.

7              THE COURT:  Yes.  And?

8              MS. SHIN:  I was just responding to Mr. Sachs' point.

9              THE COURT:  On the issue of the GoDaddy subpoena, I am

10   permitting its issuance on the limited bases that I've been

11   discussing with Ms. Shin.

12             What I would need, as a practical matter, Mr. Sachs,

13   have you served the subpoena?

14             MR. SACHS:  The subpoena was served.  We have heard

15   back from GoDaddy.  GoDaddy has indicated that they would not

16   even respond to it until they contacted their client, and we

17   told GoDaddy that their client was aware.  I am happy to put

18   Ms. Shin in touch with them, and maybe we can work out an

19   agreed procedure for the --

20             THE COURT:  I'm doubtful that you can, but I would be

21   happy if you could.  If not, if they will do it by court order,

22   and you prepare an order for me that gives me the answers to

23   the first two questions.  The third, you should not get those

24   documents.

25             MR. SACHS:  I am not looking for the documents.  But I

1    would like a schedule or at least a number because if they tell

2    me that five documents were lost in the server crash, that's

3    different than them telling me 36 or 50 or a thousand.

4          THE COURT:  Agreed.  But I want whatever you draft in

5    terms of requests to not call for production of the documents

6    themselves.  I am obtaining from you now an undertaking that if

7    for any reason GoDaddy produces materials, you are not even

8    going to look at them, and you will immediately transfer them

9    to Ms. Shin.

10          MR. SACHS:  Absolutely, your Honor.

11          THE COURT:  Understood.

12          This is unusual, but I will allow it because I want to

13    understand what happened to these materials.  I think we all

14    want to understand what happened to these materials.  If they

15    need it by court order, prepare a court order and I will review

16    it.  If they will do it based on your subpoena, then we are

17    fine.  But those are the concerns I have.

18          MR. SACHS:  I do think we have to modify the subpoena.

19    What I suggest, your Honor, in the first instance is, I draft a

20    revised schedule to the subpoena.  I run it by Ms. Shin.  I do

21    believe, because hope springs eternal, that Ms. Shin and I will

22    have no problem working out the revised paragraph 3 of the

23    subpoena, consistent with your Honor's directions.  If not, we

24    will submit it the same way that Mr. Broadbent and Ms. Shin

25    submitted alternate versions for the submission to London, but

 1   we will try.

 2          THE COURT:  On the issue of the forensic examination,

 3   I am not permitting that at this time, but there is leave to

 4   renew, depending on what Ms. Abraham recounts at her

 5   deposition.

 6          I am interested.  I am not yet concerned.  And I need

 7   to be concerned before I permit the forensic examination.  So I

 8   appreciate very much the very careful tailoring that the

 9   Akerman firm has done with respect to the inquiry, but I'm

10   still not going to permit it on the record that I have before

11   me.  That said, depending on what Ms. Abraham recalls in her

12   deposition, I may revisit it.

13          Let me proceed to the next topic or we will be here --

14   we may well be here all afternoon.

15          Mr. Sachs, you are standing.  What is it you wish me

16   to know, sir?

17          MR. SACHS:  The next topic from my letter was the

18   documents relating to expenses.

19          THE COURT:  I want to understand your current position

20   on that because I thought I saw a letter from you at the end

21   that said that materials have been produced and that this

22   wasn't an issue.

23          MR. SACHS:  No.  The materials have been produced and

24   the issue is even worse.

25          THE COURT:  Wait, wait, and wait some more.

1          What is the issue that is not -- is it Mr. Nass'

2    materials?  are there still fights about that?  Because I

3    actually thought you sent something to me that said that you

4    weren't complaining about something and then the Cozen firm

5    said to me that you were.

6          MR. SACHS:  What I said, your Honor, or what I meant

7    to say is that -- let me step back for a second.

8          THE COURT:  I am looking at your letter of December

9    17.  The second paragraph ends with the sentence:  Three

10   documents were produced which are enclosed herewith as Exhibits

11   1 through 3, none of which admissibly support the damages

12   claim.  We are back with damages.

13         MR. SACHS:  What we are not back with and the reason

14   that I brought that to your Honor's attention is, there is a

15   claim in this case that Ms. Wasserman and Mr. Honig owe

16   $1,261,388 for expenses and fees incurred in plaintiff's

17   pursuing the performance of the alleged contract with Mitch

18   Leigh because of the alleged promises by Ms. Wasserman and the

19   alleged fraud by Mr. Honig.

20         THE COURT:  Slow down, counsel, but yes.

21         MR. SACHS:  We served interrogatories in early October

22   and document requests in early September asking for documents

23   supporting the claims and asking for a breakout of the 1

24   million 261 and change.  We never got a breakout.

25         As to documents, there are three summaries which were

1   attached as Exhibits 7 through 9 of my November 30 letter,

2   which were in the original production, all with different

3   numbers, all with different dates, and none of which matched

4   $1,261,388.

5           We were also told by e-mail, which is Exhibit 12, part

6   of Exhibit 12 of my letter on November 30, the e-mail on

7   November 28 saying that plaintiff was, and I quote, in the

8   process of obtaining documentation of Ms. Abraham's cost and

9   fees from various sources, including Ms. Abraham's former

10  attorney, and that was Mr. Nass, and he was the person who in

11  November of 2014 filed a claim in this amount, $1,261,388,

12  against the Leigh estate.  The subpoena came back yesterday.

13  Whenever it came back, we got the documents yesterday.  And

14  there was nothing in the documents that supported, as an

15  evidentiary matter, an admissible form that number.  Two of the

16  documents --

17          THE COURT:  Put aside admissibility for now.  Is there

18  any collection of documents that, added up, gets to that

19  number?

20          MR. SACHS:  No.  What there is is one document, which

21  was the third exhibit to my letter of December 14.  December

22  17.  It's the last page.

23          THE COURT:  Yesterday's letter.

24          MR. SACHS:  The last page, which is ABR7254, which

25  duplicates something that's been in the production, but, as

1    your Honor can see, this totals 2 million 465 and change.  Even

2    if you take out the first line, which is above the line U.S.

3    coexecutive producer, it's either too high or too little, and I

4    don't want to make a Goldilocks joke, but it doesn't match.

5              We are now on December 18, a week from Christmas.

6    This issue has been an issue since November of 2014, when they

7    filed a claim in actually this amount with the Leigh estate.

8              THE COURT:  Although the entity that filed the claim

9    was not the Arnold & Porter firm, correct?

10             MR. SACHS:  But it was Ms. Abraham who submitted a

11   declaration to support it.

12             THE COURT:  Of course.

13             MR. SACHS:  What I'm saying, your Honor, is -- and

14   since the middle of 2017, this claim has been in this case

15   against Mrs. Wasserman and Mr. Honig.  When do we get the

16   documents that add up to that number, and where are they?

17             What I understood from the November 28 e-mail was,

18   while Ms. Abraham gave -- and no one said this.  What I

19   inferred was, Ms. Abraham gave documents supporting this claim

20   to her prior counsel and we are getting them back.  So far that

21   has not happened.  So far nothing has happened.

22             If you look down this list, the first item on the list

23   from what Mr. Nass' firm produced and what plaintiff has

24   produced for us, 11 round-trip business class tickets from U.S.

25   to London, $125,000 and change.  You know, either there are

1   receipts for that or there aren't, and the receipts will either

2   be between early February 2014 and August 2, 2014, which is the

3   time period of the alleged contract, or they won't, but we are

4   entitled to have them.

5          London hotel expenses, same thing.  It's a really,

6   really high number, but where is it?  Where is it and where was

7   it back in 2014?  And I'm not blaming the Nass firm and I'm

8   surely not blaming Arnold & Porter, but there is a claim for a

9   million two and change against my clients without a single

10  document supporting it.

11         THE COURT:  Ms. Shin or Ms. Hu, let me hear from one

12  of you.

13         Ms. Shin, are you taking the first crack at it?

14         MS. SHIN:  I will, your Honor.

15         Your Honor, we are disappointed in Mr. Nass'

16  production.  Right now we are determining whether we are going

17  to follow up with him.

18         In the meantime, we are working to re-create the hotel

19  where we are actually contacting the airlines and the flights

20  to be able to get them.

21         I understand that she did have a file with those

22  records which she did give to her attorney, but this was,

23  unfortunately, what came back.

24         THE COURT:  Let me make sure I understand that.  Did

25  it come back that way because Mr. Nass is holding these

1    documents as some sort of retaining lien issue?

2        MS. SHIN:  He did.  He did say he was withholding

3    documents before he produced because of a retaining lien.

4    However, as I understand it, he produced what he had,

5    everything that he had.

6        THE COURT:  How can that be?  Let's back up for a

7    moment.  Do you agree with Mr. Sachs, speaking of hope springs

8    eternal, that there is not a summary produced that comes up

9    with the almost 1.3 million dollar figure, is it true that

10    there is no document that explains where that number is derived

11    from?

12        MS. SHIN:  No, your Honor.  I believe that there are

13    summaries, I believe, that do add up to the 1.2.  I have to go

14    back to see our privileged log to see if those have been

15    retained.  Your Honor, what they are asking for are the backup

16    receipts.

17        THE COURT:  I understand that.  But I am asking the

18    question.  Somewhere in the productions that you have made is

19    there a document or collection of documents that adds up to

20    this 1.2 number?

21        I'm asking because it's only fair if your adversaries

22    are seeing this number to try and figure out where this number

23    comes from.  Is there a summary that has been produced that

24    contains this number?

25        MS. SHIN:  I am not sure, your Honor.

1          THE COURT:  Again, if it's being withheld on privilege

2     grounds, then I don't fault Mr. Sachs for not finding it.  It

3     is also somewhat distressing that there are all of these other

4     schedules that come up with different numbers.

5          But you are saying to me now that there was, at some

6     point in the history of the world, a file that Ms. Abraham kept

7     that had all of the receipts that she needs?  You are saying as

8     well that she gave the entirety of this file to Mr. Nass and

9     his law firm for safekeeping.  And you are saying that

10    irrespective of whatever retaining lien issues he has or

11    continues to have, he has given to you what he represents to be

12    the entirety of his file with respect to expenses?

13         MS. SHIN:  Yes, your Honor.

14         THE COURT:  That's crazy.  You are telling me he lost

15    everything else?

16         MS. SHIN:  No.  He said he never had them, but

17    Ms. Abraham said she had them and gave them to Mr. Nass, upon

18    which he filed the estate claim for 1.2 million.

19         THE COURT:  Did he tell you, and you will stop me if

20    I'm intruding on privileged communications, how that number was

21    arrived at?

22         MS. SHIN:  No, I did not have that conversation.

23         THE COURT:  I would like you to have that

24    conversation.  I would like to understand what it is.  What you

25    are telling me today is, you can't or have not produced the

1    receipts or the substantiation for the expenses because your

2    client doesn't have them, correct?

3            MS. SHIN:  That is correct.  But we are now obtaining

4    them from the various hotels and airlines.

5            THE COURT:  And it is your expectation that you will

6    be able to re-create all of this?

7            MS. SHIN:  Yes, your Honor.

8            THE COURT:  We shall see.

9            Mr. Sachs, do you have an answer, sir?

10           MR. SACHS:  First, Exhibit 7, 8 and 9 are the only

11   three summaries and, from my November 30 letter, they appear in

12   multiple times in the production.  But those are the only

13   three.

14           The other thing I'll say, your Honor, is the only

15   place where this 1,261,388 number appears is in the submission

16   in November of 2014 of a claim against the Leigh estate and in

17   the amended complaint in this case.

18           I understand that now, which I would characterize as a

19   bit late in the day, since discovery is over in less than six

20   weeks, fact discovery, just now, for the first time, to be

21   starting to gather documents from hotels and airlines, that

22   counsel, prior counsel knew in November of 2014 they needed,

23   and current counsel knew at least in July of 2017 that they

24   needed.  Because that number appears in the complaint and that

25   number appears in the amended complaint.  We will be put at a

1    disadvantage even if it is just to figure out what happened and

2    why the travel was made that way and what the expenses were to

3    get these documents sometime in January.

4              THE COURT:  Sir, I'm not disagreeing with you.  I'm

5    understanding from Ms. Shin that she had an expectation, based

6    on conversations with her client, that Mr. Nass held the trove

7    of documents and it turns out we found out yesterday he didn't.

8              MR. SACHS:  Your Honor, with all respect to the

9    efforts to retrieve those documents from Mr. Nass, and I

10   appreciate this because actually it was kind of unusual because

11   I had just asked Ms. Shyman to draft the same subpoena that

12   as -- Ms. Shyman walked into my office and said, was Susan Hu

13   listening to your conversation with me?  Because we both needed

14   to serve a subpoena on Mr. Nass.

15             The question is, why a subpoena wasn't served on Mr.

16   Nass a year and a half ago.  If Ms. Abraham didn't have the

17   documents and said she gave them to Mr. Nass and Mr. Nass was

18   refusing to give them back for retaining lien or other reasons,

19   why now, why serve a subpoena in late November or early

20   December when plaintiff knew she didn't have the documents and

21   she needed the documents?

22             THE COURT:  Sir, add it to my list of disappointing

23   conduct in this case.  I understand it, but it is where we are

24   now.

25             It is my hope and expectation that plaintiff's counsel

1    will do their very best in short order to re-create these

2    receipts.  And if they can't, then that number changes.  Or you

3    will tell me at some point closer to trial or summary judgment

4    practice that I should preclude references to that number and

5    maybe I will.  Right now that is the state of play.

6             What is it that you want me to do?

7             MR. SACHS:  What I wanted to do is to say that enough

8    is enough and this is the deadline and I get to move for

9    preclusion now.  I gather, your Honor, because I am paying

10   attention, that you are not going to do that.

11            THE COURT:  I'm not doing it now.

12            MR. SACHS:  I would like there to be a deadline.

13   Because right now fact discovery cuts off on January 30.  Right

14   now plaintiff's deposition is sometime shortly before January

15   30.  And I need these documents, at the very least, a couple of

16   weeks before.

17            THE COURT:  I don't think you need them a couple of

18   weeks before.  You will tell me if it requires you to ask for

19   leave to have Ms. Abraham's deposition outside the January 30

20   date.  No.  If they are not produced in January, I don't think

21   they are getting produced.  I don't think I'm allowing their

22   production.  But I'm giving them January to get these documents

23   together.

24            I think asking for them to have them to you two weeks

25   or three weeks in advance of her deposition is, to me, in this

1    respect an artificial deadline.  But if you tell me when these

2    documents come in that you need another week to prepare for her

3    deposition, I will listen to you.

4              MR. SACHS:  Thank you, your Honor.

5              THE COURT:  Sir, while you're standing, residence, is

6    that you or is that Mr. Broadbent?

7              MR. SACHS:  I have one other issue, which is Marlene

8    Rue.

9              THE COURT:  I thought I saw from the many letters that

10   I received that you were going to receive, if it could be

11   obtained, contact information.

12             MR. SACHS:  What we have is an e-mail address, and

13   what we have been told by plaintiff's counsel is that plaintiff

14   only has the e-mail address, and I believe that that's what

15   plaintiff told plaintiff's counsel because, as I've said

16   before, I don't quarrel with anything that Ms. Shin or Ms. Hu

17   tells me.  I don't.  I am sure that's what they have been told,

18   but it makes no sense.  It makes no sense because what the

19   November 30 letter from plaintiff's counsel to your Honor says

20   is that all plaintiff has is Ms. Rue's e-mail address and says

21   that Ms. Rue was, quote, plaintiff's independent contractor

22   assistant who has not worked with plaintiff for nearly four

23   years.  That's incorrect and also makes no sense.

24             An e-mail was sent to me and was also produced in this

25   case by Ms. Abraham on October 28, 2016, which is not four

1   years ago.  And copied on that was Ms. Rue by plaintiff.

2   Ms. Rue was clearly still working with plaintiff as of October

3   28, 2016.

4          The other thing, your Honor, is, even if Ms. Rue --

5   again, I have no reason to doubt that she was an independent

6   contractor executive assistant to Ms. Abraham.  But independent

7   contractors get 1099s from their employer or from the person

8   with whom they are contracting.  Ms. Rue was also working for

9   plaintiff for far more than a short period of time.  It spans

10  the entire time at issue in this case going into late October

11  2016.

12         With all respect to what plaintiff has told her

13  counsel, her files, her tax files, some records of her

14  business, has more about Ms. Rue than just her personal e-mail

15  address.  But that's the way business works.

16         THE COURT:  Ms. Shin, what contact information do you

17  have today regarding Ms. Rue?

18         MS. SHIN:  Only the last known e-mail address, your

19  Honor.

20         I hear Mr. Sachs.  My understanding is that there was

21  no 1099 filed because she didn't make the money, enough money

22  to require it.  It's not that what he's saying doesn't make

23  sense.  It is all that she has.

24         THE COURT:  Why is it that she is being copied on

25  e-mails in October of 2016?

1          MS. SHIN:  I don't know, your Honor.  But the e-mail

2    address must have still worked.  That is my speculation.  That

3    is my understanding.  In terms of the contact information, I

4    asked her to search.  The only contact information she has from

5    Ms. Rue is the last known e-mail address.

6          THE COURT:  That seems like a very strange

7    relationship with one's assistant, if you can only get her by

8    e-mail.  You are telling me that your client -- again, not

9    meaning to breach the privilege, your client has no other way

10   of getting in touch with Ms. Rue at all?

11         MS. SHIN:  That is my understanding, your Honor.  She

12   only has that e-mail address.  I asked her to search, but

13   that's it.

14         THE COURT:  Did she ever, ever have any other means of

15   communication with Ms. Rue?

16         MS. SHIN:  I believe the office number that she used.

17         THE COURT:  That is not in service anymore, correct?

18         MS. SHIN:  That is my understanding, yes.

19         THE COURT:  When is the last time that your client had

20   any form of communication with Ms. Rue?

21         MS. SHIN:  My understanding was four years ago.

22         THE COURT:  Clearly not because in October of 2016,

23   she communicated with her by copying her on the e-mail to

24   Mr. Sachs.  That's just not correct, unless you want to tell me

25   that Mr. Sachs is fabricating his e-mail.

1          MS. SHIN:  No, I don't think so at all.  What I said,

2     and I hate to speculate, I suspect that he, out of habit,

3     copied Ms. Rue at the e-mail address she used for copying, but

4     I don't believe she was working for her at that time.

5          THE COURT:  She just randomly copied her on an e-mail

6     about the very topic with which she and Ms. Rue worked

7     together?

8          MS. SHIN:  I suspect that is the case, but, your

9     Honor, my understanding from the client is she hasn't worked

10    for her in four years.

11         THE COURT:  Ms. Shin, I'm asking you or Ms. Hu to

12    reach back to your client to let her know that I was disturbed

13    to learn that her four-year recollection, or her last

14    recollection of the last communications four years ago is

15    belied by her inclusion on an e-mail from 2016.  I am asking

16    you to ask her to think again about how recently she contacted

17    Ms. Rue and perhaps to advise your adversaries as to the

18    recency of that communication.

19         And if indeed that's all she has, then that's all she

20    has, but I don't appreciate erroneous information, and someone

21    here is in error.  And I don't think at this time that it is

22    Mr. Sachs.  Perhaps it is a situation where Ms. Abraham's

23    recollection needs to be refreshed.  You can refresh it with

24    the e-mail.

25         Do you, Ms. Shin or Ms. Hu, have a copy of the e-mail

 1    that is being referred to?

 2            MS. SHIN:  Your Honor, one thing I would say is, I was

 3    just searching my e-mails.  There was a last cell number that

 4    Ms. Abraham had.  It doesn't work.  I didn't want to provide

 5    that because it's not up to date.  All we had was the e-mail

 6    address.

 7            THE COURT:  I think I would have wanted to know that a

 8    little bit earlier on.

 9            MS. SHIN:  I apologize, your Honor.  I just have to

10    pull up a couple of e-mails about this topic.

11            MR. BROADBENT:  Your Honor, I hate to interrupt on an

12    issue I did not raise, but we are interested in getting to the

13    bottom of this issue as well.

14            So I wanted to bring to the Court's attention and to

15    the parties' attention, as Ms. Shin and Ms. Hu covered with

16    their client, that the privileged log produced on December 12

17    identifies continued communications copying Mr. Rue in May of

18    2016.  There are a couple of those.  I think I just wanted to

19    point them in that direction as well as they continue to

20    consult with their client.

21            THE COURT:  Thank you.  I appreciate knowing that it

22    went to May and October of 2016.  Thank you, Mr. Broadbent.

23            Mr. Sachs, am I done with you?

24            MR. SACHS:  Yes.  I just wanted to give the production

25    number of that e-mail.

1        THE COURT:  I believe she is aware of the

2   communication she said to me.

3        MR. SACHS:  I would actually like to have the cell

4   phone number that is out of service and the cell phone

5   provider, if they know who it was, because sometimes you can

6   track people down that way.

7        THE COURT:  Ms. Shin, I am asking for the production

8   of that information to the defense.

9        The issue of residence, is that Mr. Broadbent's issue?

10       MR. SACHS:  It's not mine.

11       THE COURT:  Good answer.

12       Mr. Broadbent, on the issue of residence, I am going

13  to say this as politely as I can an hour and 15 minutes into

14  this conversation.  What do you want, sir?  Because you've been

15  given information, according to the Arnold & Porter firm, that

16  substantiates the allegations made.  What is it that you want?

17  Do you disbelieve that she lived in London or in California?

18  Do you believe that she was actually in Florida during the

19  relevant time period?  What is it that you're seeking from me?

20       MR. BROADBENT:  Your Honor, speaking about residence

21  separately from the question of jurisdiction, I just wanted to

22  make sure I'm clear on what you want me to address.

23       THE COURT:  You clearly want information about

24  Ms. Abraham's residence now and during the relevant time

25  period.  Am I correct?

 1          MR. BROADBENT:  Yes, correct, your Honor.

 2          THE COURT:  And you saw that Ms. Shin wrote to me and

 3     gave me a listing of documents regarding residence that she had

 4     given or had produced in discovery.  Did you see the letter,

 5     sir?

 6          MR. BROADBENT:  Yes, your Honor.  I believe I recalled

 7     that letter.

 8          THE COURT:  Did you in fact receive the documents

 9     listed in that paragraph regarding the residence of Ms. Abraham

10     at various points in time?

11          MR. BROADBENT:  Your Honor, we received documents from

12     the plaintiff, but it's our position that those documents do

13     not demonstrate any residence in anyplace of Ms. Abraham.

14          THE COURT:  You are not answering my question, sir.

15     Ms. Shin listed a bunch of documents that were produced to you.

16     Did you in fact receive those documents?

17          MR. BROADBENT:  I'm sorry, your Honor, if I wasn't

18     clear.  The first part of my sentence was intended to say, yes,

19     I received the documents identified by Ms. Shin.

20          THE COURT:  You are saying they are not sufficient.

21     What is it that you seek that can't be obtained during the

22     deposition of Ms. Abraham?

23          MR. BROADBENT:  Your Honor, we want to know, and I

24     hate to answer your question using the same words you have used

25     in the question.  We simply want to know where she resided.

1    And what we have so far are documents suggesting that she

2    maintained offices in certain locations, that she held a

3    Florida driver's license, with which Ms. Shin advised me was

4    old, although our investigation suggested it was current, and

5    that Ms. Abraham had at various points different types of visas

6    to permit her to work in the United Kingdom, not that she had

7    any residence there.

8             Putting aside the question of jurisdiction, it returns

9    to the question of expenses and a claim by Ms. Abraham that she

10   was required to obtain a hotel in London to the tune of

11   $185,000 at the same time she represented that she resided in

12   London.

13            What we have right now are documents saying generally

14   she might have been at certain places at certain periods of

15   time.  What we don't have is any evidence that she had any

16   residence whatsoever in any of those places.

17            THE COURT:  Ms. Shin, am I asking you or Ms. Hu?

18            MS. SHIN:  You are asking me, your Honor.

19            THE COURT:  Thank you.

20            In the year 2014, where did Ms. Abraham reside?

21            MS. SHIN:  In LA, your Honor.

22            THE COURT:  For the entirety of the year 2014 she

23   resided in LA?

24            MS. SHIN:  Her citizenship was in LA.  She resided

25   mostly in LA, but she spends a lot of time in the UK.  She does

 1   not have a residence in the UK.

 2           THE COURT:  There is no sort of little place she can

 3   lay her hat whenever she is in the UK.  She is always in a

 4   hotel room when she is there?

 5           MS. SHIN:  She stays in a hotel room, she stays with

 6   friends, she stays with her network.

 7           THE COURT:  In 2015, where did she live?  What was she

 8   a citizen of?

 9           MS. SHIN:  LA, your Honor.

10           THE COURT:  2016.

11           MS. SHIN:  LA, your Honor.  With fulfilling the

12   residency requirements that she was trying to build in the UK.

13           THE COURT:  2017.

14           MS. SHIN:  Same thing, your Honor.  LA and staying as

15   much as she can in the UK.

16           THE COURT:  When you say staying as much as she can,

17   less than half the year?

18           MS. SHIN:  I am not sure exactly the number of days

19   she stays there.  The UK is very specific about how many days

20   you need to stay, at least six months or something that adds up

21   to that, but she does not have a residence in the UK.  She

22   stays with friends, people she knows, or a women's network.

23   Not just in London; all throughout the UK.

24           THE COURT:  For 2016 and '17, she was a domiciliary of

25   California.  But often as she could, as often as her visas

```
 1    permitted, she stayed in the United Kingdom, is that correct?
 2            MS. SHIN:  Yes, your Honor.  That would be reflected
 3    on her passport.
 4            THE COURT:  2018, this year, what is she?
 5            MS. SHIN:  She is officially now a permanent resident
 6    of the UK, but she still maintains her home in LA.
 7            THE COURT:  So she considers herself a UK domiciliary
 8    as of 2018?
 9            MS. SHIN:  She does, your Honor.  She maintains her
10    home in LA.
11            THE COURT:  Not as of 2017.
12            MS. SHIN:  The end of 2017, I believe.
13            THE COURT:  You were about to tell me something.
14            MS. SHIN:  She does have a Florida driver's license
15    which she obtained when she lived there in the '90s and maybe
16    early 2000s.  The address on that home is her mother's home.
17    She has an ailing mother who lives in Florida.  She doesn't
18    have any other driver's license.  She found it.  She made a
19    switch to keep that one.
20            THE COURT:  Throughout her time in California she was
21    driving using the Florida driver's license or did she just not
22    drive?
23            MS. SHIN:  That is my understanding.  She doesn't have
24    any other driver's licenses.  She doesn't live this Florida.  I
25    am not sure why it matters.  It is her ailing mother's home
```

1    address.

2            THE COURT:  From 2014 to 2017, was she residing in the

3    same residence in LA or did she move houses?

4            MS. SHIN:  I believe she stayed in the same residence.

5            THE COURT:  And your concern is that given her

6    background and experiences that have happened to her, she is

7    worried about producing that address?

8            MS. SHIN:  Yes, your Honor.  Any of the personal

9    information that the defendant believes seems to be getting

10   out, which we are trying to cooperate, and we tried to

11   understand what his concerns were.  To the extent it was

12   diversity, that I hear.  I am not sure exactly why there is any

13   issue with diversity at this point, given that his clients live

14   in New York, Mr. Sachs' clients live in Arizona and New York.

15   We tried to accommodate -- yes.  We did bring for your Honor's

16   in camera review the documents that I mentioned because she is

17   very upset by this and I do think -- so it doesn't go any

18   further than necessary, she asked to let you know about it.

19           THE COURT:  Mr. Broadbent, why do you need more

20   information than what I have just obtained from Ms. Shin in

21   this questioning?

22           MR. BROADBENT:  Your Honor, Ms. Shin's statements are

23   inconsistent with those that Ms. Abraham would have been

24   required to submit to the authorities in the United Kingdom

25   regarding her residence.

1          THE COURT:  How so?

2          MR. BROADBENT:  Specifically, to obtain the permits

3     that she obtained, she would have been required to represent

4     that she was away from the UK for fewer than 180 days, i.e.,

5     she resided in the UK for more than half of the year.

6          The point that I understand Ms. Shin to be making,

7     which, again, I echo Mr. Sachs, I have no comment on Ms. Shin.

8     I assume that she retained it from her client and believed it

9     to be true, but that's not consistent with the requirements of

10    the UK permits that Ms. Abraham claims that she had and the one

11    that she did produce from 2017.

12         One reason we need more information is because the

13    representations we have been given are not consistent with the

14    documents that we have been given.

15         THE COURT:  Sir, I don't understand the inconsistency.

16    She has a home in California and she is trying to become a

17    permanent resident of the United Kingdom.  Those are the two

18    choices.  I presume today she has a home in the United Kingdom

19    and she is still not living in hotels.  But according to

20    Ms. Shin, for the period of time up through the end of 2017 she

21    was staying in hotels or with friends or with a women's

22    network.

23         With respect to the issue of residence for diversity

24    purposes, she is not a New York resident or an Arizona

25    resident.

1              With respect to the question of expenses, Ms. Shin has

2      explained, and I think you can obtain this information, you can

3      confirm this information with Ms. Abraham, that there was no

4      house.  It may not have been the best move or the most

5      economically efficient, but she had no residence.

6              Ms. Shin, have I misstated what you have said to me?

7              MS. SHIN:  No, your Honor.  That is correct.

8              THE COURT:  Mr. Broadbent, I believe that is enough on

9      that issue.  I appreciate you disagree with me on that issue.

10             MR. BROADBENT:  Your Honor, respectfully, may I just

11     have one more moment on this?

12             THE COURT:  You may.  Although I really don't enjoy

13     comments that begin respectfully because it's usually followed

14     by something that evinces a lack of respect, but go ahead.

15     I'll give you your rebuttal time, sir.

16             MR. BROADBENT:  Thank, your Honor.  I said

17     respectfully because I did have no commentary on what you've

18     stated.

19             I wish to point out, however, that there was an issue

20     in the prior litigation regarding Mr. Honig's residence and

21     state of citizenship of which Ms. Abraham is aware and that

22     state was Florida, her allegations regarding that.

23             That issue is not resolved in that litigation, but we

24     do not want to be in a position where Ms. Abraham is later

25     permitted to argue or able to argue that in fact there was no

1    diversity here because she argued that Mr. Honig was a resident

2    and citizen of Florida.

3         The reason I raise this is because we don't have any

4    documents or any allegations specifically.  We have only one

5    government-issued document stating that she had a driver's

6    license in Florida and one UK-issued document which would have

7    required her to reside in the UK for well over half the year.

8         We are concerned about this primarily because of a

9    lack of information and the fact that we do not want

10   Ms. Abraham to maintain the argument later regarding diversity

11   in the event that she is unsuccessful.

12        THE COURT:  Ms. Shin, are you, on behalf of your

13   client, foreswearing any argument that Ms. Abraham was a

14   Florida resident during any relevant time period?

15        MS. SHIN:  Yes, your Honor.  She was not a Florida

16   resident during any time period.

17        THE COURT:  I see no basis now for any claim of lack

18   of diversity.  Please understand, and your client will

19   understand as well, that if we go further down this road and

20   she suddenly makes a claim, there will be consequences.  You

21   are telling me she is not going to make that claim, is that

22   correct?

23        MS. SHIN:  Absolutely not, your Honor.

24        THE COURT:  That is fine.  We are moving on.  Thank

25   you.

1              Mr. Broadbent, are there additional issues that I have

2      not raised in my discussions with Mr. Sachs, additional

3      discovery issues that you have before I turn to Ms. Shin and

4      her reciprocal claims of discovery deficiencies?

5              MR. BROADBENT:  A moment, your Honor, just to take a

6      look at my notes, if that may be permitted.

7              THE COURT:  Of course.

8              MR. BROADBENT:  Your Honor, my letter of November 30

9      identifying what we grouped in three different categories of

10     issues.  You have addressed the residence and jurisdictional

11     issues.  I believe we have addressed the same concerns that I

12     would have with respect to plaintiff's expenses.

13             I did also raise a concern regarding the documents on

14     plaintiff's demand for $250 million, which we have not

15     addressed, if your Honor wishes to address that issue as well.

16             THE COURT:  I do.  We may be talking past each other.

17     But I think you have a concern about a document sought

18     regarding, as you put it, 50 years of Man of La Mancha

19     productions.  Is that your issue, sir?

20             MR. BROADBENT:  No, your Honor.  The question that we

21     raised in my letter of November 30 was as to the documents that

22     Ms. Abraham relied upon in determining that her claim against

23     the estate should be $250 million, and we have raised this

24     issue because it is a significant number that has an impact on

25     the estate and it could have an impact on the property as well

 1    as for all of the parties, and we have not seen any document or

 2    any facts which would support such a claim.

 3         Ms. Shin has explained here in court that the only

 4    documents available at the time of the complaint were a very

 5    limited set of documents provided by prior counsel, which,

 6    based on previous representations by her, were produced to us

 7    early in this case.  Again, there is nothing in there which

 8    would reflect a measure of damages in an amount of $250

 9    million.

10         To the contrary, the documents the plaintiff has

11    produced, some of which were referenced in your discussion with

12    Mr. Sachs, put a number for plaintiff's expectation at least in

13    the United States at $1 million as a coproducer.  We are

14    seeking the documents --

15         THE COURT:  Mr. Broadbent, isn't that the difference

16    between expenses and damages?  It may be that Ms. Abraham

17    believes herself to be out of pocket just over a million

18    dollars in expenses, but I'm presuming the 250 million includes

19    what she believes to have been, rightly or wrongly, what she

20    would have made, what would have been realized had the

21    production gone forward.  You want the documents that

22    substantiate that, sir, is that correct?

23         MR. BROADBENT:  Yes, your Honor.  And I do want to

24    draw a distinction between the $1.2 million in expenses and a

25    line item in plaintiff's calculation of damages of November

1    2014 for her status as an above-the-line producer in the amount

2    of -- your Honor, do you still have nearby Mr. Sachs' letter of

3    November 30?

4                THE COURT:  Of course.

5                MR. BROADBENT:  In that letter Mr. Sachs kindly

6    attached as Exhibit 8 a calculation of plaintiff's damages to

7    date, November 13, 2014, document produced by the plaintiff.

8                THE COURT:  Yes.  I'm looking at it.

9                MR. BROADBENT:  This document has as its top line item

10   "above the line," U.S. coexecutive producer.  That's the number

11   to which I'm referring as separate from the plaintiff's claim.

12               THE COURT:  Yes.  It's 1 million in English pounds and

13   next to it is, I guess, an equivalency in dollars,

14   $1,576,734.70.  I do see that, sir.

15               MR. BROADBENT:  Your Honor, that line item just

16   further suggests that the $250 million has no basis.  Putting

17   aside even plaintiff's personal calculation in November 2014,

18   we have not seen any document upon which plaintiff was able to

19   determine that her interest in this production would have even

20   come close to that amount.  And as I recall from our initial

21   conference, your Honor was surprised at that number and many of

22   us were when we read it in the complaint because it simply

23   doesn't tie to the reality of the industry.  That's why we are

24   seeking documents which Ms. Abraham used in determining that

25   that was the number to be stated in her complaint.

1          THE COURT:  Ms. Shin, may I hear from you, please.

2          MS. SHIN:  Yes, your Honor.  I don't have anything

3    more to say than what we have in the letter other than to the

4    extent there were some analyses on damages prelitigation, those

5    have been withheld on work product grounds.  We are going to be

6    producing a model.  We have retained experts.  There will be a

7    report and any document that's relied on will be listed in

8    accordance with the rules.

9          THE COURT:  Is your expert going to substantiate a

10   $250 million figure or something less than that, or do you not

11   know?

12         MS. SHIN:  I can't say right now.  I am not sure, your

13   Honor.  If it's lower, we may consider amending the complaint,

14   but at this point we don't know.

15         THE COURT:  Mr. Broadbent, that is your answer, sir.

16         MR. BROADBENT:  Thank you, your Honor.

17         THE COURT:  Mr. Broadbent, perhaps I was

18   misunderstanding something else that had been written or

19   perhaps I have you confused with Mr. Sachs.

20            Someone was concerned about being required to produce

21   information about Man of La Mancha productions over the

22   preceding 50 years and there was a reference to not all

23   productions being equal.  Was that you, sir, or someone else,

24   or is that issue resolved?

25         MR. BROADBENT:  Your Honor, I do have a concern about

1    plaintiff's request for financial information related to La

2    Mancha dating back a decade as well as decades beyond that.  In

3    the event I wasn't clear, it was an issue that I did not raise,

4    although we did respond to the issue when raised by plaintiff

5    with respect to documents they were seeking from the estate of

6    Mr. Leigh.

7              THE COURT:  Mr. Broadbent, have I discussed with you

8    all of the deficiencies in plaintiff's production that you wish

9    to bring to my attention?

10             MR. BROADBENT:  Yes, your Honor.

11             THE COURT:  Thank you.

12             Ms. Shin, I want to hear from you, but I also am

13   respectful of my court reporter who wishes to take a break at

14   some point.  I'm anticipating that our discussion is going to

15   exceed five minutes.  Is that correct?

16             MS. SHIN:  I believe so, your Honor.

17             THE COURT:  How best to handle this?  We need a

18   five-minute for a court reporter.  Do you wish to remain on the

19   line or do you wish to call back?

20             MS. SHIN:  Your Honor, if there is any way to call

21   back, I would appreciate it.  I'm hosting an event and speaking

22   at it.  I have not been able to go and speak just yet.  Is

23   there another time, sometime this afternoon?

24             THE COURT:  No, there is not a time this afternoon.  I

25   have conferences 2:30, 3:30, 4:00, and 5:15, so I am booked

1    until 6:00 this evening.  No is the short answer.  Of course, I

2    have every confidence in Ms. Hu's ability to handle this if you

3    want to leave it with her, and perhaps during the break you can

4    talk to her and communicate that information.  Let me hear your

5    thoughts.

6              MS. SHIN:  I am happy to take a break.  How long would

7    you like, your Honor?

8              THE COURT:  Ten minutes, please.  We will resume in 10

9    minutes.

10             Mr. Broadbent, you are also going to call back in 10

11   minutes?

12             MR. BROADBENT:  Your Honor, you broke up a little bit,

13   and I apologize.  I did not hear the amount of time.

14             THE COURT:  Ten minutes, sir.  I am hoping you and

15   Ms. Shin can make a joint call to chambers in 10 minutes.  Is

16   that doable, sir?

17             MR. BROADBENT:  Absolutely, your Honor.  I will be

18   available.

19             MS. SHIN:  We will use the same line.

20             THE COURT:  Yes.  We will take a break.  We will hear

21   from you both in 10 minutes.  Thank you.

22             (Recess)

23             THE COURT:  We resume.

24             Ms. Shin, you're on the line?

25             MS. SHIN:  Yes, your Honor.

1          THE COURT:  That is excellent news.

2          Ms. Shin, tell me, please, the first issue you wish to

3     address.

4          MS. SHIN:  First, I would like to address the hard

5     copy documents from Ms. Leigh's office.

6          THE COURT:  I want to make sure I understand this.

7     What I'm understanding to be the state of affairs is that your

8     client saw a collection, a sheaf of documents in Mr. Leigh's

9     desk.  Mr. Leigh passed away.  It is your understanding that

10    Mr. Honig took some of the documents but not all of them.  Is

11    that correct?

12         MS. SHIN:  That is my understanding, your Honor.

13         THE COURT:  Do you believe that every document that

14    Mr. Honig took has been produced to you in this litigation?

15         MS. SHIN:  Your Honor, I don't think so.  I don't

16    know.  There have been a number of objections.  We are still

17    going through Mr. Honig's production.  There have been a number

18    of them as late as, I believe, last week or a week before.

19         But, your Honor, I understand that he has only

20    produced documents related to this litigation at this point.  I

21    am not sure what that means, but I do believe that they have

22    gone through and inserted e-mails, which I am happy about.  The

23    answer is, I don't know.

24         THE COURT:  Do you believe that there is a possibility

25    that Mr. Honig retrieved documents from Mr. Leigh that have no

1    relation to the subject matter of this lawsuit?

2              MS. SHIN:  I'm sure that's possible, yes.

3              THE COURT:  So the concern would be that Mr. Honig

4    produced all documents that he took from Mr. Leigh that are

5    relevant to this litigation.

6              I want to make sure I understand what you are seeking

7    ultimately.  Is it that you are seeking re-creation of the

8    entire collection of materials that Mr. Leigh kept in that

9    drawer of his desk?  I don't know how to give you the

10   confidence that you are seeking that these materials have been

11   produced.

12             MS. SHIN:  Your Honor, at the end of the day, my

13   client saw a power of attorney wherever Mr. Leigh got it from.

14   It was in his offices, his office.  He showed it to her when

15   she asked about, what do you mean, two-thirds?  What do you

16   mean, control?  And there was a power of attorney.

17             And all I have heard throughout this litigation since

18   it started was on the first day none of the attorneys could

19   answer your Honor's very point-blank question, is there a power

20   of attorney?  There was no answer.  Since that time I have

21   heard now that there is no such thing.  This is what I want to

22   see.  I am not accusing the lawyers in this case of hiding it,

23   but I have very grave concerns about whether that document

24   existed and now no longer exists.

25             THE COURT:  Perhaps I should have asked a better

question at the outset.  Your concern is really not with every

little scrap of paper in Mr. Leigh's desk.  Your principal

concern is with the existence or not of the power of attorney

that your client recalls seeing, correct?

MS. SHIN:  Yes, your Honor.  It was in his office.

THE COURT:  Mr. Sachs, should I be directing this to

you and not to Mr. Broadbent?

MR. SACHS:  I actually think both, your Honor.

THE COURT:  Let me hear from you, please.

MR. SACHS:  Here is the state of play from Mr. Honig's

standpoint.

One, Mr. Honig has never seen a power of attorney from

his client where he was agent and then had a power of attorney

later, Hellen Darion or Joe Darion in favor of Mr. Leigh, never

unequivocally.

THE COURT:  Let me hear that again because I want to

make sure.  You are saying that Mr. Honig never saw a power of

attorney from either Darion to Mr. Leigh?

MR. SACHS:  Yes.  Unequivocally.  Full stop.

THE COURT:  If Ms. Abraham recalls seeing it, she saw

something else?

MR. SACHS:  Mr. Honig was not in that office.  So

whatever Mr. Leigh did or didn't pull out of a drawer.  And my

understanding is, from the report of the deposition, although

we don't have the transcript, is that Ms. Maldonado,

Mr. Leigh's assistant, testified that there were no documents
kept in his office, but I am not swearing for Ms. Maldonado.
Mr. Honig wasn't there.

Supposedly, according to the complaint, Mr. Leigh
called Mr. Honig and Mr. Honig confirmed that he had the
original of that power of attorney in his office because he was
the business manager for Mr. Leigh.  Unequivocally, Mr. Honig
said he never had such a document, and he never had such a
phone call.

That's on the existence of a power of attorney.  What
happened after Mr. Leigh died, because I know there was some
back and forth about this at a conference when I made the
mistake of not coming, and I'm only joking about that, when Mr.
Leigh died, Mr. Honig was asked to make sure that documents
relating to La Mancha that needed to be kept were kept, and he
designated some of them and he took some of them.

THE COURT:  What do you mean by, he designated some of
them?

MR. SACHS:  He indicated these shouldn't be disposed
of.  They relate to La Mancha and we need them, even if they
are 30 years old or 50 years old.  I'm being colloquial now.
He was there.  He was asked by the Leigh family to go through
the documents, and some of the documents he said you should
save these and some of the documents he took.

After the Schillings letter came in on July 11, 2014,

the Cozen firm asked Mr. Honig for all documents back that

related to Ms. Abraham, and he returned all of them to the

Cozen firm, No. 1.

No. 2, we have --

THE COURT:  I'm sorry.  Again, I need to make sure I

understand this.  Mr. Honig, to the extent that he had these

documents, he took these documents from Mr. Leigh, he gave them

back to the Leigh estate.

MR. SACHS:  To the Cozen O'Connor firm.  Those were

documents relating to Ms. Abraham.

With respect to the remaining documents relating to

Man of La Mancha, with the exception, possibly, of two

additional documents that we were waiting to confirm our

understanding of them, all hard copy documents, whether from

Mr. Leigh's office or that Mr. Honig otherwise had, have been

reviewed by this firm, and not just Mr. Honig, for

responsiveness and have been produced.

THE COURT:  If responsive.

MR. SACHS:  It's documents that relate -- first of

all, if it has to do with Ms. Abraham, it's responsive.  If it

has to do with the period that Ms. Shin and I have had a debate

about, but we have not had a meet and confer on, which is that

we have not gone back earlier than January 1, 2011, and we also

have not produced documents relating to small rights rather

than grand rights meaning rights to music rather than rights to

1   the entire play.  We have not produced documents relating to

2   foreign productions as opposed to Broadway and London.

3          THE COURT:  These are all bases of dispute?

4          MR. SACHS:  I don't know that we have a dispute.

5          THE COURT:  That's fine.  Because you have not

6   presented to them today.

7          MR. SACHS:  Correct.  Because we have not had a meet

8   and confer as to any additional documents that they want from

9   those.  That's what I mean by responsive.

10         We have turned Mr. Honig's office, which is small,

11  upside down for documents that are responsive to plaintiff's

12  request.  But as to the issue of the power of attorney, just to

13  loop back, there never was one.

14         THE COURT:  Of which --

15         MR. SACHS:  -- Mr. Honig was aware.  Mr. Honig never

16  was aware of one.  He never took one.  He never returned one.

17  To his knowledge, there never was one as between Mr. Leigh on

18  the one hand and Joe or Hellen Darion on the other hand.

19         Mr. Honig, and we have produced this, had an agency

20  agreement with Hellen Darion in -- I don't have it in front of

21  me, but in 2014, I believe, and a power of attorney from

22  Ms. Darion in 2016, and I'm doing this from memory.  But those

23  have been produced.  But those were on behalf of Mr. Honig, not

24  on behalf of Mr. Leigh, and they were from Hellen Darion.

25         But those documents have been produced and those

1    documents did not come from Mr. Leigh's office.  Those

2    documents came directly to Mr. Honig because Mr. Honig has

3    represented, as an agent and then as a power of attorney,

4    Hellen Darion for a number of years.

5            THE COURT:  To review, to the extent Mr. Honig got any

6    documents out of Mr. Leigh's desk or surrounding area, he got

7    them because they were related to Ms. Abraham or to La Mancha.

8    If they were related to Ms. Abraham, they were then not

9    necessarily returned to, but forwarded to the Cozen firm upon

10   their request.  If they related to La Mancha, he may have kept

11   some of them, but they have all been produced in this

12   litigation to the extent he had them.

13           MR. SACHS:  Searched and produced if responsive.

14           THE COURT:  Let's be clear.  I am not sure today Mr.

15   Honig could identify the source of a document.

16           MR. SACHS:  That's the problem.  And I will say that

17   what Mr. Honig has told me is, it's not about desk files.  It's

18   about files anywhere in the apartment which was Mr. Leigh's

19   office.  He went through the entire, I'll call it apartment,

20   because that's what Mr. Honig has called it, for documents

21   relating to La Mancha that should be retained.  And some of

22   them he told the Leigh family to retain and some of them he

23   said, I'll take these to my office because they were business

24   related rather than creative related.

25           THE COURT:  Something else, sir?  Because I want to

```
 1    talk to Mr. Broadbent.

 2            Mr. Broadbent, what is your understanding of any

 3    materials that may have been obtained from Mr. Leigh's office

 4    upon his passing?

 5            Is Mr. Broadbent on the call?

 6            MR. SACHS:  He was.

 7            MR. BROADBENT:  Your Honor.  I had you on mute so you

 8    didn't hear me taking a sip of water and coughing.

 9            THE COURT:  But now I have you, and now I know exactly

10    what you were doing before you took me off of mute.

11            Sir, what is your understanding of the disposition of

12    materials relevant to this case that were housed at one point

13    in Mr. Leigh's office?

14            MR. BROADBENT:  Your Honor, I have very little to add

15    to Mr. Sachs' explanation of the facts as it is consistent with

16    our understanding, that is, that Mr. Honig came to the

17    apartment office, that is, it was an office located within what

18    was otherwise an apartment in a Trump building.

19            He reviewed documents, retained some.  In fact, he

20    took some back to his office, designated others for the Leigh

21    family to retain.

22            And then at some later point, when the letter from the

23    Schillings firm arrived to the office of Cozen O'Connor, as

24    Mr. Sachs states, Cozen O'Connor asked Mr. Honig for the

25    documents relating to Ms. Abraham in this matter.  We received
```

1    them, and we have in fact produced those documents, as I

2    advised Ms. Shin previously, and I cannot recall if it was -- I

3    think it may have been our second or third production.

4            There are a series of hard copies and scanned

5    documents which we retained electronically in a scan of the

6    printout, but these are documents that were provided to us by

7    Mr. Honig related to this matter that he had removed from the

8    office of Mitch Leigh following Mitch Leigh's death.

9            THE COURT:  Mr. Broadbent, so I'm clear, is it fair to

10   say that the Cozen firm obtained documents from the office and

11   then obtained additional documents from Mr. Honig that had once

12   been kept in the office?  Is that fair?

13           MR. BROADBENT:  No, your Honor.  I agree with the

14   second part of your statement, that is, with respect to this

15   matter, Ms. Abraham, yes, we obtained those documents from

16   Mr. Leigh's office through Mr. Honig.

17           As far as other documents in Mr. Leigh's office, the

18   only reason I said no is because I don't want to give some

19   impression that there were other documents in Mr. Leigh's

20   office that the estate retained or that the Cozen O'Connor firm

21   retained that are relevant and responsive and discoverable in

22   this case.

23           It is true that we have documents which were in

24   Mr. Leigh's possession at the time of his death, but these

25   relate primarily to his most significant interest at the time,

1    which was real estate in Jackson, New Jersey.

2         We do in fact have documents from Mr. Leigh's office,

3    and we have reviewed documents in our possession that may have

4    been in Mr. Leigh's office at the time.  But there is nothing

5    additional to produce because, as Mr. Sachs explained, the

6    documents related to this matter were reviewed and selected by

7    Mr. Honig and then later delivered to us and produced by us in

8    this litigation.

9         THE COURT:  Mr. Broadbent, let me explain to you why I

10   was asking the follow-up question that I did.  I thought I

11   understood from Mr. Sachs' recitation of events that Mr. Honig

12   made two determinations upon being given access to Mr. Leigh's

13   office.  The first was materials that he requested or

14   designated or suggested that the Leigh family keep and that is

15   something different from the documents that he retrieved.  I

16   wondered if there were materials that had not been taken by Mr.

17   Honig that related to Man of La Mancha or were otherwise

18   responsive and relevant to the issues in this litigation.

19        MR. BROADBENT:  The answer, your Honor, is, there were

20   documents that Mr. Honig did not take with him.  We agree with

21   that.  There were documents that the estate retained following

22   Mr. Leigh's death that Mr. Honig did not take.

23        Some of those documents related to Man of La Mancha.

24   But when I say related to Man of La Mancha, we are talking

25   about the 50-year history of a production that spun off musical

 1   rights, rights for the music together with the lyrics; as

 2   Mr. Sachs pointed out, productions across the world, amateur

 3   productions, etc.  So the mere fact that a document mentions

 4   Man of La Mancha did not indicate that it would be relevant or

 5   responsive in this case.

 6        That said, we have tracked down the documents that we

 7   believe the estate retained following Mr. Leigh's death and

 8   reviewed those documents and determined that there was nothing

 9   else responsive in this matter.

10        THE COURT:  Mr. Broadbent, in one of your letters to

11   me you indicated that the compromise or the accommodation that

12   you offered to Ms. Shin is that you would produce documents

13   relating to the last West End production of Man of La Mancha,

14   which was in the '60s, and the last Broadway production of Man

15   of La Mancha, which was in 2002.  But then I thought I

16   understood you to be saying that there were no such documents.

17        First of all, did you suggest to her that those were

18   materials relating to earlier productions of the musical that

19   you would consider to be relevant or at least would be willing

20   to produce?

21        MR. BROADBENT:  Your Honor, our response, I believe,

22   was originally that we would be willing to produce the

23   documents related to the 2002 production of Man of La Mancha

24   which, as your Honor stated, was the last Broadway production.

25   I believe at some later point that would have included looking

1    for documents related to the West End production, but, again,

2    it was in 1968, I believe.  So at no point did we represent

3    that we had them; just a willingness to determine if we might

4    have such documents.

5              THE COURT:  Was that offer accepted?

6              MR. BROADBENT:  I don't know if Ms. Shin has an

7    interest in the documents other than those productions.  You'd

8    have to consult with Ms. Shin.

9              THE COURT:  Let me ask you the question.  Do you

10   have -- by you, I mean your client or your firm -- have

11   documents relating to the 2002 Broadway production?

12             MR. BROADBENT:  No, your Honor.

13             THE COURT:  Do you, and by you I mean your clients or

14   your firm, have documents relating to the 1960s West End

15   production?

16             MR. BROADBENT:  No, your Honor.

17             THE COURT:  I understand.

18             Ms. Shin, let me return to you.  On the issue that

19   began what was just now a frolicking detour which concerns the

20   materials that were in Mr. Leigh's office or in his desk, I

21   have the representations from counsel for your adversaries that

22   you've gotten all that is responsive and that there is no power

23   of attorney.  What else would you want me to do?

24             MS. SHIN:  Your Honor, it's difficult.  I think that

25   that is what counsel understands and what counsel was told.

1          It's hard for me to say, oh, maybe my client was

2    mistaken as she saw it.  We have documents that specifically

3    say Mr. Leigh represented Hellen Darion.  I'm a little bit

4    mystified that we are here and these documents, in my view,

5    weren't properly retained, weren't properly searched.

6          I think there are a lot of questions here about what

7    happened to them, and there is certainly an interest on the

8    part of the parties to say, everybody got a vote and that's it

9    and say this didn't exist.  But my client thought -- I am not

10   sure -- I don't know what to say, your Honor.

11         THE COURT:  I am just saying, I can't order them to

12   produce something that they have represented to me as officers

13   of the court their clients tell them they don't have.

14   Certainly it will be very interesting depositions of these

15   individuals, and I will be sad if it turns out they recall

16   having seen this very power of attorney they now disclaim the

17   existence of.  But I've got nothing else on it, so I am going

18   to ask you, with that, to turn to the next deficiency.

19         MS. SHIN:  Your Honor, it's not even a deficiency.

20         One of the issues that I would like your Honor to

21   consider and recognize, I do think that there is a basis here

22   to say that the parties had a duty to start preserving and

23   ensuring that people preserved, all people who would have

24   relevant documents, as of April 2.  I am not sure where that

25   gets us in terms of the whole conversation that we had.

1          Ms. Maldonado testified that Mr. Honig did come in and

2     take some documents.  She testified he didn't need any help in

3     terms of the amount.  She doesn't remember the amount of

4     documents.  But to the extent anything was left at the end of

5     the lease, which she wasn't very clear on when it was that they

6     had to vacate, her job was to get rid of all the documents.

7          It's hard at this point that we are looking for a very

8     key document throughout this litigation.  We don't have it.

9          In terms of preservation, I do think that documents

10    weren't properly preserved.  I would like a finding that

11    documents should have been preserved at least earlier than

12    July.

13         THE COURT:  What is the basis for your belief?  You

14    are asking me now to give you an adverse inference at trial?

15         MS. SHIN:  Your Honor, yes.  I take it from the way

16    you asked it that you are not inclined.

17         THE COURT:  You have given me no basis to do so.  I

18    don't understand the factual basis on which you want me to find

19    that they recklessly or intentionally destroyed documents.

20    What is it that makes you believe that they were on notice as

21    of April 2 that they had to retain documents?

22         I'm also not sure, what is the basis for believing

23    that there are documents that they have not preserved other

24    than your client's recollection, which, to be clear, is in

25    conflict with others, about the existence or not of a power of

1    attorney?  Are there other documents out there that you believe

2    have not been maintained?

3         MS. SHIN:  Your Honor, one of the things that

4    concerned me was the e-mail that I attached to the letter.

5    There is an e-mail on January 15 where Ms. Maldonado said it

6    was dictated by Mr. Leigh that Mitch represents Hellen in

7    control of the two-thirds majority of MOLM, which is

8    inconsistent with what the other parties seem to be saying now.

9    We do have other documents that say that he controls Darion.

10   It's throughout the documents, but it's inconsistent with there

11   not being a power of attorney that supports that.

12        THE COURT:  One moment.  On the basis of a reference

13   to someone being irritated, I am not going to have an adverse

14   inference.

15        MS. SHIN:  Your Honor, it is the other e-mail, January

16   15.

17        THE COURT:  Yes.  I feel like we are talking past each

18   other.  You are asking me to make an adverse inference because

19   of the lack of preservation after April 2.  The reason why you

20   have selected the April 2 date is, I thought, because of the

21   forwarding of an e-mail from Ms. Maldonado to Mr. Honig in

22   which Ms. Abraham expressed irritation.

23        MS. SHIN:  Yes, your Honor.  She expressed irritation

24   to Ms. Maldonado because a third party, Manny Kladitis -- who,

25   as it turns out, he was also producing a show -- I am not sure

1    what his relationship was to Leigh.  He is a third party for

2    sure, but informed her that her contact with Mitch was not

3    going to be honored.

4         Subsequent to that, it seemed that the parties' were

5    at least showing some effort to honor the contract after that.

6    But at that point I think on that there is case law that says

7    that there should be credible -- at this point e-mails like

8    this should have given them a credible basis for a potential

9    litigation.

10         THE COURT:  I don't see it in this e-mail.

11         Not on the record I have before me am I going to make

12    an adverse inference with a date of April 2 of 2014.

13         I'll let you proceed to your next issue.

14         MS. SHIN:  The other issue is the financial documents.

15    What I'm hearing from Mr. Broadbent today is that even though

16    they had agreed to search for and produce the 2002 West End or

17    Broadway financial data, we didn't see it and we have been

18    waiting and looking for it, so we are not getting it.  They

19    don't have it.

20         THE COURT:  There are two different things between we

21    are not getting it and they don't have it.

22         Ms. Shin, let me first understand that there was a

23    request that I understand to have been broader for financial

24    information.  Did you accept Mr. Broadbent's offer of them

25    seeking and producing to you materials relating to the 2002

1    Broadway production?

2          MS. SHIN:  We received a letter saying that that's

3    what they will look for.  I think we are entitled to

4    everything.  I didn't expect it.  But we wanted to look at what

5    they had, that we have been waiting for it and looking out for

6    the financial data in the production.

7          THE COURT:  The answer to my question is, no, you did

8    not accept it, but you simply allowed them to believe either

9    that it was or was not acceptable to you?  Did you communicate

10   anything either way with respect to their offer?

11         MS. SHIN:  I am not sure if it was a letter, but I

12   said we would look at it and we would meet and confer again.

13         THE COURT:  I see.

14         Mr. Broadbent, did you understand that your compromise

15   position of the 2002 Broadway production had been accepted or

16   deemed acceptable by plaintiff's counsel?

17         MR. BROADBENT:  No, your Honor.  I didn't know what

18   plaintiff's counsel thought about it other than that she wanted

19   the documents we were offering to produce.

20         THE COURT:  Whether or not she told you it was

21   acceptable, did you in fact look for any documents relating to

22   the 2002 Broadway production?

23         MR. BROADBENT:  Yes, your Honor.  As stated in my

24   letter of December 7, we have subpoenaed the accountants who

25   would have such records, Lutz & Carr.  They were the

1  accountants on the production.  We subpoenaed Lutz & Carr to

2  determine if they have any such records.

3          As I also indicated, we are making other efforts to

4  determine whether some other third party may have them so we

5  can obtain them from that third party.

6          But with respect to the Leighs and the estate, no.

7  The estate does not have these records from the 2002 production

8  of Man of La Mancha.

9          THE COURT:  Ms. Shin, that is an answer.  They do not

10 have the documents.  They have reached out to Lutz & Carr, the

11 accountants, and other sources for those documents.

12          Anything else, Ms. Shin you want to add on that point?

13          MS. SHIN:  Yes, your Honor.  At Ms. Maldonado's

14 deposition she testified that I believe she started working for

15 Mr. Leigh in or about 1995.  As long as she could recall, she

16 was in charge of maintaining bookkeeping for the various

17 financial accounts as part of her job at Music Makers and

18 working for Mitch Leigh.  One of those accounts was Music

19 Makers and most of the data and financial information relating

20 to Man of La Mancha came in through a sheet maintained in a

21 QuickBooks program.  Some of the income and financial

22 information also went into other Mitch Leigh companies.

23          She managed about, I believe her testimony was five of

24 them, and she kept them up each month.  There were inputs and

25 things, people that paid and so on and so forth.  We believe

1        that information is responsive to the requests 21 and 22.

2                THE COURT:  This is something on which you have met

3        and conferred with Mr. Broadbent?

4                MS. SHIN:  Well, yes, we have met and conferred about

5        21 and 22 quite a few times, our request for financial

6        documents showing income and revenue of Man of La Mancha.

7                THE COURT:  Let me ask the question more precisely.

8        After the deposition last week, did you reach out to Mr.

9        Broadbent and say that there must be additional materials in

10       light of her testimony?

11               MS. SHIN:  Your Honor, what we did was, we sent an

12       e-mail to Mr. Broadbent and Mr. Fiebach asking for the

13       production of those, and on the record I called for the

14       production of those and Mr. Fiebach asked for an e-mail.

15               THE COURT:  Mr. Broadbent, you received this e-mail?

16               MR. BROADBENT:  Yes, your Honor.

17               THE COURT:  And have you had further discussions with

18       Ms. Shin about the responsiveness or existence of these

19       materials?

20               MR. BROADBENT:  No, your Honor.  We have not spoken to

21       Ms. Shin further since the e-mail regarding those documents.

22               THE COURT:  You can speak with me.

23               MR. BROADBENT:  Your Honor, I'm sorry.  The e-mail

24       that Ms. Shin was referencing was sent yesterday morning at

25       9:30.  I have, since that time, attempted to comply with the

1    three items that Ms. Hu, who sent the e-mail, requested, as I

2    determined whether they are available and whether we believe

3    they are responsive.  At least with regards to the QuickBooks

4    files, we disagree.  But I have since yesterday morning

5    attempted to get the facts to have an answer, but I have not

6    since that time developed those facts so I could have an

7    answer.

8           THE COURT:  Sir, while we are on the phone and in

9    conference now, do you have or are you still formulating a

10   position as to whether these QuickBooks accounts or other

11   bookkeeping accounts would be responsive and would be produced

12   if found?

13          MR. BROADBENT:  Yes, your Honor, I do have a position

14   on the responsiveness of those documents.

15          THE COURT:  And that position is?

16          MR. BROADBENT:  I was getting there very slowly.

17          THE COURT:  I see.

18          MR. BROADBENT:  Our position is, these documents would

19   not be responsive, at least in the years in which we appear to

20   be discussing them in the latter half of the 2000s.

21          The production of 2002, which is the last document

22   that is in our possession, in our opinion, that could possibly

23   be relevant to this dispute, again, that was in 2002.  It

24   wouldn't have continued to spin off any royalties or other

25   financial information about that period of time.  Ms. Maldonado

1    would not have been logging royalty payments or other things

2    received in 2012 for a production that occurred in 2002.

3         We have already agreed to produce documents related to

4    the 2002 production if we happen to identify them.  If for some

5    reason we have 16-year-old QuickBooks files and those files

6    have added information from 2002, we would consider whether

7    that fell within our previous representation, but I can't say

8    because I don't have them.

9         I can say that the QuickBooks files that existed, if

10   at all, in the period of time in which we are talking about, it

11   wouldn't have contained any responsive information related to

12   Man of La Mancha.

13        I also want to know, I do have concern about having

14   this discussion regarding testimony for a witness who has not

15   in fact reviewed the transcript for its accuracy and prior to

16   the parties receiving copies of it.  But I am aware she

17   testified about the existence at some point of these files.  So

18   we are attempting to determine whether any file that could have

19   been referenced by Ms. Maldonado existed, but my position,

20   depending on the results, I expect my position will be, no,

21   none of these things are responsive.

22        THE COURT:  At this time do you even know if they

23   exist?

24        MR. BROADBENT:  No, your Honor.  But I will note that

25   we have collected Ms. Maldonado's computer, as previously

 1    Mr. Fiebach advised you, and are conducting searches of that

 2    computer.  That is one way in which the documents would be

 3    identified to the extent they exist.

 4          THE COURT:  Based on your recollection of the

 5    deposition, do you recall what was the time frame during which

 6    Ms. Maldonado was maintaining these accounts?

 7          MR. BROADBENT:  Your Honor, I was not present at the

 8    deposition.  I do not have a recollection.

 9          I apologize for Mr. Fiebach's absence.  He is

10    attending to a personal matter that occurred starting last

11    week, and he has been in and out.  I apologize to him being

12    unavailable to comment on the matter.

13          THE COURT:  Yes, Ms. Shin.

14          MS. SHIN:  Ms. Hu was present as well, so my best

15    recollection was that she started working there in 1995.  And

16    whether it was QuickBooks, I am not sure if it was back then,

17    but this is something that she has always been in charge of

18    doing, maintaining the bookkeeping and the financial accounts

19    for the various accounts.

20          THE COURT:  Not quite responsive.  She was doing the

21    accounting for whom, for Mr. Leigh or for someone else?

22          MS. SHIN:  Music Makers through Mr. Leigh and Abby

23    Leigh.

24          THE COURT:  Is that going on to the present?

25          MS. SHIN:  I don't believe so, no, not since she left

1   her position with Music Makers.

2          THE COURT:  When did she leave her position with Music

3   Makers, if you can recall?

4          MS. SHIN:  She stayed until the last day until the

5   office closed and the lease was up.  Her best recollection was

6   mid June 2014.

7          THE COURT:  As much as I am enjoying a third hour of

8   discovery disputes, I am concerned about ones in which there

9   have not really been robust meet and confers.

10         With that caveat, Ms. Shin, are there other issues

11  that you have had a meet and confer with with your adversaries

12  that you want to bring up in this call?

13         MS. SHIN:  Your Honor, we have not had a meet and

14  confer since the one where we discussed all issues on the 4th,

15  December 4, and then November 30.  But other than what I heard

16  today, I have not heard any follow-up on the Music Makers

17  e-mail search.

18         THE COURT:  Now you know that he received your e-mail

19  or Ms. Hu's e-mail this morning and he is following up on it.

20  I am not sure I'm expecting him to do more than that.

21         Let me ask the question more pointedly.  Tell me,

22  please, what other issues I can resolve in this call.

23         MS. SHIN:  Your Honor, I think you have gone through

24  all the ones that have been included in our letters.

25         THE COURT:  Mr. Broadbent, are you still on the line,

 1   sir?

 2                MR. BROADBENT:  I am, yes, your Honor.

 3                THE COURT:  I am asking you the same question.  What

 4   other issues can I resolve in this conversation?

 5                MR. BROADBENT:  No other issues at this time, your

 6   Honor.

 7                THE COURT:  Mr. Sachs, or Ms. Shyman.

 8                Let me let you talk.

 9                Ms. Shyman, are there other issues that I can address

10   in this conversation?

11                MS. SHYMAN:  Not at this time.

12                THE COURT:  Ms. Shyman, are we going to have another

13   one of these three-hour conferences with additional discovery

14   issues, or is it possible the parties can work together for the

15   remainder of discovery in this case?

16                MS. SHYMAN:  It is not my personal intention to come

17   to another three-hour discovery conference in this case, but

18   stay tuned because there is another month and a half of

19   discovery.

20                THE COURT:  I will not keep you further because you

21   will be billing your clients, and I don't want to waste the

22   effort.

23                I cannot adequately express my dismay at how poorly

24   people are getting along.  I'll simply wait for the next round

25   of discovery disputes and I will resolve them as well.

1          Ms. Shin or Ms. Hu, I am going to ask you to obtain a

2   transcript of this conference in case I need it to refer to for

3   our next round of discovery disputes.

4          I am going to now adjourn and wish you all happy

5   holidays.  If I don't talk to you before the new year, Happy

6   New Year.

7          We are adjourned.  Thank you so much.

8          (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25