# Exhibit 36

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
ROBYN ABRAHAM,

                                    Plaintiff,   :

                  - against -

ABBY LEIGH in her individual capacity
and as Executrix of the ESTATE OF
MITCH LEIGH, THE VIOLA FUND, ABBY LEIGH
LTD, MARTHA WASSERMAN in her individual
capacity and as Executrix of the ESTATE
OF DALE WASSERMAN, HELLEN DARION, in her
individual capacity and as Executrix of
the ESTATE OF JOSEPH DARION, and
ALAN HONIG,

                                    Defendants.  :
-----------------------------------------x

                       666 Fifth Avenue
                       New York, New York

                       January 17, 2019
                         9:39 a.m.


             VIDEOTAPED EXAMINATION BEFORE

TRIAL of ROBYN ABRAHAM, the Plaintiff herein,

taken by the Defendants, pursuant to Court

Order, held at the above-mentioned time and place,

before Michelle Lemberger, a Notary Public of

the State of New York.

Page 22

Robyn Abraham

1
2    answered.  That's it.  She's answered
3    the question.
4          MR. LAFAYETTE:  I have not
5    asked that question before.
6          MS. SHIN:  Yes or not.
7          MR. LAFAYETTE:  My question
8    was -- and I'll ask the court
9    reporter to read it back.
10   (Whereupon, at this time, the requested
11   portion was read by the reporter.)
12         MS. SHIN:  Same objection.
13   It's been answered.
14   A.  I'm deferring to my counsel.
15         MR. LAFAYETTE:  Are you
16   directing your client not to answer
17   the question?
18         MS. SHIN:  No.  She's already
19   answered it.
20   A.  I've answered it.
21   Q.  Do you have any document in which
22   Ms. Bases gives you permission to communicate
23   with Martha Wasserman?
24         MS. SHIN:  Objection.
25   Foundation.  Asked and answered.

Page 23

Robyn Abraham

1
2    Form.
3    A.  I've answered the question.
4          MS. SHIN:  You can answer it,
5    if you understood the question.
6    A.  I'm not sure I understood it.
7          MR. LAFAYETTE:  Could we read
8    it back, please?
9    (Whereupon, at this time, the requested
10   portion was read by the reporter.)
11   A.  I don't, no.  I don't know.
12   Q.  Have you ever met Martha Wasserman?
13   A.  Yes.
14   Q.  Okay.
15   A.  Many times.
16   Q.  When did you first meet?
17   A.  I met her at a conference in April,
18   I believe of 2013 in Denver.
19   Q.  And before that, had you ever spoken
20   to Martha Wasserman?
21   A.  I had no idea who she was.
22   Q.  And how did you meet Ms. Wasserman?
23   A.  We were introduced at a conference
24   in Denver.
25   Q.  And who introduced you to Martha

Page 24

Robyn Abraham

1
2    Wasserman?
3    A.  I believe it was Dr. Wayne Dyers.
4    Q.  And can you tell me the
5    circumstances of Mr. -- Dr. Dyers introducing
6    you to Ms. Wasserman?
7          MS. SHIN:  Objection to form.
8    A.  I don't understand the question.
9    Q.  Okay.
10         THE WITNESS:  Can I get some
11   tea?  I've been kind of asking and
12   I'm kind of wired in here.
13         MS. SHIN:  Let's take a break.
14   Is there anything that she can drink?
15         MR. LAFAYETTE:  Let's go off
16   the record.
17         VIDEOGRAPHER:  It is 10:00 a.m.
18   and we are off the record.
19         (Discussion held off the
20   record.)
21         VIDEOGRAPHER:  The time is
22   10:02 a.m. and we're back on the
23   record.
24   BY MR. LAFAYETTE:
25   Q.  And after you were introduced to

Page 25

Robyn Abraham

1
2    Ms. Wasserman, did you have a discussion with
3    her?
4    A.  No, not really.
5    Q.  Okay.  And when did you next
6    communicate with her?
7    A.  Well, I think she invited me to
8    lunch that day, and she told me about Man of
9    La Mancha and the problems they've been
10   having over the years.
11   Q.  And can you tell me what she said?
12   A.  Oh, from -- I can't remember
13   exactly, but she said that there had been a
14   number of -- that she loved the musical, it
15   was her husband's pride and joy.  And that
16   there had been problems with it over the
17   years with the rights holders and issues and
18   getting it up and running, and a number of
19   things.  But I couldn't tell you exactly the
20   contents of the conversation from five years
21   ago, six years ago.
22   Q.  Okay.  And after that lunch, did you
23   have any other communications with her at the
24   conference?
25   A.  At the conference, I don't know.  I

Page 26

Robyn Abraham

1          know we were introduced and I recall that Dr.
2  Dyers had recommended me because I knew him.
3  He used to be on Public Television and I
4  worked at -- I worked for PBS in Miami where
5  he used to appear.
6          Q.  When you say he recommended you,
7  could you explain what you mean by that?
8          A.  He just recommended that Martha talk
9  to me.
10          Q.  For any particular purpose?
11          A.  Well, he thought, Dr. Dyers thought
12  I am very good at what I do, so he suggested
13  Martha talk to me.
14          Q.  And did you have an occasion after
15  the conference to communicate with
16  Ms. Wasserman?
17          A.  Yes.  She gave me her card and told
18  me to get in touch.  And wanted to basically
19  have a conversation of, you know, what I
20  thought would be good to restart Man of La
21  Mancha, and I told her I'd think about it.
22          Q.  And when did she say that to you?
23          A.  During the conference.
24          Q.  And did you get back in touch with
25

Page 27

Robyn Abraham

1  her?
2          A.  Well, she gave me her card and asked
3  me to, so, yes.
4          Q.  Ms. Abraham, we're going to mark a
5  document as Abraham Exhibit 1 which bears
6  Bates stamped ABR 001065.
7              (Whereupon, at this time, the
8              reporter marked the above-mentioned
9              e-mail chain as Abraham Exhibit 1 for
10             identification.)
11  BY MR. LAFAYETTE:
12          Q.  Drawing your attention to Bates
13  stamp ABR 001068, and an e-mail that begins
14  on April 29, 2013, at 2:10 p.m.
15             Do you see that e-mail?
16          A.  No, I don't.  I'm getting there.
17             (Witness peruses document.)
18          A.  At what time?
19          Q.  It's April 29, 2013 at 2:10 p.m.
20          A.  Yes.
21          Q.  Is that your first communication
22  with Ms. Wasserman after the Denver
23  conference?
24          A.  I don't know.
25

Page 28

Robyn Abraham

1          Q.  In this e-mail, you mention that Man
2  of La Mancha is your favorite musical, do you
3  see that?
4          A.  Yes.
5          Q.  Is it your favorite musical?
6          A.  Yes.
7          Q.  It in it you say you're Disney
8  trained, highly successful international
9  entertainment media attorney, solicitor, MBA.
10  Do you see that?
11          A.  Yes.
12          Q.  And can you tell me what you mean by
13  a Disney-trained entertainment media
14  attorney?
15          A.  I think it's self explanatory, but
16  what's the question?
17          Q.  What do you mean by Disney trained?
18          A.  I was trained by the general counsel
19  of Disney.
20          Q.  You worked for him?
21          A.  Yes.  I worked for Joe Shapiro who
22  was the Disney general counsel, correct.
23          Q.  And you were outside counsel for
24  Disney?
25

Page 29

Robyn Abraham

1          A.  Correct, correct.
2          Q.  And in what way did he train you?
3              MS. SHIN:  Objection to form.
4          A.  Well, that's like an impossible
5  question to answer.  It's how Disney runs
6  television.  I ran the television shows for
7  Disney in Florida, in Orlando.
8          Q.  And what television shows were
9  those?
10          A.  The new Mickey Mouse Club.
11          Q.  Any other ones?
12          A.  Well, I did other shows for them in
13  bits and pieces.  Whatever was requested.
14  And I worked with Ted Kay at the Disney
15  channel and a number of other executives at
16  Disney in doing what they requested in terms
17  of legal and business affairs.
18          Q.  Did any of those projects involve
19  entertainment other than television?
20          A.  Well, they were all musical, so,
21  yes.
22          Q.  When you say they were all musical,
23  what do you mean?
24          A.  Well, there was music licensing,

Page 46

Robyn Abraham

1 and she said she'd let me know.
2
3     Q.   And isn't it correct that you state,
4 I'd be delighted to help you expand the Dale
5 Wasserman brand as well as to help you stage
6 his lesser-known plays in the U.S. and
7 international.
8     A.   If that's what she wanted to do and
9 that's her request, then I said, If that's
10 what you want, I'm happy to help.
11    Q.   And when did she say that it was
12 something that she wanted?
13    A.   At lunch, the day we met.
14    Q.   That's in Denver?
15    A.   Correct.
16    Q.   And Ms. Wasserman responded that she
17 wanted to have a few days to think about it,
18 correct?
19    A.   I don't recall.
20    Q.   Can you look at the top e-mail and
21 I'll ask if that refreshes your recollection.
22         (Witness peruses document.)
23    A.   What's the question?
24         MR. LAFAYETTE:  Can you read it
25    back?

Page 47

Robyn Abraham

1
2     A.   I don't know what you're asking me?
3     (Whereupon, at this time, the requested
4 portion was read by the reporter.)
5     A.   Whatever the e-mail says.
6     Q.   It says that she wanted to have a
7 few days to think about it, correct?
8     A.   I'm looking at where that is.
9         (Witness peruses document.)
10    A.   Oh, yes, the first sentence.  It
11 says, May I have a few days to think about
12 it.  Yes, I see that.
13    Q.   And notwithstanding, did you e-mail
14 her the next day?
15    A.   I don't recall.
16    Q.   Can you take a look at the next
17 e-mail on top of the e-mail from Martha
18 Wasserman to which you just referred?
19         (Witness peruses document.)
20    A.   I don't know.  I don't know what the
21 question is.
22    Q.   I asked you if it's true that the
23 next day you wrote to Ms. Wasserman?
24    A.   I don't recall.
25    Q.   Okay.  Taking a look at the e-mail

Page 48

Robyn Abraham

1
2 that begins on page ABR 1066, the bottom of
3 the page, where it says on April 30, 2013 at
4 twelve o'clock p.m., R. Abraham wrote, do you
5 see that?
6     A.   I see what it says.
7     Q.   Okay?
8     A.   I don't --
9     Q.   Is that a true and correct copy of
10 an e-mail that you sent to Martha Wasserman?
11    A.   I don't --
12    Q.   On April 30, 2013?
13    A.   I don't know.  I don't know.
14    Q.   Looking above that, at the e-mail
15 from Martha Wasserman dated April 30, 2013 at
16 2:51 p.m., do you see that?
17    A.   Um-hum.  Yes.
18    Q.   Is that a true and correct copy of
19 an e-mail that you received from Martha
20 Wasserman?
21    A.   I don't recall.
22         MS. SHIN:  I'm sorry, where are
23    you looking?
24         MR. LAFAYETTE:  I'm looking on
25    page ABR 1066, and there's an e-mail,

Page 49

Robyn Abraham

1
2    starts around the middle of the page
3    from Martha Wasserman to R. Abraham,
4    and it is dated April 30, 2013 at
5    2:51 p.m., and I asked the witness is
6    this a true and correct copy of an
7    e-mail that she received from Martha
8    Wasserman.
9     A.   I don't recall.  It was more than
10 five years ago, almost six years ago.
11         MR. LAFAYETTE:  I'm going to
12    mark as Abraham Exhibit 2 an e-mail
13    that bears the Bates stamp ABR
14    000589.
15         (Whereupon, at this time, the
16    reporter marked the above-mentioned
17    e-mail as Abraham Exhibit 2 for
18    identification.)
19 BY MR. LAFAYETTE:
20    Q.   Ms. Abraham, have you seen this
21 e-mail before?
22    A.   I recognize it.
23    Q.   Okay.  And is this e-mail a true and
24 correct copy of an e-mail that you received
25 from Martha Wasserman on Tuesday, April 30,

Page 50

```
1                    Robyn Abraham
2    2013 at 3:18 p.m.?
3         A.  I don't know if it was received on
4    that day.  But I do recognize it as being
5    received at some point.  It does look
6    familiar.
7         Q.  And is it a true and correct copy of
8    an e-mail that you received from Martha
9    Wasserman?
10        A.  I believe so.
11        Q.  And the subject line says, Re Denver
12   lunch follow-up.
13        Do you see that?
14        A.  Yes, I do.
15        Q.  And when the subject line says Re,
16   is it your understanding that that refers to
17   a response to another e-mail?
18        A.  I don't know what it refers to.
19        Q.  And do you know if this e-mail was
20   in response to an e-mail that you sent?
21        A.  I don't know.
22        Q.  Do you know if this e-mail was part
23   of a chain?
24        A.  I don't know.
25        Q.  Now, Ms. Abraham, this is a document
```

Page 51

```
1                    Robyn Abraham
2    that was not produced by you in e-mail
3    format.  Do you know why there is no e-mail
4    format of this document?
5         A.  I don't know what e-mail format
6    means.
7         Q.  That it's not in the form of a
8    conventional native e-mail from your
9    computer.
10        MS. SHIN:  Objection to form.
11        A.  I don't know how that happens or
12   doesn't happen.
13        Q.  Do you understand that there are
14   certain e-mails that you've produced in
15   connection with this action for which you did
16   not produce an original e-mail format?
17        MS. SHIN:  Objection to form.
18        A.  I don't understand the question.
19        Q.  Do you have a native e-mail on your
20   computer for this document?
21        MS. SHIN:  Objection to form.
22        A.  What is a native e-mail?
23        Q.  An existing computer electronic
24   e-mail, as opposed to a PDF or hard copy
25   document?
```

Page 52

```
1                    Robyn Abraham
2         MS. SHIN:  Objection to form.
3         A.  I don't understand the question.
4         Q.  Do you take the position in this
5    action that you lost certain e-mails due to a
6    crash of your server by Go Daddy?
7         A.  Well, I don't know what happened,
8    but I do know everything I received I sent to
9    counsel in London, and sent everything as
10   received as directed by Schillings Law Firm.
11        Q.  Okay.  And did you print out certain
12   e-mails to send to the Schillings Law Firm?
13        A.  Did I print out -- I was told to
14   preserve the documents involving this case --
15        Q.  Okay.
16        A.  -- and forward to Schillings.
17        Q.  And when was that?
18        A.  When was that?  I think it occurred
19   sometime in 2014, after Mitch died.
20        Q.  And how did you preserve the
21   documents?
22        A.  I forwarded them to Shillings Law
23   Firm.
24        Q.  And how did you forward them to
25   them?
```

Page 53

```
1                    Robyn Abraham
2         A.  Via zip file, via e-mail, as I was
3    requested to do.
4         Q.  So you attached these documents to
5    an e-mail and forwarded them to Schillings?
6         MS. SHIN:  Objection to form.
7         A.  I don't recall exactly.  I just sent
8    them to my attorneys.
9         Q.  And to your knowledge, did at some
10   time thereafter, did you lose certain of the
11   e-mails from your computer system?
12        MS. SHIN:  Objection to form.
13        A.  I don't know -- I don't know what
14   happened, but I know that there are things
15   that Go Daddy has experienced which have
16   caused problems.  So I can't say what caused
17   that, I don't know.
18        Q.  And do you believe that when you say
19   that Go Daddy has experienced -- when you say
20   that there are things that Go Daddy has
21   experienced which has caused problems, can
22   you tell me what you mean by that?
23        A.  Well, it's public record that
24   they've had crashes and hackings and things
25   of that sort.  So I'm just reading what was
```

Page 54

Robyn Abraham

1
2  online, when the servers have been down and
3  e-mails have been missing, something that's
4  publically reported.
5      Q.  And do you believe that due to some
6  kind of a Go Daddy crash, that you lost
7  certain data?
8      A.  I don't know what happened.  I'm not
9  an IT person.  I don't know what happened.
10     Q.  Did you delete any e-mails?
11     A.  No.
12     Q.  Did you create any e-mails?
13     A.  No.
14     Q.  Do you know when it was that you
15 lost this data?
16     A.  No.
17     Q.  Do you know at what point in time
18 you discovered this data was missing?
19     A.  No.
20     Q.  Have you been asked by your counsel
21 for electronic versions of e-mail -- strike
22 that.
23         Have you been asked by your counsel
24 for electronic versions of the e-mail that's
25 been marked as Abraham Exhibit 2?

Page 55

Robyn Abraham

1
2      MS. SHIN:  If you could just
3         rephrase that question so it doesn't
4         sound like whatever her answer is
5         might be privileged.
6      Q.  Have you searched your computer for
7  electronic versions of the e-mail that's been
8  marked as Abraham Exhibit 2?
9      A.  I haven't, no.
10     Q.  Do you believe that you produced to
11 your counsel all e-mails in e-mail format
12 that have to do with this action?
13     A.  I've produced everything to both
14 British and American counsel.
15     Q.  Have third parties searched your
16 computer for electronic data related to this
17 action?
18         MS. SHIN:  Objection to form.
19     A.  I don't know.
20     Q.  How did your attorney receive -- how
21 did your attorney receive the documents that
22 you produced in this action?
23         MS. SHIN:  Objection to form.
24     A.  I provided my attorneys with
25 whatever they requested.

Page 56

Robyn Abraham

1
2      Q.  Did you download the documents from
3  your computer?
4          MS. SHIN:  Objection to form.
5      A.  I don't recall.
6      Q.  Did an outside vendor download any
7  documents from your computer?
8          MS. SHIN:  Objection to form.
9      A.  I don't know.
10     Q.  Did you turn your computer over to
11 your attorney?
12         MS. SHIN:  Objection to form.
13         THE WITNESS:  Am I supposed to
14     answer?
15         MS. SHIN:  If you understand
16     the question.
17     A.  I don't understand what's being
18 asked.
19     Q.  What kind of computers do you
20 maintain?
21         MS. SHIN:  Objection to form.
22     A.  I have an iPad, I have phones, I had
23 Samsung phones.  I don't know what kind of
24 laptop I have.
25     Q.  Has your laptop been searched for

Page 57

Robyn Abraham

1
2  documents in connection with this action?
3          MS. SHIN:  Objection to form.
4      A.  I don't know.
5      Q.  Did you provide that laptop to your
6  attorneys in this action?
7      A.  Yes.
8      Q.  And did you provide your iPad to the
9  attorneys -- to attorneys in this
10 action?
11     A.  No.
12     Q.  And did you provide your phone to
13 the attorneys in this action?
14     A.  Yes.
15     Q.  Is the laptop that you provided to
16 your attorneys -- strike that.
17         How long have you had the laptop
18 that you provided to your attorneys in this
19 action?
20     A.  About a year.
21     Q.  And prior to that, did you have
22 another laptop?
23     A.  Yes.
24     Q.  And what happened to that laptop?
25     A.  It crashed.

Page 58

Robyn Abraham

1        Q.  When you say it crashed, can you
2   tell me what you mean by that?
3        A.  Well, somebody slammed it in an
4   overhead bin and that was pretty much the end
5   of it.
6        Q.  And that was on an airplane?
7        A.  Yes.
8        Q.  Did you make a claim in connection
9   with that?
10           MS. SHIN:  Objection to form.
11       A.  Did I make a claim?  No.  Well, I
12   might have.  I think it was American -- I
13   might have.  I don't remember.
14           MR. LAFAYETTE:  I'm going to
15       call for production of any claim that
16       she may have filed with American in
17       connection with that incident.
18           MS. SHIN:  We will take it
19       under advisement.
20       Q.  And since -- what kind of laptop was
21   it that --
22       A.  I don't know.  All I know is, it was
23   white.
24       Q.  And when did this incident happen

Page 59

Robyn Abraham

1   with American Airlines?
2        A.  I don't remember.
3        Q.  Do you know approximately?
4        A.  No.
5        Q.  Was it after 2013?
6        A.  Oh, yes.
7        Q.  And did you use any other laptop
8   between 2013 and 2016?
9        A.  No.
10       Q.  After 2013, did you use a desktop
11   computer?
12       A.  No.
13       Q.  Do you know if this incident
14   involving your laptop getting crushed on
15   American Airlines occurred after you provided
16   documents to Schillings?
17       A.  I don't know exactly what the timing
18   was.  I think it was sometime after Mitch
19   died, but that's the best I can recall.
20       Q.  If you provided documents to
21   Schillings, would it have been through that
22   particular laptop?
23       A.  I don't recall.
24       Q.  And the -- you stated that the

Page 60

Robyn Abraham

1   current laptop that you have now, you've had
2   for a year?
3        A.  About that.  I don't know exactly,
4   but somewhere around that.
5        Q.  And the -- between the time --
6   between the time that your laptop got crushed
7   on American Airlines and one year ago, did
8   you have another laptop?
9        A.  No.  I used an iPad.
10       Q.  And for how long did you use an
11   iPad?
12       A.  On and off when I needed it.
13       Q.  And do you recall from what years
14   you used this iPad?
15       A.  I don't remember.
16       Q.  Did you use -- did you have the iPad
17   in 2013?
18       A.  I don't think so.
19       Q.  Did you have an iPad in 2014?
20       A.  I don't exactly remember.
21       Q.  Did you begin using the iPad after
22   your laptop got crushed on American Airlines?
23       A.  Yes.
24       Q.  And do you know approximately for

Page 61

Robyn Abraham

1   how many years you went without a laptop
2   computer?
3        A.  Well, you can use the iPad as a
4   computer.  So it worked fine.  I don't know
5   how many years.  Two or three.
6        Q.  Did you have one iPad or did you
7   have several iPads?
8        A.  Just one.
9        Q.  And did you have this iPad searched
10   by your attorneys?
11       A.  No.
12       Q.  Ms. Abraham, were your attorneys
13   aware that your laptop got crushed --
14       A.  Yes.
15       Q.  -- on the American Airlines flight?
16       A.  Yes.
17       Q.  And taking a look at what's been
18   marked as Abraham Exhibit 2, do you believe
19   this is an authentic e-mail?
20       A.  I recall the contents, and I do
21   believe it is authentic, yes.
22       Q.  And this is not a document that you
23   typed?
24       A.  No.

Page 62

Robyn Abraham

1          Q.  And is this a document that you
2   altered in any way?
3          A.  No.
4          Q.  Do you recall at any time printing
5   out e-mails?
6          A.  No.
7          Q.  And let me caveat that.  That had to
8   do with this action.
9          A.  No.
10          Q.  Do you know if anybody else printed
11   out e-mails having to do with this action for
12   you?
13          A.  I may have asked Marlene to save all
14   the documents in a file, because I was
15   concerned after Mitch died.  But I don't
16   know, I can't recall exactly.
17          Q.  And why were you concerned after
18   Mitch died?
19          A.  Why was I concerned after Mitch
20   died?  Because he died.  When a principal in
21   a contract dies, it's concerning.
22          Q.  And so simply because he died, you
23   decided to have Ms. Rue folder e-mails?
24          MS. SHIN:  Objection to form.

Page 63

Robyn Abraham

1          A.  I don't know what -- I don't know
2   what the question is.
3          Q.  Okay.  You testified that you may
4   have asked Marlene to save the e-mails
5   because you were concerned after Mitch died.
6   Was it solely because he died or was there
7   any other concern that you had?
8          A.  I, in the ordinary course of
9   business, I tried to save important
10   documents.  So I asked her to just save the
11   documents.  I don't know if she printed them
12   or she didn't.  I don't remember.
13          Q.  Did you ask her to do that in
14   writing?
15          A.  No.
16          MS. SHIN:  Whenever is
17          convenient for you, can we take a
18          five-minute bathroom break?
19          MR. LAFAYETTE:  Sure.  We could
20          do it right now.
21          VIDEOGRAPHER:  The time is
22          10:58 a.m. and we are off the record.
23          (Whereupon, a brief recess was
24          taken.)

Page 64

Robyn Abraham

1          VIDEOGRAPHER:  The time is
2   11:09 a.m. and we're back on the
3   record.
4   BY MR. LAFAYETTE:
5          Q.  Ms. Abraham, did Ms. Rue have access
6   to your computer?
7          MS. SHIN:  Objection to form.
8          A.  I don't think so.
9          Q.  Did she have access to your laptop
10   computer at the time she worked for you?
11          A.  No.
12          MS. SHIN:  Objection.  Can I
13          just, if it's okay, do you mean to
14          say computer?  Or account?
15          MR. LAFAYETTE:  The laptop.
16          The physical laptop.
17          MS. SHIN:  Okay.
18          Q.  Did Ms. Rue have access to your
19   e-mail account?
20          A.  Not that I'm aware of.
21          Q.  Can you tell me how it was that she
22   would save your e-mails?
23          A.  I may have printed them out to give
24   to her and just to hold on to.

Page 65

Robyn Abraham

1          Q.  Is that the best of your
2   recollection?
3          A.  To the best of my recollection, I
4   think so.  It's been a number of years ago,
5   so I'm giving you the best of my
6   recollection.
7          Q.  Did you use Microsoft Outlook?
8          A.  No.
9          Q.  What type of e-mail system did you
10   use?
11          A.  Just Go Daddy, and gmail.
12          Q.  If you could take a look at what we
13   marked as Abraham Exhibit 1.  And if you look
14   at the second page of that document, in the
15   second to the last paragraph of your April
16   30th, 4:25 p.m. e-mail, you state, Also, as a
17   U.S., U.K. attorney solicitor deal maker, it
18   would be helpful to know whether you own all
19   the rights to MOLM or whether the composer
20   and lyricist and/or their respective estates
21   need to be contacted and coordinated.
22          Do you see that?
23          A.  Yes.
24          Q.  Did Ms. Wasserman ever respond to

Page 106

```
1                Robyn Abraham
2   12, 2013 at 3:46 p.m.?
3        A.  Yes, but I don't have Mountain Time.
4   I never use Mountain Time.  So that must be
5   her timestamp, not mine.
6        Q.  Okay.  And do you recognize this as
7   an e-mail you received from Martha Wasserman,
8   I'm sorry, as an e-mail that you sent to
9   Martha Wasserman?
10       A.  It looks familiar.
11       Q.  And in this e-mail, you request that
12  Martha Wasserman send you website information
13  regarding the New York Times cruise, correct?
14           MS. SHIN:  Objection to form.
15       A.  What's the question?
16           MR. LAFAYETTE:  I'll ask the
17       court reporter to read it back.
18       (Whereupon, at this time, the requested
19  portion was read by the reporter.)
20       A.  Well, she called me about it and all
21  she gave me was a handout or she sent me a
22  handout or something, so I did ask her for
23  details on the invitation she extended.
24           MR. LAFAYETTE:  I'm going to
25       mark as Abraham Exhibit 14 a document
```

Page 107

```
1                Robyn Abraham
2       bearing Bates stamp 0000091.
3           (Whereupon, at this time, the
4       reporter marked the above-mentioned
5       e-mail as Abraham Exhibit 14 for
6       identification.)
7   BY MR. LAFAYETTE:
8        Q.  Ms. Abraham, on the first page of
9   the document, is this an e-mail that you sent
10  to Ms. Wasserman?
11       A.  It looks familiar, following up on a
12  phone conversation that she asked me if I got
13  the information for the cruise.
14       Q.  And on the second page of the
15  document, is this an e-mail that you received
16  from Martha Wasserman?
17       A.  It appears to be.
18           MR. LAFAYETTE:  I'm going to
19       mark as Abraham Exhibit 15 a document
20       that bears Bates stamps ABR 000576.
21           (Whereupon, at this time, the
22       reporter marked the above-mentioned
23       e-mail as Abraham Exhibit 15 for
24       identification.)
25  BY MR. LAFAYETTE:
```

Page 108

```
1                Robyn Abraham
2        Q.  Ms. Abraham, is this a true and
3   correct copy of an e-mail that you received
4   from Martha Wasserman?
5        A.  I believe so, yes.
6        Q.  And is this an authentic e-mail?
7        A.  Yes.  I believe so.  It looks
8   familiar.
9        Q.  Did you create this document?
10       A.  No.
11       Q.  Did anybody else, to your knowledge,
12  create this document?
13       A.  I believe it's authentic.
14       Q.  Looking -- again, just for the
15  record, this was an e-mail that was produced
16  without a corresponding e-mail type document.
17           Is this a document that you printed
18  out for your attorneys?
19       A.  I believe so.
20       Q.  And do you recall what computer you
21  used to print this out?
22       A.  Whatever I had at the time.  I don't
23  recall what computer it was.
24       Q.  Was it the laptop that got crushed
25  on American Airlines?
```

Page 109

```
1                Robyn Abraham
2        A.  I don't -- I don't remember which
3   laptop it was.
4        Q.  Well, do you remember when it was
5   that you provided the e-mails to your
6   attorney?
7        A.  Well, these were provided to my
8   attorneys in London probably sometime in
9   summer of 2014.
10       Q.  And what laptop did you have at that
11  time?
12       A.  I believe it was the white laptop
13  that I had.
14       Q.  That's the one that got crushed on
15  American Airlines, correct?
16       A.  The one I don't have anymore.
17       Q.  Well, you testified that it got
18  crushed on American Airlines, correct?
19       A.  Well, somebody slammed the overhead
20  on it and it was broken.
21       Q.  Can you tell me what you did with
22  that broken laptop?
23       A.  Yes.  I gave it to my computer
24  expert who tried to pull the data off of it,
25  and he said he was not successful.
```

Page 110

1                    Robyn Abraham
2    Q.  Okay.  Who is your computer expert?
3    A.  Steve Bardfield.
4    Q.  What is his name?
5    A.  Steve Bardfield.
6    Q.  And where does Mr. Bardfield live?
7    A.  He lives in Studio City, California.
8    Q.  And how do you spell his name?
9    A.  B-A-R-D-F-I-E-L-D.
10   Q.  And do you have an address and
11   telephone number for Mr. Bardfield?
12   A.  I don't have his address.  I believe
13   he's publically listed.  I don't know it off
14   the top of my head.
15   Q.  What does he do for a living?
16   A.  He's a computer expert for I don't
17   know what company.  But he works for them
18   full time and then does laptop work for
19   individuals on an as-needed basis.
20   Q.  Okay.  Can you provide his telephone
21   number to Ms. Shin?
22   A.  My counsel has it.
23   Q.  And who has possession of the
24   laptop?
25   A.  He took it.

Page 111

1                    Robyn Abraham
2    Q.  Does he still have it?
3    A.  I don't know.
4    Q.  Have you asked him for it?
5    A.  Well, he said he used it for parts.
6    Q.  And when did he tell you that?
7    A.  After he took it.  He said, Do I
8    have a problem with it, I said, No.  He said,
9    It's dead, you can't use it anyway.
10   Q.  Have you contacted him since the
11   commencement of this litigation to see if he
12   still maintains the laptop?
13   A.  Yes.
14   Q.  And what did he say?
15   A.  He said it's gone.
16       MR. LAFAYETTE:  I'm going to
17   call for production of his telephone
18   number.
19       MS. SHIN:  We will take it
20   under advisement.
21   Q.  And taking a look at what we've
22   marked now as Abraham Exhibit 15, and the
23   second page of what's been marked as Abraham
24   Exhibit 14, do you see that both of those
25   e-mails say, Dear Abraham?

Page 112

1                    Robyn Abraham
2    A.  Yes.
3    Q.  And do you see that they both have
4    the same subject?
5    A.  Yes.
6    Q.  And do you see that they're
7    apparently two minutes apart?
8    A.  I see what they say, yes.
9        MR. LAFAYETTE:  I'm going to
10   mark as Abraham Exhibit 16 a document
11   that bears Bates stamps ABR 003104
12   and ABR 003 -- I'm sorry, let me
13   start off, it's a document that bears
14   Bates stamps ABR 003104 through ABR
15   003107.
16       (Whereupon, at this time, the
17   reporter marked the above-mentioned
18   e-mail as Abraham Exhibit 16 for
19   identification.)
20       MS. SHIN:  16?
21       MR. LAFAYETTE:  Yes.
22   BY MR. LAFAYETTE:
23   Q.  Ms. Abraham, do you recognize what's
24   been marked as Abraham Exhibit 16?
25   A.  I remember this e-mail, yes.

Page 113

1                    Robyn Abraham
2    Q.  And do you know why there are three
3    blank pages that follow the cover page of
4    this e-mail?
5    A.  I don't know.
6    Q.  Is this an authentic e-mail?
7    A.  I recall receiving this, and sending
8    it to counsel.  So to the best of my
9    knowledge, yes.
10   Q.  Just going back to what's been
11   marked as Abraham Exhibit 15, do you believe
12   that to be an authentic e-mail?
13   A.  I recognize it, and it looks
14   familiar.  So I do believe that to be
15   authentic.
16   Q.  Did you create this e-mail?
17   A.  No.
18   Q.  Do you know if anybody else created
19   this e-mail, other than Ms. Wasserman?
20   A.  I was going to say, I believe Ms.
21   Wasserman created this e-mail.
22       MR. LAFAYETTE:  I'm going to
23   mark as Abraham Exhibit 17 a document
24   bearing Bates stamps ABR 001160
25   through ABR 001161.

Page 118

                    Robyn Abraham
1
2    however many versions later.
3            MR. LAFAYETTE:  I'm going to
4        mark as Abraham Exhibit 19, a
5        document bearing Bates stamp ABR
6        000577.
7            (Whereupon, at this time, the
8        reporter marked the above-mentioned
9        e-mail as Abraham Exhibit 19 for
10       identification.)
11   BY MR. LAFAYETTE:
12       Q.  Ms. Abraham, is this an e-mail you
13   received from Martha Wasserman?
14       A.  I remember receiving something like
15   this after receiving something very different
16   like within a short period of time.  Because
17   this one is copied to Nan Bases and she
18   called and told me that Nan Bases had yelled
19   at her.  So she had to write an e-mail asking
20   for the hundred thousand up front.  Because
21   she was in trouble with Nan and she didn't
22   want to get in trouble with Nan.  So I do
23   remember this e-mail.
24       Q.  And is this a true and correct copy
25   of the e-mail that you received?

Page 119

                    Robyn Abraham
1
2        A.  I don't know.  I mean, let's put it
3    this way.  It looks familiar, but I do
4    remember her asking me for one thing and
5    sending me one set of e-mails and then
6    sending me something completely different
7    like within a very short period of time.  And
8    my calling her and going, What?  So she said,
9    well, Nan was yelling at her and she had to
10   ask for the money upfront.
11       Q.  And when you say had to ask for the
12   money up front, are you referring to anything
13   in this e-mail?
14       A.  Yes.  She's putting in this e-mail
15   her hundred thousand nonrefundable advance --
16   oh, I didn't even know she had the calculated
17   potential of revenue per week, that part I
18   don't recall, but, yeah, that was a complete
19   turnaround from what was happening
20   previously.
21       Q.  And moreover in this e-mail she
22   makes reference to pursuing the MOLM proposal
23   and doing business with Mitch and Helen.
24       Do you see that?
25       A.  Is there a question?

Page 120

                    Robyn Abraham
1
2        Q.  I'm asking if you see that in the
3    e-mail.
4        A.  The e-mail says what it says.
5        Q.  Do you see that in the e-mail?
6        A.  Yes.  I see this.
7        Q.  Okay.  And who is Helen?
8        A.  Well --
9        Q.  If you know?
10       A.  I didn't write this e-mail.  So you
11   would have to ask your client.
12       Q.  Did you know who Ms. Wasserman was
13   referring to by Helen?
14       A.  I'm assuming she had met Helen
15   Darion although she told me she was
16   incompetent in a few prior phone calls.  So
17   I'm assuming she meant Helen Darion, I didn't
18   know of another Helen.
19       Q.  When did she tell you that
20   Ms. Darion was incompetent?
21       A.  Oh, fairly on, around -- probably
22   around late summer, early fall of 2013.
23       Q.  And this was in a phone
24   conversation?
25       A.  Yes.

Page 121

                    Robyn Abraham
1
2        Q.  And did anyone overhear your phone
3    conversation, to your knowledge?
4        A.  Not that I am aware of.  She also
5    repeated that to me when we went to lunch.  I
6    don't remember which lunch.  But she said
7    that Helen had owned a very expensive
8    apartment in New York and it was dilapidated,
9    and it was a pity because Helen was unable to
10   care for herself.  And she went on and on
11   about Helen and explained that that's why
12   Mitch controlled Helen's rights, and that
13   part I very clearly remember.  So this was
14   like what I got after Nan Bases reportedly
15   yelled at Martha.  And then Martha invited me
16   back on the cruise anyway.
17       Q.  After you received the e-mail that's
18   been marked as Abraham Exhibit 19, did you
19   continue to contact -- strike that.
20       After you received the e-mail that's
21   been marked as Abraham Exhibit 19, did you
22   continue to communicate with Ms. Wasserman?
23           MS. SHIN:  Objection to form.
24           THE WITNESS:  Do I answer?
25           MS. SHIN:  Yes.

Page 122

1                    Robyn Abraham
2        A.  She continued to call me.
3        Q.  And did you communicate to her when
4    she called you?
5        A.  I'm sorry?
6        Q.  Did you communicate with her when
7    she called you?
8        A.  Well, I answered the phone.
9        Q.  And did you speak to her?
10       A.  Well, she called me, so, yes, I said
11   hello, and I did ask her, I said, Do you want
12   to get Nan on the phone.  She said, no, Nan
13   yells at her.
14       Q.  And so, therefore, you continued to
15   communicate directly with Ms. Wasserman,
16   correct?
17       A.  I wasn't acting as her attorney.  I
18   was acting in a way that she had asked me to
19   go to Mitch for whatever it is Martha wanted
20   that day.  So I was like, Martha, do you want
21   to get Nan on the phone, no, she'll yell at
22   me.
23       Q.  And as of that date, did you know
24   that Ms. Wasserman was represented by an
25   attorney?

Page 123

1                    Robyn Abraham
2            MS. SHIN:  Objection to form.
3        What day?
4        Q.  As of the day of the e-mail,
5    September 20, 2013.
6        A.  I don't remember what day she called
7    me.  She called me fairly regularly.  So I
8    mean, I saw the e-mail.  The e-mail says what
9    it says.  So I believe I've answered the
10   question.
11           MS. SHIN:  Can we take a
12       five-minute break, whenever you're
13       ready?
14           MR. LAFAYETTE:  Very soon.
15           I will mark as Abraham Exhibit
16       20 a document that bears Bates stamp
17       ABR 003108.
18           (Whereupon, at this time, the
19       reporter marked the above-mentioned
20       e-mail as Abraham Exhibit 20 for
21       identification.)
22   BY MR. LAFAYETTE:
23       Q.  Is what's been marked as Abraham
24   Exhibit 20 your response to what's been
25   marked as Abraham Exhibit 19?

Page 124

1                    Robyn Abraham
2        A.  I don't know if it was my response,
3    but the e-mail looks familiar.
4        Q.  Let me just go back to Exhibit 19
5    for a moment.
6        Is Exhibit 19 an authentic e-mail?
7            MS. SHIN:  Objection to form.
8        A.  It appears to be.  It's from your
9    client.
10       Q.  And did you do anything to alter
11   this e-mail from Ms. Wasserman that's been
12   marked as Exhibit 19?
13       A.  No.
14       Q.  And this e-mail was not produced in
15   e-mail format.  Is this one of the documents
16   that you gave your attorneys --
17           MS. SHIN:  Objection.  I'm
18       going to object to your
19       representation.  I don't think that's
20       accurate.  But I just wanted to put
21       that on the record.
22           MR. LAFAYETTE:  Okay.
23       A.  I'm sorry, what is the question?
24       Q.  My question was, is this one of the
25   e-mails that you provided to Schillings in

Page 125

1                    Robyn Abraham
2    2014?
3        A.  Which exhibit are you talking about?
4        Q.  Exhibit 19.
5        A.  This appears to be a true and
6    correct e-mail from Martha.
7        Q.  And is this one of the e-mails that
8    you provided to your attorneys?
9        A.  Yes.  I provided them with
10   everything I had.
11       Q.  And did you print out this e-mail?
12       A.  I believe so.
13       Q.  In the document that we've marked as
14   Exhibit 20, you state that you cannot
15   directly contact Mitch given your
16   longstanding excellent relationship with
17   senior members of ASCAP.
18       Do you see that?
19       A.  Are you on the second to bottom
20   paragraph?
21       Q.  Yes.
22       A.  Yes, I see it.
23       Q.  Could you explain why you were
24   prohibited from contacting Mitch?
25       A.  I don't recall.

Page 126

Robyn Abraham

1
2    Q.  And in the last line, you say, Of
3  course, this request expeditiously was
4  approved as well.  What were you referring
5  to?
6    A.  I can't recall.  I don't -- I don't
7  know what this request expeditiously was
8  approved as well means.
9    Q.  And did you speak to Nan Bases after
10  sending this e-mail?
11    MS. SHIN:  Objection to form.
12    A.  I don't recall.  I know I've spoken
13  with Nan, but I don't remember the timing of
14  when I spoke with Nan.
15    MR. LAFAYETTE:  I'm going to
16    mark as Abraham Exhibit 21 a document
17    bearing Bates stamps W 0000431.
18    MS. SHIN:  Before we go into
19    that document, it's 1:09.  So I don't
20    know, I mean, I can run and do the
21    ladies' room real quick if you want
22    to continue and we'll come right
23    back.
24    MR. LAFAYETTE:  Okay.  Let's do
25    that because I just want to finish an

Page 127

Robyn Abraham

1
2  area and then we will go to lunch.
3    MS. SHIN:  How much longer
4    after I come back?
5    MR. LAFAYETTE:  Maybe 15
6    minutes.
7    VIDEOGRAPHER:  The time is 1:09
8    p.m. and we are off the record.
9    (Whereupon, a brief recess was
10    taken.)
11    VIDEOGRAPHER:  The time is 1:15
12    p.m. and we're back on the record.
13    MR. LAFAYETTE:  I'm going to
14    mark a different document as Abraham
15    Exhibit 21.  It bears Bates stamps
16    ABR 001163, and ABR 001164.
17    (Whereupon, at this time, the
18    reporter marked the above-mentioned
19    e-mail as Abraham Exhibit 21 for
20    identification.)
21  BY MR. LAFAYETTE:
22    Q.  Ms. Abraham, if you will look at the
23  page that's ABR 001164, and the document that
24  we previously marked as Abraham Exhibit 19,
25  you will notice that exhibit -- you will

Page 128

Robyn Abraham

1
2  notice that Exhibit 19 does not have the P.S.
3  that Exhibit 21 has on the second page?
4    Do you notice that?
5    A.  No, I just figured there was a page
6  missing on this.  I don't -- I mean, if you
7  point it out, I see what you're saying.  But
8  I just figured this continued to another
9  page.
10    Q.  So your speculation is that there's
11  another page that follows ABR 000577 that
12  would have that P.S. on it?
13    MS. SHIN:  Objection to form.
14    A.  I don't know.
15    Q.  Do you know -- do you have any
16  understanding why what's been marked as
17  Abraham Exhibit 19 is missing the P.S.?
18    A.  I don't know if it is.  I just don't
19  see it on here.  But it may have continued to
20  another page.  I don't know.
21    Q.  Did you edit the document that was
22  marked as Exhibit 19?
23    A.  No.
24    Q.  Do you know if anybody else did?
25    A.  No.  I just figure it got cut off

Page 129

Robyn Abraham

1
2  somewhere.
3    Q.  But do you know that?
4    A.  I don't know it.  I'm not an IT
5  person.
6    Q.  So you're speculating?
7    A.  I don't know.
8    MS. SHIN:  Objection to form.
9    MR. LAFAYETTE:  I'm going to
10    mark as Abraham Exhibit 22 a document
11    bearing Bates stamps ABR 003109.
12    (Whereupon, at this time, the
13    reporter marked the above-mentioned
14    e-mail as Abraham Exhibit 22 for
15    identification.)
16  BY MR. LAFAYETTE:
17    Q.  Ms. Abraham, have you taken a look
18  at that document?
19    A.  Yes.
20    Q.  Is this a copy of an e-mail that you
21  sent to Martha Wasserman on September 23,
22  2013?
23    A.  It appears to be, yes.
24    Q.  And is this an authentic e-mail?
25    A.  Yes, to the best of my recollection,

Page 138

Robyn Abraham

1      A.  Because she told me she would do
2  that if I helped her get this going.  And I
3  was asking her to do what she said she was
4  going to do.
5            MR. LAFAYETTE:  Okay.  Let's
6      take a break.
7            MS. SHIN:  When should we come
8            back?
9            VIDEOGRAPHER:  The time is 1:31
10     p.m. and we are off the record.
11            (Whereupon, a brief recess was
12     taken.)
13            VIDEOGRAPHER:  The time is 2:28
14     p.m. and we are back on the record.
15  BY MR. LAFAYETTE:
16      Q.  I just want to go back to your
17  computers and handheld devices for a second.
18  What computers do you currently use?
19      A.  I've got -- are you talking hand
20  held?  I've got an iPhone, I've got an iPad,
21  and I've got a laptop.
22      Q.  With respect to the iPad, how long
23  have you had that iPad?
24      A.  Probably four or five years.


Page 138

Robyn Abraham

1      A.  Because she told me she would do
2  that if I helped her get this going.  And I
3  was asking her to do what she said she was
4  going to do.
5            MR. LAFAYETTE:  Okay.  Let's
6      take a break.
7            MS. SHIN:  When should we come
8            back?
9            VIDEOGRAPHER:  The time is 1:31
10     p.m. and we are off the record.
11            (Whereupon, a brief recess was
12     taken.)
13            VIDEOGRAPHER:  The time is 2:28
14     p.m. and we are back on the record.
15  BY MR. LAFAYETTE:
16      Q.  I just want to go back to your
17  computers and handheld devices for a second.
18  What computers do you currently use?
19      A.  I've got -- are you talking hand
20  held?  I've got an iPhone, I've got an iPad,
21  and I've got a laptop.
22      Q.  With respect to the iPad, how long
23  have you had that iPad?
24      A.  Probably four or five years.

Page 139

Robyn Abraham

1      Q.  And with respect to your phone, how
2  long have you had that phone?
3      A.  This one is new.  This one is
4  probably about eight months old.
5      Q.  Okay.  And before that phone, did
6  you have another phone?
7      A.  Yes, I had two other phones.
8      Q.  Two other phones?
9      A.  Two other phones.
10      Q.  And what kind of phones were those?
11      A.  They were Samsungs.
12      Q.  And where are those phones today?
13      A.  I gave them to my counsel, who used
14  them for whatever.  And then she gave them
15  back to me.
16      Q.  And how long did you have those two
17  Samsung phones?
18      A.  Long time.  Probably -- well, not
19  the -- I had an Edge.  The Edge one I had
20  only for about two years.  And it like melted
21  and kind of turned black and smoked and that
22  kind of fun stuff.  And then the one before
23  that, I had a black Samsung which now has a
24  short in it, and that one was probably for

Page 140

Robyn Abraham

1  about five years.
2      Q.  Okay.  So for what five-year period
3  did you have the Samsung?
4      A.  Both of them.  Oh, for the Samsung,
5  I probably had it from 2011 until about 2015.
6      Q.  And for what period of time did you
7  have the Edge?
8      A.  That was from about 2015 to about
9  2017 or '18.
10      Q.  Okay.  And with respect to your
11  iPad, did you have an iPad prior to the one
12  you currently have?
13      A.  No.  It's the old model.
14      Q.  And with respect to your current
15  laptop, how long have you had that?
16      A.  About a year and a half.
17      Q.  And during what period of time did
18  you have the laptop that you said got crushed
19  in the overhead bin?
20      A.  That one, probably about four years,
21  from about 2010 to 2014.
22      Q.  I'm not sure if I asked you this,
23  but did you file any written reports about
24  your laptop getting damaged?

Page 141

Robyn Abraham

1      A.  I may have, but I remember American
2  Airlines said that they weren't going to pay
3  for it because they didn't do it, it was
4  another passenger.  They didn't cause the
5  problem.
6      Q.  Did they tell you this in writing?
7      A.  I don't remember.  I don't think --
8  I think I submitted something, they have like
9  an online thing that you submit.  So I
10  submitted an online thing.  And I don't know
11  if I got anything back.  But when I didn't, I
12  called them.
13      Q.  And could you describe a little more
14  particularly like what caused your laptop to
15  get crushed in the overhead bin?
16      A.  Yes.  I had it in a case, like a
17  laptop case, just a regular case.  And
18  somebody was getting on and moving things
19  around, and then slammed the top of the
20  overhead bin onto it.
21      Q.  The cover of the overhead bin?
22      A.  You know how you put things in the
23  overhead bin on a plane?
24      Q.  Yes.

Page 142

1                        Robyn Abraham
2        A.  They were moving their suitcase in
3   and I was on the phone, and they slammed the
4   overhead bin onto the laptop.
5        Q.  And you don't know the person that
6   did this, do you, the identity of the person
7   that did this?
8        A.  I don't know who it was, and -- no.
9   I didn't know it was broken at the time, it
10  was in a case.
11            MR. LAFAYETTE:  I'm going to
12        call for the production of any
13        documents concerning this incident
14        with American Airlines.
15            MS. SHIN:  I think you already
16        did that, but okay.  We will take it
17        under advisement.
18        Q.  And do you have any knowledge of
19  when any of the Go Daddy server crashes may
20  have occurred?
21        A.  I gave that to my counsel.  I mean,
22  it was ongoing from 2012 where there was a
23  big one in 2012 and then there were a couple
24  of them along the way.  So I don't know the
25  exact dates, but it's all available -- if you

Page 143

1                        Robyn Abraham
2   go Google this online, you can find the same
3   thing I did.  But when I complained about
4   things missing, they sent me coupons.
5        Q.  And what accounts did you find
6   things missing?
7        A.  Well, when I was working on things
8   and didn't see them anymore, it was on the
9   global dot TV and it was also on the
10  encapsule dot com account.  And they were
11  both Go Daddy accounts.
12        Q.  And did you discover that e-mails
13  were missing?
14        A.  Yes.
15        Q.  Did Go Daddy ever acknowledge that
16  any -- did Go Daddy ever acknowledge to you
17  that any of their server crashes caused you
18  to lose e-mails?
19            MS. SHIN:  Objection to form.
20        A.  I don't know how to answer that
21  question.  They said that there was a problem
22  they're working on.  That's the best they
23  would give me.
24        Q.  Now, I want to -- during the period
25  of time that you had the laptop --

Page 144

1                        Robyn Abraham
2        A.  Can you speak up, I'm sorry, I can't
3   hear you.
4        Q.  During the period of time that you
5   had the laptop that got crushed in the
6   overhead bin, could you explain to me how you
7   would access your e-mail?
8        A.  From the phone, from my phone.
9        Q.  From your phone, you never accessed
10  your e-mail through your laptop computer?
11        A.  Well, when it was crushed, I
12  couldn't.
13        Q.  Before the time it was crushed I'm
14  asking.
15        A.  Yes.  I accessed it through the
16  computer, the laptop.
17        Q.  Could you just describe for me when
18  you opened your computer exactly what you
19  would do to access your e-mail?
20        A.  Yes.  I would have to go on to like
21  Google or Fox server and then hit the button
22  for the Go Daddy, and then type in my account
23  and the pass code.
24        Q.  Can you just tell me what the Fox
25  server was?  I'm not familiar with what that

Page 145

1                        Robyn Abraham
2   is.
3        A.  I said there was a link on the like
4   Google or Firefox server, and I would hit the
5   link and it would show up in a little box,
6   and then I would put in my e-mail and my
7   password.
8        Q.  And is that the same for HB Global
9   as well as the encapsule e-mail?
10        A.  They're both the same system but
11  they're different passwords.  They're both Go
12  Daddy accounts, if that answers your
13  question.
14        Q.  Do you currently still use Go Daddy
15  for e-mail?
16        A.  Believe it or not, yes, I do.  They
17  said just change your password.  I've had it
18  happen on gmail too, so, like I said --
19            MR. LAFAYETTE:  Okay.  I'm
20        going to mark as Abraham Exhibit 23 a
21        document that bears the Bates stamp
22        ABR 000578.
23            (Whereupon, at this time, the
24        reporter marked the above-mentioned
25        e-mail as Abraham Exhibit 23 for

Page 146

Robyn Abraham

2     identification.)
3  BY MR. LAFAYETTE:
4          MS. SHIN:  What number is this?
5          MS. SHYMAN:  23.
6  BY MR. LAFAYETTE:
7     Q.  Is this a true and correct copy of
8  an e-mail that you received from Martha
9  Wasserman?
10    A.  To the best of my knowledge, yes.
11    Q.  And is this document authentic?
12         MS. SHIN:  Object to form.
13    Q.  Is this an authentic e-mail?
14    A.  To the best of my knowledge, yes.
15    Q.  And did you at any time edit this
16 e-mail?
17    A.  No.
18    Q.  Do you know if anybody else did?
19    A.  I thought it came from Martha
20 Wasserman, so, no.
21    Q.  On your laptop that you had in 2013,
22 did you have Microsoft Word?
23    A.  I don't remember what I had.  I had
24 some kind of Microsoft, I think.  It was an
25 Android.

Page 147

Robyn Abraham

2     Q.  Your laptop was an Android?
3     A.  It was not a, you know, iMac.  So
4  whatever they put on it is what I had.
5     Q.  Your laptop was not a Mac?
6     A.  No, it wasn't a Mac.
7     Q.  Do you remember what kind of laptop
8  it was?
9     A.  It may have been an IBM.  I'm not
10 sure.
11    Q.  Do you have a -- do you know what
12 kind of operating system it had?
13    A.  I'm afraid not, no.
14    Q.  Did you have Excel on it?
15    A.  If I did, I didn't know about it.
16    Q.  Do you know if anybody altered this
17 e-mail, to your knowledge?
18    A.  I'm sorry.
19         MS. SHIN:  Objection.
20    Q.  Do you know if anybody altered this
21 e-mail, to your knowledge?
22         MS. SHIN:  Objection to form.
23    A.  No.
24    Q.  Referring to Abraham 23.
25    A.  No.

Page 148

Robyn Abraham

2     Q.  The e-mail states that you need to
3  raise $100,000 to even begin to discuss this.
4  Do you see that?
5     A.  Yes.
6     Q.  Did you ever raise $100,000 in
7  connection with Man of La Mancha?
8     A.  No.
9     Q.  Do you know where you were on
10 September 23, 2013?
11    A.  I have no idea.  I don't know.
12         MR. LAFAYETTE:  I'm going to
13    mark as Abraham Exhibit 24, a
14    document that bears Bates stamp ABR
15    001165 and ABR 001166.
16         (Whereupon, at this time, the
17    reporter marked the above-mentioned
18    e-mail as Abraham Exhibit 24 for
19    identification.)
20 BY MR. LAFAYETTE:
21    Q.  Is this an e-mail that you received
22 from Martha Wasserman?
23    A.  I believe so.
24    Q.  In this e-mail, Ms. Wasserman makes
25 it clear that with respect to Man of La

Page 149

Robyn Abraham

2  Mancha, you're proceeding on your own behalf;
3  isn't that correct?
4          MS. SHIN:  Objection to form.
5     A.  I think it states what it states in
6  this e-mail.
7     Q.  And did you understand that from
8  this e-mail?
9          MS. SHIN:  Objection to form.
10    A.  Well, this e-mail states what Martha
11 states in this e-mail and then Martha would
12 call me and say, you know, Nan told her to do
13 this.  So I was getting mixed signals.
14    Q.  Did you call Nan or e-mail Nan to
15 ask her for an explanation?
16         MS. SHIN:  Objection to form.
17    A.  No, I wasn't trying to be Martha's
18 lawyer.  So I didn't see any reason I had to
19 do that.
20    Q.  But you were a lawyer at this time,
21 correct?
22         MS. SHIN:  Objection to form.
23    A.  I wasn't trying to be Martha's
24 lawyer.  And I didn't see a problem.  I was
25 working with her on something she asked for,

Page 158

1                    Robyn Abraham
2   advised by Ms. Wasserman not to correspond
3   with her that you continued to correspond
4   with her as demonstrated by this e-mail?
5             MS. SHIN:  Objection to form.
6             THE WITNESS:  Should I answer?
7             MS. SHIN:  Yes.  If you
8        understood it.
9        A.  Yes.  Because she kept calling me
10  and asking me for advice.
11       Q.  And did she call you between
12  September 23, 2013 and October 3, 2013 to ask
13  you for advice?
14            MS. SHIN:  Objection to form.
15       A.  I don't know the exact dates.  But I
16  do recall she continued to continue our
17  relationship.
18            MR. LAFAYETTE:  I'm going to
19       mark as Abraham Exhibit 27, a
20       document that bears Bates stamp ABR
21       000579.
22            (Whereupon, at this time, the
23       reporter marked the above-mentioned
24       e-mail as Abraham Exhibit 27 for
25       identification.)

Page 159

1                    Robyn Abraham
2   BY MR. LAFAYETTE:
3        Q.  Is what's been marked as Abraham
4   Exhibit 27 a true and correct copy of an
5   e-mail you received from Martha Wasserman?
6        A.  To the best of my knowledge, yes.
7        Q.  And did you play any role in
8   creating this e-mail?
9        A.  No.
10       Q.  Do you know if anyone other than
11  Martha Wasserman played any role in creating
12  this e-mail?
13       A.  I do not know.
14       Q.  After you received this e-mail, did
15  you continue to correspond with Ms.
16  Wasserman?
17       A.  I don't know if I corresponded.  I
18  do know that we continued phone
19  conversations, and she had invited me on a
20  Christmas cruise.  So we probably had
21  conversations along those lines.
22       Q.  And did you discuss the production
23  of Man of La Mancha?
24            MS. SHIN:  Objection to form.
25       A.  When?

Page 160

1                    Robyn Abraham
2        Q.  In any of those subsequent
3   conversations.
4        A.  Well, that was kind of why she
5   wanted me to go on the Christmas cruise.  So
6   I don't, you know, I spoke with her and
7   answered whatever questions she had.
8             MR. LAFAYETTE:  I'm going to
9        mark as Abraham Exhibit 28 an e-mail
10       that bears the Bates stamp ABR
11       001173.  And actually it continues on
12       to ABR 001174.
13            (Whereupon, at this time, the
14       reporter marked the above-mentioned
15       e-mail as Abraham Exhibit 28 for
16       identification.)
17  BY MR. LAFAYETTE:
18       Q.  Is Abraham Exhibit 28 a true and
19  correct copy of the e-mail you received from
20  Martha Wasserman?
21       A.  I suspect so.  I don't have a direct
22  recollection of this one in particular.  But
23  I do remember receiving a number of e-mails
24  from Martha during these days that were
25  contrary when Nan was copied.  So --

Page 161

1                    Robyn Abraham
2        Q.  But she does ask you to contact Nan
3   Bases, not her, regarding MOLM, correct?
4        A.  Well, she -- what are you referring
5   to?  I'm confused.
6        Q.  In this e-mail she asks you to
7   contact Nan Bases if you have any questions
8   regarding Man of La Mancha, and not her,
9   correct?
10       A.  I don't see where it says not her.
11       Q.  Okay.  If you take a look at the
12  second page, right before the fourth line up
13  in the e-mail, it says, As I said in my
14  previous e-mail, please, Robyn, contact Nan
15  Bases, my New York attorney, if you have any
16  questions re MOLM, not me.
17            Do you see that?
18       A.  That's different than what she told
19  me in the morning.
20       Q.  Okay.  But do you see this in the
21  e-mail?
22       A.  Yes, I do see.
23       Q.  Did you comply with this request?
24       A.  I didn't have any questions, so
25  there was no reason to contact Nan Bases.

Robyn Abraham

1    asked Lisa to bring it in.  I don't remember
2    if this was the first meeting or the second
3    meeting, and she brought it in.  And it said
4    Helen Darion, Mitch Leigh, and he flipped
5    through it and showed me his signature, and
6    he said, See, I own everything.  I said,
7    well, you don't own everything because it's
8    two out of three.  It's me and Helen Darion,
9    so what I say goes.
10       Q.  And you said you don't recall if it
11   was a first meeting or a second meeting with
12   Mr. Leigh?
13       A.  Mitch, right.  It wasn't in San
14   Francisco, it was in his office.
15       Q.  So it was the first meeting, you
16   believe?
17       A.  I don't think so.
18       Q.  So in that second meeting, was there
19   any phone call to Mr. Honig?
20       A.  No.
21       Q.  Was Mr. Honig present?
22       A.  No, he was not present.
23       Q.  Can you describe for me in any more
24   detail the document that Mr. Leigh showed

Robyn Abraham

1    you?
2        A.  Well, it looked like a power of
3    attorney.  It was maybe about ten pages long.
4    And I saw Helen Darion, I saw his name, and
5    just really just glanced at it.  I asked him
6    for a copy, and he said, No, you can't have
7    it.  And that was it.
8        Q.  And did you -- did the document say
9    power of attorney on it?
10       A.  It said power of attorney, Helen
11   Darion.
12       Q.  There was a title on it that said
13   power of attorney?
14       A.  Power of attorney, and underneath it
15   said Helen Darion.
16       Q.  Do you know what date that document
17   was dated?
18       A.  I think it was like late 1990s.
19       Q.  And do you recall any of the wording
20   of that document?
21       A.  No.  He made sure I didn't -- I
22   wasn't able to read the whole thing, but it
23   was signed and countersigned.  It may have
24   said Helen and Joe Darion, but I do remember

Robyn Abraham

1    seeing his power of attorney and it
2    referenced Man of La Mancha.  I remember
3    those three points.
4        Q.  When was the next time subsequent to
5    January 6, 2014 that you spoke to Alan Honig?
6        A.  I don't think I spoke with him.  I
7    think I may have sent him an e-mail asking
8    about due diligence on Man of La Mancha and
9    what was done, and who owned what.  I may
10   have tried to call him.  I remember him not
11   being happy I called him from the car,
12   because there was a lot of noise and he
13   didn't like that.  He was like, Well, if
14   you've got something to say go to an office
15   so I can hear you.
16           And I asked him very specifically
17   about the stage rights, London, Broadway,
18   movie rights, any other contracts that had
19   been signed, and I asked him about Tam's,
20   Woodmark and Musicscope, and who owned what,
21   and whether the rights were available.
22           MR. LAFAYETTE:  Okay.  Why
23       don't we take a ten-minute break?
24           VIDEOGRAPHER:  The time is 4:35

Robyn Abraham

1    p.m. and we are off the record.
2           (Whereupon, a brief recess was
3       taken.)
4           VIDEOGRAPHER:  The time is 4:50
5       p.m. and we are back on the record.
6           MR. LAFAYETTE:  I'm going to
7       mark as Abraham Exhibit 36 a document
8       bearing Bates stamp ABR 000431.
9           (Whereupon, at this time, the
10      reporter marked the above-mentioned
11      e-mail as Abraham Exhibit 36 for
12      identification.)
13   BY MR. LAFAYETTE:
14       Q.  Ms. Abraham, is this a true and
15   correct copy of an e-mail chain that was
16   forwarded to you by Beverly Diamond on
17   December 16, 2013?
18       A.  I vaguely remember this.  I kind of
19   tuned out on real estate.  But it looks
20   familiar, so I -- if you got it from me, I
21   assume it's correct.
22       Q.  And is this one of the documents
23   that you provided to your attorneys at
24   Schillings?

Page 214

1                    Robyn Abraham
2       A.  Yes.  Whatever I had, I sent them
3  everything.
4       Q.  Okay.  And do you recall if this
5  document was not in e-mail form, do you
6  recall if you printed this document out?
7       A.  I don't recall how it got to
8  Schillings.  But it got to Schillings, so
9  I -- if it didn't come from a forward, it was
10 printed out by me.
11      Q.  And can I just -- how did you --
12 after you printed the documents out, how did
13 you get them to Schillings?  Did you scan
14 them and send them?
15      A.  They were scanned in.
16      Q.  And sent to them?
17      A.  Yes.
18      Q.  And you used a scanner for that?
19      A.  Yes.
20      Q.  Did you ever convert any documents
21 to a PDF form?
22          MS. SHIN:  Objection to form.
23      A.  Pardon me?
24          MS. SHIN:  Objection to form.
25      A.  Not that I recall.

Page 215

1                    Robyn Abraham
2          MR. LAFAYETTE:  I'm going to
3      mark as Abraham Exhibit 37 a document
4      that's Bates stamped Leigh 000249.
5          (Whereupon, at this time, the
6      reporter marked the above-mentioned
7      e-mail as Abraham Exhibit 37 for
8      identification.)
9  BY MR. LAFAYETTE:
10      Q.  Ms. Abraham, is this a copy of an
11 e-mail chain that you were copied on by
12 Beverly Diamond?
13      A.  I don't know.  As I said, the
14 contents look familiar.  But I don't think
15 this is one of my documents.
16          MR. LAFAYETTE:  And I'm going
17      to mark as exhibit Abraham Exhibit 38
18      a two-page document that bears Bates
19      stamps ABR 001201 and ABR 001202.
20          (Whereupon, at this time, the
21      reporter marked the above-mentioned
22      e-mail as Abraham Exhibit 38 for
23      identification.)
24 BY MR. LAFAYETTE:
25      Q.  Ms. Abraham, I forgot to ask you

Page 216

1                    Robyn Abraham
2  something about Abraham Exhibit 36.  Could
3  you go back to that document?
4       A.  Yes.
5       Q.  Did you edit or alter this document
6  at all?
7       A.  No, I don't even know if I recognize
8  it.  But I didn't alter or edit anything.
9       Q.  Okay.  And is this a true and
10 correct copy of the e-mail that was forwarded
11 to you by Beverly Diamond, e-mail chain that
12 was forwarded to you by Beverly Diamond?
13      A.  It says it was forwarded, so I'm
14 assuming she had sent me whatever this is.
15      Q.  Okay.  An if you'll take a look at
16 what was marked as Abraham Exhibit 39?
17      A.  I don't have 39.
18      Q.  I'm sorry, if you can take a look at
19 what's been marked as Abraham Exhibit 38.
20 And if you could look at the e-mail from --
21 on the second page from Beverly Diamond to
22 Tom Bavino CCing you, dated December 16, 2013
23 at 2:01 p.m.
24          Do you see that?  Do you see that
25 e-mail?

Page 217

1                    Robyn Abraham
2       A.  Yes.
3       Q.  And if you can go back to Abraham
4  Exhibit 36, and do you see the e-mail from
5  Beverly Diamond to Tom Bavino CCing you at
6  December 16, 2013 at 2:01 p.m.?
7       A.  Yes.
8       Q.  Okay.  And if you would look at the
9  last sentence of that, the second to last
10 sentence in that e-mail, which says, Please
11 let me know, begins with, Please let me know.
12 Do you see that?
13      A.  Yes.
14      Q.  And do you know why the sentences in
15 exhibit -- those sentences in Exhibit 36 and
16 Exhibit 38 are different?
17      A.  No.
18          (Witness peruses document.)
19      A.  No, I don't.
20          MR. LAFAYETTE:  I'm going to
21      mark as Abraham Exhibit 39 a document
22      that bears Bates stamps ABR 000580.
23          (Whereupon, at this time, the
24      reporter marked the above-mentioned
25      e-mail as Abraham Exhibit 39 for

Page 222

1                    Robyn Abraham
2    up?
3         A.  No.  I mean, whatever I wrote up was
4    sent back to Lisa for his comments.
5         Q.  In an e-mail?
6         A.  I don't remember how it was
7    provided, but I do remember that whatever he
8    dictated was sent back.  It may have been
9    faxed to him, I don't recall exactly how it
10   was provided.  But it was provided in a draft
11   form for his review.
12        Q.  Was it a draft agreement for his
13   review?
14        A.  It was a draft agreement.
15        Q.  And that would have been sent by you
16   to Mr. Leigh?
17        A.  It would have been sent from me to
18   his office.  He didn't do his own e-mail or
19   he had Lisa review everything.
20            MR. LAFAYETTE:  I'm going to
21        mark as Abraham Exhibit 41 a document
22        that bears Bates stamps ABR 000438.
23            (Whereupon, at this time, the
24        reporter marked the above-mentioned
25        e-mail as Abraham Exhibit 41 for

Page 223

1                    Robyn Abraham
2         identification.)
3    BY MR. LAFAYETTE:
4         Q.  Ms. Abraham, can you tell me how you
5    received this e-mail?
6         A.  Beverly occasionally would forward
7    e-mails to me and CC or BCC me.  I don't know
8    how I got this particular one.  She may have
9    given me a copy.  I don't remember
10   specifically exactly how I got this one.
11        Q.  Okay.  And is this an authentic
12   e-mail to your understanding?
13        A.  Well, I didn't write it --
14            MS. SHIN:  Objection to the
15        form.
16        A.  To the best of my knowledge, yes.
17        Q.  Did you create this e-mail?
18        A.  No.
19        Q.  Do you know anyone other than
20   Beverly Diamond that may have created this
21   e-mail?
22        A.  My understanding was Beverly had
23   sent this e-mail to Lisa Maldenado.
24        Q.  And what is your understanding based
25   upon?

Page 224

1                    Robyn Abraham
2         A.  Beverly told me that.
3         Q.  Okay.
4            MR. LAFAYETTE:  I'm going to
5        mark as Abraham Exhibit 42 a document
6        bearing Bates stamp ABR 003145.
7            Strike that, I'm going to do a
8        different one.  I'm going to mark as
9        Abraham Exhibit 42 a document bearing
10       Bates stamps ABR 006608.
11           (Whereupon, at this time, the
12       reporter marked the above-mentioned
13       e-mail as Abraham Exhibit 42 for
14       identification.)
15   BY MR. LAFAYETTE:
16        Q.  Ms. Abraham, is the e-mail on the
17   top of the page, dated January 10, 2014,
18   10:21 a.m. a true and correct copy of an
19   e-mail that you sent to Martha Wasserman?
20        A.  To the best of my knowledge, yes.
21        Q.  Is this an authentic document?
22           MS. SHIN:  Objection to form.
23        A.  To the best of my knowledge, yes.
24        Q.  And the e-mail at the bottom of the
25   page, is this a true and correct copy of an

Page 225

1                    Robyn Abraham
2    e-mail that was sent to you by Martha
3    Wasserman on January 10, 2014 at 11:58 a.m.?
4         A.  To the best of my knowledge, yes.
5         Q.  And is this one of the documents
6    that you printed out and provided your
7    attorneys?
8         A.  To the best of my knowledge, yes.
9         Q.  Okay.  And you notice that the --
10   well, let me ask you this.
11           Is the e-mail on the bottom
12   Mrs. Wasserman's response to your e-mail at
13   the top of the page?
14        A.  I don't know.
15        Q.  Does it appear to be?
16        A.  I don't know.
17        Q.  If you notice it, they both have the
18   same subject matter line, correct?
19        A.  Yes, I see they have the same
20   subject matter.
21        Q.  Okay.  And you notice that in the
22   bottom e-mail, where it says to R. Abraham,
23   there is quotes around R. Abraham, both in
24   the beginning and the end, do you see that?
25        A.  Yes.

Page 226

Robyn Abraham

1          Q.  And at the top e-mail you see R.
2   Abraham.  There is no quote before the R and
3   there is a quote after the word Abraham in
4   the from line?
5          A.  I see what it says.
6          Q.  Okay.  Do you know why that would
7   be?
8          A.  No, I do not.
9          Q.  And in your experience, is an e-mail
10  that responds to another e-mail on the top of
11  the page or at the bottom of the page?
12             MS. SHIN:  Objection to form.
13         A.  I don't know.
14         Q.  Let me reword that.
15             In your experience, when someone
16  responds to an e-mail, does that e-mail
17  appear above the e-mail to which it is
18  responding?
19         A.  I don't know.
20         Q.  Have you ever seen an e-mail where
21  the e-mail responding to an e-mail is on the
22  bottom?
23             MS. SHIN:  Objection to form.
24         A.  I --

Page 227

Robyn Abraham

1          Q.  Other than this instance?
2          A.  I haven't looked for one before, so
3   I really don't know.
4          Q.  Does this seem peculiar to you?
5              MS. SHIN:  Objection to form.
6          A.  After what I've been through with Go
7   Daddy, no, nothing seems peculiar to me, no.
8          Q.  So you believe this is an issue with
9   Go Daddy?
10         A.  Well, I don't know.  I'm not an IT
11  person.
12         Q.  And is this -- are these authentic
13  e-mails?
14             MS. SHIN:  Objection to form.
15         A.  To the best of my knowledge, yes.
16         Q.  Did you type both of these e-mails?
17         A.  I didn't type -- I probably sent the
18  Friday e-mail, because it says I did.  That's
19  it.
20         Q.  The Friday e-mail at the --
21         A.  To Martha.
22         Q.  To Martha?
23         A.  Yes.  That's, it says it's my
24  e-mail.

Page 228

Robyn Abraham

1          Q.  Did you create the e-mail from
2   Martha Wasserman to yourself?
3          A.  No.
4              MR. LAFAYETTE:  I'm going to
5          mark as Abraham Exhibit 43 a document
6          that's Bates stamped ABR 000489.
7              (Whereupon, at this time, the
8          reporter marked the above-mentioned
9          e-mail as Abraham Exhibit 43 for
10         identification.)
11  BY MR. LAFAYETTE:
12         Q.  Ms. Abraham, is this a true and
13  correct copy of an e-mail that you received
14  from Lisa Maldenado on January 15, 2014?
15         A.  According to what it says, I suspect
16  it is, yes.
17         Q.  Okay.  And is it an authentic
18  e-mail --
19             MS. SHIN:  Objection.
20         Q.  -- to your understanding?
21             MS. SHIN:  Objection to form.
22         A.  It's what Mitch told me as well, so
23  I believe it is accurate.
24             MR. LAFAYETTE:  I'm going to

Page 229

Robyn Abraham

1   mark as Abraham Exhibit 44 an
2   e-mail -- I'm sorry, a document which
3   is Bates stamped ABR 003112.
4              (Whereupon, at this time, the
5          reporter marked the above-mentioned
6          e-mail as Abraham Exhibit 44 for
7          identification.)
8   BY MR. LAFAYETTE:
9          Q.  Ms. Abraham, is the top e-mail a
10  true and correct copy of an e-mail that you
11  sent to Martha Wasserman on January 20, 2014,
12  at 11:08 a.m.?
13             (Witness peruses document.)
14         A.  It looks accurate to the best of my
15  knowledge.
16         Q.  And is the e-mail on the bottom of
17  the page an e-mail that you received from
18  Martha Wasserman on January 20, 2014?
19         A.  To the best of my knowledge, yes.
20         Q.  And is it a true and correct copy?
21         A.  To the best of my knowledge, yes.
22         Q.  And did you in any way create the
23  e-mail from Martha Wasserman to R. Abraham
24  dated January 20, 2014 at 11:51 a.m. that's

Page 230

```
 1                  Robyn Abraham
 2   reflected in this document?
 3        A.  No.
 4        Q.  Do you know if anybody else did
 5   other than Martha Wasserman?
 6        A.  I believe Martha Wasserman sent me
 7   what she sent me.
 8        Q.  And, again, if you look at the -- is
 9   the bottom e-mail a response to the top
10   e-mail, to your knowledge?
11        A.  I don't know.
12        Q.  And can I ask you why were you still
13   communicating directly with Martha Wasserman
14   on January 20, 2014 when she had earlier
15   requested that you only correspond with her
16   attorney?
17             MS. SHIN:  Objection to form.
18        A.  Because Martha would send that, copy
19   Nan, and then call me a day or two later and
20   ask me what's going on.  And I wasn't
21   representing Martha as a lawyer.  So she
22   wanted to know what was going on, so I let
23   her know what was going on.
24        Q.  Do you know why this document does
25   not exist in e-mail format?
```

Page 231

```
 1                  Robyn Abraham
 2             MS. SHIN:  Objection to form.
 3        Foundation.
 4        A.  I do not.
 5             MR. LAFAYETTE:  I'm going to
 6        mark as Abraham Exhibit 45, a one
 7        page document which is Bates stamped
 8        ABR 003113.
 9             (Whereupon, at this time, the
10        reporter marked the above-mentioned
11        e-mail as Abraham Exhibit 45 for
12        identification.)
13   BY MR. LAFAYETTE:
14        Q.  Taking a look at what's been marked
15   as Abraham Exhibit 45, the top e-mail is an
16   e-mail from R. Abraham to Dale Wasserman at
17   cox dot net, do you understand Dale Wasserman
18   at cox dot net to be Martha Wasserman's
19   e-mail address?
20        A.  As far as I know, I think she had
21   used another one at one point but that does
22   ring a bell.
23        Q.  Is this an e-mail that you sent to
24   Martha Wasserman?
25        A.  The Friday, February 28th one looks
```

Page 232

```
 1                  Robyn Abraham
 2   familiar that I had, yes.
 3        Q.  The one that's at 10:19 a.m. at the
 4   top of the page?
 5        A.  Yes.
 6        Q.  And is that an authentic e-mail?
 7        A.  I can't hear you.
 8             MS. SHIN:  Objection to form.
 9        Q.  Is that an authentic e-mail?
10             MS. SHIN:  Objection to the
11        form.
12        A.  To the best of my knowledge, yes.
13        Q.  And is the e-mail at the bottom from
14   Dale Wasserman at cox dot net to R. Abraham,
15   is that a response by Martha Wasserman to
16   your e-mail, to your knowledge?
17        A.  I don't know if it's a response, but
18   it does look familiar.
19        Q.  And again, at the top of the page,
20   there's no quotation mark in the from before
21   R. Abraham.
22             Do you see that?
23        A.  Yes.
24        Q.  Do you know why that is?
25        A.  No.
```

Page 233

```
 1                  Robyn Abraham
 2        Q.  Do you know why there's no re in the
 3   subject matter of the e-mail on the bottom?
 4        A.  No.
 5        Q.  Do you know why the e-mail at the
 6   bottom -- why -- strike that.
 7             And going back to Abraham Exhibit
 8   44, again, if you look at the top of the page
 9   in the from line there's no quotation mark
10   before R. Abraham.
11             Do you see that?
12        A.  Yes.
13        Q.  Do you know why that is?
14        A.  No.
15             MR. LAFAYETTE:  Can we go off
16        the record for one second.
17             VIDEOGRAPHER:  Sure.  The time
18        is 5:29 p.m. and we are off the
19        record.
20             (Discussion held off the
21        record.)
22             VIDEOGRAPHER:  The time is 5:31
23        p.m., we're back on the record.
24             MR. LAFAYETTE:  I'm going to
25        mark as Abraham Exhibit 46 a two-page
```