JAMHABRO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROBYN ABRAHAM,

                    Plaintiff,

          v.                              17 Civ. 5429 (KPF)

ABBY LEIGH, et al.,

                                          Oral Argument

                    Defendants.

------------------------------x

                                          New York, N.Y.
                                          October 22, 2019
                                          3:30 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                                    District Judge

                              APPEARANCES

LAW OFFICES OF COLLEEN KERWICK
      Attorney for Plaintiff
BY:   COLLEEN MARY NI CHAIRMHAIC

COZEN O'CONNOR
      Attorneys for Defendant Estate of Mitch Leigh
BY:   MICHAEL JOHN BROADBENT
      H. ROBERT FIEBACH

Also present:   Ira Sacks, Esq.
                Anna Hanke, Esq.

JAMHABRO

1              (Case called)

2              MS. CHAIRMHAIC:  Colleen Chairmhaic, counsel for Robyn

3     Abraham.

4              THE COURT:   Good afternoon, Ms. Chairmhaic.

5              And good afternoon to you as well.

6              MS. ABRAHAM:  I'm Robyn Abraham.

7              THE COURT:  Yes, thank you.

8              MR. FIEBACH:  Good afternoon, your Honor.  Robert

9     Fiebach for the Estate of Mitch Leigh, and to my right is

10    Mr. Broadbent that you know.  Also observing from our firm is

11    Anna Hanke who's sitting right there.

12             THE COURT:  She is welcome.  Thank you very much.

13             Mr. Sacks, you don't mind if I say I'm surprised to

14    see you here.

15             MR. SACKS:  I wouldn't miss it for anything, your

16    Honor.

17             THE COURT:  All right.  May I inquire, sir, you don't

18    today have a horse in this race, is that not correct?

19             MR. SACKS:  That is correct, your Honor.

20             THE COURT:  But you're here as an observer, and I

21    can't exclude you, so it's fine.  You're here.

22             There are some matters I want to address, preliminary

23    matters that I want to ask some questions of the parties,

24    please.

25             Ms. Chairmhaic, since last you and I have seen each

JAMHABRO

1    other, there were several rounds of emails and at least one

2    telephonic discussion.  I am understanding that because you are

3    here standing with Ms. Abraham, the representation issues that

4    have been addressed in some of our prior proceedings have been

5    resolved.  Am I correct?

6              MS. CHAIRMHAIC:  The representation has been resolved

7    in accordance with the October 7, 2019, agreement.

8              THE COURT:  Let me be, please, more precise.  Right

9    now, today, for purposes of this motion, you represent

10   Ms. Abraham?

11             MS. CHAIRMHAIC:  Correct.  I'm representing Robyn for

12   this motion and for the two bundled depositions coming up next

13   week, as I indicated to her I would, so as to make the

14   transition to new trial counsel easier.

15             THE COURT:  Should I be anticipating a transition to

16   new trial counsel, or is that something still under discussion?

17             MS. CHAIRMHAIC:  We're hopeful that that will happen

18   once the motion for sanctions is resolved.

19             THE COURT:  You and the Wiss firm --

20             MS. CHAIRMHAIC:  Correct.

21             THE COURT:  -- filed a joint motion to enforce the

22   settlement.  I'm understanding by your being here that that

23   motion is now withdrawn because the matter is, in fact,

24   settled, and pursuant to my understanding of that settlement, I

25   permitted the disbursal of certain funds.  Am I correct?

JAMHABRO

1          MS. CHAIRMHAIC:  Wiss & Partners would like the

2    settlement agreement to be enforced as a court order.

3          THE COURT:  So the motion is still out there?

4          MS. CHAIRMHAIC:  The motion -- my understanding is

5    that the motion is resolved and, it would be hoped, by

6    stipulated judgment.

7          THE COURT:  Is there a form order that I should be

8    expecting from Wiss & Partners or a stipulation that I should

9    be expecting from all of the parties on the plaintiff's table?

10          MS. CHAIRMHAIC:  With your guidance, we would be happy

11    to provide that to you, but it is the wish of Wiss & Partners

12    that the settlement agreement be enforced as a court order --

13          THE COURT:  When you say --

14          MS. CHAIRMHAIC:  -- as the skeletal terms of it.

15          THE COURT:  The skeletal terms only?

16          MS. CHAIRMHAIC:  Yes.

17          THE COURT:  May I address your client directly?

18          MS. CHAIRMHAIC:  Yes.

19          THE COURT:  Ms. Abraham, you've heard me speak for a

20    moment or two with Ms. Chairmhaic about the motion to enforce

21    the settlement agreement.  What is your understanding of the

22    resolution of that motion?

23          MS. ABRAHAM:  As represented to your Honor on

24    October 7 when we were all together, that I concur with

25    Ms. Chairmhaic with regard to the points and that nothing has

JAMHABRO

1    changed since October 7 other than presentation by Wiss &

2    Partners of an eight-page agreement which was overly broad and

3    burdensome which I did not agree to.  So since then we have

4    agreed to enforce exactly what we had represented to this Court

5    on October 7, which is the oral settlement agreement.

6              THE COURT:  You'll recall that on October 7 you all

7    studiously avoided putting that on the record.  Ms. Chairmhaic,

8    in a letter to me as part of the motion to enforce the

9    settlement, gave a bullet point list of terms.  Do you recall

10   seeing that document?

11             MS. ABRAHAM:  Among many, many others vaguely.  So I

12   don't remember it in full, but I do remember what we discussed

13   in the jury room, and the contents of that were accurate.  So

14   assuming that is the same document as represented to the Court,

15   I do concur, as represented to the Court on October 7, were

16   those terms.

17             THE COURT:  All right.  So if I were to endorse the

18   bullet points that are contained in Ms. Chairmhaic's submission

19   to me, will that suffice?

20             MS. ABRAHAM:  I'd like to just be able to look at it

21   again, if that would be OK, maybe by the end of this hearing or

22   here in court.  I don't recall the full contents, but I have a

23   pretty good memory, so I'm assuming it is what we talked about,

24   which was accurate to the best of my knowledge.

25             THE COURT:  Then on the broader issue of

JAMHABRO

1    representation today, Ms. Chairmhaic is your counsel for

2    purposes of this proceeding?

3            MS. ABRAHAM:  Yes, your Honor.

4            THE COURT:  I do understand that.  I'll let you sit

5    down, please.

6            Ms. Chairmhaic, a second question for you.  I don't

7    know that your opposition papers go into great depth regarding

8    the standards for the imposition of sanctions.  I recognize

9    that you disagreed with a number of the factual assertions and

10   with some of the arguments made.  Do you disagree with the

11   recitation of the standards for the imposition of sanctions in

12   Mr. Sacks' submission, submissions, because there are two, and

13   then later in the lead defendant's submissions?

14           MS. CHAIRMHAIC:  Which disagree that the facts present

15   cause for sanctions in this case?

16           THE COURT:  Ms. Chairmhaic, let me be more pointed,

17   then.  What I'm really getting at is the following:  If it

18   turns out that today I'm rendering an oral decision in the

19   issue, it would be my preference not to recite into the record

20   the cases for the proposition of sanctions under my inherent

21   powers, sanctions under Rule 37, sanctions for spoliation,

22   because, as recited by Mr. Sacks and then later by the Cozen

23   O'Connor firm, I don't believe that the recitation of the legal

24   standards is in error.  Did you take issue with any of the

25   legal standards that were cited to me?

JAMHABRO

1          MS. CHAIRMHAIC:  It was, again, our hope that it

2     wouldn't get to the point of sanctions because -- and I have

3     spoken to Arnold & Porter about that too, and they had

4     concurred that they did not believe that there were -- that

5     Robyn had doctored emails.

6          THE COURT:  I don't think you're --

7          MS. CHAIRMHAIC:  I do hear what you're saying with

8     regards to their legal analysis with regards to sanctions.

9          THE COURT:  Ms. Chairmhaic, I have to give a legal

10    standard where I find, ultimately, that they're warranted or

11    not warranted.  I just want the law to be correct.  I believe

12    that the law as presented to me by Mr. Sacks and by the lead

13    defendants is correct.  I don't believe that you went into

14    great detail on the legal issues --

15          MS. CHAIRMHAIC:  Right.

16          THE COURT:  -- preferring instead to focus on the

17    factual.  I assume, therefore, that you didn't think they had

18    misstated the law on sanctions.  You simply believed that even

19    with that law correctly presented, your client's conduct,

20    whatever it is, did not amount to meriting sanctions.  Am I

21    correct?

22          MS. CHAIRMHAIC:  Correct.

23          THE COURT:  As a result, at some point when I decide,

24    because I do have to decide this motion, do I need to recite

25    into the record the standards for the imposition of sanctions,

JAMHABRO

1    or can we agree that the standards that were presented were

2    correct and our fight, your fight, with the folks at the back

3    table is as to whether the conduct suffices?

4         MS. CHAIRMHAIC:  That is correct.

5         THE COURT:  OK.  That was what I was trying to get at.

6    I wasn't trying to trick you in any way.  For some people it

7    can be very distracting to the point of being boring to have

8    case cites thrown at them, and so I didn't want to do that if

9    you all were sort of agreeing as to what the ground rules were.

10        All right.  I'm going to ask you to sit down for just

11   a moment, please.  Thank you.

12        MS. CHAIRMHAIC:  Thank you.

13        THE COURT:  There are two other -- actually, which of

14   Mr. Fiebach or Mr. Broadbent should I be directing my questions

15   to?

16        MR. FIEBACH:  The sanctions hearing, Mr. Broadbent,

17   your Honor.

18        THE COURT:  Thank you.

19        I'll ask both of you, and one of you is going to give

20   me an answer.  You've just heard me discuss with

21   plaintiff's counsel the need or advisability of reading into

22   the record the legal standards for sanctions.  Again, it is my

23   preference not to do so unless someone wants me to.  I have

24   them here.  It's just, to me, boring.  So do you have a

25   thought, sir?

JAMHABRO

1          MR. BROADBENT:  I don't need your Honor to read them
2     into the record, no.
3          THE COURT:  All right.  I'm assuming you didn't
4     disagree with what Mr. Sacks initially laid out as the
5     standards that governed my conduct?
6          MR. BROADBENT:  I believe we, in fact, agreed.  So --
7          THE COURT:  So there.  Then I'm not going to be
8     reading them.  Thank you very much.
9          Just a couple of prefatory comments before I begin
10    asking the questions that I have.  Number one, I see no need
11    and, therefore, my decision today will not in any way address
12    or touch on matters that may or may not have happened in
13    Florida years ago or lawsuits that may or may not have been
14    filed against the law firms involved in this case or other
15    litigation that may have taken place.  It just doesn't, to me,
16    seem to matter, prior litigation.
17          Do you believe it does, Ms. Chairmhaic?
18          MS. CHAIRMHAIC:  Yes, we do.
19          THE COURT:  Why?
20          MS. CHAIRMHAIC:  We believe that the etiology of the
21    motion for sanctions was that there was an unequivocal breach
22    of contract and they were looking for a defense.  During
23    discovery, Ms. Abraham's maiden name became known, and it was
24    googled.  It came up with information about her past history
25    from 30 years ago, and we believe that that served as a seed

JAMHABRO

1    for which this motion for sanction was grown from.  I believe

2    that she endured a huge tragedy 30 years ago.  It was defenses

3    to domestic violence and child sex abuse that were created by a

4    man called Dr. Richard Gardner.  Robyn was part of that

5    epidemic.  His theories of Munchausen syndrome by proxy never

6    made it into the DSM, but it did make it into the family courts

7    at that time.

8            Robyn fought that, and she was one of many, many, many

9    mothers at that time who were discredited for reporting

10   domestic violence and child sex abuse.  They were called a liar

11   if they had no proof.  If they had evidence, they were called

12   fabricators.  If they persisted, they were called crazy.  His

13   theories never made it into the DSM.  She fought the system

14   and, just like with many other people who fought the system,

15   she got sucked into it, and she got hurt.  That became very

16   public, and we do believe that the disclosure of that cast the

17   seed for two law firms and six attorneys to create this defense

18   coined in that she had somehow doctored and fabricated emails,

19   which we don't believe that she did.

20           THE COURT:  But as distinguished from a situation

21   where they simply are seeing emails with different words and

22   are trying to figure out how it is that they can coexist, you

23   want me to find that all of this began because they were

24   worried about this litigation and they therefore seized on this

25   thing from 30 years ago and, what, made up everything since?

JAMHABRO

1       MS. CHAIRMHAIC:  I believe that it gave them the

2  defense that she had previously been accused of fabricating in

3  a domestic violence/child sex abuse case, which time has proven

4  her to be correct, her assertions --

5       THE COURT:  OK.  One thing you really do have to learn

6  is that you really do have to stop interrupting me and cutting

7  me off.  That's not going to work today.

8       But my point is this:  I would have thought that you

9  wouldn't want me to consider those findings of 30 years ago at

10  all and to just put them out of my mind and to go about with

11  what I have today from the parties that I have seen in the

12  litigation before me firsthand, but no, you actually do want me

13  to think about it.  You don't want me to think about the

14  findings of incredibility that were made 30 years ago.  You

15  simply want me to take note of this litigation as a seedbed for

16  the allegations that are presently before me?

17       MS. CHAIRMHAIC:  Correct.  We would like you to take

18  note of the litigations from 30 years as a seedbed, but not --

19  the findings in those were since superseded by her immigration

20  papers in London which said that she, obviously, has no mental

21  illness or incapacity in any way, shape, or form which goes

22  counter to what was decided 30 years ago.

23       THE COURT:  Yet I don't understand that there's been

24  any effort to rescind those prior decisions or those prior

25  findings.  Has there been?  Has there been a successful one?

1    Because what you're asking me to do is pick and choose.  So I'm

2    supposed to look at these things for which I have no firsthand

3    knowledge and to say they were lying when they made these

4    findings about her, but those lies precipitated the very

5    sanctions motions that we have now.

6         MS. CHAIRMHAIC:  We're happy to brief that.

7         THE COURT:  No, we're not going to brief anything.

8    You've done enough briefing in this case.  I asked a question,

9    and you gave me the answer.  The answer is you want me to

10   consider the litigation of 30 years ago.  I didn't think you

11   did, but now I know that you do, and that's fine.

12        I'm also just going to note, though, at times your

13   opposition papers were over the top, and the "Star Wars"

14   reference –– "Star Wars"/"South Park" reference, completely

15   unwarranted.  There were statements I thought were based more

16   in passion than in law.  So I've read it and I have the ability

17   to read things without getting inflamed by statements that are

18   made therein, but I just want you to understand, should there

19   be future submissions before me, that this one was over the

20   top.

21        With that, let me turn to the questions that I have.

22   I want to understand, in the first instance, why –– well, make

23   sure I understand, with respect to these emails, why it is they

24   exist only in the PDF format.  It is my understanding that

25   these emails, certain emails, were saved in PDF format or

1    printed and then scanned and sent to prior counsel at the

2    Schillings firm.  Am I correct?

3         MS. CHAIRMHAIC:  Correct.  There were some emails that

4    were printed to PDF and sent to Rachel Atkins and preserved in

5    the format that they were received since.  They were also

6    forwarded to Arnold & Porter.  My understanding, from speaking

7    with Rachel Atkins, was that Robyn sends a lot of emails.

8    Instead of forwarding them all to her, Rachel asked her to give

9    her a package, and then Robyn put together the package instead

10   of receiving thousands of emails from her.

11        THE COURT:  But not all of the emails that were put

12   into PDF form exist only as PDFs.  We're not here for thousands

13   of emails.  There were 33 called to my attention, correct?

14        MS. CHAIRMHAIC:  Correct.

15        THE COURT:  And it is not the case that transforming

16   or printing an email into a PDF format destroys the native

17   format of the email, am I correct?

18        MS. CHAIRMHAIC:  Correct.

19        THE COURT:  So one reason proffered for why these

20   emails do not exist in native format is because they were

21   both -- both email accounts -- well, one is HB Global and the

22   other is INTCAPSOL, International Capital Solutions?  I don't

23   know what it is.  But anyway, those two accounts, they were

24   both maintained by the GoDaddy Internet service provider or

25   email supporter, is that correct?

JAMHABRO

1      MS. CHAIRMHAIC:  Correct, they were on the GoDaddy

2  platform.

3      THE COURT:  Thank you.  That's a better way of

4  putting it.

5      So what I was told first by the Arnold & Porter firm,

6  and I believe that you are repeating it, is that there was

7  something that happened on the GoDaddy platform that caused

8  certain emails to be lost in their native format.  Is that

9  correct?

10     MS. CHAIRMHAIC:  I believe that Robyn was not sure

11  what happened to the emails, and she gave multiple explanations

12  for what could have happened.  They could have archived some

13  and deleted them by accident.  They could have been recalled.

14     THE COURT:  No, no, stop again.  The first thing I was

15  told by the Arnold & Porter firm, and in fact the only thing I

16  was told by the Arnold & Porter firm, was that there was a

17  problem with the GoDaddy platform that caused Ms. Abraham to

18  lose certain emails.  Is that not correct?

19     MS. CHAIRMHAIC:  I did call and speak with the GoDaddy

20  people on the phone along with Robyn and Larry Daniel, and they

21  said that they have lots of server crashes every day, but they

22  only keep records of them for two weeks.  So they wouldn't be

23  able to give us any more information five years afterwards.

24  They keep records of their crashes two weeks only.

25     THE COURT:  I don't think you're answering my

```
 1   question.  My question was, was it not the case that Arnold &

 2   Porter told me that the only reason was something wrong with

 3   the GoDaddy platform?

 4          MS. CHAIRMHAIC:  I read the transcript before your

 5   Honor, and I did read that Susan Shin had made that

 6   representation to the Court.

 7          THE COURT:  OK.  The question you did answer, which I

 8   did not yet ask, was that I can harmonize that with the

 9   defense's subpoena to GoDaddy which recites no outages in these

10   particular pods where information is stored because you were

11   told by someone else that there are, in fact, daily outages at

12   GoDaddy.  Is that what you were told?

13          MS. CHAIRMHAIC:  What was represented to me in a phone

14   call I was joined into --

15          THE COURT:  And that's where in my record?

16          MS. CHAIRMHAIC:  I believe that it's in the affidavit

17   from Larry Daniel.

18          THE COURT:  All right.  Please continue.

19          MS. CHAIRMHAIC:  It's my understanding that they do

20   have outages.  They just don't keep records of them because

21   they have outages and they have a lot of them every two weeks,

22   and then they don't keep anything after two weeks.  So going to

23   subpoena something from five years ago, it's going to return

24   with no records.  That was my understanding pursuant to a

25   teleconference I was joined into, and I believe that Larry
```

JAMHABRO

```
 1    Daniels was on that call too.  He's the expert, so it's in his
 2    affidavit.
 3             THE COURT:  Of course.  Let me please take a moment to
 4    look at that.  Thank you.
 5             That's not entirely what he says.  On the paragraph
 6    that spans pages 1 to 2, what he says is that each server and
 7    email provider may handle hundreds of thousands or millions of
 8    email messages in a single day.  The log file's saved to track
 9    what happened with these messages or specific archive messages
10    can be hundreds of megabytes or even gigabytes for each day.
11    As email providers only keep their logs for a short period of
12    time, for example, two weeks, there would be no way to retrieve
13    a backup of these emails from four years ago.
14             That doesn't say that there are daily crashes and
15    outages that would cause people to lose emails and that there's
16    no way of GoDaddy keeping track of them.  So if there's another
17    place in his affidavit that you want me to be directed to,
18    please let me know.
19             MS. CHAIRMHAIC:  OK.  I believe that that's what I was
20    referring to, what ended up in his report.  And also on
21    page 16, footnote 1 of my opposition to Robyn's memorandum of
22    law and opposition to defendant Wasserman's and Honig's motion
23    for sanctions, it's referenced there again.
24             THE COURT:  Yes, although that's your recitation, and
25    I have no one from GoDaddy telling me that.
```

JAMHABRO

1          MS. CHAIRMHAIC:  Right.

2          THE COURT:  But then things changed because then I

3    understood that the issue was one of the computer being broken.

4     I understood it was damaged in transit, but the references to

5    what was damaged speak to the case of the computer, the screen,

6    the DVD drive, things of that nature.  I did not see that the

7    hard drive was irretrievably damaged and even Mr. Bardfield's

8    evidence that was submitted to me dated July 24, and somehow

9    notarized July 29, but we'll leave that to the side, that also

10   doesn't say that the hard drive was damaged beyond repair.

11   There are references in his invoice to data retrieval without

12   telling me that there was no data to retrieve.

13          I'm not sure how I can accept this as a statement that

14   one would be unable to retrieve from the hard drive these

15   messages.  Secondarily, I'm not sure how it matters because if

16   GoDaddy didn't keep them because of outages, why would it

17   matter what was on her hard drive?

18          MS. CHAIRMHAIC:  In order to do a forensic examination

19   of her computer to try to track potentially deleted emails,

20   they would need to have the data from her computer, and Larry

21   Daniel did also ask for the computer which she had operated on

22   for that purpose.  So we called Steven Bardfield, and he had

23   said that there was a Sony VAIO computer that was damaged in

24   transit, either dropped in airport baggage or something of that

25   format, and we saw the invoice that there was data retrieval

JAMHABRO

1    done on that computer, and it was the casing that had been

2    damaged.  I asked Steven Bardfield if he retrieved the data

3    from it, and he said there were two or three computers that he

4    had worked on for Robyn, and he was not sure at that time.  But

5    we were unable to get the computer or the hard drive from that

6    computer in order to be able to give it to Larry Daniel to do

7    his forensic investigation.

8            THE COURT:  What is your position with respect to

9    Ms. Abraham's obligation to retain materials that were of

10   interest to this litigation?  Because I thought I understood

11   from the opposition, and I'm sure I was misunderstanding this,

12   that there was a suggestion that the litigation hold only went

13   one way.  That defendants, by July of 2014, should have done

14   something to maintain all of their emails, but that she didn't

15   have a corresponding obligation.  Is that what you're arguing?

16           MS. CHAIRMHAIC:  No.

17           THE COURT:  OK.

18           MS. CHAIRMHAIC:  I do believe that she had an

19   obligation to retain everything.  She was, obviously, on notice

20   that there was going to be a lawsuit, considering she brought

21   it.

22           THE COURT:  Yes.

23           MS. CHAIRMHAIC:  And that was why one of our

24   recommendations was that she accept responsibility for not

25   maintaining the hard drive, not maintaining -- the lawsuit was

1   brought in 2017, and the hard drive was gone in 2014.

2              THE COURT:  Yes, but the Schillings demand letter was

3   in 2014 --

4              MS. CHAIRMHAIC:  Yes, exactly.

5              THE COURT:  -- which I know you know.

6              MS. CHAIRMHAIC:  She was on notice that she was going

7   to be bringing a lawsuit for breach of contract if it could not

8   be resolved due to financial losses of making a -- of

9   performing under this contract and not getting paid.  She did

10  give her computer for parts, which we believed was a mistake on

11  her part.  It certainly hurt her case and brings us here to

12  this motion for sanctions.

13             So it was my recommendation to Robyn when we went

14  through the file just -- you can't authenticate these emails

15  because you didn't save your computer.  Accept responsibility

16  for that and make out your case in another way.  That's why she

17  did accept responsibility for that, and we did say to the Court

18  that she would be willing to have those emails precluded and

19  not use them in the trial of this action in her case against

20  defendant Leigh.

21             THE COURT:  Of course.  But by destroying the hard

22  drive, she also destroys the chance of the defense to see if

23  there was anything on her hard drive that would be useful to

24  them.  I believe that's what they've identified to me as the

25  problem.

JAMHABRO

1        You'll please understand that one of the things that

2   causes me concern, and it may be because theories evolve or new

3   counsel get involved, but it's troublesome to me that the

4   reasons given for why these emails don't exist keep changing,

5   because I've gone through several already.  First it was blame

6   GoDaddy, and I don't really have a great substantiation for

7   that argument.  Then it was blame the airline, but of course

8   we'll never know because we have no idea of what was saved, and

9   he couldn't tell us today.  I appreciate Mr. Bardfield's candor

10  in that regard.  Then it was an argument that Ms. Abraham has

11  an accretive method of sending emails where she'll send many,

12  many emails during the day, and if she doesn't get a response,

13  she may modify her emails as she sends them so that perhaps

14  there could be a one-sentence first email and later on there's

15  a second email with an additional sentence or a modified

16  sentence, and then if still not a reply, moving on to something

17  else.  Or I think a variation of this would be that she would

18  sometimes by mistake, just given the sheer number of emails,

19  send draft emails and then sends a final email later on.

20  That's another explanation, correct?

21        I'm calling it an accretive process.  Maybe you have a

22  different name for it.

23        MS. CHAIRMHAIC:  My understanding is that there are

24  anomalies in the emails, and she couldn't find the live

25  versions of the emails.  And she's been trying to figure out

JAMHABRO

1    what happened, and she's coming up with all sorts of potential

2    reasons because she doesn't know what happened.

3              THE COURT:  OK.

4              MS. CHAIRMHAIC:  So these are potential

5    justifications:  Well, maybe I archived them and maybe I

6    deleted that folder, or maybe somebody recalled them or

7    maybe -- like, if you didn't do it, you're not going to know.

8              THE COURT:  Of course, but Ms. Chairmhaic, we're in

9    the middle of a sanctions hearing.

10             MS. CHAIRMHAIC:  Correct.

11             THE COURT:  I don't really want speculation, and it's

12   a little rich to have these sort of spitballing discussions

13   while she's saying that Mr. Nguyen's affidavit is nothing but

14   speculation.

15             If you're telling me that I should find that the

16   anomalies, as you've described them, can be explained by her

17   idiosyncratic email-sending practices, I want to know.  I want

18   to know that that is an argument that you are making so that I

19   can explore it with you.  If you're saying that it is a theory

20   that we have since shot down as we've looked at the evidence

21   and compared it, I want to know that as well.

22             MS. CHAIRMHAIC:  I can absolutely say, as an officer

23   of the court, that I am very familiar with Robyn Abraham's

24   email practices, more familiar than I would like to be.

25             THE COURT:  I know you know.

JAMHABRO

1          MS. CHAIRMHAIC:  And she absolutely sends a huge

2    amount of emails which all say the same thing.  Sometimes she

3    will have one or two sentences in those emails differently.

4    She has sent me once 89 emails in one day.

5          THE COURT:  Yes, I'm aware of the day.  But the issue

6    is when she's sending you those emails, are you responding?

7    Are these email chains that are being sent to you 89 times or

8    are they 89 separate emails?

9          MS. CHAIRMHAIC:  Sometimes they're chains; sometimes

10   they're separate.  I don't know how she does it.

11         THE COURT:  Here's the bigger question.  Does she

12   change your responses when she sends them?  Because that's the

13   problem I have.  They're not faulting her sending an email and

14   then maybe changing her mind and sending it a little bit later

15   with an added sentence to make something clear.  What's being

16   shown to me in the emails that I've been asked to compare are

17   additions and subtractions from other people, and that's the

18   thing that I would think even her idiosyncratic email process

19   couldn't describe.

20         Are you suggesting to me that I should examine or

21   explore as an explanation for why these emails exist two

22   different ways that it's because of this accretive email

23   practice?

24         MS. CHAIRMHAIC:  From my own personal experience, I

25   respond to Robyn's emails, and sometimes my responses get

JAMHABRO

1    repetitive with line sentences here and there because she

2    demands responses.  But I certainly have sent many responsive

3    emails to her which say substantially the same thing, with a

4    line or two difference.

5         THE COURT:  Let me understand this:  If, indeed, it's

6    an email string, so something that is sent, almost variations

7    on a theme, sent six times.  I would expect there to be six

8    versions of it that Ms. Abraham would have and six versions of

9    it that the recipient would have.  What I have is I've got one

10   and one on each side, and they're different.  I therefore can't

11   understand or I don't find easy an explanation that it's

12   because she was resending an email over and over again.  But

13   you tell me.

14        MS. CHAIRMHAIC:  I wish I had the ability to go into

15   her emails and print out all of the emails that she has and see

16   the pattern of day by day, but it's a huge task, and she did

17   not have the funds to show that level of her emails to Larry

18   Daniel.  She gave him what she had.

19        THE COURT:  Yes, which is why his expert report is of

20   limited utility to me.

21        MS. CHAIRMHAIC:   Correct.

22        THE COURT:  It just tells me that I shouldn't,

23   basically, worry my pretty little head about the ones that are

24   complete fabrications because that's too speculative to believe

25   that they're complete fabrications, and may be that is the

JAMHABRO

1    case.  What I have, though, is there has to be -- and this is

2    the problem that I have with your opposition, a big problem

3    that I have -- there has to be an explanation for how these

4    things exist as they do.  And if the explanation is a GoDaddy

5    server crash, that doesn't explain how they exist on two -- in

6    two people's files in different formats.  If the answer is it's

7    an accretive process where there are 20 versions of the email

8    sent in a day, it doesn't explain why it's the counterparty's

9    email that's getting modified and not Ms. Abraham's.  So that's

10   the problem I'm having.

11           How do you explain the additions to Ms. Diamond's

12   email?

13           MS. CHAIRMHAIC:  Beverly Diamond is -- Beverly Diamond

14   is deceased, so I have not been able to see her inbox.

15           THE COURT:  Of course.  All right.  Fair enough.  I've

16   got other stuff here, and you've seen them.  I'm not talking

17   about emails that you haven't seen.

18           MS. CHAIRMHAIC:  Yes.

19           THE COURT:  I need a working theory, other than

20   fabrication, that explains how they exist in two different

21   formats.

22           MS. CHAIRMHAIC:  My understanding from working with

23   Robyn is that she sends a large volume of emails.  She

24   encourages people to give a large volume of responses.  They

25   may not all be the same, and her record preservation mechanism

JAMHABRO

1  has not been good.  And as a result of that, we did recommend

2  that she voluntarily preclude those emails.

3         I do believe, also, that given that she has an

4  indefensible breach of contract, that she did a phenomenal job

5  on that contract to secure the interest of --

6         THE COURT:  I don't know why that matters.

7         MS. CHAIRMHAIC:  Because she didn't have a motive.

8         THE COURT:  Let me be clear.  I just had another case

9  entirely unrelated to yours where there was a sanctions motion

10 that involved the alteration of emails, localized hacks,

11 deactivated emails, and there as well the issues on which the

12 fabricated emails had any meaning or pertained to were really

13 collateral issues.  So there was a really interesting question

14 that, of course, I did not -- I was not able to ask for a

15 number of reasons:  Why bother gilding the lily?  Why bother

16 lying about that stuff?  She may have a fantastic contract

17 breach claim.  I'm not going to say indefensible.  I don't

18 know.  I haven't gotten to the trial yet.  But I have these

19 emails and they're different, and I'm trying to understand

20 that.

21         It doesn't matter to me at all that it's on a

22 collateral matter if, indeed, they were fabricated.  So put to

23 the side how awesome her claim is and tell me why these emails

24 were not fabricated.

25         MS. CHAIRMHAIC:  My understanding from talking to

JAMHABRO

1    Robyn and asking her to explain it, as you're asking me to

2    explain it now, is that --

3            THE COURT:  I presume this wasn't the first time

4    you've been asked to explain this, but go ahead.

5            MS. CHAIRMHAIC:  No, it's not.

6            -- was that defendants found something in her past,

7    and they built on it as a seed.  There are anomalies in her

8    emails that could not be explained.

9            THE COURT:  And you're saying -- are they the

10   fabricators?

11           MS. CHAIRMHAIC:  It was my client's position that they

12   potentially recalled emails which would make them vanish from

13   her inbox, which is one of the reasons why they didn't exist

14   anymore.

15           THE COURT:  You're anticipating my next question,

16   which is the fourth argument for why these things aren't as bad

17   as I think they are, is that this idea of recalling and

18   deleting, and I want to understand that argument better because

19   it really is made in only the most cursory way.

20           Are you suggesting that they recalled emails in 2014

21   or after the litigation hold in this case or today or something

22   else?

23           MS. CHAIRMHAIC:  Well, I asked Larry Daniel how these

24   emails did not exist anymore, and he said:  Well, the easiest

25   way would be that they just got deleted, you can archive them,

JAMHABRO

1    they can get deleted in another folder, you may get filters on

2    it that could get deleted, you could delete it yourself by

3    accident, or they could be recalled by the other side.

4         Why I thought that was of interest is that the

5    defendants in this case have been suing each other for fraud,

6    and I know they settled that case.  It's *Leigh v. Honig*.

7         THE COURT:  It was my case.  I'm familiar with it.  I

8    believe it's my case.  Maybe they had another case that I

9    didn't -- gentlemen, is there another case other than the one

10   that was before me?

11        MR. BROADBENT:  That's it, your Honor.

12        THE COURT:  That's it.  That settled before anything

13   really interesting happened.  So, I mean, if you're asking me

14   to treat as definitive facts the pleadings of that case, I'm

15   not prepared to do it, and I don't know that there was any

16   discovery that substantiated any of the allegations there.  But

17   please, keep going.

18        MS. CHAIRMHAIC:  That's not a reflection on any of the

19   counsel in this case.  It's just a reflection on it is as

20   possible that Robyn deleted emails as it is that they recalled

21   emails.  Again, with such a huge volume of emails that -- they

22   had more of an interest in their claim that Robyn doctored

23   emails than Robyn did to actually doctor emails.  She can make

24   out her case without the emails.  They don't have a defense

25   without this theory of doctoring.  And I understand that the

JAMHABRO

1    evidence is that they've built a very good case.

2            THE COURT:  All right.  I saw in Mr. Daniels' rebuttal

3    report what he says is:  "I also requested the subject emails

4    in the original electronic format.  They had either been

5    accidentally deleted or recalled."  Now, please understand,

6    accidentally deleted or recalled, to me, doesn't have the same

7    sense of malevolence that you were just suggesting.  You're

8    saying they weren't accidentally deleted or recalled.  They

9    were recalled by the other side in order to make the claims

10   they now make.  I just want to understand, because that's not

11   what his report says.

12           MS. CHAIRMHAIC:  OK.  I believe that the argument may

13   have came from the need for a defense to let's just get this

14   case kicked out in a sanctions motion.  I believe that Martha

15   Wasserman had testified at her deposition that she had lost

16   most, if not all, of her emails.  I believe that you can send

17   bad emails and want to get them taken out of your inbox.  There

18   could be many reasons for them to do that.  But I think that

19   the theory of falsifying emails was latched onto as a golden

20   ticket to get out of this case.

21           THE COURT:  I see.  I thought I understood that the

22   defense had the challenged emails in a native format.  So at

23   least the stuff on there -- perhaps I'm mistaken.  I'll ask the

24   folks at the back table promptly.  But I thought the point was

25   one of the reasons they felt confident that the modifications

JAMHABRO

1    weren't coming from their side was that they had the emails in

2    original format with the metadata, and therefore they knew what

3    it said.  And it was their inability to test them, again, to

4    test or discern the metadata in Ms. Abraham's PDF version, that

5    brought about these sanctions motion.  Did I misperceive the

6    facts?

7            MS. CHAIRMHAIC:  My understanding was that those were

8    similar emails but different emails.  And, again, that goes to

9    Robyn's email practice in that if you look at my emails with

10   Robyn, you will see that there's a lot of them which look

11   almost the same, but there's lines here and there that are

12   different, and that goes for me and her.  She demands a lot of

13   responses.

14           THE COURT:  Yes.  Now I'm sure you're not making

15   yourself an advocate and witness at the same time.

16           MS. CHAIRMHAIC:  Right.  I apologize, your Honor.

17           THE COURT:  No, I understand.  I don't want to run

18   afoul of any professional responsibility issues.  We have

19   enough issues in this case without implicating those.

20           MS. CHAIRMHAIC:  Thank you.

21           THE COURT:  All right.  There's a reference in

22   Ms. Abraham's affidavit to a computer used from 2014 to 2018.

23   I'm looking specifically at paragraph 18, and I can show it to

24   you if you are interested, although that means you're going to

25   have to see my handwritten annotations.  I thought there was a

JAMHABRO

1    computer that was damaged in 2014.  Am I correct?

2            MS. CHAIRMHAIC:  My understanding from Steven

3    Bardfield was that there was at least two computers that were

4    damaged.

5            THE COURT:  I've never heard about a second computer

6    being damaged.  I mean, you're now telling me that.  Let me

7    look again at what he wrote to me:  "There was a Sony VAIO

8    laptop in or about September 2014."  I don't know that he

9    ever represented -- has he represented to me that he worked on

10   another computer?  Do I have that in this record?

11           MS. CHAIRMHAIC:  Yes, it should be in the record.  I

12   specifically recall a conversation with him saying that:  You

13   retrieved the data.  Where is it?  We need the data.  I said:

14   How many computers did you work on for her?  And he said there

15   were at least two, and there were two Sony VAIOs.

16           THE COURT:  OK.  But one of them we know had the

17   unfortunate airline incident.

18           MS. CHAIRMHAIC:  Yes.

19           THE COURT:  What happened to the other one?

20           MS. CHAIRMHAIC:  He did not tell me.

21           THE COURT:  Did you ask him?

22           MS. CHAIRMHAIC:  I did.  He said it was damaged.  He

23   did not say how.  He wouldn't have known.  He just saw a

24   damaged computer.

25           THE COURT:  Is Ms. Abraham the unluckiest VAIO owner

JAMHABRO

```
 1   on the planet that she has two laptop computers that, in the
 2   course of this litigation, were damaged beyond repair?
 3             MS. CHAIRMHAIC:  Sony VAIO discontinued that brand.
 4             THE COURT:  OK.  I think you're getting my point.  It
 5   was a little more rhetorical.
 6             MS. CHAIRMHAIC:  Right.
 7             THE COURT:  I'm amazed you didn't try to substantiate
 8   it with a declaration from him that indeed there were two
 9   computers.  They were both damaged beyond repair.  I only have
10   one referenced here.
11             MS. CHAIRMHAIC:  He gave me the affidavit that he was
12   willing to give me, but he confirmed with me when I was
13   pestering him for the black box, he said there was at least
14   two.
15             THE COURT:  Yes, that's the affidavit he wasn't
16   willing to give to you, and maybe I should draw something from
17   that.
18             All right.  In your papers you indicated that I should
19   not credit Mr. Nguyen's affidavit, number one, because he was
20   not an expert and, number two, because it wasn't a sworn
21   statement.
22             I'm hoping that you're backing away from the latter
23   because I thought it was a sworn statement.  Are you?
24             MS. CHAIRMHAIC:  I am backing away from the latter
25   because he did say that it was stated upon penalty of perjury
```

JAMHABRO

1    even though it wasn't notarized.

2              THE COURT:  Yes.  I would have accepted that here, so

3    I don't think that's an issue.

4              Do you still believe that he is not competent to speak

5    about the topics on which he spoke?

6              MS. CHAIRMHAIC:  I didn't see an extensive educational

7    background in IT from him.  I saw that he was a police officer

8    who worked in domestic violence type of cases out in Texas up

9    until six years before he reinvented himself as an expert.

10             THE COURT:  Should I be wary of folks involved in

11   domestic violence cases?  I'm not sure why that matters to

12   anything.

13             MS. CHAIRMHAIC:  I'm just saying he was a police

14   officer, and he went from earning like $60,000 a year to $325

15   an hour, which, if he worked full-time hours, that would be

16   over half a million dollars a year as an expert witness.

17             THE COURT:  Every morning he wakes up and wishes that

18   he worked full-time as an expert witness.  I don't think he is,

19   but that's for a different day.

20             So you think I should give less credit to it?

21             MS. CHAIRMHAIC:  I think that Larry Daniel has a

22   stronger background.

23             THE COURT:  But he only speaks to three documents.

24             MS. CHAIRMHAIC:  Right, which were to explain the

25   anomalies, because with funds limited -- he charged a thousand

1   dollars, and he -- I said, you know, why are there these

2   anomalies in the emails?  Were they fabricated from whole

3   cloth?  And he said:  No, this is just a different setting.

4   You print it in conversational setting.  This is -- you can

5   manually change that.  That's common practice.

6           THE COURT:  Sure.

7           MS. CHAIRMHAIC:  He explained those satisfactorily

8   enough for us to say, OK.  So she's not --

9           THE COURT:  Yes.

10          MS. CHAIRMHAIC:  -- a criminal.

11          THE COURT:  Of course, in Mr. Nguyen's response, he

12  certainly seems to at least take issue with some of his

13  statements.  It would have been better to have a more detailed

14  response from Mr. Daniel, especially because he's addressing --

15  even if I were to spot you the three that he addresses, that

16  leaves me ten I still have to consider.

17          But let me please do this:  I'd like to take a turn

18  with the folks at the back table, if you don't mind having a

19  pause in your questioning for now.

20          MS. CHAIRMHAIC:  Thank you, your Honor.

21          THE COURT:  All right.  Thank you.

22          Mr. Broadbent, to begin, am I correct it's 13 emails

23  that we're talking about, yes?

24          MR. BROADBENT:  Yes.

25          THE COURT:  There were 33 PDFs that were given to you.

JAMHABRO

1    How many non-PDFs were given to you by Ms. Abraham?

2              MR. BROADBENT:  Emails that were produced not in PDF

3    format?

4              THE COURT:  In native form, sir, yes.

5              MR. BROADBENT:  It's in Mr. Nguyen's affidavit.  I

6    don't know the number.  I know it's significant.

7              THE COURT:  That's fine.  I'll pull it up.  Thank you,

8    sir.

9              MR. BROADBENT:  The email file type was 492.

10             THE COURT:  Yes, 492 emails of 789 documents with a

11   PDF file extension.  Fair enough.

12             We're only here today about the 13, correct?

13             MR. BROADBENT:  Your Honor, if the 13 are proven to be

14   part of a fraud, the 33 are then also suspect because they

15   exhibit the same -- I'm sorry, your Honor.

16             THE COURT:  No, this is -- again, I'm surprised that I

17   am surprised by my oral argument with the parties.  I hope you

18   know I prepared for this.  I'm surprised that you're suddenly

19   telling me that I should actually think about something other

20   than the things that you've asked me to think about.  So I

21   don't know whether that means that, depending on how I decide

22   today's motion, you may decide to have a whole new sanctions

23   motion.  I thought this was an easy question.

24             You're asking me to consider 13 emails, correct?

25             MR. BROADBENT:  Yes.

JAMHABRO

1          THE COURT:  OK.  Fine.  That's what we've got.

2          I think you heard me discuss with Ms. Chairmhaic the

3    various explanations that have been given for how these emails

4    ended up as they ended up.  So if you don't mind reviewing that

5    with me, I'd like to do that.

6          You gave me information from GoDaddy indicating that

7    there was no damage that would have caused any loss of data,

8    correct?  There were no outages?

9          MR. BROADBENT:  The substance of your Honor's

10   statement is correct.  It came from defendants Honig and

11   Wasserman.

12          THE COURT:  Yes, OK.

13          MR. BROADBENT:  But the substance is correct, there

14   was no record of any outages based on the information received

15   from GoDaddy.

16          THE COURT:  But now, today, I've heard something -- a

17   variation on that which I didn't appreciate until the footnote

18   was called to my attention, and that was that what I should

19   have intuited is that, in fact, every day emails are lost,

20   things happen, and that there could be -- the fact that there

21   was no acknowledgment of lost emails does not mean that there

22   weren't lost emails.  That's what I'm understanding today from

23   Ms. Chairmhaic's conversation and Mr. Daniels' conversation

24   with the GoDaddy personnel.

25          It may be, sir, that your subpoena did not know enough

JAMHABRO

1   to ask or maybe there was no one to -- I shouldn't blame you,

2   and I'm not blaming Mr. Sacks, but I just want to -- how would

3   you like me to reconcile what's been proffered by the defense,

4   which is the no outages, to what's been proffered by

5   plaintiff's counsel, which is that every day there are lost

6   emails, and it's just a fact of life and you're just not going

7   to know after two weeks?

8          MR. BROADBENT:  Your Honor, I have two responses:  The

9   first, the statement that you've just described, as you said,

10  came from plaintiff's counsel.  To the extent it represents a

11  phone conversation with an unknown individual at GoDaddy,

12  there's no sworn testimony from any such person.  There's no

13  affidavit from somebody at GoDaddy.  At best we have secondhand

14  recollection of an unidentified person whose credentials we

15  don't know at GoDaddy.

16         But assume that that statement is correct for a

17  moment.  It doesn't explain why these emails exist in only PDF

18  form.  Some emails exist in native form and PDF form, and some

19  emails exist in native form only.  If it is true that there was

20  some data lost after Ms. Abraham had already generated printed

21  copies in the form that we see here, then we would have emails

22  in that form for every single email that she produced because

23  such emails would have been generated, and then only the 13 of

24  the 33 would be missing.  The fact is we only have focus on the

25  13.  Those 13 don't appear in native format in her production.

JAMHABRO

1    Some of them do in some way or another in other parties'

2    production.  But the loss of data that Ms. Abraham appears to

3    rely on wouldn't have been so targeted as to only cause her to

4    lose the natives of these particular emails.

5        Putting aside the other anomalies, the editing of an

6    email from Ms. Diamond or Ms. Wasserman, the missing quotes,

7    all of those things, it doesn't track that the server outage

8    would be so targeted.  We should have PDF versions in this

9    format of everything and then only 13 missing natives, or we

10   should have none of this type of email because the explanation

11   is I printed these things in this format, which is itself

12   suspect.  But GoDaddy's millions of losses every day don't come

13   in and say I'm going to grab these emails.  There's no rhyme or

14   reason to the loss other than the fact that the plaintiff made

15   certain edits or changes or generated the emails.  So even if

16   we can accept the explanation from Ms. Chairmhaic pursuant to a

17   phone call with some person, it still wouldn't explain a number

18   of the anomalies or the data loss itself.

19        THE COURT:  Is there anything else -- see, because you

20   speak second, you've heard my questions already, so I'd rather

21   not re-ask them.

22        But on the GoDaddy topic, on the discussions that I

23   had with Ms. Chairmhaic regarding GoDaddy, is there anything

24   else you wish to offer in your defense or, I guess, in further

25   support of your sanctions motion?  It's fine if the answer's

1   no.  I want to make sure.  I want to move on to another topic,

2   and I don't want to leave you with an undelivered argument.

3          MR. BROADBENT:  No, your Honor.  That's it on GoDaddy.

4          THE COURT:  OK.  The computers, the broken computer,

5   were you aware that there were two computers?

6          MR. BROADBENT:  Your Honor, I made a note of that when

7   your Honor observed that.  I recall there being two different

8   invoices from Mr. Bardfield but not assigned to different

9   computers.  The plaintiff in her depositions explained the

10  various devices that she had over the last few years.  She had

11  an iPad which she had had for four or five years.  The list was

12  taken in 2019.  So she had an iPad dating back to 2014,

13  multiple phones, a laptop computer she identified that got

14  crushed in the overhead bin.  I don't recall her saying that

15  she had a second laptop during the same period of time or that

16  there was another laptop being destroyed.  That said, it may

17  have been said in passing at some point, but it's not something

18  that I recall.

19         THE COURT:  All right.  But I would have thought --

20  not that I took this deposition, obviously, but if someone

21  says, I had a laptop computer and it was crushed, I might say,

22  Did you get a replacement for it?  And if they said yes, I

23  might ask about that.  It would be understandable that someone

24  having lost a laptop would not go the rest of their lives

25  without a laptop; that they'd find something else.  So

JAMHABRO

1   shouldn't we have assumed that there would have been something

2   that would have -- that she would have bought something else?

3       MR. BROADBENT:   Yes, and Mr. Lafayette, who was

4   questioning the plaintiff --

5       THE COURT:   Throw him under the bus.

6       MR. BROADBENT:   He decided to show up, so I have to

7   make reference to him.

8       THE COURT:   I'm sure he appreciates that, yes.

9       MR. BROADBENT:   I'm not repeating the entire content

10  of the deposition because we don't want to be here for the rest

11  of the day, but he did question the plaintiff about the various

12  devices and what happened here and what happened thereafter.

13      THE COURT:   Did anyone ever ask to review or perform a

14  forensic examination on any laptop that Ms. Abraham might have

15  had in her possession?

16      MR. BROADBENT:   We asked the plaintiff to produce the

17  documents.   I don't recall -- I don't believe that we asked her

18  to give us the laptop for forensic examination, but again, she

19  had explained she no longer had the laptop on which those

20  emails would have resided.

21      THE COURT:   So you're not disputing her statements

22  today that there are, in fact, two laptops, both of which met

23  unfortunate ends?

24      MR. BROADBENT:   I don't know.   That's the point.   None

25  of this has been demonstrated to be true.   She may say that.   I

JAMHABRO

1    don't know if that's accurate.  There's nobody here --

2    Mr. Bardfield isn't here to say these are the two laptops I

3    worked on, this happened, this happened.

4              THE COURT:  Of course not.  He speaks about one.  He

5    doesn't speak about the other.

6              MR. BROADBENT:  Right.

7              THE COURT:  That's why the second laptop is all news

8    to me, but there is discussion about -- well, let me phrase it

9    this way:  In order to test your hypothesis that Ms. Abraham

10   fabricated emails, it would have been useful to you to perform

11   a forensic examination of her laptop computer which, of course,

12   I didn't let you do, but did you even know prior to today that

13   there were two laptop computers, that both met unfortunate

14   ends -- and folks at the front table stop nodding -- that both

15   met unfortunate ends and were repaired, or not, by

16   Mr. Broadbent?

17             MR. BROADBENT:  Your Honor, I don't recall if there

18   was a second laptop mentioned.  I do now recall the very first

19   time -- the very first time we discussed this, the very thing

20   that Mr. Sacks asked for was a forensic examination because he

21   did not want to be forced to bring a motion for sanctions

22   without having done so.

23             THE COURT:  I understand.

24             MR. BROADBENT:  So I apologize for not remembering

25   that at first, but that request, although we did not make it at

JAMHABRO

1   the time this issue first arose, that was the nature of

2   Mr. Sacks' inquiry, whether he could, in fact, conduct such an

3   examination, whether the plaintiff would conduct such an

4   examination, to demonstrate why these things were happening.

5           THE COURT:  All right.  Another discussion that we've

6   had this afternoon involves Ms. Abraham's emailing protocols or

7   emailing habits.  Am I correct that what you've produced in

8   this -- well, were there efforts undertaken by your firm to

9   remove duplicative documents?

10          MR. BROADBENT:  As part of our production?

11          THE COURT:  Indeed, sir.

12          MR. BROADBENT:  Yes.  If something was the same email

13  multiple times because it had been saved in a folder and then

14  another folder, we would have de-duped it.

15          THE COURT:  De-duped it?

16          MR. BROADBENT:  If it's literally identical, it has an

17  MD5 hash, that means it's the exact same file simply kept in

18  multiple places.

19          THE COURT:  That's exactly -- you've anticipated my

20  question.  So to the extent it was a difference, it was re-sent

21  at a different time or another sentence was added or something

22  else, it would not have been de-duped from your production?

23          MR. BROADBENT:  Right, because it wouldn't be the

24  same.  Even if it was the same to the naked eye, the computer

25  wouldn't understand it to be the same; therefore, it would have

JAMHABRO

1   been produced both ways.

2          THE COURT:  I see.  Ms. Chairmhaic brought up the fact

3   that Ms. Wasserman, in her deposition, acknowledged the loss of

4   certain emails.  Were you at that deposition, sir?

5          MR. BROADBENT:  I was, your Honor.

6          THE COURT:  Do you have a recollection of what her

7   testimony was in that regard?

8          MR. BROADBENT:  I recall Ms. Wasserman saying

9   something about no longer having certain emails.  Whether she

10  lost them or how they were destroyed, I don't recall the detail

11  of that, but I do recall that Ms. Wasserman did not have or may

12  have been understood at that time not to have certain emails.

13  I do know following that deposition that Ms. Wasserman's

14  counsel went back and searched for additional emails, and I

15  believe did, in fact, make a further production.  That may have

16  resolved the issue after the deposition.

17         THE COURT:  All right.  The question, which should not

18  surprise you, if Ms. Wasserman is able to lose emails, why is

19  Ms. Abraham not?

20         MR. BROADBENT:  Because Ms. Wasserman has not come in

21  with fake copies and does not come in with emails that appeared

22  to be strange and contained edits that change an email which

23  was otherwise produced in its native format with the exact same

24  identifying information.  The two most troubling emails, your

25  Honor, are the email from Ms. Diamond to Tom Bovino, a chain in

which the plaintiff is copied, but at no point is the plaintiff

sending an email in that chain.  The change at the bottom

substitutes certain texts about Ms. Abraham's real estate

experience with the --

THE COURT:  Celebration program in Florida.

MR. BROADBENT:  Yes.  And whether that's accurately

stated is unclear.  At her deposition the plaintiff denied

having real estate experience, so I'm not sure the change was

to add that text.  That email was produced in native format by

our client, Ms. Leigh, as well as the plaintiff herself with

the exact same sender, recipient, and time stamp.  None of the

explanations that Ms. Abraham has given can explain how that

happened.  Nothing.  The same is true for the deletion at the

end of an email sent by Ms. Wasserman.  They're time stamped

the same time.  It was an email from Ms. Wasserman and not the

plaintiff.

Ms. Wasserman did, in fact, produce a copy of the

email, and the missing text is a postscript advising the

plaintiff in 2013 that she would need to put up an advance,

which, if your Honor will recall, the demand for an advance

formed the basis of part of Ms. Abraham's claim that Mr. Honig

was extorting her and that the Leigh defendant had in some way

done Ms. Abraham wrong by asking her for an advance at the time

she claimed that she had Mr. Smith and Sir Trevor Nunn.

These emails have no explanation.  It has nothing to

JAMHABRO

1  do with the plaintiff's email habits.  They do not come from

2  her.  It doesn't go to the loss of data.  We have the other

3  emails from other parties.  It cannot go to the loss of the

4  computer, same reason.  We have the actual email from other

5  parties.  Each one of the plaintiff's explanation will never,

6  will never, address those two anomalies.

7           On that basis alone, I think, your Honor, there's

8  grounds for sanctions.  But the remainder of the emails, the

9  technical problems as Ms. Chairmhaic explained them are kind of

10  like a Jenga tower.  At some point you pull all the

11  explanations out, and the thing comes down.  There's no

12  unifying theory.  There's a bounce around from emails -- maybe

13  it was a change in the settings, maybe I lost the documents,

14  maybe you lost the documents.  But under threat of sanctions on

15  dismissal of her case for $250 million against our client, I

16  would think Ms. Abraham would do everything in her power to

17  come up with some explanation.  And at most we have a guess in

18  each case, and no guess that explains changes to emails

19  produced in native format by Ms. Abraham and the other parties,

20  and no guess that will explain how all of this happened in the

21  first instance.

22           I think I'm now ten miles from your Honor's question,

23  so I will stop till you ask the next one.

24           THE COURT:  That's a wise move.

25           I didn't appreciate until preparing for this argument

JAMHABRO

1    the sort of later -- the latest claim, which at least for me it

2    was the latest claim, which is perhaps emails were recalled and

3    deleted by the folks at the defense table.  Not the lawyers,

4    obviously, but your clients.  Did you want to be heard on that

5    issue?  Can you exclude the possibility?

6         MR. BROADBENT:  Can I absolutely exclude that at any

7    point Ms. Wasserman or another party recalled an email that she

8    sent?  I cannot.

9         THE COURT:  I'll let you focus on your clients, maybe

10   not Mr. Sacks' clients.

11        MR. BROADBENT:  I turn to Ms. Wasserman because none

12   of the emails that were alleged would have been recalled, none

13   of the fraudulent emails, were sent by Ms. Leigh or Mr. Leigh.

14   So that's why I'm turning to Ms. Wasserman, your Honor.

15        THE COURT:  OK.

16        MR. BROADBENT:  Is it theoretically possible that at

17   some point Ms. Wasserman recalled an email?  Yes, but again,

18   that would not -- the theory seems to be that somehow, now

19   realizing that an email was bad for her, Ms. Wasserman was able

20   to go back and recall the email as it was sent in 2014.  I'm

21   not sure how that would happen.  Moreover, your Honor, in a

22   number of cases, these emails were copied to other parties.

23   Those people may have had those emails.  I can continue to

24   guess as to why the recall theory doesn't work, but I'm just

25   guessing against a guess.

JAMHABRO

1          THE COURT:  I won't make you do that, sir.  Let me

2     then please change topics.

3          When Ms. Chairmhaic first got on the case, she very,

4     perhaps, prudently offered to just not use any of these emails.

5     And I bet if you asked her, she'd drop all 33 of the emails and

6     not the 13 rather than have another round of this.  You want

7     more.  You want more.  You want sanctions.

8          MR. BROADBENT:  Yes.

9          THE COURT:  You want dismissal.  You do understand

10     that, I mean, short of criminal contempt, which I don't think

11     anyone's asking for today, you're asking me to do the most

12     drastic thing I can do with a case, no?

13          MR. BROADBENT:  I am, your Honor.

14          THE COURT:  Why are you?

15          MR. BROADBENT:  Because the fraud that Ms. Abraham

16     perpetrated on the court is extensive.  She has yet to take

17     responsibility for that.  She has offered no explanation for

18     why or how any of it happened that will hold water.  And the

19     fraud has carried us this far and has impacted the parties'

20     ability to present their defense, to develop theories of the

21     case, and to determine how to proceed.  For example, a number

22     of the emails involving Ms. Wasserman -- and I'm reluctant to

23     turn to Ms. Wasserman again, but this is important, your

24     Honor -- to the extent the plaintiff could use emails to show

25     that Ms. Wasserman had agreed to a production with Ms. Abraham,

1    that could, in theory, give Ms. Abraham two out of three votes

2    which she could then turn to argue would give her the right to

3    stage "La Mancha." We disagree that the emails would give her

4    that, but that would be her theory.

5          THE COURT: I thought I understood from something that

6    was sent to me in recent days that plaintiffs are not worried

7    about these emails at all because Mr. Honig's going to testify

8    and substantiate her claims. I don't know that to be the case.

9    Maybe Mr. Sacks wants to weigh in on that point, but that's

10   what I was told, was I not?

11         MR. BROADBENT: Your Honor, you were told something

12   along those lines. Mr. Honig is not here to explain why these

13   emails are not important. And having been caught engaged in

14   the conduct, for Ms. Abraham to say, well, these emails aren't

15   very important, I won't use them at the trial, doesn't excuse

16   the fact that she did use them to impact our defenses and our

17   theory of the case, the way we approach the case.

18         Up until the point at which this issue was discovered,

19   what we saw, your Honor, were multiple emails involving

20   Ms. Wasserman in which the plaintiff and Ms. Wasserman had

21   discussions that made no sense to us but that we had to try to

22   understand in figuring out how to approach the case. Did

23   Ms. Wasserman explain the need for an advance? Did she not?

24   Did she agree to do something, as the plaintiff was able to

25   cut-and-paste emails to purport to show, or did she not so

agree?

Furthermore, your Honor, we have been here for two years as your Honor, I am sure, well knows, and we are only now on the verge of summary judgment and trial, which is when these emails would need to be excluded. But for the entire remainder of the case, they mattered. They were understood to be genuine, authentic emails according to the plaintiff's testimony, whether we disagreed with her or not, whether we believed they were fraudulent or not. Up until this point, and possibly thereafter if your Honor denies the motion or doesn't conclude that they were fraudulent, we'll still have to accept, even if they are not used, that they were not fraudulent.

So using them to carry us this far and cause us to approach the case in some way, I believe, does require dismissal, and that's consistent with the sanctions that have been granted in prior cases. The fraud is so pervasive, so extensive, and so unapologetically directed at the parties, whether or not the document shows up in court is irrelevant.

Mr. Sacks was hesitant to bring the motion in the first instance. We were hesitant to join it, your Honor, because the results are extreme. But at this point, having reviewed everything, having been here for so long, we do believe that's the only appropriate sanction, whether or not Ms. Abraham has agreed to withdraw the emails and not present

JAMHABRO

```
1   them in trial.
2            THE COURT:  Sir, I do want to get to Ms. Chairmhaic in
3   a moment, but I do want to ask you a few more questions.
4            One of the things that has been suggested by your
5   adversary is that there really isn't a need to make up these
6   emails.  You heard me refer to it earlier as the lily-gilding
7   argument.  That she's got enough evidence; she doesn't need to
8   make this stuff up because it's collateral to her claims.  I
9   appreciate from some of your prior comments that you may
10  disagree with that, and I think your reply suggests that you
11  do, but it's not as though she fabricated the contract that is
12  at the heart of this case and said, Ahh, here it is.  I've been
13  looking for it all along, or the power of attorney that no one
14  can seem to find.  So one could argue that these emails are on
15  the periphery.
16           Even if I find them to have been fraudulently created,
17  do they merit the very extreme sanction of dismissal?
18           MR. BROADBENT:  Well, the point I was just explaining
19  to your Honor about the two-thirds issue, that is essential to
20  the matter.
21           THE COURT:  OK.
22           MR. BROADBENT:  Whether Ms. Wasserman may have agreed
23  to something would give Ms. Abraham, in her mind, certain
24  rights.  She sought to enforce the agreement just against us,
25  that's true, but had Ms. Wasserman agreed to something, as the
```

1    cut-and-paste emails or the other emails purport to show, then

2    that would create a right that Ms. Abraham wouldn't otherwise

3    have and that she would have two-third vote, especially after

4    the realization that there was no power of attorney giving

5    Mr. Leigh control over the Darion interest, which was the

6    original theory, as your Honor will recall, that Mr. Leigh

7    could sign on behalf of himself and on behalf of Darion, giving

8    him the right to control two-thirds.  That theory, being

9    unsupported, no evidence of that power of attorney appearing,

10   that increased the need on the plaintiff to have some evidence

11   that Ms. Wasserman agreed.

12        I can't explain to your Honor why, even if this was

13   gilding the lily -- and I obviously disagree, but I won't get

14   into the merits -- that's not a reason that the plaintiff

15   wouldn't engage in the conduct.  She could have thought to

16   strengthen her case, even if she believed she would win, to

17   force certain parties into a settlement; could have simply

18   sought to make it more difficult.  I think it's the same reason

19   why somebody might, having engaged in extensive financial

20   fraud, not hang up their hat, go home, and live somewhere in

21   their mansion in the Hamptons, Your Honor.

22        THE COURT:  Yes, I'm not sure I understand your

23   argument.

24        MR. BROADBENT:  My point is this:  Just because

25   someone has made a lot of money or succeeded at something, it's

JAMHABRO

1   not a reason for them to just suddenly stop and say, I'm not

2   going to try and have a better case or I'm not going to go

3   further.  Perhaps if the evidence of the fraud wasn't so

4   strong, I could see the explanation of why would she create

5   these emails.  Having no explanation for emails that are

6   identical in form except for added text, whether or not she

7   argues now that there was no reason to do that, there's no

8   explanation for how that happened.  Her motivation, although

9   relevant, can't be explained by, well, I have a good case;

10   therefore, I wouldn't do this.

11       I want to turn briefly to the email involving

12   Ms. Diamond because the text that Ms. Abraham added to the

13   bottom of the email with Ms. Diamond gives credence to the

14   theory, otherwise unsupported, that the plaintiff was drawn

15   into some preexisting negotiation between Mr. Leigh and Beverly

16   Diamond through Mr. Leigh's representative, Tom Bovino.  We set

17   this forth in our memorandum, in our initial memorandum, your

18   Honor, but I'll just briefly summarize it.

19       The email traffic leading up to a meeting between

20   Ms. Abraham and Mr. Leigh in January is primarily between

21   Ms. Wasserman and Ms. Abraham.  In October of 2013, Ms. Abraham

22   sends an email to Ms. Wasserman referencing the Jackson

23   Twenty-One real estate development in central New Jersey,

24   saying something to the effect of -- and I can read it, your

25   Honor, but the point is this might be the quickest way to

1    Mitch's heart.  Thereafter, your Honor, Beverly Diamond shows

2    up communicating with Tom Bovino, Beverly Diamond being

3    Ms. Abraham's friend, possibly her cousin.  It's unclear.

4    There's no preexisting, as far as we can tell, relationship

5    between Ms. Diamond, Mr. Bovino, and Mr. Leigh.  The reason

6    based on the traffic, other than the altered email from

7    Ms. Diamond, to contact Mr. Bovino is to try and, as eventually

8    did happen, sneak in through the back door to discuss "La

9    Mancha" with Mr. Leigh.

10           The plaintiff testified at her deposition on this

11   issue saying, well, they -- referencing, I assume, Mr. Bovino

12   and Ms. Diamond -- they thought I would be helpful because of

13   my experience with Celebration in Florida.  That gives the

14   impression that Ms. Abraham was a passive actor, which is the

15   furthest thing from the truth.  But other than her testimony,

16   there was no support for that issue.  The email in which she

17   added the idea that Beverly Diamond suggests bringing in Robyn

18   because of her experience is the proof that Ms. Abraham would

19   need to show that she did not engage in that improper conduct

20   in contacting Mr. Leigh; that is, if she was a passive actor

21   and she did not seek out Mr. Leigh, did not engage in the

22   relationship with him, did not breach that fiduciary duty.

23   There was no support for that theory and, in fact, the emails

24   show otherwise.  The emails that Ms. Abraham changed -- and

25   again, this is one of the emails we have in native format, so

JAMHABRO

1   we know that it was altered -- that is the only document that

2   would give credence to the idea that Ms. Abraham was simply

3   brought into this because she knows something about Celebration

4   in Florida.

5          So it's one example, your Honor, but it is an

6   important one.  Although our overarching theory is each of

7   these emails, whether Ms. Abraham thinks she has a good case,

8   still impacted the way we approached the litigation.  That

9   particular change created a basis for an argument that did not

10  otherwise exist and, in fact, would have been refuted by the

11  other arguments.

12         THE COURT:  Sir, at the beginning in my housekeeping

13  discussions, I discussed a topic that I didn't think was going

14  to be discussed, and then Ms. Chairmhaic explained why she

15  believed it needed to be discussed.  If you want to be heard on

16  the issue of the Florida litigations, I will hear from you.  If

17  you wish not to be heard on the issues, I will not hear from

18  you.

19         MR. BROADBENT:  Your Honor, our only view is this:  We

20  think the Florida litigation is irrelevant.  We think the

21  suggestion that the Akerman firm or this firm decided to bring

22  this motion on the basis of the prior cases is without -- it's

23  offensive to us, your Honor.  We think it's inaccurate, and

24  this has, in our view, no role to play in this issue.

25         That said, as your Honor indicated, it appeared that

JAMHABRO

1    the plaintiff was asking you to pick and choose or to decide

2    that parties who were found to be truthful had, in fact, lied.

3    So to the extent your Honor chose to consider it, it has to be

4    considered in its entirety.  That is, the only record in that

5    litigation is that Ms. Abraham was found to have engaged in

6    that conduct.  We don't think your Honor should consider that,

7    but if the plaintiff presses it and if your Honor does decide

8    to do so, that's what the record shows, and we think the whole

9    picture should be considered.

10            THE COURT:  Sir, Mr. Sacks, I think more than you

11   wanted sanctions predicated on an attorney contact issue.  Do

12   you wish to be heard on that point or is that not something

13   you're pursuing?

14            MR. BROADBENT:  No, we didn't raise that issue, your

15   Honor.

16            THE COURT:  I didn't think you did, so I'm not going

17   to discuss it with you then.

18            All right.  You may sit down, sir.  Thank you.

19            Mr. Sacks, since you're here, beyond why Mr. Honig's

20   name was cited to me in recent days or weeks, I am presuming,

21   sir, that Mr. Honig has nothing to add to this particular

22   motion that I am addressing.  That maybe I'll get to hear from

23   him at trial, but I don't need to think about him at all in

24   thinking about this motion.

25            MR. SACKS:  That's correct, in my view, your Honor.

JAMHABRO

1    THE COURT:  All right.  That's what I needed to know.
2    Thank you.
3    Ms. Chairmhaic, let me please hear from you in reply.
4    MS. CHAIRMHAIC:  Firstly, I wanted to say that when I
5    said that about the Florida litigation planting a seed, at no
6    time have I ever known Mr. Sacks to be unethical in any of
7    these dealings whatsoever.  It was I believe that the Florida
8    litigation planted a seed that perhaps Robyn had engaged in
9    certain conduct which made them go looking for things, and when
10   they went looking for things, they found the anomalies in the
11   emails, which do look bad on cursory review, until you know the
12   sheer volume of emails that Robyn generates and the volume of
13   responses that she elicits.
14       One of the issues that Mr. Broadbent brought up was
15   the emails between Beverly Diamond and Tom Bovino.  Abby Leigh
16   was not copied on those emails, but Robyn was bcc'd on them and
17   similar with a lot of communications between industry
18   professionals.  There was, from my understanding, more than one
19   email between these parties, which might explain why some had
20   words in them which others did not.
21       I'd also note that Abby Leigh is talking about
22   problems in emails which are not relevant to Abby Leigh herself
23   and/or to the estate's claim that Mitch Leigh gave a contract
24   to Robyn and they entered into the contract.  At no point in
25   time has anybody said that that was not a valid contract or

JAMHABRO

1    that Mitch Leigh did not sign it.  He signed it.  He held

2    himself out as having the authority to enter into it.

3             With regards to whether he had that authority or not,

4    some of that is in the transcripts that says that there was a

5    two-third share.  We don't need the emails to make that out,

6    but some of that is also in prior litigations that the "Man of

7    La Mancha," Joe Darion and Mitch Leigh and Wasserman, they were

8    always fighting with each other.  In London they had been known

9    as the warring men of La Mancha.

10             THE COURT:  Yes, and there was the case before Judge

11    Leval, I believe, the prior case before Judge Leval, if I'm not

12    misremembering.

13             MS. CHAIRMHAIC:  Right, right.

14             THE COURT:  But I don't know what that matters to this

15    litigation.

16             MS. CHAIRMHAIC:  I think it matters with regard to how

17    they structured their decision-making and whether Joe Darion

18    did follow through what Mitch Leigh said and whether Mitch

19    Leigh had the authority to enter into it.  Again, it goes down

20    to the motive, did Robyn have a motive to gild the lily or

21    could this just be that people looked for her to be fabricating

22    stuff and saw these emails and put one beside the other, didn't

23    recognize her pattern of email habits, and there could be two

24    emails in one day substantially similar with different text?

25    The explanation is Robyn's email habits.

JAMHABRO

1          THE COURT:  That she modified other emails, that's the

2     point.

3          MS. CHAIRMHAIC:  No, no.

4          THE COURT:  Stop interrupting me.

5          This is the thing you don't seem to understand.  I

6     don't care if she modified her own statements.  That doesn't

7     bother me at all.  I care that things are added to other

8     people's purported statements and that the native format

9     versions of these emails do not have this information.  That's

10    what concerns me.  So, again, I don't see how her email

11    idiosyncrasies go to the issue of why other people's statements

12    are changed.

13         MS. CHAIRMHAIC:  I believe that goes to her emails

14    elicit responses, and those responses could be substantially

15    similar but slightly different as well.  Again, because it she

16    has not been able to produce the live versions of those emails,

17    despite our best efforts to chase it down, we did recommend to

18    her and she accepted responsibility for not maintaining them.

19    She accepted responsibility and she said, yes, you can tell the

20    Court that I won't use those 13 emails.  I won't use the 33

21    emails.  I don't need any of them.

22         THE COURT:  But stop that, because that's not the

23    issue.  The issue isn't whether she needs the emails; the issue

24    is did she fabricate them?

25         Are you telling me right now she forswears, she says

JAMHABRO

1    she did not in any way modify any of the 13 emails that are

2    before me?  I want to hear that.  I don't want to hear an

3    explanation for how it is this came to be different.  I want

4    you to tell me.  I want her to tell me that she didn't modify

5    any of them, because I want to make a finding later on, and I

6    want to be able -- I don't want to make it on your ruminations

7    about what might have been.  You're telling me she did not

8    modify it?

9         MS. CHAIRMHAIC:  I have asked her every single day,

10   and she has said that she did not modify them.  I picked up the

11   phone and I called Kent Yalowitz two or three times, and he

12   said:  Robyn will go to her grave saying that she did not

13   modify or doctor email.

14        THE COURT:  May I speak to your client?

15        MS. CHAIRMHAIC:  Yes, absolutely.

16        THE COURT:  Ms. Abraham, you know the 13 emails at

17   issue here, yes?

18        MS. ABRAHAM:  Yes.

19        THE COURT:  You can see there are differences among

20   certain emails that, matched up next to each other, they are

21   different?

22        MS. ABRAHAM:  I understand, your Honor.

23        THE COURT:  You've seen that in some cases text has

24   been added and text has been removed.  Do you agree?

25        MS. ABRAHAM:  I see what they provided.  So, yes, I

JAMHABRO

1    agree.

2              THE COURT:  You are telling me that at no time did you

3    ever modify or cause anyone else to modify any of those emails?

4              MS. ABRAHAM:  At no time did I modify or cause anyone

5    else to modify any email at any time ever.

6              THE COURT:  All right.  Thank you.

7              Ms. Chairmhaic, there were other things you wanted to

8    say.  Please, I'm going to ask you just to pause a second.  I'm

9    getting an emergency in another case, so please excuse me.

10             (Pause)

11             THE COURT:  Ms. Chairmhaic, is there anything else you

12   wish to add?  It may be that my discussions with your client

13   have brought you to a natural summing up point, but I'll hear

14   from you.

15             MS. CHAIRMHAIC:  I would like to, in just a couple of

16   sentences, say that when Mitch Leigh saw Robyn's potential and

17   contracted with her, they had a dying "Man of La Mancha"

18   production that nobody wanted to touch.  The only way to bring

19   that back was to attach A-list talent, and Robyn was able to

20   accomplish in six months what none of them could do in

21   25 years.

22             THE COURT:  But, Ms. Chairmhaic, that has nothing to

23   do with these issues.  It has nothing to do with the issues of

24   whether documents were modified or not, and I know --

25             MS. CHAIRMHAIC:  It goes to --

JAMHABRO

1      THE COURT:  No.

2      MS. CHAIRMHAIC:  -- motive.

3      THE COURT:  No, it doesn't.  You will tell me -- I

4 know, because I've read what you gave me, that this is what you

5 keep telling me about the strength of her claims and the

6 tremendous work she did in this regard.  It doesn't help me to

7 resolve the issues as to why these emails exist in two formats.

8      MS. CHAIRMHAIC:  Again, my understanding is that it

9 boils down to the sheer volume of emails she sends and the

10 volume of responses she elicits, and I would note that in this

11 case, going through the deposition transcripts, we have Lisa

12 Maldonado who testifies to destroying and shredding documents.

13 She was the executive assistant.

14      THE COURT:  Ms. Chairmhaic, did you bring a sanctions

15 motion?

16      MS. CHAIRMHAIC:  No, we did not.

17      THE COURT:  Exactly.  So stop that and focus on what

18 I'm asking you to focus on.  I don't know why it's so difficult

19 for you to do that.  You're trying to distract me.  I'm not

20 going to be distracted.

21      MS. CHAIRMHAIC:  The point of that was that Robyn

22 believes that it's possible that they recalled emails as well

23 as deleting and shredding documents, which Martha Wasserman

24 said that she couldn't can find her emails.  Lisa Maldonado,

25 the executive assistant for Mitch Leigh, said -- she testified

JAMHABRO

```
 1    that she was destroying documents.
 2              THE COURT:  But there's been no forensic examination
 3    to prove this.  This is just a thought.  There is no proof of
 4    this.
 5              MS. CHAIRMHAIC:  There is sworn deposition testimony
 6    saying that they were deleting emails and --
 7              THE COURT:  That they recalled her emails?
 8              MS. CHAIRMHAIC:  That they were deleting documents and
 9    that they did not -- they no longer had certain emails in their
10    folders.
11              THE COURT:  Yes, I'm aware of that testimony.  My
12    point remains, you're making the argument now that she believes
13    they recalled emails so that she wouldn't have them.  Is that
14    not the point?
15              MS. CHAIRMHAIC:  The point was that when we asked
16    Larry Daniel:  How did this happen?  This looks really bad, and
17    he said:  Oh, she either deleted them, archived them, deleted
18    it accidentally, or they could have been recalled, and he gave
19    his explanations for how this could have happened.  I have a
20    client who's telling me every single day that she did not
21    doctor or modify emails, and I wanted to find out the reason.
22    We called the best of the best, what we thought was, forensic
23    guy to give us an explanation.  That's the explanation that he
24    gave.  If she didn't delete emails or doctor emails, she's not
25    going to be able to explain what she didn't do.
```

JAMHABRO

1          THE COURT:  Of course.  All right.

2          MS. CHAIRMHAIC:  So I really appreciate the time that

3     you've taken to allow her to have her day in court and to

4     explain, as best as she can, a very difficult situation which

5     has potentially professional and criminal and dispositive

6     effects on this case.  And there's a reason why I'm here today,

7     because nobody would touch the case until we could get past

8     this, if we can get past it, and I have spoken with a potential

9     trial counsel who's in the papers with regards to that.  So I'm

10    praying that we can get through today.  She has taken

11    responsibility for not preserving the documents in their native

12    format, and she did voluntarily offer to preclude all of that.

13    So I do think that she is trying to go a little bit and take

14    responsibility for not preserving documents as she believes and

15    we believe that she should have.

16          THE COURT:  OK.

17          MS. CHAIRMHAIC:  Thank you, your Honor.

18          THE COURT:  Thank you very much.

19          I'm going to step off the bench for either five

20    minutes, at which point I will be able to tell you that I

21    will make you call in for my decision or I'll have someone come

22    out and tell you it will be a little bit longer, and I'll give

23    you something tonight.  If you need to stretch your legs or

24    take a minute --

25          MR. FIEBACH:  Your Honor.

JAMHABRO

1          THE COURT:  Mr. Fiebach, yes.

2          MR. FIEBACH:  I'm not sure if it's relevant to the

3  decision that you'll make, but I just wanted to say that the

4  theory of Ms. Chairmhaic that the seeds were planted by the

5  Florida litigation are not true.  We had conversations with

6  Mr. Sacks when he had discovered some of the email problems

7  before the Florida litigation was known, and it was actually

8  our firm doing some research on the plaintiff that came up with

9  the fact that the Florida litigation existed, and then

10  thereafter we got some of the documents from the court.  But I

11  say this as an officer of the court, from the timing

12  standpoint, the theory is wrong.

13          THE COURT:  All right.  Thank you.  I'll be back soon.

14  Thank you.

15          (Recess)

16          THE COURT:  You can be seated.  I thought it best to

17  give you a decision this evening rather than have you wait

18  around on pins and needles, and I also thought that I don't

19  know that anything would be any more thoughtful.  It would be

20  equally as correct.  There may be some better verbiage, but I

21  think I should just do it.

22          I want to begin with something I think we should all

23  think about for a moment.  There were a lot of very serious

24  allegations coming from different fronts, from different

25  parties in this case, and I thought that the allegations of

JAMHABRO

misconduct by plaintiff that the defense raised were extremely

serious, and I actually thought that they were somewhat sullied

or undercut by reference to what I consider to be unrelated

events and possibly unrelated injustices of several decades

ago.  That is why when which began this matter, I thought it

best just not to consider that and to just remove it from my

thoughts, but the parties have asked me to consider it, and so

therefore I consider it.

On the issue of the events of 30 years ago in Florida,

to this day I don't know what happened in Florida, and for this

reason I have not allowed the credibility findings in that

other case to influence the decisions that I make about

Ms. Abraham's credibility in this matter.  If what happened in

that case is true, it's absolutely awful and inexcusable.  If

what happened was false and fabricated, it is also awful and

inexcusable, but I want to make clear that I do not credit for

one instant the argument that somehow defense counsel seized on

this incident of decades ago and then used it as a springboard

for the arguments that they are raising.

In addition to really overstating the matter, I think

I do have difficulty harmonizing the idea that counsel have

acted ethically when counsel have seized upon this issue to

just malign Ms. Abraham.  I just don't think both things can

exist.  The whole argument, which I'm smiling at because I find

it to be ridiculous, overlooks the point that there are emails

JAMHABRO

that exist in two versions.  For the most part, I've got

examples in native format and then I've got a contrary version

in a PDF format, and I think it grossly understates the

seriousness of the inquiry that I've been making this afternoon

to suggest that somehow they were fabricated to get back at

plaintiff for something that happened decades ago.

        The issue that I have had, the issue that I've tried

to come to terms with in this hearing is that there has to be

an explanation for why it is these things exist in two formats.

I don't want people's ruminations.  I don't want maybe this and

maybe that.  I do not want attorney *ipse dixit*.  I want

answers.

        And for that, I looked at the documents myself, and I

considered the competing reports of the expert witnesses in

this case.  Mr. Nguyen, I see no serious challenge to his

ability to make the determinations that he makes.  I do think

he is knowledgeable to the extent that he is knowledgeable.

What I noted was that he offered to me cogent explanations that

really have not effectively been rebutted.  He's offered me a

theory, a narrative, a way that these documents can be

understood given the strange typographical and other

conventions that appear on them, and a lot of what he says is

borne out by the documents themselves.

        Now, Mr. Daniel, on the other hand, I wrote a note to

myself that I found his report to be half-baked in the sense

JAMHABRO

1    that he only looked at three documents and basically just said:

2    No, no, Failla, that's speculative.  He does nothing.  He

3    doesn't provide or doesn't sufficiently provide a counter

4    explanation.  He just throws out reasons why something may

5    happen, but he really doesn't address -- and in fairness to

6    him, he wasn't engaged or retained to address in any real deep,

7    meaningful way -- what's going on with these documents.  I

8    found his explanations to be largely rebutted by Mr. Nguyen.

9    And actually, from my perspective, he really only focused on

10   three documents.  I find that Mr. Nguyen's explanation for how

11   these documents have those strange either orientations or

12   quotation marks, or whatnot, I find his explanations to be more

13   likely, more plausible than those of Mr. Daniel.  But even if I

14   put them to the side, I've got other documents that just can't

15   be explained away in this manner, and that's why today I was

16   focusing on the theories that have been offered to me to

17   explain why, in many cases, I have two documents with the same

18   time stamp and different words on it.

19         So here, I'm going through the theories with you now.

20   There is the GoDaddy theory.  This was the original theory.  It

21   was the only theory that I was given at the beginning of this

22   case.  And what has been shown to me today is that there is

23   some conflict, but nothing dispositive, for the plaintiff at

24   least.  There are these phantom outages that affect certain

25   documents, and Mr. Daniel doesn't really make the point that

1   Ms. Chairmhaic made about frequent, unexplained,

2   only-kept-for-two-weeks outages.  So I don't find this to be a

3   sufficient rebuttal of the defendants' argument that GoDaddy is

4   not an explanation for these variances.

5          So then there's the broken computer explanation.

6   Ms. Chairmhaic today very, very thoughtfully indicated that

7   this was an instance of Ms. Abraham accepting responsibility,

8   but, to my mind, only to a degree.  I didn't note until today

9   that there were two computers.  No one has gotten the

10  technician to admit to having the same problems with both

11  computers being out of commission or being unable to be used.

12  So I find this as well unsuccessful and unsatisfying as an

13  explanation for what happened with those emails.

14         In Ms. Chairmhaic's briefing, there was the third

15  explanation, which was idiosyncratic email practices.  I find

16  this to be actually, and with no disrespect, less plausible

17  than the GoDaddy and the broken computer theories because it

18  does not explain the counterparty edits.  Why is it that --

19  Ms. Abraham can have a ton of emails.  I will accept the

20  proposition that she sends many emails a day, but I don't see

21  what she's -- how her email habits end up influencing others,

22  especially with the same time stamp to have different text.

23         Also, I haven't been shown these multiple emails or

24  these multiple responses, and so it's a rumination.  It's not

25  been proven to me successfully or adequately in this

JAMHABRO

1  proceeding, and it absolutely does not explain the edits on

2  which I have focused this afternoon.

3          So, now, dovetailing with that theory is a theory

4  that, in fact, it was the defense witnesses or someone who was

5  recalling and deleting emails.  Now, I concede that there were

6  defense witnesses who testified about deleting emails, but even

7  that does not explain the recall component or how it is that I

8  have two different versions, oftentimes with the same time

9  stamp but with different text.

10          The strongest argument for the defendants is that I

11  have a bunch of exhibits that I can't explain other than by

12  finding that somebody modified them; that they were altered.

13  And ultimately, I conclude that they were altered by

14  Ms. Abraham.

15          Today I noted that counsel was very careful,

16  plaintiff's counsel, in how she phrased her arguments on this

17  point.  That it was Ms. Abraham's position, that Ms. Abraham

18  would go to her grave believing, and everything was done in

19  terms of Ms. Abraham's beliefs.  So I went straight to the

20  source, and I asked Ms. Abraham as plainly as I could.  She

21  answered, and I do not believe her, and I believe that she

22  perjured herself before me today.  And that echoed something

23  that Mr. Broadbent said to me when he referred to certain of

24  these theories or certain of these presentations as

25  unapologetic.  They are.  At some point in this process,

JAMHABRO

Ms. Abraham should just admit that these documents are doctored
and walk away from it, but even now before me she doubles and
triples and quadruples down.  That's what I'm left with.  I'm
left with the fact that these things are fabricated and that I
believe that she fabricated them.

There was some discussion earlier today about motive,
and I'm not sure that I need to make a specific finding on
motive.  I neither accept nor refute the idea that she has a
strong case without them.  I just don't know.  Therefore, I
don't think that I can find that she had no motive to fabricate
these emails.  It may be that she wished to shore up what she
perceived to be deficiencies in the case.  It may be that she
was, as I used the expression earlier, gilding the lily.  It
doesn't matter.  To improve her position in this litigation,
she altered the documents.  She submitted them in discovery.
She submitted them to me, at least one of them to me.  And even
now, in all of these proceedings, she refuses to accept or to
admit that they were fabricated.

I've viewed the expression "doubling down," and I
think that's what's going on here because there were many
opportunities for us not to be where we are today, and yet here
we are.  In fact, it's actually gotten worse because she has
perjured herself to me today, and I find -- I believe *Dunnigan*
requires certain findings about the statement, its falsity, its
materiality, and it being made with a culpable state.  I'm

JAMHABRO

1    making those findings here today.

2            As the parties know from the submissions, I have the

3    ability to impose sanctions under Rule 37.  I have the ability

4    to impose them under my inherent powers.  I have the ability to

5    impose them for fraud on the court.

6            The defendants, not surprisingly, have asked for

7    dismissal, and for the past long time, let's say 35 minutes,

8    I've been thinking about that.  I ultimately find that

9    dismissal is too severe, and I'm not going to dismiss the case,

10   but I am going to impose sanctions.

11           I respect and take to heart what Mr. Broadbent said

12   about the manner in which the Leigh defendants were injured by

13   the fraud and by the possible spoliation in this case.  They

14   went down dark alleyways investigating emails and legal issues

15   that just didn't need to be done because the emails were

16   fabricated.  They wasted their time, and they were unable to

17   strategize the case in the way they wanted to.  Conversely,

18   they are precluded at this stage from looking at the

19   plaintiff's native format emails to aid their case.  They are

20   hamstrung in that regard as well.

21           So having thought about what is the appropriate set of

22   sanctions for this case, I'm going to give them to you now.

23   All 33 PDF documents are excluded from trial.  That was easy.

24   Ms. Chairmhaic was going to agree to that anyway.

25           More importantly, Ms. Abraham will pay all of the lead

JAMHABRO

1  defendant's costs incurred as a result of the fabrication of

2  emails.  Now, I'm going to give defense counsel an appropriate

3  amount of time to figure out what those costs are.  In my

4  mind -- and this was done just quite quickly in my robing

5  room -- it would include the time that they spent investigating

6  the provenance or the format of the documents, comparing it

7  with other documents, reviewing their own clients' email

8  accounts and electronic information to see if there were

9  counterparties to these documents, the forensic expenses that

10  they incurred that Leigh paid for -- I'm not sure how much that

11  is at this point -- any legal research or writing that had to

12  be undertaken because of misdirections caused by the

13  fabrication of documents, the preparation of the papers and the

14  preparation for oral argument in this hearing today and any

15  other hearings or proceedings that can be fairly traced to the

16  fabrication of documents.

17          Now, I've thought about giving a spoliation

18  instruction to the jury and requesting an adverse -- or

19  allowing them to make, if they wish to, an adverse inference.

20  On this record, I do not feel comfortable giving a spoliation

21  instruction because I do not know that I have enough of a

22  record to find a culpable state of mind at the time the

23  computers were given away, which is, to my mind, the issue on

24  spoliation, but I'm allowing that to be renewed if the record

25  and the law supports it.

JAMHABRO

```
 1          What I do think is appropriate is that I think an

 2    adverse instruction -- or perhaps it comes out this way:

 3    Ms. Abraham can be crossed at trial on the fact that a federal

 4    judge has found that she perjured herself in a court

 5    proceeding, because she did.  I am not today thinking about

 6    professional responsibility referrals or criminal case

 7    referrals.  I think that's just too much for today, but that

 8    perjury has consequences, and the consequence may end up at

 9    this trial.

10          So those are the sanctions that I am imposing.  I

11    believe that, under the factors that I may consider under my

12    inherent powers and under Rule 37, I can impose those.  Again,

13    if somebody wants me to cite cases, I will, but at the

14    beginning of this proceeding, that was forsworn.

15          I am expecting that someone is going to get a

16    transcript of this proceeding.  I won't order you to do so.

17    From my perspective, my work on this motion is done.  I will

18    allow -- Mr. Broadbent, I'm going to task you with something,

19    because I am.  Please arrange for a schedule to produce to me a

20    submission on fees and costs, and please consult with

21    Ms. Chairmhaic at this time so that you can present something

22    to me that has time for opposition submission.  I don't

23    anticipate oral argument on that.  I think I would just do that

24    on the papers.  But that is the remaining issue on sanctions.

25          That's all I have.  Does anyone have anything to bring
```

JAMHABRO

1    to my attention?  Ms. Chairmhaic?

2              MS. CHAIRMHAIC:  Thank you, your Honor.

3              THE COURT:  Thank you, ma'am.

4              Mr. Broadbent, I'm looking at you, same question,

5    anything else?

6              MR. BROADBENT:   No, your Honor.

7              THE COURT:  We're adjourned.  I thank you very much

8    for staying.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25