UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBYN ABRAHAM, | |
| Plaintiff/Counterclaim-Defendant, | |
| -v.- | 17 Civ. 5429 (KPF) |
| ABBY LEIGH, *Executrix of the Estate of Mitch Leigh,* | **OPINION AND ORDER** |
| Defendant/Counterclaim-Plaintiff. | |

KATHERINE POLK FAILLA, District Judge:

On January 23, 2014, Plaintiff Robyn Abraham and Mitch Leigh, composer of the iconic musical *Man of La Mancha* ("MOLM"), affixed their signatures to a two-page contract (the "Talent Agreement") that purported to give Plaintiff the "sole and exclusive legal and business rights" to obtain initial interest in a revival of MOLM from a theatrical stage director, a recognized co-producer, and a well-known actor. Had she succeeded, Plaintiff would have been entitled under the Talent Agreement to the exclusive stage production rights to a 2015 MOLM revival in the United Kingdom. And, indeed, according to Plaintiff, she did satisfy her obligations under the Talent Agreement. When she received nothing in return, Plaintiff brought suit against the three holders of the rights to MOLM: Abby Leigh, in her capacity as Executrix of the Estate of Mitch Leigh; Martha Wasserman, in her capacity as Executrix of the Estate of Dale Wasserman; and Hellen Darion, in her capacity as Executrix of the Estate of Joseph Darion (collectively, the "Rights Holders"), as well as Alan Honig, who had served as an accountant to the authors of MOLM. After several years of

litigation, what remains is Plaintiff's breach of contract claim against Defendant Abby Leigh, in her capacity as Executrix of the Estate of Mitch Leigh.[1]  Defendant, in turn, counterclaimed against Plaintiff, asserting that Plaintiff breached a fiduciary duty she owed to Mr. Leigh when she drafted and entered into the Talent Agreement.

Before the Court now is Defendant's motion for summary judgment against Plaintiff's breach of contract claim and in favor of Defendant's breach of fiduciary duty counterclaim.  For the reasons that follow, the Court grants Defendant's motion for summary judgment as to Plaintiff's breach of contract claim, and denies the motion as to Defendant's counterclaim.

**BACKGROUND**[2]

### A.  Factual Background

*Man of La Mancha* was written by composer Mitch Leigh, book writer Dale Wasserman, and lyricist Joseph Darion (collectively, the "Authors").  (Pl.

---

[1]    For clarity, the Court uses "Mr. Leigh" to refer to Mitch Leigh and "Defendant" to refer to Abby Leigh.

[2]    The facts stated herein are drawn from Defendant's Rule 56.1 Statement of Material Facts Not in Dispute ("Def. 56.1" (Dkt. #430-1)), and from Plaintiff's Rule 56.1(b) Counterstatement of Disputed Material Facts ("Pl. 56.1" (Dkt. #500)), the latter of which comprises both responses to Defendant's assertions of material facts not in dispute and material facts ostensibly in dispute.  Plaintiff's compliance with Local Rule 56.1 is discussed more fully *infra*.

For ease of reference, Defendant's Memorandum of Law in Support of Her Motion for Summary Judgment will be referred to as "Def. Br." (Dkt. #430); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment as "Pl. Opp." (Dkt. #499); and Defendant's Memorandum of Law in Further Support of Her Motion for Summary Judgment as "Def. Reply" (Dkt. #474).  The Court refers to Plaintiff's operative pleading, the Amended Complaint, as "Am. Compl." (Dkt. #41), and Defendant's Amended Counterclaim as "Am. Countercl." (Dkt. #105).  Further, citations to a witness's sworn statements will be referred to using the convention "[Name] Decl.";  citations to a witness's deposition testimony will be referred to using the convention "[Name] Dep."; and citations to an expert witness's report will be referred to using the convention "[Name] Rep."

56.1 ¶ 3).  The rights to stage or control any production of MOLM are delimited by a Minimum Basic Production Contract (the "MBPC"), which was executed in 1964.  (*Id.* at ¶ 2).  Pursuant to the MBPC, all decisions concerning the staging or production of a performance of MOLM must be approved by a majority of the Authors.  (*Id.* at ¶ 5).  *See Wasserman* v. *Leigh*, No. 92 Civ. 5266 (PNL), 1994 WL 320606 (S.D.N.Y. July 1, 1994).  The Authors' successors in interest continue to be bound by the MBPC.  (Pl. 56.1 ¶ 6).  By 2014, Mr. Leigh was the only surviving Author of MOLM.  (*Id.* at ¶ 9).  Mr. Wasserman's interests were controlled by Martha Wasserman and Mr. Darion's interests were controlled by Hellen Darion.  (*Id.*).  Because of Mr. Leigh's unique position as the sole remaining Author, Hellen Darion frequently, though not always, deferred to him on artistic choices relating to MOLM.  (*Id.* at ¶ 10).

On January 6, 2014, Plaintiff, an attorney, met with Mr. Leigh to discuss the staging of a revival production of MOLM in 2015, which would be the 50th anniversary of the original production (the "January 6, 2014 Meeting").  (Pl. 56.1 ¶ 40).  After the meeting, Plaintiff proposed sending a one-page agreement memorializing that which had been discussed.  (*Id.* at ¶ 43).  On January 9, 2014, Plaintiff emailed Mr. Leigh's assistant a draft one-page agreement (the "January 9, 2014 Draft").  (*Id.* at ¶ 47).[3]  In the cover email, Plaintiff suggested that she and Mr. Leigh discuss any comments to the January 9, 2014 Draft as well as her hourly rate, which they had not previously discussed.  (*Id.* at ¶ 48; Def. Ex. 37).  The January 9, 2014 Draft stated that Plaintiff would identify

---

[3]      Plaintiff claims that she did not prepare the January 9, 2014 Draft.  (Pl. 56.1 ¶ 52).

initial interest in participation in a 2015 MOLM revival from a "leading British theatrical stage director," a "recognized UK co-producer," and at least one "well known actor." (*Id.* at ¶ 49). Plaintiff claimed that she had already received expressions of potential interest from "stars, UK co-producers, and directors." (*Id.* at ¶ 50).

On January 10, 2014, Plaintiff sent Mr. Leigh's assistant an email suggesting that Mr. Leigh was not willing to pay legal fees for her work. (Pl. 56.1 ¶ 52; Def. Ex. 38). Perturbed, Plaintiff asserted that Mr. Leigh "specifically did agree to hire me as his lawyer and solicitor for a period of six (6) months," and that Mr. Leigh's comment that he would not pay legal fees was "antithetical to that which he specifically agreed to in [the January 6, 2014] meeting." (Pl. 56.1 ¶ 52). On January 20, 2014, Plaintiff faxed a revised version of the January 9, 2014 Draft, which version removed references to being paid for fees and costs, but continued to require her to secure interest from a director, a co-producer, and a well-known actor. (*Id.* at ¶ 53).

On January 23, 2014, Mr. Leigh signed the Talent Agreement, which was entitled "Six (6) Month Exclusive Contract Re: London and United Kingdom Musical and Stage Production Rights of Man of La Mancha ('MOLM')." (Pl. 56.1 ¶ 58). The Talent Agreement granted Plaintiff:

> the sole and exclusive legal and business rights for six (6) months to represent "MOLM" in England and the United Kingdom for the purpose of obtaining initial professional interest by a) a leading British theatrical stage director; b) a recognized US or UK co-producer and c) at least one (1) well known actor (heretofore referenced collectively as "Talent") interested in the opportunity of starring in the upcoming London West

4

> End stage production of "Man of La. Mancha";
> tentatively scheduled for the 2015 50th Anniversary of
> the original staging of "MOLM".

(*Id.* at ¶¶ 59, 60, 62; Pl. Ex. A).  The exclusivity period would begin on

February 3, 2014, and conclude on August 2, 2014.  (Pl. Ex. A).  In addition,

the Talent Agreement stated that:

> [Plaintiff] and [Mr.] Leigh shall discuss [Plaintiff]'s
> provision of initial Talent interest and [Mr.] Leigh shall
> advise [Plaintiff] whether he accepts [Plaintiff]'s
> provision of initial Talent interest.  If [Mr.] Leigh does
> not accept [Plaintiff]'s provision of initial Talent interest,
> [Mr.] Leigh shall instruct [Plaintiff] which Talent interest
> he prefers so meetings with Talent representatives may
> be coordinated.  Upon provision of requested Talent
> interest by [Mr.] Leigh, [Plaintiff] will request Talent
> terms, conditions and dates of availability.   Upon
> approval by [Mr.] Leigh of Talent interest [Mr.] Leigh
> shall promptly and within five (5) business days of
> provision of Talent confirmation by [Plaintiff], shall, in
> addition to granting [Plaintiff] [Mr.] Leigh's sole and
> exclusive London and United Kingdom rights to MOLM
> pursuant to the terms herein, shall obtain from each of
> the two MOLM minority rights holders ("Minority Rights
> Holders") or their representatives, written approval from
> each of the Minority Rights Holder granting [Plaintiff]
> her respective sole and exclusive rights to London and
> United Kingdom theatrical stage and musical rights of
> "MOLM" on the same terms and conditions provided by
> Leigh.

(Pl. 56.1 ¶¶ 59, 60, 62; Pl. Ex. A).  On January 27, 2014, Plaintiff informed

Mr. Leigh that she had spoken with Sir Trevor Nunn, the celebrated West End

director, and that he had suggested Old Vic Productions as a possible co-

producer for MOLM.  (Pl. 56.1 ¶ 65).[4]

---

[4]     Though cognizant that he was knighted as a Commander of the Most Excellent Order of
the British Empire ("CBE") in 2002, the Court will adopt Nunn's preferred honorific of
"Mr."  *See* Alexis Soloski, *Trevor Nunn, British Shakespeare Master, Tries Something*

In early March 2014, Mr. Leigh suffered a stroke and died soon thereafter.  (Pl. 56.1 ¶ 72).  After Mr. Leigh's death, Plaintiff continued to attempt to secure the interest of Mr. Nunn and Old Vic Productions.  (*Id.* at ¶¶ 73, 74).  Plaintiff had met with Joseph Smith, the executive producer at Old Vic Productions, on multiple occasions in January and February 2014, and continued to correspond with Mr. Smith through May of 2014.  (*Id.* at ¶¶ 66, 70, 75; Smith Decl. ¶ 4 (Pl. Ex. K)).  Plaintiff met with Mr. Nunn on May 8, 2014, and claims further to have met with him on several prior occasions, as early as February 2014.  (Pl. 56.1 ¶ 74).

On July 11, 2014, Plaintiff sent a letter, through her attorneys, to Defendant and her attorneys, announcing that Plaintiff had performed under the Talent Agreement by securing Mr. Nunn as director and Old Vic Productions as UK co-producer for a 2015 revival of MOLM.  (Pl. 56.1 ¶ 86; Def. Ex. 52).  Attached to the letter was a copy of the Talent Agreement, and a facsimile that purported to be from Mr. Nunn, stating that he "accept[s] in principle your and Mr. Leigh's request to direct the 2015 50th Anniversary Production of *Man of La Mancha* in London, if such a production can be arranged."  (Pl. 56.1 ¶ 87; Def. Ex. 52).  The letter did not attach any confirmation from Mr. Smith or Old Vic Productions concerning Old Vic Productions' interest in co-producing the 2015 MOLM revival.  (Pl. 56.1 ¶ 88).

---

*New: Directing Americans*, N.Y. Times, Feb. 22, 2016 ("It might seem that, at 76, Mr. Nunn (who was knighted a decade ago but won't answer to Sir) has done it all.") (last accessed July 8, 2020).

On July 20, 2014, Defendant's counsel responded to Plaintiff's counsel's letter, purporting to speak on behalf of all three Rights Holders. (Pl. 56.1 ¶ 92; Def. Ex. 54). Defendant's counsel stated that neither Ms. Darion nor Ms. Wasserman was aware of the Talent Agreement, but that if Plaintiff wished to prepare a proposal for a 2015 revival of MOLM to be directed by Mr. Nunn, the Rights Holders would be "positively disposed" and would "consider the proposal in good faith." (Pl. 56.1 ¶¶ 92, 98; Def. Ex. 54). Counsel added, however, that Plaintiff would be required to pay the Rights Holders a $50,000 nonrefundable advance against royalties in order to have such a proposal considered. (Pl. 56.1 ¶ 99; Def. Ex. 54). Plaintiff did not provide a proposal to Defendant or the other Rights Holders. (Pl. 56.1 ¶ 102). Instead, Plaintiff's counsel responded to Defendant's counsel on August 2, 2020 — the final day of the exclusive period under the Talent Agreement — to state that Plaintiff disagreed with the Rights Holders' interpretation of the Talent Agreement; that Plaintiff had fully performed her contractual obligations; and that Plaintiff would respond further in the future. (*Id.* at ¶ 103). On November 20, 2014, Plaintiff filed a claim against the Estate of Mr. Leigh in the amount of $1,261,388.00. (*Id.* at ¶ 104). Plaintiff eventually abandoned this claim against Mr. Leigh's estate. (*Id.*).

## B. Procedural Background

### 1. The Complaint and the Motions to Dismiss

This litigation has a particularly complicated procedural history, which is detailed here because of its relevance to certain of the parties' arguments. Plaintiff filed this action on July 18, 2017. (Dkt. #1). She then filed the

7

Amended Complaint on September 15, 2017, after receiving leave to do so from the Court. (Dkt. #40). In an oral decision issued on June 14, 2018, the Court granted in part and denied in part several motions to dismiss the Amended Complaint filed by the defendants then in the case. (Dkt. #65 (order memorializing decision); Dkt. #78 (transcript of decision) ("June 14 2018 Tr.")). As relevant here, the Court denied Defendant's motion to dismiss Plaintiff's breach of contract claim; all other claims against Defendant were dismissed. (Dkt. #65 (order memorializing decision); June 14, 2018 Tr.).

### 2.    The Counterclaim and the Motion to Dismiss

On August 3, 2018, Defendant filed an answer to the Amended Complaint, and asserted a counterclaim against Plaintiff. (Dkt. #86). On October 11, 2018, with the Court's permission, Plaintiff moved to dismiss Defendant's counterclaim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. #90, 101). In response, on October 18, 2018, Defendant amended her counterclaim against Plaintiff. (Dkt. #105 ("Am. Countercl.")). The Amended Counterclaim alleges, in relevant part, that: (i) Plaintiff breached a fiduciary duty owed to Mr. Leigh by negotiating and entering into the Talent Agreement; and (ii) in the event Plaintiff were to receive an award of damages from her suit against Defendants, Defendant was entitled to a setoff as a result of Plaintiff's misconduct. (Am. Countercl. ¶¶ 38-53). On October 25, 2018, the Court granted Plaintiff's request that her motion to dismiss apply to Defendant's Amended Counterclaim. (Dkt. #107). Defendant

8

filed her opposition to the motion to dismiss on November 9, 2018 (Dkt. #111), and Plaintiff filed her reply brief on December 10, 2018 (Dkt. #131).

On March 11, 2019, Plaintiff's original counsel withdrew from the case with the permission of the Court. (Dkt. #213). After Plaintiff retained new counsel, that counsel adopted the prior motion papers. (Dkt. #272). The Court denied Plaintiff's motion to dismiss Defendant's Amended Counterclaim on September 9, 2019. (Dkt. #319). *Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2019 WL 4256369 (S.D.N.Y. Sept. 9, 2019) ("*Abraham I*").

### 3. The Motions for Sanctions

On January 23, 2019, two of the other defendants then in the case, Wasserman and Honig, filed a pre-motion letter seeking leave to file a motion for sanctions against Plaintiff for allegedly perpetrating a fraud on the Court in connection with certain documents produced in discovery. (Dkt. #143). On June 10, 2019, the Court granted Wasserman and Honig leave to file a motion for sanctions against Plaintiff (Dkt. #230), which they did on June 12, 2019 (Dkt. #233-236). On July 17, 2019, Defendant joined in the motion. (Dkt. #263, 264). On August 9, 2019, Plaintiff filed her papers in opposition to the pending motion for sanctions and in opposition to Defendant's joinder of that motion. (Dkt. #273-292). On August 23, 2019, Defendants filed their reply papers. (Dkt. #303-305, 307). On September 5, 2019, the Court scheduled an evidentiary hearing on the sanctions motion for October 7, 2019, though the date was later adjourned. (Dkt. #318, 338).

On October 4, 2019, in connection with their settlements with Plaintiff, Wasserman and Honig were permitted to withdraw their motion for sanctions against Plaintiff; Defendant continued to adopt their arguments in her motion. (Dkt. #348).  On October 15, 2019, Plaintiff's second team of attorneys withdrew from the case with permission of the Court, but were granted leave to represent Plaintiff at the evidentiary hearing.  (Dkt. #361, 370).

On October 22, 2019, the Court held an evidentiary hearing, after which it granted in part and denied in part Defendant's motion for sanctions.  (Dkt. #371 (order memorializing decision); Dkt. #409 (transcript of decision)).  As relevant here, the Court excluded from evidence 33 documents produced by Plaintiff in PDF form only during discovery, which documents Wasserman and Honig had identified as having indicia of being fraudulent.  (Dkt. #409 (transcript of decision); Dkt. #234).  The Court also ordered that Plaintiff pay Defendant's attorneys' fees and costs incurred as a result of the fraudulent documents.  (Dkt. #409 (transcript of decision)).  As of February 3, 2020, the parties' briefing concerning Defendant's application for attorneys' fees and costs is fully submitted to the Court.  (Dkt. #407, 427, 440).

### 4.    The Motion for Summary Judgment

Defendant also sought to file a summary judgment motion.  On June 10, 2019, the Court entered an Order setting a deadline of November 15, 2019, for the filing of pre-motion letters concerning contemplated summary judgment motions.  (Dkt. #230).  Defendant filed a pre-motion letter seeking leave to file a motion for summary judgment on October 17, 2019, and an amended pre-

motion letter on November 4, 2019.  (Dkt. #364, 394).  On November 6, 2019, the Court granted Defendant leave to file a motion for summary judgment. (Dkt. #401).  Defendant filed her motion for summary judgment on January 24, 2020.  (Dkt. #429-437).  On March 11, 2020, the date by which Plaintiff was required to file her opposition papers, Plaintiff emailed her motion papers to the Court and Defendant, and stated that she had been unable to file these documents through the Court's electronic case filing system.  (Dkt. #492).  The Court accepted Plaintiff's submission, and directed Plaintiff to file those opposition papers on the public docket on or before March 26, 2020.  (*Id.*).

On March 26, 2020, Plaintiff requested that the Court grant her leave to file certain unspecified documents in opposition to the motion for summary judgment — including a larger "opposition to motion for summary judgment" — that Plaintiff had not emailed to the Court on March 11, 2020.  (Dkt. #477). The Court denied Plaintiff's request, and subsequently directed the Clerk of Court to file on the public docket only those opposition papers that Plaintiff had emailed to the Court on March 11, 2020.  (Dkt. #492, 498).  Defendant's motion for summary judgment was fully submitted to the Court on March 25, 2020, when she filed her reply papers.  (Dkt. #473-475).

On February 25, 2020, Plaintiff requested leave to file a motion for summary judgment.  (Dkt. #450).  The Court ordered Plaintiff to file a letter on or before March 6, 2020, demonstrating good cause as to why she failed to file a pre-motion submission by the November 15, 2019 deadline.  (Dkt. #455). Plaintiff filed a letter in support of her request to file an untimely motion for

summary judgment on March 6, 2020.  (Dkt. #459).  On March 18, 2020, the
Court denied Plaintiff's application to file an untimely motion for summary
judgment, finding that Plaintiff had not demonstrated good cause for her
failure to abide by the Court's scheduling order and that Plaintiff had not
demonstrated that her motion would have a reasonable likelihood of success.
(Dkt. #471).

## DISCUSSION

**A.    Applicable Law**

> **1.    Motions for Summary Judgment Under Federal Rule of Civil
> Procedure 56**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant
summary judgment if the movant shows that there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[5]
A fact is "material" if it "might affect the outcome of the suit under the
governing law," and is genuinely in dispute "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."  *Anderson* v.
*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New
York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  In determining

---

[5]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary
judgment standard from a genuine "issue" of material fact to a genuine "dispute" of
material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting
that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue'
becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment
determination.").  This Court uses the post-amendment standard, but continues to be
guided by pre-amendment Supreme Court and Second Circuit precedent that refer to
"genuine issues of material fact."

whether there are genuine issues of material fact, courts are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Terry* v. *Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quotation omitted).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact."  *CILP Assocs., L.P.* v. *PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (internal quotation marks and alteration omitted).  But where "the burden of proof at trial would fall on the nonmoving party," the moving party can shift the initial burden by "point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Simsbury-Avon Pres. Soc'y, LLC* v. *Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

In deciding a motion for summary judgment, "a district court generally 'should not weigh evidence or assess the credibility of witnesses.'"  *Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting

*Hayes* v. *N.Y.C Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).  But to that general rule, the Second Circuit has recognized an exception:

> in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

*Jeffreys*, 426 F.3d at 554 (internal citation omitted) (quoting *Anderson*, 477 U.S. at 252).  In this rare setting, a court considering a summary judgment motion may make credibility determinations.  *SEC* v. *Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *8 (S.D.N.Y. Mar. 21, 2017).  Even then, the Second Circuit has cautioned that, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete."  *Jeffreys*, 426 F.3d at 555 n.2 (emphasis and citation omitted).  Instead, such credibility assessments are to be reserved for "extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility."  *Rojas*, 660 F.3d at 106 (citation and quotation marks omitted).  A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Simpson* v. *City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).

### 2.   Summary Judgment in Pro Se Cases

In a *pro se* case, the court must liberally construe the *pro se* party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  However, where, as here, an attorney represents herself in a proceeding, she is entitled to no special solicitude. *Tracy* v. *Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) ("In addition, the appropriate degree of special solicitude is not identical with regard to all pro se litigants.... The ultimate extension of this reasoning is that a lawyer representing himself ordinarily receives no such solicitude at all.").

### B.   Analysis

Defendant moves for summary judgment against Plaintiff's breach of contract claim, and in favor of her own counterclaim for breach of a fiduciary duty.  In support, she argues that there is no genuine dispute of fact that: (i) the Talent Agreement is a non-binding agreement to agree; (ii) Plaintiff failed to perform under the Talent Agreement; (iii) Plaintiff failed to adduce evidence of damages; (iv) the Talent Agreement expired upon Mr. Leigh's death; (v) Plaintiff breached her fiduciary duty to Mr. Leigh by entering into the Talent Agreement, thus invalidating it; and (vi) Defendant did not breach the Talent Agreement.  (*See generally* Def. Br.).  Plaintiff opposes the motion and counters each of Defendant's arguments.  Before the Court may proceed to analyzing the merits of these arguments, however, it must first address certain antecedent issues concerning Plaintiff's opposition papers.

### 1.    Plaintiff's Briefing and Evidentiary Deficiencies

As an initial matter, Plaintiff's opposition papers fail to comply with Local Rule 56.1.  Under that rule, a movant is required to identify admissible evidence in support of each factual assertion in his or her Rule 56.1 statement.  *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant ... pursuant to Rule 56.1(a) ... must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  Conversely, a nonmovant seeking to controvert these factual assertions must also cite to admissible evidence, and where properly supported facts in a Local Rule 56.1 statement are denied with only conclusory assertions, the court will find such facts to be true.  *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

While Plaintiff did furnish the Court with a Rule 56.1 Statement purporting to counter many of the factual assertions contained in Defendant's Rule 56.1 Statement, Plaintiff largely fails to cite to admissible evidence in support of her factual assertions.  (*See generally* Pl. 56.1).  Many, if not most, of the paragraphs in Plaintiff's Rule 56.1 Statement comprise conclusory assertions with no supporting evidence.  (*Id.*).  Nevertheless, even where a party offers incomplete compliance with the Local Rules, a court retains discretion "to consider the substance of the plaintiff's arguments."  *Wali* v. *One Source*

*Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted)).  Given Plaintiff's imperfect compliance with Local Rule 56.1, the Court will rely principally on its own assiduous review of the record.

After reviewing the exhibits that Plaintiff filed with her opposition papers, the Court concludes that much of the material contained therein is inadmissible.  For instance, the declarations Plaintiff filed include inadmissible hearsay.  Such evidence may not be used to defeat Defendant's motion for summary judgment.  *Selvam* v. *Experian Info. Sols., Inc.*, 651 F. App'x 29, 31-32 (2d Cir. 2016) (summary order) (holding that "the party opposing summary judgment 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment[ ] absent a showing that admissible evidence will be available at trial.'" (quoting *Burlington Coat Factory Warehouse Corp.* v. *Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985))).

In addition, certain of Plaintiff's declarations attempt to offer testimony about events of which the declarant had no direct knowledge, in contravention of Federal Rule of Evidence 602.  In his declaration Joseph Smith states that he "learned that Sir Trevor [Nunn] agreed to direct the MOLM London and Broadway Revivals subject to terms," and, further, that he "learned that Mr. Leigh approved both Old Vic Productions as Co-Executive Producer with Co-

Executive Producer Robyn Abraham, and approved that Sir Trevor [Nunn] would direct both the West End and Broadway MOLM revival." (Smith Decl. ¶ 8). But Mr. Smith had no firsthand knowledge of these facts, and could have only learned them from others. (*See* Smith Dep. (Def. Ex. 44) 39:1-3, 79:7-10 (Smith testifying that he never had a meeting with Plaintiff and Mr. Nunn and that he neither met nor corresponded with Mr. Leigh)). This evidence is also insufficient to defeat Defendant's motion for summary judgment. *DiStiso* v. *Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("Further, where a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." (quoting Fed. R. Civ. P. 56(c)(4), Fed. R. Evid. 602)).

Further, Plaintiff has submitted declarations from certain individuals holding themselves out to be experts in the field of stage production or entertainment law, including: Flody Suarez, an "experienced entertainment industry producer" (Suarez Decl. (Pl. Ex. D)); Adam Roebuck, an "investor and producer" in Broadway and London theatrical productions for more than 20 years (Roebuck Decl. (Pl. Ex. E)); and Frederick Mueser, an attorney "who has practiced in entertainment law since 1988" (Mueser Decl. (Pl. Ex. F)). None of these individuals purports to have firsthand knowledge of the drafting of the Talent Agreement or of Plaintiff's performance of her contractual duties. Instead, Plaintiff appears to rely on their declarations as providing expert testimony on topics ranging from the scope of the Talent Agreement to the

profitability of an MOLM revival.  But Plaintiff failed to disclose these
declarations during the period for expert discovery.  Rule 26(a)(2) of the Federal
Rules of Civil Procedure requires parties to disclose the identities of expert
witnesses and to produce those experts' reports "at the times and in the
sequence directed by the court."  Fed. R. Civ. P. 26(a)(2)(D).  Pursuant to
Rule 37(c)(1), "a party [who] fails to provide information or identify a witness as
required by Rule 26(a) ... is not allowed to use that information or witness to
supply evidence on a motion, at a hearing, or at a trial, unless the failure was
substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "The purpose of
the rule is to prevent the practice of 'sandbagging' an opposing party with new
evidence."  *Ebewo* v. *Martinez,* 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).

The only justification Plaintiff offers for her failure to disclose any expert
witnesses in a timely fashion is that she "provided her [former] counsel [] with
names of all experts," and thus that any failures to abide by the Court's
deadlines are to be laid at counsel's feet.  (Pl. 56.1 ¶¶ 121, 122).  But this
accusation is unsupported by any evidence and, having been raised for the first
time in Plaintiff's opposition papers — nearly five months after Plaintiff's former
counsel withdrew from the case — finds little credence.  Further, the
declarations of Mr. Suarez, Mr. Roebuck, and Mr. Mueser were signed on
March 3, 2020, March 10, 2020, and March 5, 2020, respectively (*see* Suarez
Decl.; Roebuck Decl.; Mueser Decl.); in other words, they were not signed until
nearly five months after the time for expert discovery had concluded.  In light of
all of this, the Court finds that "their declarations are precisely the type of

'sandbagging' that Rule 37(c)(1) is designed to prevent." *Alexander* v. *Fidalgo*, No. 10 Civ. 8587 (AJN), 2013 WL 12316346, at *3 (S.D.N.Y. Apr. 10, 2013). Plaintiff has not established that her failure to disclose the expert reports was substantially justified or harmless. Accordingly, to the extent they provide expert testimony, the declarations of Mr. Suarez, Mr. Roebuck, and Mr. Mueser are excluded from consideration in resolving Defendant's motion for summary judgment.

Finally, portions of Plaintiff's own declaration purport to relay information that Plaintiff gleaned from Mr. Leigh. (*See generally* Abraham Decl. (Pl. Ex. I)). Defendant argues that this testimony must be precluded under New York's dead man's statute, which provides in relevant part:

> Upon the trial of an action ..., a party or a person interested in the event ... shall not be examined as a witness in his own behalf or interest, or in behalf of the party succeeding to his title or interest against the executor, administrator or survivor of a deceased person ..., concerning a personal transaction or communication between the witness and the deceased person ..., except where the executor, administrator, survivor, ... or person so deriving title or interest is examined in his own behalf, or the testimony of the ... deceased person is given in evidence, concerning the same transaction or communication.

N.Y. CPLR § 4519 (McKinney 2005). (*See* Def. Br. 11-13).

The Second Circuit has instructed that:

> [a]lthough the Federal Rules of Evidence abolished many common-law rules governing witness competency, they expressly provide that state law determines what rules will apply in civil actions governed by state law. *See* Fed. R. Evid. 601. Because state law supplies the rules in diversity-of-citizenship cases, *see Erie Railroad Co.* v. *Tompkins,* 304 U.S. 64,

> 78-79 (1938), New York law, including its statute
> barring the testimony of certain interested witnesses,
> must be given effect.

*Rosenfeld* v. *Basquiat,* 78 F.3d 84, 88 (2d Cir. 1996). The dead man's statute

applies, under its plain language, "[u]pon the trial of an action," and under New

York practice, the statute may not be asserted to exclude evidence used in

opposition to a motion for summary judgment. *See Clark* v. *Meyer,* 188 F.

Supp. 2d 416, 420-21 (S.D.N.Y. 2002) (citations omitted). Significantly,

however, the evidence submitted on a motion for summary judgment — both in

support of and in opposition to the motion — "must set forth facts that would

be admissible in evidence if offered at trial. Thus, irrespective of how New York

might decide this question, the federal rule requires exclusion of evidence on

summary judgment motions which the dead man's statute would exclude at

trial." *Pro Bono Invs., Inc.* v. *Gerry*, No. 03 Civ. 4347 (JGK), 2005 WL 2429777,

at \*6 (S.D.N.Y. Sept. 30, 2005) (quoting *Clark*, 188 F. Supp. 2d at 420).

Stated simply, if Plaintiff's testimony would be excluded at trial, it cannot

be used to oppose Defendant's motion for summary judgment. Accordingly, to

the extent that Plaintiff's declaration offers "knowledge which [she] has gained

by the use of [her] senses from the personal presence of the deceased," such

knowledge is excluded from consideration in resolving the pending motion.

*Griswold* v. *Hart*, 205 N.Y. 384, 395 (1912).

### 2.   The Court Grants Defendant's Motion for Summary Judgment as to Plaintiff's Breach of Contract Claim

Having determined which portions of Plaintiff's opposition papers may be

considered, the Court now turns to the merits of Defendant's motion. Under

New York law, the elements of a claim for breach of contract are "[i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages." *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996).[6]

Defendant argues that Plaintiff's breach of contract claim must fail because there is no genuine dispute of material fact that the second, third, and fourth elements of a breach of contract claim are not met. (*See generally* Def. Br.). She also offers several arguments why the Talent Agreement is unenforceable, including that it is a personal services contract; it is an unenforceable agreement to agree; and Plaintiff breached fiduciary duties she owed to Mr. Leigh by entering into the Talent Agreement. (*Id.*). For her part, Plaintiff dedicates some pages of her opposition brief attempting to refute Defendant's arguments. But Plaintiff's principal argument is framed in the offensive: Plaintiff claims that Mr. Leigh was in violation of Talent Agreement from the moment he signed it, because he had previously contracted to give the production rights to MOLM to other producers. (Pl. Opp. 6-8).

The chronology of Plaintiff's dealings with Mr. Leigh is thus important to the resolution of this motion; the Court must consider not only whether the Talent Agreement was breached, but which party breached the Agreement first. As such, the Court begins by addressing the validity of the Contract, and then

---

[6]     New York law governs the instant dispute pursuant to the choice of law provisions of the Talent Agreement. (Pl. Ex. A). Additionally, both parties have relied upon New York law in their briefing. *See Celle* v. *Filipino Reporter Enters. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the choice of New York [ ] law, all are deemed to have consented to its application." (citations omitted)).

examines each alleged breach in sequence, before analyzing Defendant's other arguments for summary judgment.

### a.    The Talent Agreement Is a Valid, Enforceable Contract

Neither party disputes that the Talent Agreement was signed by Mr. Leigh and Plaintiff.  Defendant argues that the Talent Agreement is nevertheless unenforceable, because it was not an agreement, and was instead a "preliminary agreement in advance of a formalized production agreement." (Def. Br. 20).  Defendant has introduced the expert testimony of a Broadway producer and an entertainment lawyer to support her argument that the Talent Agreement lacks certain provisions that are customarily included in a production agreement, and that it is not uncommon for parties to enter into preliminary agreements in advance of production agreements.  (*Id.*; Dkt. #432 ("Breglio Report"); Dkt. #434 ("Kladitis Report")).

In its earlier decision denying Defendant's motion to dismiss Plaintiff's breach of contract claim, the Court found that the Talent Agreement was not merely an unenforceable, preliminary agreement to agree.  (June 14, 2018 Tr. 10:16-14:14).  The Court analyzed each of the five factors that *Teachers Insurance & Annuity Association of America* v. *Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987), and *Arcadian Phosphates, Inc.* v. *Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989), identified as being useful "to determine whether a preliminary manifestation of assent was a binding preliminary agreement." (June 14, 2018 Tr. 10:16-14:14).  But the Court's conclusion is best summarized by its finding that Defendant "offer[ed] no compelling reason why

23

this contract must be a complete production contract in order to be enforceable…. Mr. Leigh could have put in language that the Agreement was not binding, but that is not what happened." (*Id.* at 12:2-19).

In issuing that decision, the Court left open the possibility that Defendant could establish through expert testimony that the Talent Agreement was nothing more than a preliminary agreement to agree. (June 14, 2018 Tr. 13:6-13). But now, having reviewed the expert testimony on the point, the Court concludes that Defendant has not met that burden. The Court accepts that the Talent Agreement may have been unusual in the industry, and that a second, more detailed production agreement would have been required to iron out the specifics of the parties' arrangement (should Plaintiff have performed her contractual obligations). But this does not suggest that the Talent Agreement is itself unenforceable. *See Tribune*, 670 F. Supp. at 498 ("The parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement.").

"The best evidence of what the parties intended 'is what they say in their writing.'" *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014) (quoting *Greenfield* v. *Philles Records, Inc.,* 98 N.Y.2d 562, 569 (2002)). Here, the parties plainly wrote that, upon Plaintiff's performance, Mr. Leigh would not only grant his rights, but would ensure that the other two Rights Holders granted their rights, to Plaintiff to produce an MOLM revival. (Pl.

24

Ex. A).  The Talent Agreement did not require that a full production agreement be entered into before any rights would be conferred.  Thus, the Court finds that the Talent Agreement was a valid and enforceable contract.

> **b.   No Reasonable Jury Could Find That Mr. Leigh Violated the Talent Agreement by Entering into Competing Production Agreements with Other Producers**

The Talent Agreement includes a paragraph requiring Mr. Leigh to "suspend ... any and all present and potential 3rd party transactions and/or contracts regarding any and all London and/or UK MOLM productions of any kind ... and to fully protect [Plaintiff] against any and all potential 3rd party interference of the MOLM rights granted pursuant to this agreement." (Pl. Ex. A).  Plaintiff argues that Mr. Leigh was in violation of this paragraph from the moment he signed the Talent Agreement because, unbeknownst to Plaintiff, Mr. Leigh had already entered into at least one other contract with another producer, giving that producer rights to produce MOLM.  (Pl. Opp. 7-8; Abraham Decl. ¶¶ 20, 22, 24).  Plaintiff claims that, had she known that Mr. Leigh had already signed a competing production agreement with another producer, she would never have signed the Talent Agreement.  (Abraham Decl. ¶¶ 37, 38).  If true, Plaintiff's allegations suggest that Mr. Leigh breached the Talent Agreement right from the start.

Upon closer examination, however, the Court concludes that Plaintiff's allegations lack evidentiary support.  Plaintiff cites to only a single piece of evidence to support her argument: the February 24, 2020 declaration of Alan Honig.  (Honig Decl.).  In her declaration, Plaintiff claims that Mr. Honig

testified that, prior to entering into the Talent Agreement with Plaintiff, Mr. Leigh had entered into a production agreement with producer Manny Kladitis for the same MOLM production rights during the same time period. (Abraham Decl. ¶ 20).[7] But Plaintiff misrepresents Mr. Honig's testimony: Mr. Honig did testify that a draft production agreement between Mr. Leigh and Mr. Kladitis existed in January 2014. (Honig Decl. ¶¶ 4-6). But Mr. Honig never claimed that the agreement was signed — in fact, he testified that he did not know what happened with the draft production agreement. (*Id.*).

Mr. Honig's declaration is clarified by his deposition testimony of January 14, 2019. (*See* Honig Dep. (Def. Ex. 3)). There, in speaking about the draft agreement with Mr. Kladitis, Mr. Honig testified that "[t]here was a contract to do the production of *Man of La Mancha* in the United States, that if my recollection is correct, that Manny Kladitis was I think going to be the producer." (*Id.* at 143:24-144:3). But when asked whether the contract was signed, Mr. Honig said, "[n]o, I don't think it was a signed contract," and recalled that "[t]here was no contract in effect" when the Talent Agreement was signed. (*Id.* at 144:4-10; *see also id.* at 156:5-9 ("Q. At this time Manny had no contract to work on a first class production in New York. Isn't that right?

---

[7]     Plaintiff also alludes to the possibility of a third production agreement with producer Fred Zollo. (Pl. Opp. 7-8). But Plaintiff does not claim that any production agreement with Mr. Zollo was actually entered into, and no record evidence exists to suggest that such a production agreement existed.

A.  You say Manny had no contract to work on.  Right.  He didn't have a contract.  No.")).[8]

Any doubt as to whether Mr. Leigh had entered into a production agreement with Mr. Kladitis is resolved by Mr. Kladitis's own deposition testimony.  (Kladitis Dep. (Dkt. #475-2)).  There, Mr. Kladitis stated that the production agreement for his involvement in an MOLM production was, in fact, never signed.  (*Id.* at 57:19-21).  Given the absence of evidence that Mr. Leigh entered into *any* production agreement that competed with the Talent Agreement, including with Mr. Kladitis, there can be no genuine dispute as to this issue.  No reasonable jury could find that Mr. Leigh violated the Talent Agreement by entering into a competing production agreement.[9]

### c.    Plaintiff Failed to Perform Her Contractual Obligations

The Court next turns to Defendant's argument that Plaintiff did not herself perform under the Talent Agreement.  (Def. Br. 10-20).  On this point, the parties fundamentally disagree over what the Talent Agreement obligated Plaintiff to do.  Defendant argues that Plaintiff was required to: (i) obtain professional interest in an MOLM revival from a British theatrical stage

---

[8]    The Court notes that the draft contract between Mr. Leigh and Mr. Kladitis concerned production rights to an MOLM revival in the United States.  (Honig Dep. 143:24-144:3).  Even if such a contract had been executed, it does not appear that it would have violated the Talent Agreement, which gave Plaintiff exclusive rights regarding an MOLM revival in the United Kingdom only.  (Pl. Ex. A).

[9]    Plaintiff's request for leave to file an untimely motion for summary judgment makes clear that she believed she was entitled to summary judgment in favor of her breach of contract claim because Mr. Honig's declaration established that Mr. Leigh had violated the Talent Agreement by entering into one or more production agreements with other parties.  (Dkt. #452, 459).  For the reasons stated herein, Plaintiff's interpretation of Mr. Honig's declaration was inaccurate.  Thus, Plaintiff's proposed motion for summary judgment would have failed on the merits, had it been timely filed.

director, a recognized co-producer from the United States or the United Kingdom, and a well-known actor (together, the "Talent"); (ii) request terms, conditions, and dates of availability from the Talent; and (iii) obtain those terms, conditions, and dates of availability so they could be relayed to Mr. Leigh.  (Def. Br. 15-20).  Plaintiff's summary judgment briefing does not present a clear theory as to what she was required to do, but in her opposition papers to Defendant's earlier motion to dismiss, Plaintiff had argued that she was merely required to obtain interest from the Talent and request "terms, conditions, and dates of availability," but not to obtain or negotiate any such terms.  (Dkt. #60 at 16-17).

As the Court determined in resolving Defendant's motion to dismiss, the Talent Agreement "did not require Plaintiff to iron out every detail of the Talent's terms or have them formally signed on to the revival.  Nor did the Plaintiff have to negotiate any Talent terms or conditions, she simply had to request them."  (June 14, 2018 Tr. 16:17-21).  In the absence of a compelling argument from Defendant to deviate from its prior interpretation of the Talent Agreement, the Court will hew to it.[10]  Plaintiff was required to obtain interest

---

[10]   Citing to the Court's prior statement that the Talent Agreement is not the "clearest contract" (June 14, 2018 Tr. 3:25-4:1), Defendant invokes the doctrine of *contra proferentem* to argue that any ambiguity in the contract should be construed against Plaintiff, because she was the drafter of the contract.  (Def. Br. 18-20 (citing *McCarthy* v. *Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) ("New York follows the well-established *contra proferentem* principle which requires that 'equivocal contract provisions are generally to be construed against the drafter.'")).  But the doctrine of *contra proferentem* is not applicable here, because the contract is not ambiguous as to whether Plaintiff was required to obtain and negotiate terms, conditions, and dates of availability from the Talent.

Further, a genuine dispute of material fact exists concerning who drafted the Talent Agreement.  To be sure, certain evidence suggests that Plaintiff was the drafter.  (*See* Def. 56.1 ¶¶ 47, 44, 55, 56).  But this evidence, though compelling, is not definitive; it

from the Talent and to request their terms, conditions, and dates of availability, but she was not required to obtain or negotiate those terms.  As it happens, the Court finds that Plaintiff failed to perform even these more limited tasks.

> **i.    Plaintiff Failed to Obtain Interest and to Request Terms, Conditions, and Dates of Availability from a Well-Known Actor**

The text of the Talent Agreement unambiguously required Plaintiff to obtain professional interest and request terms, conditions, and dates of availability from a well-known actor in addition to a director and a co-producer. (Pl. Ex. A).  In opposing Defendant's motion to dismiss, Plaintiff had claimed that she was not in fact required to obtain interest from an actor, citing to an email that Plaintiff had received from Mr. Leigh's assistant in which Mr. Leigh supposedly stated that, if Plaintiff could obtain Mr. Nunn's confirmation to direct MOLM in writing, Mr. Leigh would agree to defer all casting decisions to Mr. Nunn.  (Dkt. #60 at 7 (citing Am. Compl. ¶ 74 and Ex. 9)).  The Court determined that Plaintiff had plausibly alleged that this email operated as a modification of the contract language and that, through the email, Mr. Leigh had deferred all casting decisions to Mr. Nunn, thus relieving Plaintiff of the

---

establishes that Plaintiff sent Mr. Leigh drafts of the Talent Agreement, but the extent to which Mr. Leigh participated in the drafting of the first agreement and the editing of subsequent iterations is not obvious.  (*See id.*).  For her part, Plaintiff has consistently testified that it was Mr. Leigh who drafted the Talent Agreement.  (Abraham Decl. ¶ 9). And while New York's dead man's statute would preclude Plaintiff from testifying concerning whether Mr. Leigh dictated and/or drafted the Talent Agreement, it would not prevent her from testifying that she herself did not draft it.  In light of the general presumption against weighing credibility of a witness at the motion for summary judgment stage, the Court finds that Plaintiff's testimony on this point is sufficient to establish a genuine dispute as to whether Plaintiff drafted the Talent Agreement.

obligation to find an interested, well-known actor.  (June 14, 2018 Tr. 16:21-17:13).

In opposing Defendant's motion for summary judgment, Plaintiff does *not* argue that she was relieved of the obligation to find a well-known actor with interest in performing in an MOLM revival.  In a similar vein, the email from Mr. Leigh's assistant, purporting to modify the terms of the Talent Agreement, is not amongst Plaintiff's exhibits.  (*See generally* Pl. Opp.; Pl. 56.1; Pl. Ex.).  Nor could Plaintiff have relied upon that email; it was one of the 33 documents that the Court excluded as evidence when it granted Defendant's motion for sanctions, in light of the fact that the documents had indicia of fraudulent provenance.  (*See* Dkt. #371 (order memorializing decision); Dkt. #409 (transcript of decision); Dkt. #234).  In short, the only piece of evidence suggesting that Plaintiff was not required to obtain interest from a well-known actor may not be relied upon in resolving this motion.

Absent that, the Court is left with only the Talent Agreement itself, which Plaintiff agrees is the "best evidence of M[r.] Leigh's intent[.]"  (Pl. 56.1 ¶¶ 5, 6).  The Talent Agreement plainly required Plaintiff to obtain interest from a director, a co-producer, and a well-known actor, and to request terms, conditions, and dates of availability from all three.  (Pl. Ex. A; Pl. 56.1 ¶¶ 49, 60).  But while Plaintiff has argued that she obtained interest from a director, Mr. Nunn, and a co-producer, Old Vic Productions, she fails to argue that she obtained interest from or requested terms, conditions, and dates of availability from an actor.  (*See generally* Pl. Opp.; Pl. 56.1).  More to the point, no evidence

30

exists to suggest that Plaintiff fulfilled this contractual obligation.  (Def. Br. 14;
Def. Reply 10).  This alone establishes as a matter of law that Plaintiff did not
fully perform under the Talent Agreement.  Her breach of contract claim must
fail.  *See Harsco Corp.*, 91 F.3d at 348 (holding that "adequate performance of
the contract by the plaintiff" is an element of a breach of contract claim).

> ### ii.    Plaintiff Failed to Request Terms, Conditions, and Dates of Availability from a Director or a Co-Producer

Additionally, Plaintiff has failed to introduce evidence that she fully
performed with regard to the two other categories of "Talent" addressed in the
Talent Agreement: "a leading British theatrical director" and "a recognized US
or UK co-producer."  (Pl. Ex. A; Def. Br. 10-14).  The record does suggest that
Plaintiff was able to obtain initial interest from Old Vic Productions, a
production company based in London, in co-producing a 2015 MOLM revival.
(Smith Decl. ¶¶ 11, 12).  And Plaintiff has introduced a document that appears
to be a facsimile from Mr. Nunn stating that he would agree in principle to
directing a 2015 MOLM revival.  (Pl. Ex. C).  Putting aside authentication
issues, which might well preclude the facsimile from being admitted into
evidence at trial, the Court accepts the document as being sufficient to create a
genuine dispute as to whether Plaintiff obtained Mr. Nunn's initial interest in
the revival.

Even so, there is no evidence that, having obtained initial interest from
Mr. Nunn and Old Vic Productions, Plaintiff took the next, crucial step of
requesting their terms, conditions, and dates of availability.  Mr. Smith, the

sole witness identified by Plaintiff as having knowledge of her interactions with Old Vic Productions, testified that he and Plaintiff never discussed terms or conditions of Old Vic Production's involvement in an MOLM revival.  (Smith Dep. 33:9-11 ("I mean, we — just to be clear, we never got to the place where we discussed specific terms."); *id.* at 34:4-11 ("Q:  Did you discuss any — did you discuss any of the financial needs that would be required for this production?  A:  Not in any detail at all.  I may have said revivals of musicals cost between a range of X to Y million, or some such, but definitely there was no exchange of what our services would cost, what the production would cost, and all those things."); *id.* at 77:10-17 ("Q:  Did Ms. Abraham ask you for the terms and conditions under which Old Vic Productions would be involved as a co-producer?  A:  The ones I just outlined?  Q:  Yes?  A:  Or a scope of the ones I just outlined?  Q:  Yes?  A:  No.")).[11]  Nor is there any testimony from Plaintiff or Mr. Smith that he was asked to provide Old Vic Production's dates of availability for co-producing a 2015 revival.[12]

---

[11]  Mr. Smith did testify that he believed he would have told Plaintiff that Old Vic Production's interest in co-producing an MOLM revival would have been conditioned on it acting as producer and general manager — that Old Vic Productions would be in charge of the key decisions as well as the day-to-day management of the show.  (Smith Dep. 41:11-43:7).  Even assuming that Mr. Smith did convey that information to Plaintiff, this alone would not satisfy Plaintiff's obligation to request Old Vic Productions' terms, conditions, and dates of availability.

[12]  In response to Defendant's argument that Plaintiff failed to request terms, conditions, or dates of availability from Old Vic Productions, Plaintiff claims that "Defendants precluded any discussion regarding deal points with Mr. Smith, the Executive Producer of The Old Vic, because Defendants breached Plaintiff's Exclusive Agreement and refused to transfer the necessary MOLM rights to Plaintiff."  (Pl. 56.1 ¶ 71).  Not so.  The Talent Agreement required Plaintiff to request terms, conditions, and dates of availability *before* the production rights would transfer to Plaintiff.  (Pl. Ex. A). Plaintiff's argument that Defendant's failure to transfer the rights prevented her from performing under the Talent Agreement imagines a catch-22 where none exists.  What is more, Plaintiff fails to provide a cite to support this paragraph of her Rule 56.1

With regards to Mr. Nunn, the only evidence available would suggest that Plaintiff and Mr. Nunn met on at least one occasion, and that Mr. Nunn "accept[ed] in principle" the offer to serve as director of a 2015 MOLM revival. (Pl. Ex. C; Def. Ex. 48, 49).  There is no evidence to suggest that Plaintiff requested Mr. Nunn's terms, conditions, or dates of availability.  (Def. Br. 14-15; Def. 56.1 ¶ 80).[13]

Defendant has satisfied her burden of establishing that there is no evidence upon which a reasonable jury could find that Plaintiff fully performed under the Talent Agreement.  Thus, Defendant's motion for summary judgment against Plaintiff's breach of contract claim is granted.  *See Simsbury-Avon Pres. Soc'y, LLC*, 575 F.3d at 204.

---

Statement.  The Court presumes that Plaintiff is thinking of Mr. Smith's Declaration, where he testified that Plaintiff could not have "engaged in Revival Production term discussions given [the] MOLM rightsholders['] refusal to transfer the necessary MOLM rights." (Smith Decl. ¶ 14).  But, as the Court has already held, the Talent Agreement did not require Plaintiff to negotiate terms and conditions with Old Vic Productions to perform under the Talent Agreement.  She was merely required to request Old Vic Productions' terms, conditions, and dates of availability.  Mr. Smith does not suggest that Plaintiff would have been incapable of making such a preliminary request.

[13]   Plaintiff argues that the dearth of evidence as to Mr. Nunn was caused by Defendant's failure to serve Mr. Nunn with notice of his scheduled deposition in London in accordance with English law. (Pl. 56.1 ¶¶ 80, 81). As support, Plaintiff cites to a declaration provided by her English attorney, Victoria Simon-Shore. (*Id.*).  But Plaintiff overstates Ms. Simon-Shore's testimony; Ms. Simon-Shore stated that there was a question whether service had been effective, not that service had in fact been defective. (Simon-Shore Decl. (Ex. J) ¶ 4).  Even if the service had been defective, the Court has already addressed this issue, and determined that any fault for the lack of a deposition of Mr. Nunn lies with Plaintiff.  Mr. Nunn offered to appear for a deposition the day after his deposition had been scheduled, and all parties, including Plaintiff's counsel, were available at that time. (Pl. 56.1 ¶¶ 82, 83).  Nevertheless, Plaintiff refused to let the deposition go forward without offering any justification for this choice. (*Id.* at ¶ 83).  When the parties brought this issue to the Court's attention, the Court found that Plaintiff had refused a reasonable accommodation that would have allowed her to depose Mr. Nunn with minimal additional cost to the parties. (Dkt. #389, 394).  In light of this, the Court refused Plaintiff's request to extend fact discovery to allow for a further rescheduling of Mr. Nunn's deposition. (Dkt. #389, 394).

### d. Plaintiff Failed to Adduce Sufficient Evidence of Expectation Damages

Even if Plaintiff had fully performed under the Talent Agreement, Defendant argues that her breach of contract claim would fail because Plaintiff failed to establish that she suffered damages.  (Def. Br. 6-9).  Defendant's briefing on this point focuses on the $250,000,000.00 in lost profits Plaintiff claims she suffered as a result of Defendant's alleged breach.  (*Id.*; Def. Ex. 19).

Lost profits are general damages when "the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract."  *Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007).  On the other hand, lost profits are categorized as consequential damages when the "non-breaching party suffers loss of profits on collateral business arrangements."  *Id.*  Here Plaintiff's alleged lost profits are consequential damages; she claims she was deprived of money that she might have earned from staging the MOLM revival, a collateral business arrangement, but the Talent Agreement itself did not guarantee that any money would be paid.[14]  "To recover lost profits [as consequential] damages for breach of contract under New York law, a plaintiff must make three showings: [i] the

---

[14]    Plaintiff does not argue whether her lost profits damages are consequential or general damages, and the Court accordingly understands that she has conceded this point. (*See generally* Pl. Opp.).  But even if Plaintiff's lost profits were general damages, she would still be required to prove the existence of lost profits with reasonable certainty.  *See Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) ("[General] damages, however, must be not merely speculative, possible, and imaginary, but they must be *reasonably certain* and such only as actually follow or may follow from the breach of the contract.  'Certainty,' as it pertains to general damages, refers to the *fact* of damage, not the amount." (internal citations omitted)).  As explained herein, Plaintiff has failed to establish the existence of lost profits with reasonable certainty.  Thus, her claim for lost profits damages would fail, regardless of whether construed as a claim for general or consequential damages.

34

damages were caused by the breach; [ii] the damages are provable with reasonable certainty; and [iii] the damages were within the contemplation of the parties at the time of contract." *Atlas* v. *Sedrish*, 133 F. App'x 759, 760 (2d Cir. 2005) (summary order). "In addition to proving that the *existence* of damages is reasonably certain … a party claiming consequential damages must also prove the *amount* of damage with 'reasonable certainty.'" *Tractebel Energy Mktg., Inc.*, 487 F.3d at 110-11 (quoting *Kenford Co., Inc.* v. *Cty. of Erie*, 67 N.Y.2d 257, 261 (1986)).

The Court finds that Plaintiff has failed to establish the existence of damages with reasonable certainty. As Defendant's experts aptly attest, theater productions are inherently risky ventures; Broadway and West End shows lose money more often than they turn a profit. (*See* Breglio Report at 9; Kladitis Report at 5; Stark Report (Dkt. #435) at 9). Even more to the point, the experts testified that two recent revivals of MOLM lost money. (Stark Report at 10-11; Kladitis Report at 5).

Plaintiff's only attempt to establish that a 2015 MOLM revival would have been profitable is to argue that Mr. Nunn was a very successful director, and had produced a number of profitable theatrical shows. (Abraham Decl. ¶¶ 6-8). Plaintiff claimed that she expected an MOLM revival to be as successful as Mr. Nunn's productions of *Les Miserables*, *Cats*, and *Starlight Express*, which she claims earned billions of U.K. pounds. (*Id.*).

As an initial matter, Plaintiff's argument is premised on an assumption that Mr. Nunn would have directed the MOLM revival, had it been produced.

But Mr. Nunn had only agreed "in principle" to direct the revival (Def. Ex. 48, 49); that Plaintiff and Mr. Nunn would have been able to agree to terms and conditions and enter into a binding contract for him to direct the revival requires a leap of logic that Plaintiff does not attempt to support.  But even if Mr. Nunn had directed the revival, Defendant has introduced evidence that some of the shows Mr. Nunn has directed were financial failures.  (Stark Report at 12; Def. Reply 6-7).  Plaintiff has failed to introduce evidence that would make the existence of lost profit damages any more than speculative, let alone evidence that would establish the existence of damages with reasonable certainty.  *See Schonfeld* v. *Hilliard*, 218 F.3d 164, 174 (2d Cir. 2000) ("Subject as they are to the changing whims and artistic tastes of the general public, claims for profits lost in unsuccessful entertainment ventures have received a chilly reception in the New York courts." (citing *Kenford Co.,* 67 N.Y.2d at 262)).

Even if Plaintiff had established with reasonable certainty that she would have suffered some lost profits as a result of the purported breach, no evidence exists that would permit a factfinder to calculate with any certainty just how great the damages were.  Plaintiff's estimation that she would have earned $200,000,000.00 for a long-term run of an MOLM revival is based upon the revenue she claims — without substantiation — that certain of Mr. Nunn's other productions generated.  (Abraham Decl. ¶ 8).  This unadorned speculation cannot pass for reasonable certainty.  In light of this, the Court concludes that Plaintiff's claim for lost profits must fail: "Projections of future profits based upon 'a multitude of assumptions' that require 'speculation and

conjecture' and few known factors do not provide the requisite certainty." *Schonfeld*, 218 F.3d at 172 (quoting *Kenford Co.,* 67 N.Y.2d at 262).

But while Defendant argues (and the Court agrees) that Plaintiff's claim for punitive damages and attorneys' fees and costs must also fail (Def. Br. 6 n.3),[15] Defendant does not address Plaintiff's claim for reliance damages. "Under New York law, when expectation damages defy precise calculation, reliance damages are the appropriate remedy." *See Nature's Plus Nordic A/S* v. *Nat. Organics, Inc.*, 98 F. Supp. 3d 600, 610 (E.D.N.Y. 2015) ("*Nature's Plus I*"), *aff'd*, 646 F. App'x 25 (2d Cir. 2016) (summary order) ("*Nature's Plus II*") (quotation omitted); *see also Farash* v. *Sykes Datatronics, Inc.,* 59 N.Y.2d 500, 504-05 (1983). "Reliance damages ... are intended to 'place plaintiffs in the same position as they were prior to the execution of the contract[.]'" *Summit Props. Int'l, LLC* v. *Ladies Prof'l Golf Ass'n*, No. 07 Civ. 10407 (LBS), 2010 WL 4983179, at *5 (S.D.N.Y. Dec. 6, 2010) (quoting *V.S. Int'l, S.A.* v. *Boyden World*

---

15      Plaintiff's initial disclosures stated that she intended to seek punitive damages and various types of attorneys' fees and litigation costs in amounts "to be determined" at a later date.  But, "under New York law, punitive damages are recoverable in a breach of contract action where the "conduct constituting, accompanying, or associated with the breach of contract" is (i) actionable as an independent tort, (ii) sufficiently egregious, and (iii) "part of a pattern of similar conduct directed at the public generally."  *Icebox-Scoops, Inc.* v. *Finanz St. Honore, B.V.*, 715 F. App'x 54, 56 (2d Cir. 2017) (summary order) (quoting *Rocanova* v. *Equitable Life Assur. Soc'y of the U.S.*, 83 N.Y.2d 603, 613 (1994)).  Plaintiff has made no effort to argue that her breach of contract claim would fall within this exception to the rule against punitive damages.  The alleged breach of contract was not actionable as an independent tort, especially egregious, or part of a pattern of conduct directed at the public.  Thus, punitive damages are unavailable.  Further, "[i]n New York, 'the prevailing litigant ordinarily cannot collect ... attorneys' fees from its unsuccessful opponents....  Attorneys' fees are treated as incidents of litigation, rather than damages....  The exception is when an award is authorized by agreement between the parties or by statute or court rule.'"  *Ambac Assurance Corp.* v. *Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 584 (2018) (quoting *Congel* v. *Malfitano,* 31 N.Y.3d 272, 290-91 (2018)).  Plaintiff's breach of contract claim does not fall within this exception, so she may not recover attorneys' fees or costs.

*Corp.,* 862 F. Supp. 1188, 1198 (S.D.N.Y. 1994)); *see also* RESTATEMENT

(SECOND) OF CONTRACTS § 344(b) (1981) (damages for "reliance interest" put

promisee "in as good a position as he would he would have been in had the

contract not been made").  Reliance damages allow a plaintiff to recover "his

expenses of preparation and of part performance, as well as other foreseeable

expenses incurred in reliance upon the contract." *Bausch & Lomb, Inc.* v.

*Bressler,* 977 F.2d 720, 729 (2d Cir. 1992).

Under New York law, "a plaintiff may recover 'damages based on [her]

reliance interest, including expenditures made in preparation for performance

or in performance, less any loss that the party in breach can prove with

reasonable certainty the injured party would have suffered had the contract

been performed.'" *World of Boxing, LLC* v. *King*, 634 F. App'x 1, 3 (2d Cir. 2015)

(summary order) (quoting *St. Lawrence Factory Stores* v. *Ogdensburg Bridge &*

*Port Auth.,* 13 N.Y.3d 204, 208, (2009)).  "[R]eliance damages are recoverable

provided they are proximate in effect, and are not speculative or uncertain in

character and were fairly within the contemplation of the parties when the

[contract] was made, or might have been foreseen as a consequence of a breach

of its covenants." *Nature's Plus I*, 98 F. Supp. 3d at 610 (internal quotation

omitted).

In her initial disclosures, Plaintiff claimed that she was entitled to

$1,261,388 in "[e]xpenses, fees, and other costs related to Plaintiff's efforts to

obtain and secure performance under the [Talent Agreement]." (Def. Ex. 19).  A

careful review of the record discloses that Plaintiff has failed to substantiate

this dollar amount outside of her declaration, in which she testifies that she stayed in London at the Savoy Hotel while meeting with potential Talent trying to perform under the Talent Agreement, and expended more than one hundred thousand dollars in doing so.  (Abraham Decl. ¶ 16).[16]

There exists at least a genuine dispute of material fact concerning whether, when they signed the Talent Agreement, Mr. Leigh and Plaintiff contemplated that Plaintiff would expend money flying to London and staying at a hotel there.  The Talent Agreement itself provides that "[u]pon mutual execution of this Agreement …  Abraham agrees to promptly fly to London and contact leading British directors and international actors."  (Pl. Ex. A).  Thus, money Plaintiff spent flying to London, staying in London, and meeting with actors and directors might plausibly fall within the category of reliance damages.

However, the Court notes that Plaintiff's evidence that she suffered any such reliance damages is limited to her own testimony; she failed to produce any documentation to prove the amount of money she expended in staying at the Savoy Hotel, or in otherwise attempting to perform under the Talent Agreement.  The lack of such evidence would certainly undermine the

---

16      Plaintiff also claims that she spent more than $100,000 in traveling for and participating in this litigation.  (Abraham Decl. ¶ 17).  These expenses were not fairly within the contemplation of the parties at the time they entered into the Talent Agreement, and thus they are not recoverable as reliance damages.

Finally, Plaintiff claims that she was ordered to pay "more than $100,000" in additional attorneys' fees and costs.  (Abraham Decl. ¶ 18).  The Court cannot discern whether Plaintiff is speaking to a settlement agreement that she entered into with her former attorneys, which required Plaintiff to pay fees owed to them, or the Court's entry of a sanctions order against Plaintiff, requiring her to pay attorneys' fees and costs to Defendant.  Neither event is recoverable by Plaintiff as damages.

persuasiveness of Plaintiff's claim to more than $100,000 in reliance damages. "However, regardless of the weight of the reliance claim, it does present a triable issue of fact." *Clarke* v. *Trustees of Columbia Univ. of City of N.Y.*, No. 95 Civ. 10627 (PKL), 1996 WL 609271, at *8 (S.D.N.Y. Oct. 23, 1996). Plaintiff would have firsthand knowledge of money she spent in attempting to perform. If Plaintiff were to prevail on her breach of contract claim — and for the reasons outlined above, she could not — and a factfinder found her to be credible — a determination that the Court cannot make at this stage in the proceedings, *see Rojas*, 660 F.3d at 104 — the jury could award her damages based upon her testimony alone. *See Nature's Plus II*, 646 F. App'x at 29 (holding that, even with conflicting evidence on the point, "the jury reasonably could have concluded that, by awarding [plaintiff] its requested out-of-pocket expenses, it was restoring [plaintiff] to the position it was in before the contract was formed").

In light of this, the Court concludes that, were Plaintiff's breach of contract claim to survive to trial, summary judgment would be granted against Plaintiff on all forms of damages she seeks except reliance damages.

### e.   The Talent Agreement Was Not a Personal Services Contract

Having discussed Defendant's arguments regarding the formation of and performance under the Talent Agreement, the Court now considers several of her subsidiary arguments. To begin, Defendant argues that the Talent Agreement was a contract for personal services that expired on Mr. Leigh's death. The general rule in New York, as in other jurisdictions, is that "in the

absence of express words, ... the parties to a contract intend to bind, not only themselves, but their personal representatives." *Buccini* v. *Paterno Const. Co.*, 253 N.Y. 256, 259 (1930) (Cardozo, C.J.); *accord Minevitch* v. *Puleo*, 193 N.Y.S.2d 833, 836 (1st Dep't 1959).  But "[t]his general rule does not apply to 'personal services' contracts," *Artists Rights Enf't Corp.* v. *Estate of King* ("*King II*"), 370 F. Supp. 3d 371, 381-82 (S.D.N.Y. 2019) (citing *Minevitch*, 193 N.Y.S.2d at 836), the central feature of which is that the contract primarily entails the skill and labor of a particular individual, s*ee, e.g.*, *Steinbeck* v. *Steinbeck Heritage Found.*, 400 F. App'x 572, 579 (2d Cir. 2010) (summary order) (citing *Buccini*, 253 N.Y. at 257-58).  "In determining whether a contract is one for personal services, courts consider many factors, including: '[t]he importance of trust and confidence in the relation between the parties, the difficulty of judging the quality of the performance rendered and the length of time required for performance.'" *Artists Rights Enf't Corp.* v. *Estate of King* ("*King I*"), 224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016) (quoting Restatement (Second) of Contracts § 367 cmt. b (1981)).  This inquiry can be "intensely fact oriented." *Zink Commc'ns* v. *Elliott*, No. 90 Civ. 4297 (CSH), 1990 WL 176382, at *17 (S.D.N.Y. Nov. 2, 1990).

Defendant argues that the Talent Agreement is a personal services contract because it provided that, upon Plaintiff's performance, Mr. Leigh would obtain from the other Rights Holders, Ms. Wasserman and Ms. Darion, their written approval to grant Plaintiff sole and exclusive production rights to a 2015 MOLM revival in the United Kingdom.  (Def. Br. 26-27; Pl. Ex. A).

Approval from at least one of these Rights Holders would be necessary to grant Plaintiff the production rights, due to the MBPC's majority-approval requirement.  (Pl. 56.1 ¶ 5).  From this, Defendant argues that only Mr. Leigh could obtain written approval from the other Rights Holders, and more specifically, that Mr. Leigh's relationship with Hellen Darion would enable him to obtain her approval.  (Def. Br. 26-27).  In support, Defendant relies upon testimony from Mr. Honig that Ms. Darion tended to defer to Mr. Leigh on artistic issues, because he was the last surviving Author, and that she frequently shared his opinions regarding matters pertaining to MOLM.  (Pl. 56.1 ¶ 10).[17]

Ultimately, the Court is unconvinced by Defendant's argument.  "The personal-services exception to the general rule that contracts survive death is based on the notion of impossibility — that it is impossible to effectuate the parties' intent where the performance contemplated is particular to the individuals involved."  *King II*, 370 F. Supp. 3d at 381-82 (citing *Lacy* v. *Getman*, 119 N.Y. 109, 115-16 (1890), and Samuel Williston, A TREATISE ON THE LAW OF CONTRACTS § 77:72 (4th ed. 2004)).  While Mr. Leigh may have been best

---

[17]   Plaintiff does not address Defendant's argument that the Talent Agreement is a personal services contract, except to claim that Mr. Leigh did not need to convince Ms. Darion to approve a production agreement, because Mr. Leigh held a power of attorney over Ms. Darion's MOLM rights.  (Def. 56.1 ¶ 10).  But the only evidence that Mr. Leigh held a power of attorney for Ms. Darion's rights comes from Plaintiff's declaration, in which she testifies that Mr. Leigh told her he held two-thirds of the rights to MOLM and that Mr. Leigh "showed [her] his power of attorney of the rights of Hellen Darion." (Abraham Decl. ¶ 2).  This testimony is inadmissible under the New York's dead man's statute, because it conveys "knowledge which [Plaintiff, an interested party,] has gained by the use of [her] senses from the personal presence of the deceased."  *Griswold* v. *Hart*, 205 N.Y. 384, 395 (1912).  All other evidence suggests that there was never a power of attorney from Ms. Darion to Mr. Leigh.  (Def. 56.1 ¶ 8).

situated to convince the other Rights Holders to grant Plaintiff the rights to produce an MOLM revival, it is not beyond the realm of possibility that the Rights Holders could grant their rights without Mr. Leigh's recommendation. Indeed, correspondence exchanged after Mr. Leigh's passing suggested that the Rights Holders were "positively disposed" to a proposal from Plaintiff for an MOLM revival directed by Mr. Nunn.  (Def. Ex. 54).

Further, the personal-services exception is an "implied condition" to every personal services contract, exempting it from the default rule that a contract survives the death of the signatories.  *Buccini*, 253 N.Y. at 256, 258. In the Talent Agreement, however, the rule prolonging the life of a contract beyond the lives of its signatories does not merely apply by default, but rather is incorporated into the Agreement:  "The Agreement … will be binding upon [Mr.] Leigh and [Plaintiff], and their respective successors, employees, heirs and assigns.  (Pl. Ex. A).  Thus, to the extent that the personal-services exception might have controlled by implication, it was explicitly superseded by the terms of the Talent Agreement.  *See Morgan Art Found. Ltd.* v. *Brannan*, No. 18 Civ. 8231 (AT) (BCM), 2020 WL 469982, at *14 (S.D.N.Y. Jan. 28, 2020) (finding that a contract that was expressly binding upon the parties' successors and assigns was "inconsistent with [a] personal services theory"); *Citibank, N.A.* v. *Nyland (CF8) Ltd.*, 692 F. Supp. 1488, 1491 (S.D.N.Y. 1987) (holding that management agreement at issue was "a personal service contract" which "is in no way binding upon successors or assigns"), *aff'd*, 878 F.2d 620 (2d Cir.

1989).[18]  As multiple courts in this District and in New York State have found, parties may expressly provide for assignability of personal services.  *Preferred Oncology Networks of Am., Inc.* v. *Bottino*, No. 96 Civ. 1898 (BDP), 1997 WL 305253, at *2-3 (S.D.N.Y. May 28, 1997) (collecting cases).  For these reasons, the Court concludes that the Talent Agreement was not a personal services contract, and did not expire upon Mr. Leigh's death.

      **f.**    **A Genuine Dispute of Material Fact Exists as to Whether Plaintiff Was Mr. Leigh's Attorney When He Signed the Talent Agreement**

Defendant's final argument for summary judgment as to Plaintiff's breach of contract claim[19] doubles as an argument in favor of her own counterclaim:  Plaintiff breached a fiduciary duty owed to Mr. Leigh.  To

---

[18]    Defendant argues that the provision of the Talent Agreement making it binding upon the parties' heirs is not dispositive as to whether the Agreement was a personal services contract.  (Def. Br. 27 n.10).  To support this argument, Defendant states that "Mr. Leigh could not have relied on this clause to compel Plaintiff's [heirs] to meet with prospective Talent or act as a co-producer for MOLM."  (*Id.*).  The Court does not disagree that it is unlikely that either party would be granted the remedy of specific performance upon a breach.  But this does not speak to whether the Talent Agreement is a contract for personal services; indeed, specific performance is not an available remedy for the breach of a personal services contract even where both parties to the contract survive.  *See Marriott International, Inc.* v. *Eden Roc, LLLP*, 962 N.Y.S.2d 111, 112 (1st Dep't 2013) (discretion inherent in personal service contract prohibited enforcement through specific performance); *Alexander Interactive, Inc.* v. *Adorama, Inc.*, No. 12 Civ. 6608 (PKC) (JCF), 2014 WL 113728, at *4 (S.D.N.Y. Jan. 13, 2014) (same).

[19]    Defendant presents one other argument that this Court summarily rejects:  She claims that she could not have breached the Talent Agreement because on July 20, 2014, after Mr. Leigh had died and Plaintiff had come forward to claim that she had fully performed and to demand that the Talent Agreement be honored, the Rights Holders offered Plaintiff the "opportunity to come forward with a production agreement which would include Sir Trevor as director and a request for terms and conditions, but she failed to do so."  (Def. Br. 22).  But the Rights Holders' offer to allow Plaintiff to make a proposal for an MOLM revival production was contingent upon Plaintiff paying a $50,000 nonrefundable advance against royalties.  (Pl. 56.1 ¶ 99; Def. Ex. 54).  If Plaintiff had fully performed, the Rights Holders would have been justified in requiring her to prove that performance.  But, in requiring Plaintiff to pay $50,000 before any rights would be transferred to her, Defendant insisted on a term that was not present in the Talent Agreement.  Accordingly, the Rights Holders' July 20, 2014 offer could not have constituted performance of the Talent Agreement.

establish a *prima facie* case of breach of fiduciary duty in New York, a plaintiff must allege "(i) a duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson* v. *Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).  Defendant's theory is that Plaintiff was serving as Mr. Leigh's attorney at the time they entered into the Talent Agreement, that her entry into the Talent Agreement breached her fiduciary duty as Mr. Leigh's attorney, and that she should thus be precluded from enforcing the Agreement.  (Def. Br. 28-35).  Defendant's arguments hinge on Plaintiff having acted as Mr. Leigh's attorney when the Talent Agreement was drafted and signed.  For the reasons that follow, the Court finds that a genuine dispute exists as to that material fact, precluding the entry of summary judgment in Defendant's favor as to her counterclaim.

The Court has already recited the relevant law on this topic in its September 9, 2019 Opinion, *Abraham I*, 2019 WL 4256369, at *4, and so will offer only a brief overview here.  "A fiduciary relationship exists under New York law when one … is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation." *Flickinger* v. *Harold C. Brown & Co.*, Inc., 947 F.2d 595, 599 (2d Cir. 1991) (internal quotations omitted).  Attorney-client relationships are "sufficiently rooted in trust and confidence to trigger" fiduciary duties. *World Wrestling Entm't, Inc.* v. *Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 503 (S.D.N.Y. 2007) (quoting *Ross* v. *FSG PrivatAir Inc.*, No. 03 Civ. 7292 (NRB), 2004 WL 1837366, at *5 (S.D.N.Y. Aug. 17, 2004)).  In fact, "a fiduciary duty arises when a lawyer deals with

persons who, although not strictly [the lawyer's] clients, [the lawyer] has or should have reason to believe rely on [the lawyer]." *Koppel* v. *4987 Corp.*, No. 96 Civ. 7570 (HB), 2001 WL 47000, at *11 (S.D.N.Y. Jan. 19, 2001) (quoting *Croce* v. *Kurnit*, 565 F. Supp. 884, 890 (S.D.N.Y. 1982), *aff'd*, 737 F.2d 229 (2d Cir. 1984)).  Thus, "a court must look to the words and actions of the parties to ascertain the existence of a [fiduciary] relationship." *Moran* v. *Hurst*, 822 N.Y.S.2d 564, 566 (2d Dep't 2006) (citing *Tropp* v. *Lumer*, 806 N.Y.S.2d 599, 600 (2d Dep't 2005)).

The record contains substantial evidence suggesting that Plaintiff was Mr. Leigh's attorney at the time they entered into the Talent Agreement. Defendant points to documentary evidence in the form of communications between and among Plaintiff, Mr. Leigh, and Mr. Leigh's staff in the days following the January 6, 2014 Meeting.  (Def. Br. 28-29).  In those communications, Plaintiff claimed to Mr. Leigh that he had hired her as his attorney during the January 6, 2014 Meeting.  In one email, sent on January 9, 2014, Plaintiff wrote: "Since we did not discuss fees or costs during our January 6 meeting, we can address this as a discussion point for final comments in the Agreement."  (Def. Ex. 37).  Plaintiff also included her hourly rate.  (*Id.*).  It appears that Mr. Leigh's staff responded to this email by claiming that Mr. Leigh would not pay Plaintiff legal fees, causing Plaintiff to write on January 10, 2014 that "[Mr. Leigh] specifically did agree to hire [Plaintiff] as his lawyer and solicitor for a period of six (6) months."  (*See* Pl. 56.1 ¶ 52; Def. Ex. 38).

Plaintiff also stated that Mr. Leigh "advised [he] would hire [Plaintiff] on [his] behalf for 6 months as [his] attorney/solicitor to secure [his] list of initial UK and US talent interest." (*See* Pl. 56.1 ¶ 52; Def. Ex. 38, 39). Plaintiff frequently signed emails by identifying herself as "counsel" and "Esq." (Pl. 56.1 ¶ 51). Defendant also introduced an expert report from a professor of legal ethics and responsibility, who opined that, based upon his review of the record, Plaintiff served as Mr. Leigh's counsel. (Dkt. #433 ("Fox Report")).

Ultimately, however, the Court finds just enough evidence suggesting that Plaintiff was not Mr. Leigh's attorney at the time they entered the Talent Agreement to create a genuine dispute of material fact. Most crucially, there is Plaintiff's declaration, where she testifies that she did not serve as Mr. Leigh's attorney. (Abraham Decl. ¶ 40).[20] Of course, Plaintiff's testimony on this topic is undermined by her own contemporaneous declarations that she had been hired as Plaintiff's attorney. (Pl. 56.1 ¶ 51). But other, albeit limited, bits of the documentary record support Plaintiff's testimony. In one fax sent from Plaintiff to Mr. Leigh on January 10, 2014, Plaintiff stated that she was "optimistic that if authorized to proceed as [Mr. Leigh's] London exclusive counsel, she could deliver" the desired results. But in the same exhibit, Plaintiff goes on to claim that "during the meeting ... [Mr. Leigh] advised

---

[20]     The Court finds less persuasive Plaintiff's testimony that no retainer agreement exists. As the Court has already noted, "an attorney-client relationship does not depend on the existence of a formal retainer agreement or upon payment of a fee." *Abraham I*, 2019 WL 4256369, at *6 (quoting *Moran* v. *Hurst*, 822 N.Y.S.2d 564, 566 (2d Dep't 2006)).

[Plaintiff that he] would hire [her] on [his] behalf for 6 months as [his] attorney/solicitor." (Def. Ex. 39).

Further, the emails between Plaintiff and Mr. Leigh's staff following the January 6, 2014 Meeting suggest that a dispute arose regarding Mr. Leigh's willingness to pay Plaintiff legal fees. (Def. Ex. 37, 38). Following that dispute, Plaintiff did not renew her request to insert language concerning the fees to which she would be entitled into the Talent Agreement. (Pl. 56.1 ¶ 53). From this, a reasonable factfinder might infer that, despite Plaintiff's protestations that she had already been hired to act as his attorney, Mr. Leigh declined to finalize this arrangement and did not understand Plaintiff to be operating as his attorney when he entered into the Talent Agreement.

Other alterations to successive drafts of the Talent Agreement arguably bolster such an inference. While in early drafts of the Agreement Plaintiff's signature line read "Robyn Abraham, Esq., Counsel" (Def. Ex. 37), later drafts — circulated after the parties' fee dispute — list only Plaintiff's name, without a reference to her serving as an attorney (Def. Ex. 41; Pl. Ex. A). And no portion of the Talent Agreement explicitly refers to Plaintiff providing any legal services to Mr. Leigh. Defendant claims that the Talent Agreement's grant of "legal and business rights for six (6) months to represent 'MOLM' in England and the United Kingdom for the purpose of obtaining initial professional interest" obligated Plaintiff to represent MOLM in her capacity as an attorney or

"British Solicitor."  (Def. Br. 29-30; Pl. Ex. A).[21]  But obtaining "initial professional interest" does not, on its face, require the practice of law.  The Court finds that a more natural reading of this clause would have it confer upon Plaintiff the lawful rights to represent MOLM in ascertaining initial talent.

In short, the Court has no difficulty finding that a reasonable jury could determine that Plaintiff led Mr. Leigh to believe that she was acting as his attorney when they entered into the Talent Agreement.  But, though by a slimmer margin, a reasonable jury might also find that Plaintiff's efforts to represent Mr. Leigh were thwarted, and that Mr. Leigh understood that any potential attorney-client relationship had died on the vine before the Talent Agreement was signed.  In light of this genuine dispute, a breach of fiduciary duty cannot serve as an independent reason to grant summary judgment against Plaintiff's breach of contract claim, and summary judgment must be denied as to Defendant's counterclaim.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment on Plaintiff's breach of contract claim is GRANTED.  Defendant's motion for summary judgment in favor of her own counterclaim for breach of a fiduciary duty is DENIED.

---

[21]    The Court notes that Plaintiff identified herself as a "British solicitor" in the Talent Agreement (Pl. Ex. A), but has since testified that she does not hold a "British Law Practicing Certificate" and thus cannot work as a solicitor.  (Abraham Decl. ¶¶ 34, 35).

The Clerk of Court is directed to terminate the motion at docket entry 429.  Defendant is hereby ORDERED to file a letter proposing next steps concerning her counterclaim on or before **July 29, 2020**.

SO ORDERED.

Dated:      July 8, 2020
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

50