UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBYN ABRAHAM,

                              Plaintiff,

                    -v.-

ABBY LEIGH, *et al.*,

                              Defendants.

---

17 Civ. 5429 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Robyn Abraham recently filed three motions in this case.  The motions request different forms of relief — reconsideration of the Court's prior decision granting the Leigh Defendants' motion for summary judgment (*see* Dkt. #511-514), the unsealing of certain documents and the reinstatement of certain stricken materials to the record (*see* Dkt. #506-510), and this Court's recusal from this case (*see* Dkt. #516-521; *see also* Dkt. #526-533).[1]  However, the arguments overlap to a significant extent, as does the factual support Plaintiff proffers for each motion.  For this reason, the motions are addressed together in this Opinion, and they are denied for the reasons set forth herein.

## BACKGROUND

As the docket attests, this case has substantial factual and procedural histories.  That said, certain of Plaintiff's factual assertions in support of the

---

[1]     On August 4, 2020, Plaintiff filed a Notice of Filing Supplement to Plaintiff's Motions, a document styled as a brief, and several volumes of exhibits.  (Dkt. #526-533).  The next day, the Court accepted the filing, outlined certain deficiencies in it, and noted that the materials were being filed under seal because they disclosed "irrelevant, salacious, or personally sensitive material."  (Dkt. #533).  For the reasons set forth *infra*, the Court continues to maintain those documents under seal.

instant motions are contradicted, in whole or in part, by the record in this case, and thus require clarification and/or contextualization by this Court.

## A.    Extraneous Material Not Considered by the Court

Preliminarily, the Court observes that Plaintiff has introduced a surfeit of extraneous information into the record.  The problem is not merely one of duplication, although Plaintiff has submitted the same exhibits multiple times in connection with these motions.  (*See* Dkt. #533 (order addressing duplication)).[2]  Rather, Plaintiff has introduced extensive information and allegations into the record concerning her personal history and those of her child, her former husband, and one of her former counsel.  If true — and the record does not permit the Court to resolve the point — these allegations are deeply disturbing.  The fact remains, however, that these allegations are irrelevant, factually and legally, to the issues in dispute.  Whatever evils may have befallen Plaintiff and her child decades ago, they offer no insight as to whether Plaintiff satisfied her obligations under the Talent Agreement.[3]

Worse yet, Plaintiff has repeatedly attempted to file on the public docket deeply personal information regarding prior counsel, which information is

---

[2]    For ease of reference, the Court will cite once to Plaintiff's submissions in sourcing her arguments, even if the argument is contained in multiple submissions.

[3]    Plaintiff argues that counsel to Martha Wasserman and Alan Honig injected "125 pages of more than 20 year old completely unrelated" materials on these sensitive issues. (Dkt. #512 at 13).  Counsel did introduce this material in the context of responding to the motion to withdraw filed by Plaintiff's first counsel, in a list of discovery deficiencies that needed immediate redress.  Notably, however, all of this material was filed under seal.  (*See* Dkt. #199).  It is Plaintiff who keeps raising the issues in her public filings, while omitting mention of the fact that other courts have discredited certain key allegations in prior legal proceedings.  (*See id.*).

similarly irrelevant to the legal issues in dispute.  It is not entirely clear to the Court whether these efforts are the product of simple mean-spiritedness, or whether they reflect a strategy to dissuade counsel from invoking their rights under a settlement agreement involving both sides.  Whatever the purpose of Plaintiff's disclosures, they have no place in this litigation, and they are unbecoming to someone with Plaintiff's legal training and ostensible personal history.

**B.      Plaintiff's Proffered Factual and Record Disputes**

**1.      The "Long Con" Theory**

Plaintiff's current motions are predicated on allegations of concerted action between and among Defendants and others, including Plaintiff's two prior sets of attorneys.  As it happens, however, certain allegations are not borne out by the record.  Proceeding in chronological order, Plaintiff begins by suggesting that the instant litigation is the product of an elaborate scheme to defraud Plaintiff that was perpetrated by Defendants over a period of years: "Having been advised that Defendants would lose this case on summary judgment if Plaintiff were to file in London, Defendants devised a scheme to change jurisdiction of this case from London to New York and require Plaintiff to return from the UK to the US."  (Dkt. #512 at 11).  The scheme, according to Plaintiff, included the following elements:

     i.     Defendants would file a series of "Red Herring Cases" in this District, in order to dupe Plaintiff's first counsel, Arnold & Porter LLP, into filing Plaintiff's case in this District;

     ii.     Arnold & Porter would file Plaintiff's case in this District;

iii.     Defendants would dismiss the earlier-filed cases without fees, costs, or damages; and

iv.     Defendants would then band together through a mutual defense agreement to file numerous motions "pursuant to their stated objective of harassing [counsel] to withdraw from Plaintiff's representation."

(*Id.* at 11-13).

The factual premises of Plaintiff's theory are demonstrably false.  It is true that the heirs of *Man of La Mancha*'s composers filed mirror-image lawsuits against each other in 2016, but those lawsuits did not speak to Plaintiff's claims.  *See Leigh* v. *Darion*, No. 16 Civ. 7896 (KPF) (commenced October 10, 2016; terminated November 17, 2017); *Darion* v. *Leigh*, No. 16 Civ. 8026 (KPF) (commenced October 13, 2016; terminated November 17, 2017). Moreover, the dockets make clear that each of the suits progressed for more than a year, with significant Court conferences and motion practice, before settlement was achieved.  It may well be the case that, after being served with Plaintiff's complaint, the MOLM heirs found it preferable to join forces and defend against a common enemy, but that is a far cry from the long-term deception imagined by Plaintiff.  In any event, as the Leigh Defendants note (*see* Dkt. #534 at 8), Plaintiff's prior counsel had no obligation to file her complaint in this District; counsel chose to do so, and counsel chose to seek to have this case related to the earlier cases before this Court (*see* Dkt. #3).

Plaintiff is also wrong in claiming that her prior counsel was "harass[ed] … to withdraw from Plaintiff's representation."  (Dkt. #512 at 13; *see also id.* at 14 ("Following Defendants' relentless Tag Team vexatious

litigation, Plaintiff's Arnold and Porter counsel withdrew in March 2019.")).  As an aside, the notion that a firm as large as Arnold & Porter could be harassed into withdrawal by any opposing counsel beggars belief.  But the firm also made clear in its motion to withdraw that

> Arnold & Porter seeks leave to withdraw on grounds of fundamental and irreconcilable conflict with its client, Plaintiff Robyn Abraham.  These conflicts have significantly eroded the attorney-client relationship and Arnold & Porter has determined that it can no longer effectively continue its representation of Ms. Abraham.

(Dkt. #188 at 2).  These reasons were amplified during discussions in the robing room with counsel in Plaintiff's presence.  (*See* Minute Entry of March 11, 2019; Dkt. #217 (transcript) at 83-84).  Put simply, it was Plaintiff, and not opposing counsel, who precipitated Arnold & Porter's withdrawal from the case.

### 2.    The Claims of Evidence Tampering

Similar problems beset Plaintiff's theory that after she rejected what she believed to be an unreasonably low settlement offer, Defendants concocted false claims of evidence tampering.  (*See* Dkt. #512 at 13-14).  As Plaintiff must remember, the parties engaged in substantial briefing on this issue (*see, e.g.*, Dkt. #144 (Honig and Wasserman pre-motion submission regarding Plaintiff), 154 (Abraham pre-motion submission regarding Leigh), 157 (Abraham pre-motion submission regarding Wasserman), 233-236 (motion papers for Honig and Wasserman), 264 (Leigh Defendants' motion for joinder), 273-292 (Abraham opposition papers), 303-305 (Honig and Wasserman reply papers), 307 (Leigh Defendants' reply papers)), culminating in a lengthy oral argument

held on October 22, 2020.  At the conclusion of the argument, the Court found

in relevant part:

> [T]here are emails that exist in two versions. For the
> most part, I've got examples in native format and then
> I've got a contrary version in a PDF format.… The issue
> that I have had, the issue that I've tried to come to terms
> with in this hearing is that there has to be an
> explanation for why it is these things exist in two
> formats.  I don't want people's ruminations.  I don't
> want maybe this and maybe that.   I do not want
> attorney *ipse dixit*.  I want answers.
>
> * * *
>
> [T]oday I was focusing on the theories that have been
> offered to me to explain why, in many cases, I have two
> documents with the same time stamp and different
> words on it.
>
> So here, I'm going through the theories with you now.
> There is the GoDaddy theory.  This was the original
> theory.  It was the only theory that I was given at the
> beginning of this case.  And what has been shown to me
> today is that there is some conflict, but nothing
> dispositive, for the plaintiff at least.  There are these
> phantom outages that affect certain documents, and
> [Plaintiff's expert witness] Mr. Daniel doesn't really
> make the point that Ms. [Kerwick] made about frequent,
> unexplained, only-kept-for-two-weeks outages.   So I
> don't find this to be a sufficient rebuttal of the
> defendants' argument that GoDaddy is not an
> explanation for these variances.
>
> So then there's the broken computer explanation.  Ms.
> [Kerwick] today very, very thoughtfully indicated that
> this was an instance of Ms. Abraham accepting
> responsibility, but, to my mind, only to a degree. I didn't
> [know] until today that there were two computers.  No
> one has gotten the technician to admit to having the
> same problems with both computers being out of
> commission or being unable to be used.  So I find this
> as  well  unsuccessful  and  unsatisfying  as  an
> explanation for what happened with those emails.

In Ms. [Kerwick]'s briefing, there was the third explanation, which was idiosyncratic email practices. I find this to be actually, and with no disrespect, less plausible than the GoDaddy and the broken computer theories because it does not explain the counterparty edits.

\* \* \*

So, now, dovetailing with that theory is a theory that, in fact, it was the defense witnesses or someone who was recalling and deleting emails. Now, I concede that there were defense witnesses who testified about deleting emails, but even that does not explain the recall component or how it is that I have two different versions, oftentimes with the same time stamp but with different text.

*The strongest argument for the defendants is that I have a bunch of exhibits that I can't explain other than by finding that somebody modified them; that they were altered. And ultimately, I conclude that they were altered by Ms. Abraham.*

Today I noted that counsel was very careful, plaintiff's counsel, in how she phrased her arguments on this point. That it was Ms. Abraham's position, that Ms. Abraham would go to her grave believing, and everything was done in terms of Ms. Abraham's beliefs. So I went straight to the source, and I asked Ms. Abraham as plainly as I could. *She answered, and I do not believe her, and I believe that she perjured herself before me today.* And that echoed something that Mr. Broadbent said to me when he referred to certain of these theories or certain of these presentations as unapologetic. They are. At some point in this process, Ms. Abraham should just admit that these documents are doctored and walk away from it, but even now before me she doubles and triples and quadruples down. That's what I'm left with. I'm left with the fact that these things are fabricated and that I believe that she fabricated them.

(Dkt. #409 at 64-70 (emphases added)). As sanctions for Plaintiff's document

fabrication and perjury, the Court excluded the 33 challenged documents

(which existed in PDF form only),[4] imposed on Plaintiff the fees and costs incurred by the Leigh Defendants in addressing this issue, and left open the possibility of an adverse instruction at trial.  (*Id.* at 70-72).

Plaintiff repeatedly states in her motion papers that she "did not tamper with any evidence in this case nor in any other case or matter."  (Dkt. #512 at 14).  The Court has found otherwise after exhaustive investigation and argument; it will not alter that finding here.[5]

### 3.    The "Grooming" Allegations

Plaintiff's third theory of concerted action is perhaps the most troubling. Plaintiff claims that her second team of attorneys — comprising the Washington, D.C. firm of Wiss & Partners LLP along with local counsel Colleen Kerwick — "target[ed]," "falsely befriend[ed]," and, indeed, "'groom[ed]'" Plaintiff in order to dupe her into hiring them.  (Dkt. #512 at 14; *see also id.* at 15 n.5 (claiming that Wiss "weaponized her casual relationship with Plaintiff to blackmail, extort and criminally threaten Plaintiff in this case")).  Once Plaintiff secured their services, "[k]nowing that there was a potential settlement with the Akerman clients in play, thus began Ms. Kerwick's and Ms. Wiss's

---

[4]    While Plaintiff now decries the exclusion of those documents, she previously foreswore use of them in an attempt to forestall resolution of the sanctions motion.  (*See* Dkt. #311).

[5]    Plaintiff also claims fraud in Defendant Leigh's filing of a counterclaim against Plaintiff alleging breach of fiduciary duty.  (*See* Dkt. #512 at 13).  To the extent that Plaintiff is claiming undue delay because the claim was filed more than a year after the case was filed, that delay was occasioned by the filing and resolution of an antecedent motion to dismiss.  To the extent that Plaintiff challenges the counterclaim on the merits, the Court observes that the claim was not resolved during summary judgment practice, and will instead be resolved at trial.  (*See* Dkt. #505 at 44-49).

documented Tag Team blackmail, extortion and gaslighting campaign coordinated with and on behalf of Defendants in this case." (*Id.* at 15). According to Plaintiff, problems began with Kerwick's notices of appearance in the case, and then grew to include self-interested amendments to Plaintiff's settlement agreement with Defendants Wasserman and Honig, who were represented by the law firm Akerman LLP.  When Plaintiff protested the changes to the agreement, Kerwick supposedly "threatened Plaintiff that she would contact Plaintiff's former husband and his powerful Brooklyn family to dismiss this case and 'worse.'" (*Id.* at 16).  In addition, Kerwick and Wiss (i) "threatened Plaintiff that they would jointly present false testimony against Plaintiff in the strategically coordinated Defendant's Motion for Sanctions," and (ii) "threatened to criminally harm Plaintiff on behalf of Defense Counsel Cozen and their client." (*Id.* at 17).  Were these allegations true, they would be deeply troubling, implicating as they do both ethical improprieties and criminal activity.  Here, again, however, the principal factual assertions are demonstrably false, and thus the proffered conspiracy is troubling for an entirely different reason.[6]

To begin, the notion that Wiss and Kerwick somehow conspired with counsel for the Leigh Defendants to harm Plaintiff is preposterous.  (*See, e.g.,* Dkt. #507 at 16 ("Kerwick's De Facto Representation on behalf of Defense

---

[6]      The Court's use of the limiting adjective "principal" is deliberate.  It may be that Wiss & Partners and/or Kerwick did not adequately document the attorney-client relationship once formed; that is an issue as to which the Court lacks sufficient information to reach a conclusion.  The Court is confident, however, that an attorney-client relationship was formed.

Counsel Cozen O'Connor (their client Mrs. Leigh) and Marcia Wiss, fully contrary to Plaintiff's interests, continue[s] to present date.")).  Kerwick came into the case at *Plaintiff's* instigation; Plaintiff included an *amicus* submission from Kerwick (on behalf of the Families Civil Liberties Union) discussing her need for counsel in this matter when Arnold & Porter moved to withdraw from the case.  (Dkt. #203-1).  And it was precisely because Plaintiff leveled accusations of collusion between and among Kerwick, Wiss, and defense counsel that her attorneys moved to withdraw from the case.  (Dkt. #382 at 6 (Kerwick: "I felt when it came to a point that we were not in sync that I needed to alert the Court to the fact that I feel challenged in my continued representation of her, which has got nothing to do with the case.  There have been certain concerns that I might be conspiring with the law firm of Cozen O'Connor, and there were certain concerns that I was conspiring to do her out of fees.")).  Indeed, in sharp contrast to her current contentions, Plaintiff exclaimed during the October 7, 2019 hearing on Wiss's and Kerwick's motion, "I do not want Colleen [Kerwick] to withdraw.  I think she's an excellent attorney, and I do not understand the relationship that she has with Ms. Wiss." (*Id.* at 24).[7]

---

[7]     Two other points in this regard merit brief mention.  *First*, the argument that Wiss and Kerwick were somehow in cahoots with counsel for the Leigh Defendants, Cozen O'Connor, is logically flawed, inasmuch as the proffered evidence of collusion concerns Wiss's and Kerwick's conduct with respect to settlement negotiations with the Akerman firm, with which negotiations Cozen O'Connor was not involved.  *Second*, and equally flawed, is Plaintiff's claim that Wiss and Kerwick "threatened Plaintiff that they would jointly present false testimony against Plaintiff in the strategically coordinated Defendant's Motion for Sanctions which was scheduled by Cozen Defense Counsel in October 2019."  (Dkt. #507 at 16).  The sanctions motion at issue concerned Plaintiff's fabrication of documents, which fabrication occurred well before Wiss and Kerwick were

The Court was also able to review, in real time, the Kerwick/Wiss submissions that were filed in this case on Plaintiff's behalf, and to observe Kerwick's arguments on Plaintiff's behalf at court conferences.  It was clear to the Court that counsel's focus remained at all times on Plaintiff's best interests.  (*See, e.g.*, Dkt. #273-292 (submission in opposition to sanctions motion), 311 (letter motion disclaiming intent to use challenged documents), 315 (request for discovery), 327 (letter motion to reopen certificate of default), 461 (opposing request by Plaintiff to unseal all documents in the case, which counsel did not believe would be "in Plaintiff's best interest")).

The Court also rejects Plaintiff's oft-invoked refrain that Wiss & Partners was never her counsel.  (*See, e.g.*, Dkt. #512 at 16 n.7 ("Wiss has no signed retention agreement with Plaintiff, is not a New York attorney, is not a litigator, is not authorized to practice before the New York Southern District and filed no pleadings in this case.")).  During the October 7, 2019 conference, the Court met privately in the robing room (with defense counsel's consent) with Plaintiff, representatives of Wiss & Partners, and Kerwick; it heard from all sides, reviewed the relevant documents, and though it did not need to decide the issue at the outset, it subsequently concluded that Plaintiff had, in fact, established an attorney-client relationship with both the Wiss firm and Kerwick.  (*See* Dkt. #382 at 22, 27-28, 125-28; *see also* Dkt. #372 at 17 ("Ms. Abraham, you have to stop using that descriptive when you speak of Wiss &

---

retained as counsel.  The Court strains to think of what relevant testimony, false or otherwise, Wiss or Kerwick could have provided on the issues at hand.

Partners.  You are wasting time on this call telling me that they are not, and have never been, your attorney.")).

And the notion that Plaintiff was somehow browbeaten by Wiss and Kerwick cannot be accepted by anyone with firsthand observations of the relationship.  Again to remind Plaintiff of what happened on October 7, 2019, the Court was prepared to let the settlement agreement with Defendants Honig and Wasserman fall apart because of Plaintiff's inability to resolve her issues with Wiss and Kerwick.  Plaintiff, citing her extensive experience as a transactional lawyer, announced that she would try to broker a settlement with her attorneys, which — after nearly an hour in the Court's jury room — she ultimately succeeded in doing.  (Dkt. #382 at 128 ("I thank the three of you for working it out in a very thoughtful, mature way.  I appreciate that very much. I think it was Ms. Abraham's suggestion that you do so, so I give her credit for that."); Dkt. #372 at 5-6 (discussing settlement reached in jury room)).  And though there were bumps in the road during the three weeks following the settlement, the parties ultimately agreed to the terms negotiated on October 7, 2019.  (Dkt. #379 (Court order memorializing settlement terms)).

It may well be the case that Plaintiff made certain decisions about her representation because of time constraints, or because she had difficulty in securing other counsel to represent her.  Those pressures inhere, however, in any litigation.  The Court stands by its observation of Plaintiff from the October 7 hearing: "You talk about being forced to do something, but it is you who has tried repeatedly to force Ms. Kerwick and Ms. Wiss to do things on pain of all

12

sorts of things, including ethics complaints." (Dkt. #372 at 25; *see also* Dkt. #401 (Court order discussing application by Plaintiff to have Kerwick ordered to remain on the case as *pro bono* counsel)). And having reviewed several email exchanges between Plaintiff and counsel and having observed all parties firsthand, the Court rejects out of hand any argument that Wiss or Kerwick improperly "threatened Plaintiff with physical, legal, financial and professional harm." (Dkt. #512 at 11).

## C.    The Summary Judgment Opposition

In her motions, Plaintiff advances a timeline concerning her efforts to file an opposition to the Leigh Defendants' motion for summary judgment. (*See, e.g.*, Dkt. #512 at 18-19). Here, too, the record disproves the most significant of Plaintiff's claims.

Plaintiff begins by asserting that in March 2019, this District "suspended Plaintiff's PACER/ECF filing account" (Dkt. #512 at 18), and then catalogues certain "unusual events" regarding her account (*id.* at 19). For avoidance of doubt, the Court states that it had no role in the events that led to Plaintiff's notification in March 2020 that her account was inactive; the Court understands the notification to have resulted from a delinquency in payments, but makes clear that it was not the result of any Court order. Moreover, the notice Plaintiff received, which she includes with her motion papers (Dkt. #519 at 5), expressly recites: "You may continue to log in and perform other activities (e.g., *e-file*, request filing privileges), but you will not have PACER search privileges." (*Id.* (emphasis added)). In other words, when Plaintiff advised the

Court on March 11, 2020, of her inability to file her summary judgment papers, she either misperceived or misstated the notice she had received. (*See* Dkt. #465).

From this point forward, the Leigh Defendants present a timeline that hews more closely to the record. (Dkt. #534 at 4-6). The Court accepted Plaintiff's opposition papers by email, and on March 18, 2020, it permitted Plaintiff to e-file "those papers that she emailed to the Court and Leigh Defendants on March 11, 2020." (Dkt. #470). In the meantime, the Leigh Defendants filed their reply submissions on March 25, 2020, pursuant to the Court's earlier scheduling order. (Dkt. #474-475). The next day, March 26, 2020, Plaintiff moved for reconsideration of the Court's order that allowed her to file those documents that had been emailed to the Court and the Leigh Defendants on March 11, 2020. (Dkt. #477; *see also* Dkt. #478 (Leigh Defendants' opposition)). Before the Court could respond, on March 27, 2020, Plaintiff sought to file briefing and exhibits that differed from what she had filed on March 11, 2020. (Dkt. #481-489). The Court rejected her attempts, construing them as an impermissible sur-reply, and ordered Plaintiff "to file on the public docket as her submissions in opposition to the pending motion for summary judgment only those documents that she emailed to the Court and Leigh Defendants on March 11, 2020." (Dkt. #492). When Plaintiff did not, the Court struck the impermissible filings and ordered the Clerk of Court to docket the materials that had been emailed to the Court on March 11, 2020. (*See* Dkt. #498 (order), 499-500 (Plaintiff's filings of March 11, 2020, which the Court

14

ordered the Clerk of Court to docket)).  Less than a week later, Plaintiff renewed

several requests, including a request that the Court permit her "to file all

missing Opposition To Summary Judgment documents, including but not

limited to depositions precluded from filing previously." (Dkt. #496).  The

Court denied her request by Order dated April 6, 2020.  (Dkt. #498).[8]

## DISCUSSION

### A.    The Court Denies Plaintiff's Motion for Reconsideration

### 1.    Applicable Law

A party may obtain relief on a motion for reconsideration "only when the

[party] identifies an intervening change of controlling law, the availability of

new evidence, or the need to correct a clear error or prevent manifest injustice."

*Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Tr.*, 729 F.3d 99,

104 (2d Cir. 2013) (quotation omitted); *accord Virgin Atl. Airways, Ltd.* v. *Nat'l

Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).  "The standard for granting

[a motion for reconsideration] is strict, and reconsideration will generally be

denied unless the moving party can point to controlling decisions or data that

the court overlooked — matters, in other words, that might reasonably be

expected to alter the conclusion reached by the court."  *Shrader* v. *CSX

Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  Conversely, a motion for

---

[8]     In its Order of April 6, 2020, the Court precluded Plaintiff "from filing further
submissions of any type until the earlier of a further order of the Court in this regard,
or the Court's resolution of Defendants' pending motion for summary judgment." (Dkt.
#498).  To forestall any future claims of hair-splitting, the Court acknowledges that its
order had the effect of suspending Plaintiff's filing privileges for the three-month period
that preceded issuance of the summary judgment decision.

15

reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]'" *Analytical Surveys, Inc.* v. *Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quoting *Sequa Corp.* v. *GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)); *see also Stone* v. *Theatrical Inv. Corp.*, 80 F. Supp. 3d 505, 506 (S.D.N.Y. 2015) (observing that a motion for reconsideration "is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced" (internal quotations and citations omitted)).

### 2.   Analysis

To a degree, Plaintiff's motions for reconsideration and for unsealing overlap; among other commonalities, both motions challenge the sealing of certain documents in the case and both challenge the striking of certain documents from the record.  (*Compare* Dkt. #507, *with* Dkt. #512).  But because the Court and the parties (including Plaintiff) had equal access to all of the summary judgment materials, including those filed under seal, the Court construes Plaintiff's motion for reconsideration to focus on those materials that were not considered by the Court in rendering its decision, i.e., those ordered stricken from the record.

The Court will not revisit its decision to strike docket entries 481 through 489 from the record.  As detailed above, Plaintiff advised the Court of her difficulties with ECF on March 11, 2020, and submitted her opposition papers by email that same day.  The next day, Plaintiff sought additional time to file

16

her opposition papers, noting, "[a]s of this morning, Plaintiff presently is precluded from filing via ECF." (Dkt. #465). The Court granted the request for an extension (*id.*), but did not understand Plaintiff to be seeking to file something different than or additional to what had been emailed to the Court and the Leigh Defendants. Of note, the Court granted Plaintiff until March 20, 2020, to file her papers by ECF, and then extended that deadline until March 27, 2020, based in part on Plaintiff's representations that no prejudice to the Leigh Defendants would arise from those extensions. And yet the Leigh Defendants' reply brief, which of necessity would respond to Plaintiff's opposition materials, was due on March 25, 2020. Precisely for this reason, the Court made clear in its March 18, 2020 endorsement that "Plaintiff may only file those papers that she emailed to the Court and Leigh Defendants on March 11, 2020." (Dkt. #470).

Nearly one week later — and one day after the Leigh Defendants had filed their reply submission — Plaintiff expressed her intent to file materials additional to those emailed on March 11, 2020, and for the first time mentioned her intent to file deposition transcripts. (Dkt. #477). Given the obvious prejudice to the Leigh Defendants, as well as the lack of prior notice to the Court, the Court denied the request. (Dkt. #492). Even then, as the Leigh Defendants note (*see* Dkt. #534 at 6), the Court reviewed the relevant deposition transcripts in reaching its decision because the parties cited to those transcripts in their motion papers (*see, e.g.*, Dkt. #505 at 18, 26-27, 32 (references to deposition transcripts)).

To the extent that Plaintiff is asking the Court to reconsider its October 22, 2019 decision striking certain exhibits because of fraudulent provenance (*see* Dkt. #512 at 13-14), the Court denies that request as well. After extensive briefing and oral argument, the Court found that Plaintiff had altered or fabricated 33 documents and then perjured herself regarding those documents, and it excluded those documents from evidence.  (Dkt. #371, 409). Plaintiff has introduced no evidence or argument to cause the Court to rethink its decisions in this regard.

In sum, Plaintiff has not identified any evidence that the Court should have, but failed to, consider in resolving the Leigh Defendants' summary judgment motion.  Plaintiff has likewise identified no basis in law or in fact for the Court to reconsider its Opinion and Order of July 8, 2020.  Her motion for reconsideration is thus denied.

**B.    The Court Denies Plaintiff's Motion to Unseal**

**1.    Relevant Facts**

Separate and apart from her requests for reinstatement of stricken documents, Plaintiff moves to "unseal all documents in this case," claiming violations of her (as distinguished from the public's) rights of access to the courts, of due process, and under the First Amendment.  (*See, e.g.*, Dkt. #507). Plaintiff's motion is curious, inasmuch as Plaintiff has had access to all of the materials considered by the Court in this case.  It also betrays a misunderstanding of the procedural history of the case, specifically as it pertains to the issue of sealing.

18

In September 2018, Plaintiff's then-counsel, Arnold & Porter, submitted a Stipulated Protective Order Regarding Confidential Material (the "Protective Order") on behalf of all parties for the Court's consideration; the Court endorsed the Protective Order on September 7, 2018. (Dkt. #95, 97). Thereafter, each of the parties invoked the Protective Order in asking the Court to seal or permit redaction of various filings with the Court. (*See, e.g.*, Dkt. #133, 140, 146, 153, 164, 170, 196, 231, 252, 256, 294, 295, 296). Based on its review of Plaintiff's motion and of Plaintiff's prior requests for sealing (*see, e.g.*, Dkt. #457, 479), the Court does not understand the sealed filings that predate summary judgment practice to be the source of Plaintiff's concern. More recently, the Leigh Defendants invoked the Protective Order to request sealing of certain exhibits submitted with their summary judgment motion. (Dkt. #436). The Court understands that Plaintiff does object to the sealing that the Court permitted in January 2020 (Dkt. #438), but notes that Plaintiff has at times argued mistakenly that no Protective Order exists (*see, e.g.*, Dkt. #507 at 2 ("The Sealing of This Civil Breach of Contract Documents Without Examination or Protective Order Is Violative of Plaintiff's Access to Courts, Rights of Due Process and First Amendment Rights")).

Sealing requests of a different type emerged beginning in the fall of 2019, contemporaneously with Plaintiff's settlement with Defendants Honig and Wasserman and the dissolution of her relationship with Kerwick and Wiss. Counsel for Honig and Wasserman — who had been the impetus for the sanctions motion against Plaintiff for document fabrication — asked the Court

to expunge certain documents regarding that motion from the record, which

request the Court declined because the documents had been filed under seal.

(Dkt. #348).  Plaintiff and her then-counsel next sought to seal a series of

documents relating to the settlement of claims between and among Plaintiff,

Kerwick, and Wiss, and between and among Plaintiff, Honig, and Wasserman,

arguing in relevant part:

> It is respectfully requested that ECF Doc # 395, 397, 398, 399 be sealed.  Notwithstanding the presumption of access under both the common law and the first amendment, the countervailing factors include that the contested documents are subject to a confidentiality agreement with Defendant Wasserman and Defendant Honig; a non-disparagement agreement with Defendant Wasserman and Defendant Honig and a court ordered peace bond in favor of Wiss & Partners and the undersigned.

(Dkt. #400; *see also* Dkt. #411 (Plaintiff's *pro se* motion to seal documents

related to the settlement)).  The Court resolved the application by making

docket entries 395 and 398 viewable to the Court and parties only.  (Dkt.

#401).

As relations soured between Plaintiff and her second team of attorneys,

the tone of her submissions changed, with a disturbing uptick in irrelevant

assertions and *ad hominem* attacks by Plaintiff on Defendants and on her own

counsel.  The Court responded by sealing certain of Plaintiff's submissions (and

the responses thereto), while publicly disclosing as much as it considered

appropriate in its orders.  (*See, e.g.*, Dkt. #401 (Court order sealing, but

referring to, submissions by Plaintiff in support of application to have Kerwick

ordered to remain as *pro bono* counsel), 418 ("It is noteworthy to the Court that

despite repeated remonstrations from the Court — including a finding of perjury — Plaintiff continues to include misleading, and at times false, statements in her submissions.  The Court has no need to detail all such statements in this Order, but it notes that Plaintiff has repeatedly mischaracterized the conduct of the Leigh Defendants, the procedural history of this case, and the content of the Court's Orders in her submissions to the Court.")).  The Court's warnings to Plaintiff regarding tone went unheeded; additionally, the Court became aware of potential violations by Plaintiff of her October 2019 settlement agreement.  Because of the nature of the allegations, the invective levied by Plaintiff at her prior counsel, and the overall irrelevance of Plaintiff's dispute with her counsel to the issues before it, the Court designated the materials as *ex parte*, and allowed them to be viewable to Plaintiff and her former counsel only.  (*See, e.g.*, Dkt. #454, 494, 495).  What is more, the Court permitted Kerwick and the Akerman firm to remain on the docket over Plaintiff's objection.  (*See, e.g.*, Dkt. #462 (order denying request to unseal all sealed filings from July 2019 to the present and explaining why the Court (i) permitted Kerwick and Akerman to continue to receive ECF notifications, and (ii) permitted Kerwick to communicate information regarding Plaintiff's conduct under the settlement agreement to Plaintiff and the Court by email)).

### 2. Applicable Law

Courts have recognized a long-established "general presumption in favor of public access to judicial documents." *Collado* v. *City of New York*, 193 F.

Supp. 3d 286, 288 (S.D.N.Y. 2016).  The Second Circuit has defined "judicial

documents" as documents filed with a court that are "relevant to the

performance of the judicial function and useful in the judicial process."

*Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (internal

quotation marks omitted) (quoting *United States* v. *Amodeo*, 44 F.3d 141, 145

(2d Cir. 1995)).  The presumption of access is "based on the need for federal

courts to have a measure of accountability and for the public to have

confidence in the administration of justice."  *United States* v. *Amodeo*, 71 F.3d

1044, 1048 (2d Cir. 1995).

>    As a sister court in this District ably explained:

> The Second Circuit recently summarized the three steps
> that the Court must follow to determine whether the
> presumption of public access attaches to a particular
> document and bars disclosure. *Mirlis* v. *Greer*, 952 F.3d
> 51, 59 (2d Cir. 2020).  First, the Court determines
> whether the document is a "judicial document" — "one
> that has been placed before the court by the parties and
> that is relevant to the performance of the judicial
> function and useful in the judicial process."  *Id.*
> (internal quotation marks omitted).  Second, the
> Court "proceeds to 'determine the weight of the presumption
> of access to that document.'"  *Id.* (quoting *United States*
> v. *Erie Cty.*, 763 F.3d 235, 239, 241 (2d Cir. 2014)).
> "The weight to be accorded is 'governed by the role of
> the material at issue in the exercise of Article III judicial
> power and the resultant value of such information to
> those monitoring the federal courts.'"  *Id.* (quoting
> [*Amodeo*, 71 F.3d at 1049]).  "Finally, the court must
> identify all of the factors that legitimately counsel
> against disclosure of the judicial document, and
> balance those factors against the weight properly
> accorded the presumption of access."  *Id.*

*Theallet* v. *H&M Hennes & Mauritz, L.P.*, No. 20 Civ. 2212 (GHW), 2020 WL

4194898, at *2 (S.D.N.Y. July 20, 2020); *see also Lugosch*, 435 F.3d at 120

("Documents may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." (internal quotation marks omitted) (quoting *In re Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987))).

### 3.   Analysis

As suggested by the preceding procedural review, the Court will not, on this record, unseal any document, or portion of a document, that it sealed pursuant to requests from the parties under the Protective Order.  For one thing, Plaintiff is unclear in her argument; at times, she references the public right of access, but more often than not, she claims personal violations of her right of access to the courts, her due process rights, and her First Amendment rights.  Furthermore, to the extent that Plaintiff is seeking reversal of a designation of confidentiality that was made by her, her prior counsel, and/or any of her adversaries and then accepted by the Court, there is a process established in the Protective Order that she has not followed.  (*See* Dkt. #97).

The Court understands, however, that Plaintiff is more interested in disclosing to the public those sealed docket entries that pertain to her settlement with Defendants Honig and Wasserman, her settlement with Kerwick and Wiss, and her ongoing disputes with Kerwick and Wiss.  The Court will not permit that to happen.  As indicated throughout this Opinion, after obtaining what she sought in these two settlements, Plaintiff resorted to disseminating in her public filings on ECF (i) patent falsehoods about Defendants and about all counsel involved in this case and (ii) irrelevant, but

intensely personal, information about her second team of attorneys.
Admonitions from the Court did nothing to stem Plaintiff's vitriol, and the
Court was accordingly forced to use its sealing authority.  The Court's docket is
not a place for calumny or score-settling, nor will the Court abet Plaintiff in any
attempts to violate the settlement agreements she reached in this case or to
shade the record for other proceedings in other fora.  Her motion for unsealing
is therefore denied.  *See generally Banco Santander (Brasil), S.A.* v. *Am. Airlines,
Inc.*, No. 20 Civ. 3098 (RPK), 2020 WL 4926271, at *3 (E.D.N.Y. Aug. 21, 2020)
(collecting cases for the proposition that the presumption of access to judicial
documents is lessened where the information in question is irrelevant to the
issues in dispute).

## C.     The Court Denies Plaintiff's Motion for Recusal

### 1.     Applicable Law

Plaintiff's final motion is one for recusal.  Section 455(a) of Title 28
provides that "[a]ny justice, judge, or magistrate judge of the United States
shall disqualify [her]self in any proceeding in which [her] impartiality might
reasonably be questioned."  28 U.S.C. § 455(a).  Subsection (b) of this statute,
in relevant part, requires a judge to recuse herself "[w]here [s]he has a personal
bias or prejudice concerning a party, or personal knowledge of disputed
evidentiary facts concerning the proceeding."  *Id.* § 455(b)(1).  Section 144 of
Title 28 further provides that a judge shall not proceed in a matter in which he

or she "has a personal bias or prejudice either against [the plaintiff] or in favor of any adverse party."  28 U.S.C. § 144.

Section 455 "sets out an objective standard for recusal, creating the so-called 'appearance of justice' rule."  *DeLuca* v. *Long Island Lighting Co.*, 862 F.2d 427, 428 (2d Cir. 1988) (internal citation omitted); *see also ISC Holding AG* v. *Nobel Biocare Fin. AG*, 688 F.3d 98, 107 (2d Cir. 2012) ("This provision is to 'be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance.'" (quoting *Liteky* v. *United States*, 510 U.S. 540, 548 (1994)).  Under that test, a court asks: "Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned?  Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?"  *United States* v. *Bayless*, 201 F.3d 116, 126 (2d Cir. 2000) (quoting *Diamondstone* v. *Macaluso*, 148 F.3d 113, 120-21 (2d Cir. 1998)).

"The [Second Circuit] has cautioned that ... the grounds asserted in a recusal motion must be scrutinized with care, and judges should not recuse themselves solely because a party claims an appearance of partiality."  *Barnett* v. *United States*, No. 11 Civ. 2376 (LAP), 2012 WL 1003594, at *1 (S.D.N.Y. Mar. 26, 2012) (internal quotation marks omitted) (quoting *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001)).  More fundamentally, where the standards governing disqualification are *not* met, "disqualification is not optional; rather, it is prohibited."  *In re Aguinda*, 241 F.3d at 201; *see also In re Drexel Burnham*

25

*Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988) ("A judge is as much obliged not to recuse [herself] when it is not called for as [s]he is obliged to when it is."). Were it otherwise, recusal motions would become a tool for "judge-shopping" and "impeding the administration of justice." *In re Martin-Trigona*, 573 F. Supp. 1237, 1243 (D. Conn. 1983). And Section 455 "is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *United States* v. *Cooley*, 1 F.3d 985, 993 (10th Cir. 1993).

Finally, "[r]ulings adverse to a party are not regarded in and of themselves as evidence of such bias or prejudice as would require recusal." *Bishop* v. *United States*, No. 04 Civ. 3633 (CSH), 2004 WL 1497690, at *1 (S.D.N.Y. July 1, 2004). As the Supreme Court has observed:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States* v. *Grinnell Corp.*, 384 U.S. [563, 583 (1966)], 86 S. Ct., at 1710. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of

26

> favoritism or antagonism as to make fair judgment
> impossible.

*Liteky*, 510 U.S. at 555; *accord Doe* v. *E. Lyme Bd. of Educ.*, 962 F.3d 649, 666

n.21 (2d Cir. 2020).

### 2. Analysis

Citing due process, court access, and First Amendment claims, Plaintiff

advances the following factual bases for the Court's recusal:

i.  The Court erred in sealing and striking materials from Plaintiff's opposition submission to the Leigh Defendants' summary judgment motion.

ii.  The Court erred and retaliated against Plaintiff in repeatedly suspending her PACER/ECF filing rights.

iii.  The Court erred in permitting Colleen Kerwick to remain on the docket and file submissions, including sealed and *ex parte* submissions, while suspending Plaintiff's filing rights.

iv.  The Court erred in granting the Leigh Defendants' motion for summary judgment after striking her opposition submission.

v.  The Court erred in sealing certain documents submitted with the parties' summary judgment motions without making the requisite findings or the existence of a protective order.

(*See generally* Dkt. #517).

Certain of Plaintiff's factual premises are false. For example, the Court

was not involved in the initial suspension of Plaintiff's ECF privileges (which, as

noted, does not appear to have extended to her filing privileges), and only

precluded Plaintiff from filing for a brief period beginning in April of this year

after her submissions grew more repetitive and misleading. (Dkt. #498 at 2

("Given the number and the tenor of Plaintiff's submissions in recent weeks —
and their diminishing fidelity to the record in this case — the Court is
convinced that more drastic steps are necessary to prevent Plaintiff from
clogging the Court's docket with irrelevant, if not false, information and unduly
burdening Defendants."); *see also* Dkt. #490 (Leigh Defendants' request to
shorten the 21-day safe harbor period under Fed. R. Civ. P. 11)).  And the
Court has explained in the two preceding sections the legal justifications for its
decisions to strike certain documents and to seal or restrict access to others.

More fundamentally, as *Liteky* made clear, Plaintiff's redress for any or
all of these claims is to raise them on appeal.  Whether considered individually
or in the aggregate, Plaintiff's claims evince neither favoritism toward her
adversaries nor antagonism toward her.  And that is because there is none.
Plaintiff has repeatedly noted that this is a simple breach of contract action.
(*See, e.g.*, Dkt. #512 at 2).  At the same time, Plaintiff has sought to
transmogrify this case into something far more sinister, by littering the record
with false claims and scurrilous allegations.  The Court strives to achieve
fairness for all participants in the process, both litigants and their counsel.  Its
desire to preserve the integrity of its docket is not favoritism, nor is its
insistence that Plaintiff abide by the Federal Rules of Evidence, the Federal
Rules of Civil Procedure, the Local Civil Rules of the Southern District of New
York, and the Individual Practices of this Court.  The Court is obligated not to
recuse itself in this case, and it will not.

## CONCLUSION

For the reasons set forth in the remainder of this Opinion, Plaintiff's motion for reconsideration is DENIED; Plaintiff's motion to unseal is DENIED; and Plaintiff's motion for recusal is DENIED.  The Clerk of Court is directed to terminate the motion at docket entry 506.

SO ORDERED.

Dated:      August 28, 2020
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge