UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBYN ABRAHAM,

                          Plaintiff,

              v.

ABBY LEIGH, *as Executrix of the Estate of Mitch Leigh,*

                          Defendant.

17 Civ. 5429 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:[1]

        In an oral decision issued on October 22, 2019, the Court granted in part a motion for sanctions against Plaintiff Robyn Abraham that had been brought by Defendant Abby Leigh in her capacity as Executrix of the Estate of Mitch Leigh.[2]  After finding that Plaintiff had not only fraudulently doctored certain documents to improve her position in this litigation, but also perjured herself, the Court excluded from evidence 33 documents (the "Sanctioned Documents") produced by Plaintiff during discovery.  The Court also ordered that Plaintiff pay Defendant's attorneys' fees and costs incurred as a result of the Sanctioned Documents.  Defendant submitted a fee petition, and Plaintiff filed objections to that petition.  For the reasons set forth in the remainder of this Opinion, the Court awards Defendant attorneys' fees in the amount of $52,507.50 and costs in the amount of $637.10.

---

[1]     The caption has been modified to reflect the parties to the instant application.

[2]     For clarity, the Court uses "Mr. Leigh" to refer to Mitch Leigh and "Defendant" to refer to Abby Leigh.

# BACKGROUND[3]

## A.      Factual Background

According to Plaintiff, on January 23, 2014, she and Mitch Leigh,

composer of the musical *Man of La Mancha* ("MOLM"), agreed to a "Six (6)

Month Exclusive Contract Re: London and United Kingdom Musical and Stage

Production Rights of Man of La Mancha" (the "Talent Agreement"), pursuant to

which Plaintiff was to solicit and secure interest in a revival of the musical by

top-notch talent and production personnel.  (Am. Compl. ¶¶ 1, 47-48).  In

exchange, Mr. Leigh agreed to grant Plaintiff "the sole and exclusive legal and

business rights" to produce MOLM in London, tour the U.K., and transfer to

Broadway with all industry standard U.S. touring and ancillary rights.  (*Id.* at

¶ 48).

Plaintiff further alleged that by February 26, 2014, she had satisfied her

performance obligations under the Talent Agreement by securing an approved

director and co-producer (the "Talent").  (Am. Compl. ¶¶ 61-71).  Pursuant to

---

[3]      The facts stated herein are drawn primarily from the Amended Complaint, the operative
pleading in this matter ("Am. Compl." (Dkt. #41)).  Facts are also drawn from former
Defendants Alan Honig's and Martha Wasserman's Memorandum of Law in Support of
Motion for Sanctions as a Result of Fraud by Plaintiff Robyn Abraham ("Sanctions
Motion" (Dkt. #236)), including the supporting declarations of Ira S. Sacks, Esq. ("Sacks
Decl." (Dkt. #234) and Duc Nguyen ("Nguyen Decl." (Dkt. #235)); and Defendant Abby
Leigh's Memorandum of Law in Support of Joinder in the Sanctions Motion (the "Leigh
Joinder" (Dkt. #264)).  The Court recognizes that, in a subsequent decision, it granted
summary judgment in favor of the Leigh Defendants, thereby finding insufficient proof
of certain of Plaintiff's allegations.  *See Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2020
WL 3833424 (S.D.N.Y. July 8, 2020), *reconsideration denied*, No. 17 Civ. 5429 (KPF),
2020 WL 5095655 (S.D.N.Y. Aug. 28, 2020).  However, at the time Defendant's
sanctions motion was filed, the Amended Complaint was still the operative pleading.

For ease of reference, the Court refers to Defendant's Application for Attorney Fees and
Costs as "Def. Br." (Dkt. #407), and the supporting declaration of Michael J. Broadbent
as the "Broadbent Decl." (Dkt. 408); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #426);
and Defendant's reply brief as "Def. Reply" (Dkt. #440).

the Talent Agreement, upon Mr. Leigh's approval, Mr. Leigh would, within five business days of provision of Talent confirmation by Plaintiff, perform his obligations under the Talent Agreement.  (*Id.* at ¶ 71).  However, instead of performing these obligations, Mr. Leigh modified certain terms of Talent Agreement to require, *inter alia*, written confirmation from the recruited Talent. (*Id.* at ¶¶ 72-77).

Plaintiff alleges that, before the Talent Agreement expired, she obtained written letters of intent from the Talent pre-approved by Mr. Leigh before his death.  (Am. Comp. ¶ 98).  When Mr. Leigh passed away on March 16, 2014 (during the term of the Talent Agreement), his widow — Defendant Leigh here — was named Executrix of the Leigh Estate.  (*Id.* at ¶ 78).  On July 11, 2014, Plaintiff's counsel sent a letter to Defendant's counsel, requesting that the Leigh Estate (i) fully acknowledge Plaintiff's performance and (ii) perform in accordance with the terms of the Talent Agreement.  (*Id.* at ¶ 99).  On July 20, 2014, Defendant's counsel responded to the letter and, it is alleged, repudiated the Talent Agreement between Plaintiff and Mr. Leigh.  (*Id.* at ¶ 100).  The response stated that if Plaintiff wished to submit a proposal for a 2015 revival of MOLM, the proposal would be considered "in good faith."  (*Id.* at ¶ 101). Significantly, however, Plaintiff would have to pay a $50,000 non-refundable advance against royalties in order to have such a proposal considered.  (*Id.*).

By 2017, Plaintiff had not recovered what she was allegedly due under the Talent Agreement.  Thereafter, Plaintiff brought suit against the three holders of the rights to MOLM — Defendant, in her capacity as Executrix of the

Estate of Mitch Leigh; Martha Wasserman, in her capacity as Executrix of the Estate of Dale Wasserman; and Hellen Darion, in her capacity as Executrix of the Estate of Joseph Darion — as well as Alan Honig, who had served as an accountant to the authors of MOLM.  (*See generally* Am. Compl.).  Plaintiff specifically alleged a breach of contract claim against Defendant Leigh, fraudulent inducement claims against former Defendants Wasserman and Honig, and tortious interference and promissory estoppel against all Defendants.  (*Id.* at ¶¶ 143-77).

## B.    Procedural History

This case has an especially complicated procedural history that is discussed at length in several prior opinions, all of which are incorporated herein by reference.  *See Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2020 WL 5095655 (S.D.N.Y. Aug. 28, 2020) (opinion denying Plaintiff's motions for reconsideration, unsealing of certain materials, and recusal); *Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2020 WL 3833424 (S.D.N.Y. July 8, 2020) (opinion granting Leigh Defendants' motion for summary judgment); *Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2019 WL 4256369 (S.D.N.Y. Sept. 9, 2019) (opinion denying Plaintiff's motion to dismiss counterclaims); *Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2018 WL 3632520 (S.D.N.Y. July 30, 2018) (opinion denying motions for reconsideration of prior opinion granting in part and denying in part Defendants' motions to dismiss).  The Court focuses in this Opinion on the facts and procedural history undergirding the imposition of sanctions on Plaintiff.

1.  **Initial Concerns Regarding the Authenticity of Plaintiff's Productions and the GoDaddy Theory**

Plaintiff filed this action on July 18, 2017.  (Dkt. #1).  She then filed the Amended Complaint on September 15, 2017, after receiving leave to do so from the Court.  (Dkt. #37, 40-41).  In an oral decision issued on June 14, 2018, the Court granted in part and denied in part several motions to dismiss the Amended Complaint filed by those defendants then in the case (collectively, "Defendants").  (Dkt. #65 (order memorializing decision); Dkt. #78 (transcript of decision) ("June 14, 2018 Tr.")).  As relevant here, the Court denied Defendant Leigh's motion to dismiss Plaintiff's breach of contract claim; all other claims against Defendant were dismissed.  (Dkt. #65 (order memorializing decision); June 14, 2018 Tr.).

As the parties proceeded through discovery, various disputes arose.  On November 30, 2018, counsel for former Defendants Martha Wasserman and Alan Honig wrote to the Court to express concerns that Plaintiff's production of certain PDF-format emails bore indicia of fraud, because, *inter alia*, the PDF-format emails were not produced with any metadata, nor were they produced by any other party, including putative parties to the communication.  (*See* Sacks Decl. ¶ 56; *id.*, Ex. 34).[4]  Plaintiff's former counsel at Arnold & Porter LLP subsequently advised counsel to Wasserman and Honig that the corresponding native-format files had been lost due to a crash of one or more

---

[4]     Plaintiff's discovery production contained emails in two different file types: (i) email documents in their native formats with associated metadata; and (ii) PDF-format email documents without associated metadata, the latter of which are at issue here.  (Sacks Decl. ¶ 6).

servers maintained by web host and domain registrar GoDaddy.com LLC (the "GoDaddy Theory").  (*See* Dkt. #150-3).[5]  Accepting this explanation, Wasserman and Honig served a document production subpoena on GoDaddy (*see* Dkt. #150-2), and also requested that the Court permit Defendants to "forensically examine Abraham's computer and email accounts" (Sacks Decl., Ex. 34 at 2).

On December 18, 2018, the Court held a discovery conference concerning this issue.  (Dkt. #138 (transcript)).  Plaintiff's former counsel expanded on the GoDaddy Theory, asseverating that because "there was trouble with the servers that Ms. Abraham used, [ ] GoDaddy.com," the native-format versions of some of the PDF-format emails no longer existed, "but they did exist in 2014, when they were preserved and printed."  (*Id.* at 14).  Plaintiff's former counsel assured the Court that there was no other reason as to why these emails no longer existed in their native format.  (*Id.* at 17).  Following additional argument, the Court permitted Defendants to serve a subpoena on GoDaddy, but denied Defendants' request for a forensic examination, with leave to renew the request depending on the information gathered from Plaintiff's deposition.  (*Id.* at 24-26).

## 2.   Plaintiff's Deposition and the Broken Computer Theory

Plaintiff was deposed on January 17, 2019.  (*See* Sacks Decl. ¶ 59; *id.*, Ex. 36).  There, Plaintiff disclosed for the first time that the laptop she used in

---

[5]     Plaintiff sent and received emails primarily through two email accounts related to her businesses, both of which were hosted by GoDaddy.  (Sacks Decl. ¶ 7).

2013 and 2014 had been damaged (the "Broken Computer Theory"), because "somebody slammed it in an overhead bin and that was pretty much the end of it." (*Id.*, Ex. 36 at 7-8). Plaintiff further testified that her attorneys had been aware that her laptop had been crushed on a flight. (*Id.*, Ex. 36 at 8). Plaintiff clarified that this was the laptop that she used when she provided relevant emails to her attorneys in London back in 2014. (*Id.*, Ex. 36 at 10). In addition, Plaintiff testified that: (i) she had provided the broken laptop to her "computer expert [Steve Bardfield] who tried to pull the data off of it, and he said he was not successful"; (ii) she no longer had the laptop because she left it with Bardfield, who "used it for parts" with her knowledge and assent; and (iii) she contacted Bardfield after filing this lawsuit to see if he still maintained the laptop and was told that "it's gone." (*See id.*, Ex. 36 at 10-11).

On February 11, 2019, Plaintiff produced photographs purportedly showing the damage to her laptop and a copy of an invoice from Steve Bardfield dated September 27, 2014. (*See* Sacks Decl., Ex. 37). The invoice stated that (i) the laptop had been "dropped"; (ii) "Case damaged, DVD drive broken, exhaust fan port broken, display broken"; and (iii) Plaintiff had been charged for data recovery and analysis, but had received a discount on the invoice due to a credit for "[o]ld computer for parts." (*See id.*, Ex. 37). There was no indication on the invoice that the hard drive, from which electronically stored information could be recovered, had been damaged in any way. (*Id.* at ¶ 62).

### 3.    The Motion for Sanctions and the Idiosyncratic Email Practices Theory

One week after Plaintiff's deposition, on January 23, 2019, counsel for Wasserman and Honig filed a pre-motion letter seeking leave to file a motion for sanctions against Plaintiff for allegedly perpetrating a fraud on the Court in connection with the PDF-format email documents.  (Dkt. #144).  On June 10, 2019, the Court granted Wasserman and Honig leave to file a motion for sanctions against Plaintiff (Dkt. #230), which they did on June 12, 2019 (Dkt. #233-236).  On July 17, 2019, Defendant Leigh joined in the motion.  (Dkt. #263-264).[6]

As noted, the conduct at issue centered on Plaintiff's production of certain emails in PDF format, without metadata and without a corresponding native-format version.  (Sacks Decl. ¶ 6).  The motion specifically identified 33 such documents.  (*Id.*).  Wasserman and Honig also obtained expert testimony from Duc Nguyen, a certified digital forensic examiner, who explained that at least three of those documents were not ones that originally existed in native format.  (Nguyen Decl. ¶¶ 12-42).  From this and several other indicia of fraud, Wasserman and Honig concluded that 13 of the 33 PDF-format documents were demonstrably fake or fraudulent.  (Sacks Decl. ¶ 6).  With Defendant Leigh joining, they alleged that Plaintiff perpetrated a fraud on the Court by

---

[6]     While Plaintiff belittles Defendant's work in this regard as a "One (1) Page Joinder Motion" (Pl. Opp. 1, 10), it is in fact the case that Defendant's joinder application included a separate memorandum of law, an attorney declaration, and several exhibits (*see* Leigh Joinder).  Plaintiff also overlooks Defendant's counsel's extensive work in preparation for oral argument before the Court on October 22, 2019.

creating or altering documents, allowing the destruction of her personal laptop, advancing a false and frivolous excuse for missing or altered documents, offering perjured testimony regarding the documents' authenticity, and presenting false documents to counsel and the Court. (*See* Sanctions Motion 2; Leigh Joinder 1).

On August 9, 2019, with the assistance of a new team of attorneys, Plaintiff filed her papers in opposition to the motion for sanctions and to Defendant's joinder in that motion. (Dkt. #273-292). In Plaintiff's opposition submission, she offered a third explanation (the "Idiosyncratic Email Practices Theory"), positing that the lack of native-format emails could have happened for "many reasons," "including a message being accidentally deleted by Abraham or a message being recalled by the Defendants." (Dkt. #291 at 16-17). Regarding the latter possibility, Plaintiff suggested, without evidentiary support, that "Defendants themselves deleted or retrieved/recalled emails they did not want to be submitted into evidence." (*Id.* at 17). Furthermore, Plaintiff suggested that anomalies in certain documents were due to the sheer volume of emails she sent on a given day, and her practice of sending an email intended to be saved in draft form and then sending it out again in a final version later in the day. (*Id.*).

On August 23, 2019, Defendants filed their reply papers. (Dkt. #303-305, 307). They then diverged: On October 4, 2019, in connection with their settlements with Plaintiff, Defendants Wasserman and Honig were permitted to withdraw their motion for sanctions against Plaintiff; however, the Court made

clear that the withdrawal would have no impact on Defendant Leigh's pending motion for sanctions, in which she joined and adopted Honig's and Wasserman's briefing.  (Dkt. #348).

On October 22, 2019, the Court held an evidentiary hearing to resolve Defendant's motion for sanctions.  (*See generally* Dkt. #409 ("October 22, 2019 Tr.")).  Plaintiff's new counsel reasserted the GoDaddy, Broken Computer, and Idiosyncratic Email Practices Theories to the Court.  Indeed, counsel added still another wrinkle to the evidentiary record by announcing that "at least two [of Plaintiff's] computers … were damaged." (*Id.* at 30).  This news about a second damaged computer led to the following exchange with Plaintiff's counsel:

> THE COURT:  I'm amazed you didn't try to substantiate [Mr. Bardfield's statements to counsel about a second damaged computer] with a declaration from him that indeed there were two computers.  They were both damaged beyond repair.  I only have one referenced here.

> MS. [KERWICK]: He gave me the affidavit that he was willing to give me, but he confirmed with me when I was pestering him for the black box, he said there [were] at least two.

> THE COURT: Yes, that's the affidavit he wasn't willing to give to you, and maybe I should draw something from that.

(*Id.* at 31).  When asked whether, at any time, Plaintiff ever modified or caused anyone else to modify any of the PDF-format emails at issue, Plaintiff directly responded to the Court that "[a]t no time did [she] modify or cause anyone else to modify any email at any time ever."  (*Id.* at 59).

The Court ultimately found that, for various reasons, Plaintiff's theories could not explain the anomalies identified, such as the existence of two versions of an email — one in PDF-format produced by Plaintiff, and the other in native format produced by Defendant — with the same time stamps, and the same addressees, but divergent content.  (October 22, 2019 Tr. 42, 66-68). Reviewing the record before it, the Court concluded that the only plausible explanation for the variances was that the documents at issue had been altered by Plaintiff:

> The strongest argument for the defendants is that I have a bunch of exhibits that I can't explain other than by finding that somebody modified them; that they were altered.   And ultimately, I conclude that they were altered by Ms. Abraham.
>
> Today I noted that counsel was very careful, plaintiff's counsel, in how she phrased her arguments on this point.  That it was Ms. Abraham's position, that Ms. Abraham would go to her grave believing, and everything was done in terms of Ms. Abraham's beliefs. So I went straight to the source, and I asked Ms. Abraham as plainly as I could.  She answered, and I do not believe her, and I believe that she perjured herself before me today.  And that echoed something that Mr. Broadbent said to me when he referred to certain of these theories or certain of these presentations as unapologetic.  They are.  At some point in this process, Ms. Abraham should just admit that these documents are doctored and walk away from it, but even now before me she doubles and triples and quadruples down. That's what I'm left with.  I'm left with the fact that these things are fabricated and that I believe that she fabricated them.

(*Id.* at 68-69).

With this finding, the Court excluded from evidence the 33 documents produced by Plaintiff in PDF-format only during discovery.  (October 22, 2019

Tr. 68-71).  The Court also ordered that Plaintiff pay Defendant's attorneys'
fees and costs incurred as a result of the Sanctioned Documents, including the
time spent investigating the provenance of the Sanctioned Documents,
reviewing electronic information related to the Sanctioned Documents,
retaining forensic expertise, and any other preparations that could be fairly
traced to the Sanctioned Documents.  (*Id.* at 71).  While the Court declined to
give a spoliation instruction to the jury, it did order that Plaintiff could be
crossed at trial on the finding of perjury.  (*Id.* at 71-72).  Finally, the Court
ordered the parties to confer on a schedule for submissions on fees and costs.
(*Id.* at 72; *see generally* Dkt. #371 (order memorializing decision)).

As of February 3, 2020, the parties' briefing concerning Defendant's
application for attorneys' fees and costs was fully submitted to the Court.  (*See*
Dkt. #407, 408, 426, 427, 440).

## DISCUSSION

### A.    Overview of the Parties' Arguments

Both sides have endeavored to tailor their arguments to the Court's
October 22, 2019 sanctions decision.  For Defendant's part, this includes
explaining why the Sanctioned Documents, which are neither to nor from
Mitch Leigh, nonetheless impacted the manner in which she defended herself
in the instant litigation.  (*See* Pl. Opp. 11 (outlining Plaintiff's argument that no
Leigh emails were altered)).  On this point, Defendant credibly argues that the
Sanctioned Documents "affected [her] analysis of this dispute and thus her
litigation strategy, particularly because a number of the emails involve third

12

parties and appear to give credence to otherwise-unsupported theories of the Plaintiff."  (Def. Br. 3; *see also* Def. Reply 6 ("The altered emails were produced during discovery, affected the narrative of this case, and required the Executrix to investigate, strategize, and respond.  Specifically, as set forth in the Executrix's opening submission, the Executrix has been damaged to the extent that upwards of $55,000 in legal fees and costs have been expended as a result of Plaintiff's altered emails.")).

Defendant has also striven to fit the damages she seeks into the framework articulated by the Court at the October 22, 2019 hearing.  (*See* October 22, 2019 Tr. 70-71).  In this regard, Defendant has limited her claim for fees to:

> (a) counsel and staff fees for those working directly on the Sanctioned Documents, (b) fees incurred after November 26, 2018, when Plaintiff was put on notice that her fraud had been detected, although fees associated with the Sanctioned Documents accrued prior, and (c) fees for which the entry either explicitly mentions the Sanctioned Documents or sanctions motion, or a portion of the time is clearly assignable to issues relating to the Sanctioned Documents.

(Def. Br. 6-7).  Defendant also seeks $637.10 in travel costs related to the Court's October 22 sanctions hearing.  (*Id.* at 7).

Plaintiff offers several reasons why neither fees nor costs should be imposed in favor of Defendant.  (*See generally* Pl. Opp.).  The Court has already addressed Plaintiff's "one-page joinder" argument in this Opinion, but a corollary to this argument is Plaintiff's contention that Defendant's sanctions motion is improper at its core because it was initially brought by, and then

withdrawn by, Defendants Honig and Wasserman.  (*Id.* at 1, 5, 14).  The chronology is accurate, but not the logical conclusion:  Defendant Leigh had an independent right to seek redress because of the Sanctioned Documents, and a correlative right to join in the legal arguments made by her co-defendants. Precisely for this reason, the Court made clear in granting the application for withdrawal by Honig and Wasserman that such withdrawal "will have no impact on Defendant Leigh's pending motion for sanctions, in which Defendant Leigh has joined Defendants Honig's and Wasserman's briefing."  (Dkt. #348).

Plaintiff also advances two arguments why the Court's October 22, 2019 sanctions decision was incorrect: *first*, that Defendant has "unclean hands" because of her own purported document destruction, and *second*, that the email anomalies may have been the product of unspecified cyberattacks on Plaintiff's computer.  (*See, e.g.*, Pl. Opp. 2, 7).  The former claim has been previously raised and rejected; any loss or destruction of documents by Defendants in this case was undertaken before the instant lawsuit was filed, and in the absence of a litigation hold.[7]  The latter claim is now a fourth theory to explain why the Sanctioned Documents were altered, and it founders on its lack of substantiation.  In short, to the extent that Plaintiff is asking the Court to reconsider its prior decision, Plaintiff has not provided the Court with any reason to do so.  *See Ricatto* v. *M3 Innovations Unlimited, Inc.*, No. 18 Civ. 8404 (KPF), 2020 WL 2306480, at *2 (S.D.N.Y. May 8, 2020) ("Compelling reasons for

---

[7]     Even if true, the claim that Defendant destroyed documents would not give Plaintiff *ex ante* a credit against future sanctionable behavior.

granting a motion for reconsideration are limited to 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" (quoting *Virgin Atl. Airways, Ltd.* v. *Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992))).[8]

## B.    Applicable Law

Federal Rule of Civil Procedure 37 provides that when "a party ... fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders."  Fed. R. Civ. P. 37(b)(2)(A).  Such just orders may include "striking pleadings in whole or in part; ... dismissing the action or proceeding in whole or in part; [or] rendering a default judgment against the disobedient party."  *Id.*  Further, "the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

A court may also impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs.  *Hawley* v. *Mphasis Corp.*, 302 F.R.D. 37, 46 (S.D.N.Y. 2014) (explaining that in order to impose sanctions under its inherent power, a court must find that a plaintiff

---

[8]    Plaintiff falsely accuses Defendant of "stoop[ing] so low as to inject and weaponize" unrelated information regarding Plaintiff "for the purpose of smearing Plaintiff's excellent name and reputation, and deterring Plaintiff's counsel." (Pl. Opp. 6).  As an initial matter, Defendant Leigh had nothing to do with the information about which Plaintiff now complains.  And in a prior Opinion, this Court explained why these disturbing attacks by Plaintiff miss their factual and legal marks.  *See Abraham* v. *Leigh,* No. 17 Civ. 5429 (KPF), 2020 WL 5095655, at *1-2 (S.D.N.Y. Aug. 28, 2020).

has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons"); *see generally Goodyear Tire & Rubber Co.* v. *Haeger*, 137 S. Ct. 1178, 1186-87 (2017); *Va. Props., LLC* v. *T-Mobile Ne. LLC*, 865 F.3d 110, 114 (2d Cir. 2017). In contrast with Rule 37, a court's inherent power to impose sanctions includes the power to impose "attorney's fees representing *the entire cost* of litigation." *Shanchun Yu* v. *Diguojiaoyu, Inc.*, No. 18 Civ. 7303 (JMF), 2019 WL 6174204, at *5 (S.D.N.Y. Nov. 20, 2019) (emphasis added) (citing *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 45 (1991)).

In the instant case, the Court imposed sanctions on Plaintiff pursuant to both Rule 37 and its inherent powers. (*See* Dkt. #371 (order memorializing decision); *see also* October 22, 2019 Tr. 72). Absent a showing of substantial justification or injustice, this Court must order Plaintiff to pay the reasonable expenses caused by her sanctionable conduct. *See Novak* v. *Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008) (per curiam) (declining to hold that "Rule 37(b)(2) expenses are mandatory," but finding that "[t]he use of the word 'shall' certainly suggests that an award of expenses is mandatory unless one of the two exceptions — substantial justification or other circumstances — applies"). In this application, Defendant "'bears the burden of demonstrating that its requested fees are reasonable.'" *Figueroa* v. *W.M. Barr & Co., Inc.*, No. 18 Civ. 11187 (JGK) (KHP), 2020 WL 2319129, at *2 (S.D.N.Y. May 11, 2020) (quoting *TufAmerica Inc.* v. *Diamond*, No. 12 Civ. 3529 (AJN), 2016 WL 1029553, at *3 (S.D.N.Y. Mar. 9, 2016)), *reconsideration granted in part*, 2016

16

WL 3866578 (S.D.N.Y. July 12, 2016), *and* 2018 WL 401510 (S.D.N.Y. Jan. 12, 2018)).

Attorneys' fees are awarded by determining the "'presumptively reasonable fee,'" often referred to as the "lodestar." *Millea* v. *Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *Cty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)); *see also Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 552-53 (2010).  This fee is calculated by multiplying the "reasonable hourly rate and the reasonable number of hours required by the case." *Millea*, 658 F.3d at 166.  Courts may, only after the initial calculation of the presumptively reasonable fee, adjust the total when it "does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Lilly* v. *City of New York*, 934 F.3d 222, 230 (2d Cir. 2019) (citing *Millea*, 658 F.3d at 167).  More fundamentally, the Second Circuit has recognized that a district court exercises considerable discretion in awarding attorneys' fees.  *See Millea*, 658 F.3d at 166; *see also Arbor Hill*, 522 F.3d at 190.

When evaluating reasonable hourly rates, courts look at "the rate a paying client would be willing to pay," and take into account "all case-specific variables." *Arbor Hill*, 522 F.3d at 189-90.  It is well-settled that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively," and that "such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." *Id.*  The Second Circuit's "forum

rule" also requires courts to "generally use 'the hourly rates employed in the district in which the reviewing court sits' in calculating the presumptively reasonable fee." *Simmons* v. *N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill,* 493 F.3d at 119); *see also Miroglio S.P.A.* v. *Conway Stores, Inc.*, 629 F. Supp. 2d 307, 314 (S.D.N.Y. 2009).  Finally, courts in this District have recognized that an "attorney's customary billing rate for fee-paying clients is ordinarily the best evidence of" a reasonable hourly rate.  *In re Stock Exchs. Options Trading Antitrust Litig.*, No. 99 Civ. 962 (RCC), 2006 WL 3498590, at *9 (S.D.N.Y. Dec. 4, 2006).

When evaluating the number of hours, a court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Haley* v. *Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (internal quotation marks and citation omitted).  In addition, a court should examine the hours expended by counsel with a view to the value of the work product to the client's case.  *See Lunday* v. *City of Albany*, 42 F.3d 131, 133 (2d Cir. 1994) (per curiam).  The Court is to exclude "excessive, redundant[,] or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).

In determining whether hours are excessive, "the critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Samms* v. *Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant* v. *Martinez*, 973 F.2d 96, 99 (2d

Cir. 1992)).  And where "the billing records are voluminous, it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent." *Yea Kim* v. *167 Nail Plaza, Inc.*, No. 05 Civ. 8560 (GBD) (GWG), 2009 WL 77876, at *4 (S.D.N.Y. Jan. 12, 2009) (internal quotation marks and citation omitted).  A court also retains the discretion to make across-the-board percentage reductions to exclude unreasonable hours, colloquially referred to as "trimming the fat."  *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987); *E.S.* v. *Katonah-Lewisboro Sch. Dist.*, 796 F. Supp. 2d 421, 431 (S.D.N.Y. 2011), *aff'd sub nom. E.S. ex rel. B.S.* v. *Katonah-Lewisboro Sch. Dist.*, 487 F. App'x 619 (2d Cir. 2012) (summary order).

A court also looks at the nature of the legal matter and context of the fee award in considering what is a reasonable rate and reasonable time spent on a matter.  *Figueroa*, 2020 WL 2319129, at *3.  The Second Circuit has suggested that courts should consider factors including "the experience, reputation, and ability of the attorneys," "awards in similar cases," and more broadly,

> the purpose of the award; that is, a different presumptively reasonable fee may be warranted if the fee is being awarded as a sanction for misconduct than if the fee is being awarded in connection with a successful outcome in a statutory fee-shifting case in order to make its determination.

*Arbor Hill*, 522 F.3d at 190 (citing 12 factors enumerated in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on*

*other grounds by Blanchard* v. *Bergeron*, 489 U.S. 87, 109 (1989)); *see also*

*Figueroa*, 2020 WL 2319129, at *3.[9]

## C.   Calculating Reasonable Attorneys' Fees

In this application, Defendant seeks attorneys' fees in the amount of

$54,654.50 and costs in the amount of $637.10, as a result of work in

connection with the Sanctioned Documents.  (Def. Br. 4-5).  Specifically,

Defendant seeks recovery of fees paid to the following legal professionals in the

following amounts:

---

[9]   The twelve factors enumerated in *Johnson* are (i) the time and labor required; (ii) the novelty and difficulty of the questions; (iii) the level of skill required to perform the legal service properly; (iv) the preclusion of employment by the attorney due to acceptance of the case; (v) the attorney's customary hourly rate; (vi) whether the fee is fixed or contingent; (vii) the time limitations imposed by the client or the circumstances; (viii) the amount involved in the case and results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.  *See Arbor Hill*, 522 F.3d at 186 n.3 (citing *Johnson* v. *Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard* v. *Bergeron*, 489 U.S. 87 (1989)).

This Court has previously noted that after *Arbor Hill* was decided, the Supreme Court cast doubt on the usefulness of the *Johnson* factors as a methodology for calculating attorneys' fees, stating that the method "gave very little actual guidance to district courts." *Echevarria* v. *Insight Med., P.C.*, 102 F. Supp. 3d 511, 515 n.2 (S.D.N.Y. 2015) (quoting *Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010) (internal quotation marks omitted)).  However, as the Court also noted, the *Perdue* court focused on enhancements to an attorneys' fees award applied by the district court; while the *Arbor Hill* decision, at its core, simply instructs district courts to take the *Johnson* factors (and other factors) into account when determining the reasonable hourly rate, and then to use that reasonable hourly rate to calculate the presumptively reasonable fee.  *Id.*

Furthermore, *Arbor Hill* has yet to be overruled by the Second Circuit.  In fact, the Second Circuit recently confirmed the validity of *Arbor Hill* and the use of the *Johnson* factors in calculating the lodestar amount as a threshold matter, rather than to enhance or cut the lodestar amount itself.  *See Lilly* v. *City of New York*, 934 F.3d 222, 231 (2d Cir. 2019) (explaining how the *Perdue* court confirmed the long-standing approach to calculating attorney's fees endorsed by the Second Circuit in *Arbor Hill*).

| Professional | Title | Years of Experience | Rate | Hours Incurred on Sanctioned Documents | Amount |
|---|---|---|---|---|---|
| H. Robert Fiebach | Shareholder/ Senior Counsel | 55 | $870 | 12.4 | $10,788.00 |
| Michael J. Broadbent | Member | 9 | $400/435[10] | 89.3 | $38,345.00 |
| Harper Seldin | Associate | 5 | $365 | 7.3 | $2,664.50 |
| Gailmarie Rizzo | Paralegal | 36 | $200[11] | 10.5 | $2,100.00 |
| Technological Support | E-Discovery Experts | N/A | $250-345 | 2.8 | $757.00 |
| **Total** | | | | | **$54,654.50** |

(Broadbent Decl. ¶¶ 24, 39).  Defendant argues that these amounts are reasonable given that the Sanctioned Documents pervaded every aspect of this case, as discussed above.  (Def. Br. 3).  The Court will address the requested reasonable hourly rates and hours incurred in turn.

### 1.    Determining the Reasonable Hourly Rate

While multiple Cozen O'Connor attorneys worked on matters related to the Sanctioned Documents, Defendant Leigh requests an award based on the fees of the three primary attorneys.  (Broadbent Decl. ¶¶ 14-16).  The Court notes at the outset that Defendant herself approved the hourly rates now requested and, as of the date her fee application was submitted, had paid all of the time billed at those rates prior to September 2019.  (Def. Br. 5; Broadbent Decl. ¶¶ 14-15).  While payment of fees by clients is "solid evidence" of their reasonableness in the market, *Bleecker Charles Co.* v. *350 Bleecker St. Apt.*

---

[10]    Mr. Broadbent's rate was $400 in 2018 and $435 in 2019.  (Broadbent Decl. ¶ 24 n.6).

[11]    Ms. Rizzo's standard rate, and the rate paid by the Executrix, is $265, but it has been adjusted down to $200 for this fee application.  (Broadbent Decl. ¶ 24 n.7 (citing *Winklevoss Capital Fund, LLC* v. *Shrem*, 360 F. Supp. 3d 251, 257 (S.D.N.Y. 2019) (reducing $265 rate to $200 for paralegal with "extensive experience" to be consistent with prior decisions in the Southern District of New York))).

*Corp.*, 212 F. Supp. 2d 226, 230-31 (S.D.N.Y. 2002), the Court must still exercise its discretion and look to the prevailing rates within this District to determine the reasonableness of the proposed rates.  *See A.V.E.L.A., Inc.* v. *Estate of Monroe*, No. 12 Civ. 4828 (KPF) (JCF), 2014 WL 3610902, at *2 (S.D.N.Y. July 18, 2014) ("[T]he actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is 'reasonable.'" (alteration in original) (internal quotation marks omitted) (quoting *Crescent Publ'g Grp., Inc.* v. *Playboy Enters., Inc.*, 246 F.3d 142, 151 (2d Cir. 2001))).

The Court begins with the hourly rate requested by senior counsel H. Robert Fiebach, who billed 12.4 hours with respect to work on the Sanctioned Documents.  As a Shareholder and Senior Counsel at Cozen O'Connor with 55 years of experience, Mr. Fiebach's position is equivalent to a senior or equity partner in a law partnership.  (Broadbent Decl. ¶ 16 n.5).  As such, the Court looks to rates "in line with ... prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation."  *McDonald ex rel. Prendergast* v. *Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006) (alterations in original) (quoting *Blum* v. *Stenson*, 465 U.S. 886, 895 n.11 (1984)).

The Court believes the requested hourly rate of $870 for Mr. Fiebach is high, given the nature of his work related to the Sanctioned Documents.  *See S.E.C.* v. *Yorkville Advisors, LLC*, No. 12 Civ. 7728 (GBD) (HBP), 2015 WL 855796, at *19 (S.D.N.Y. Feb. 27, 2015) ("The prevailing market rates for

22

attorneys and paralegals in the Southern District of New York for fees incurred on discovery-related motions have ranged from $450 to $600 for partners, $220 to $400 for associates and $100 to $200 for paralegals."). However, the Court also recognizes Mr. Fiebach's status as senior counsel to the firm's Commercial Litigation Department and co-chair of its Legal Malpractice Group. (Broadbent Decl., Ex. A at 2). In comparable complex commercial or intellectual property cases, rates for partners with similar experience and standing have varied. *Compare A.V.E.L.A., Inc.*, 2014 WL 3610902, at *2 (discussing *Barclays Capital Inc.* v. *Theflyonthewall.com*, No. 06 Civ. 4908 (DLC), 2010 WL 2640095 (S.D.N.Y. June 30, 2010), where the court approved an average hourly rate of $838 for a senior partner who had been practicing since 1973 and was head of his firm's Intellectual Property and Media practice group, *with Diplomatic Man, Inc.* v. *Nike, Inc.*, No. 08 Civ. 139 (GEL), 2009 WL 935674, at *5-6 (S.D.N.Y. Apr. 7, 2009), where the court found that $650 per hour was "perfectly reasonable" for the head of a large firm's commercial litigation group who had been practicing law since 1972).

Taking into account Mr. Fiebach's lengthy experience, the comparatively modest amount of time he billed to matters attributable to the Sanctioned Documents (including attending a deposition and reviewing filings), and the relatively large size of his law firm, the Court concludes that an hourly rate of $725 is reasonable here. *See Tiffany & Co.* v. *Costco Wholesale Corp.*, No. 13 Civ. 1041 (LTS) (DCF), 2019 WL 120765, at *10 (S.D.N.Y. Jan. 7, 2019) (finding hourly rates between $625 and $845 for a partner "are reasonable considering

the prevailing rates for firms engaging in complex litigation in this district"); *Malletier* v. *Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 360-61 (S.D.N.Y. 2010) (finding rates "between $475 and $540" reasonable for a partner with 24 years of experience in "intellectual property law at a large Manhattan law firm").

Mr. Broadbent is a "Member" at Cozen O'Connor, which is equivalent to a junior partner in a law partnership, and has nine years of experience in complex commercial disputes. (Broadbent Decl. ¶¶ 16 n.5, 19). It is he, among Defendant's counsel, who has spent the most time addressing issues raised by the Sanctioned Documents. Upon learning of the potential fraud by Plaintiff in November 2018, Mr. Broadbent took the lead in analyzing the facts and issues related to the Sanctioned Documents, including preparation of the briefs and argument at the October 22, 2019 hearing. (*Id.* at ¶ 20). Mr. Broadbent's rate was $400 in 2018 and $435 in 2019, and Defendant accordingly requests those rates for the hours worked incurred in those respective years. The Court agrees that these rates are reasonable in light of the generally accepted hourly rates for junior partners in comparable cases in this District, and given the substantive work Mr. Broadbent did in relation to the Sanctioned Documents. *See, e.g.*, *Mazzei* v. *Money Store*, No. 01 Civ. 5694 (JGK) (RLE), 2015 WL 2129675, at *3 (S.D.N.Y. May 6, 2015) (finding rate of $450 per hour for attorneys with 15 to 20 years of experience in complex litigation to be reasonable); *Malletier*, 687 F. Supp. 2d at 361 ("The hourly rates of $390.00 to $470.00 charged by the associates and junior partner

representing Vuitton fall at the very top of the spectrum of reasonable hourly rates for associates."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 506-07 (S.D.N.Y. 2009) (finding reasonable a junior partner's rate of $425).

Mr. Seldin, an associate at Cozen O'Conner with five years of experience, requests a rate of $365 per hour.  Mr. Seldin, who joined the firm in 2016, provided research and drafting assistance with Defendant's reply brief for this motion.  (Broadbent Decl. ¶ 21 & Ex. A).  The Court will reduce Mr. Seldin's hourly rate slightly, to $325, based on a comparison of the nature of the work he did with that of Mr. Broadbent, a junior partner with substantially more experience and responsibilities in this case.  *See, e.g.*, *Herbalist & Alchemist, Inc.* v. *Alurent Prod., Inc.*, No. 16 Civ. 9204 (ER), 2018 WL 3329857, at *3 (S.D.N.Y. July 5, 2018) (holding that an hourly rate of $325 was reasonable for a mid-level associate and was within the range of rates that have been approved for law firm associates in this District); *Malletier*, 687 F. Supp. 2d at 361 (describing $390 rate as "at the very top of the spectrum" for associates, even one demonstrably a specialist in intellectual property).

With respect to paralegal Gailmarie Rizzo, the Court finds that her reduced rate of $200 an hour is reasonable.  *See H.B. Auto. Grp., Inc.* v. *Kia Motors Am., Inc.*, 2018 WL 4017698, at *5 (S.D.N.Y. July 25, 2018) (reducing senior paralegal with 18 years of relevant experience from approximately $215 to $200 per hour).  Finally, the Court addresses the fees sought by three in-house e-discovery experts at Cozen O'Connor, who billed at rates ranging from $250 to $345.  This Court believes it appropriate to classify these individuals

25

as litigation support personnel, whose billings are typically considered fees rather than costs.  *See J.S. Nicol, Inc.* v. *Peking Handicraft, Inc.*, No. 03 Civ. 1548 (GBD) (AJP), 2008 WL 4613752, at *16 (S.D.N.Y. Oct. 17, 2008) ("Lawyers often use litigation support specialists and receive reimbursement for such services when awarded attorneys' fees." (collecting cases)); *Rodriguez ex rel. Kelly* v. *McLoughlin*, 84 F. Supp. 2d 417, 427 (S.D.N.Y. 1999) (allowing recovery for litigation manager and technical support); *cf. Joint Stock Co. Channel One Russia Worldwide* v. *Infomir LLC*, No. 16 Civ. 1318 (GBD) (BCM), 2020 WL 2512045, at *5 (S.D.N.Y. May 15, 2020) (allowing recovery of outside expert fees for "technical forensic services"); *but cf. HTV Industries, Inc.* v. *Agarwal*, 317 F. Supp. 3d 707, 726 (S.D.N.Y. 2018) ("Costs for shipping, filing fees, process servers, and litigation support are recoverable.").

Whether considered under the rubric of fees or costs, such individuals are generally analogized to paralegals and awarded comparable hourly rates. *Cf. Song* v. *47 Old Country, Inc.*, No. 09 Civ. 5566 (LDW) (SIL), 2015 WL 10641286, at *6 (E.D.N.Y. Oct. 1, 2015) ("Litigation support professionals are generally awarded hourly rates consistent with paralegals."), *report and recommendation adopted*, No. 09 Civ. 5566 (LDW), 2016 WL 1425811 (E.D.N.Y. Mar. 31, 2016).  In this case, the Court has balanced the criticality of the e-discovery experts' work to the issues in dispute, and the conservative billing of their hours, with the paucity of information provided about each of them; accordingly, the Court will permit recovery at the lower rate sought, $250 per hour.

26

### 2.    Determining the Hours Reasonably Expended

Turning now to the determination of reasonable hours, the Court has reviewed the relevant billing documents and accepts Defendant's explanation that the hours for which she seeks recovery were expended on:

a.    legal research and analysis;

b.    conferences to discuss strategies;

c.    reviewing discovery, both the Sanctioned Documents as well as other documents for comparison;

d.    carefully planning and preparing witnesses with the possibility of sanctions looming but undecided;

e.    drafting relevant research memoranda;

f.    drafting the relevant opening and responsive briefs, including to identify the ways in which the Sanctioned Documents impacted the Executrix's case preparations;

g.    orchestrating the electronic filing of the various motion papers;

h.    reviewing and filing the numerous papers filed by moving defendants and the Plaintiff, including Plaintiff's repeated attempts to move or reschedule the sanctions hearing;

i.    preparing for cancelled or rescheduled hearings related to the sanctions motions;

j.    addressing ancillary legal issues; and

k.    preparing for and arguing at the sanctions hearing on October 22, 2019.

(Broadbent Decl. ¶ 36).  The Court notes that Defendant also seeks to recover 21.7 hours of time billed for preparation of the instant fee petition, including

legal research and drafting; assembling, reviewing, analyzing, and calculating two years' worth of billing documentation; and internal discussions regarding the above.  (*Id.* at ¶ 37).

The Court recognizes and appreciates the conservative approach that Defendant has taken in her fee petition, which includes limiting the fees sought to three primary attorneys and associated support personnel, and reducing the work for which fees are sought only to those activities most directly related to the Sanctioned Documents.  The Court also accepts Defendant's explanation for why such substantial legal fees were incurred in a case in which other defendants took the laboring oar in preparing the initial sanctions motion papers.  (*See, e.g.*, Broadbent Decl. ¶¶ 32-34 (noting, *inter alia*, the need to prepare alternative defenses depending on whether the Sanctioned Documents were admitted into evidence, and the "hurdles" erected by Plaintiff to resolving the sanctions motion)).

In prior fee petitions, this Court has alternated between the use of an across-the-board percentage reduction and the disallowance of certain hours billed.  *Compare Gamero* v. *Koodo Sushi Corp.*, 328 F. Supp. 3d 165, 175 (S.D.N.Y. 2018) (disallowing certain time entries billed), *with Marzullo* v. *Karmic Release Ltd.*, No. 17 Civ. 7482 (KPF), 2018 WL 10741649, at *3 (S.D.N.Y. Apr. 24, 2018) (imposing across-the-board reduction of 15%).  Given the reductions already implemented by Defendant, the Court believes that an additional across-the-board percentage reduction is not necessary to arrive at a reasonable number of hours.  What is more, after carefully reviewing the billing

materials, the Court concludes that it will not disallow any of the individual time entries.  During its review, the Court noticed a few entries that, arguably, reflected duplication of efforts by Attorneys Fiebach and Broadbent.  However, any such disallowance would be more than counterbalanced by the fees that Defendant has not sought for the seven-page reply brief she filed in response to Plaintiff's many arguments in opposition.  (Dkt. #440).  In sum, the Court will reduce certain of the hourly rates, but none of the hours billed, by Defendant's counsel.

Finally, the Court's consideration of the *Johnson* factors also counsels in favor of finding Defendant's fee application to be reasonable.  While Plaintiff continues to deflect and deny, the record established conclusively that she fabricated certain key emails and then lied to the Court about their provenance.  Her perfidy made a mockery of the Court's orders; it lengthened the case for all parties involved; it necessitated expert investigation and substantial motion practice; and it elevated the costs to Defendant Leigh by more than $55,000.  The Court has found that Plaintiff engaged in sanctionable behavior; the conservatively-estimated fees sought by Defendant Leigh in this matter are an appropriate sanction.

As noted, the Court has accepted the hours billed, but has adjusted certain of the rates.  In consequence, it awards the following fees:

| Professional | Title | Years of Experience | Revised Rate | Hours Allowed on Sanctioned Documents | Amount |
|---|---|---|---|---|---|
| H. Robert Fiebach | Shareholder/ Senior Counsel | 55 | $725 | 12.4 | $8,990.00 |
| Michael J. Broadbent | Member | 9 | $400/435 | 89.3 | $38,345.00 |
| Harper Seldin | Associate | 5 | $325 | 7.3 | $2,372.50 |
| Gailmarie Rizzo | Paralegal | 36 | $200 | 10.5 | $2,100.00 |
| Technological Support | E-Discovery Experts | N/A | $250 | 2.8 | $700.00 |
| **Total** | | | | | **$52,507.50** |

## D.  Calculating Reasonable Costs

"[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc-Sternberg* v. *Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (citation omitted); *see generally Chen* v. *E. Market Rest., Inc.*, No. 13 Civ. 3902 (HBP), 2018 WL 3970894, at *4-5 (S.D.N.Y. Aug. 20, 2018) (discussing compensable costs).  Here, Defendant seeks to recover $637.10 in costs, representing transportation costs to and from the October 22, 2019 sanctions hearing. Again, Defendant has been conservative in the costs she seeks.  (*See* Broadbent Decl. ¶ 41 ("The Executrix did not include costs associated with photocopying or printing, electronic data storage, or research, although there are undoubtedly costs for such items related to the Sanctioned Documents, and such costs would be compensable.")).  Plaintiff offers no real defense to their assessment, and the Court finds these costs to be reasonable and appropriate. Accordingly, the Court awards Defendant $637.10 in costs.

**CONCLUSION**

For the reasons set forth in this Opinion and Order, the Court sanctions Plaintiff and awards to Defendant Leigh attorneys' fees in the amount of $52,507.50 and costs in the amount of $637.10.  Plaintiff is directed to pay this sanction to Defendant Leigh, in care of her attorneys, within 30 days of the date of this Opinion and Order.

The Clerk of Court is directed to terminate the motion at docket entry 407.  In addition, the Court observes that an open motion at docket entry 400 was previously resolved, and it thus directs the Clerk of Court to terminate that motion as well.

SO ORDERED.

Dated:      September 14, 2020
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge