UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBYN ABRAHAM,

     Plaintiff/
     Counterclaim Defendant,

     -v.-

ABBY LEIGH, *in her Individual Capacity, as Executrix of the Estate of Mitch Leigh, and as Trustee for The Viola Fund and Abby Leigh Ltd.*,

     Defendant/
     Counterclaim Plaintiff.

17 Civ. 5429 (KPF)

**ORDER**

---

KATHERINE POLK FAILLA, District Judge:

On May 2, 2023, this Court issued an order to show cause (the "OTSC"), requiring Counterclaim Defendant Robyn Abraham to substantiate fifteen factual representations made to the Court prior to and during the bench trial that took place earlier that day.[1]  In relevant part, the OTSC warned that "[s]hould [Counterclaim Defendant] fail to substantiate the [pertinent representations] — particularly those related to her Covid-19 diagnosis and medical treatment between April 29, 2023, and May 1, 2023 — the Court will consider entering a default judgment in favor of the Counterclaim Plaintiff in this case." (Dkt. #760 (OTSC)).  For the reasons that follow, the Court finds that Counterclaim Defendant has in fact failed to respond adequately to the OTSC.  As such, the Court finds that Counterclaim Plaintiff Abby Leigh is

---

[1] The Court refers to Ms. Abraham as "Counterclaim Defendant," and to Ms. Leigh as "Counterclaim Plaintiff," as the one remaining claim in this case is a counterclaim.

entitled to a default judgment in her favor on the counterclaim and to recover certain fees incurred in connection with the OTSC.

## BACKGROUND

It is impossible to capture the arc of this case in a single order. With this Order, the docket has now reached 800 entries over six years. To be clear, nearly 300 of those submissions have been filed *after* the Court's Opinion and Order granting summary judgment in favor of Counterclaim Plaintiff on the core breach of contract claim in this case. (Dkt. #505). Since that Opinion and Order on July 8, 2020, the Court has resolved myriad motions concerning, *inter alia*, reconsideration of the Court's prior orders; sanctions; recusal; and other miscellaneous issues. But the Court's efforts have all been in service of one goal: resolving the one remaining counterclaim in this case.

That goal has proven elusive. The Court has spent more than two years attempting merely to *hold* the one-day bench trial on that counterclaim. These attempts have been catalogued in a variety of orders denying Counterclaim Defendant's last-minute adjournment requests of the trial date. (*See, e.g.*, Dkt. #759 (May 1, 2023 order denying Counterclaim Defendant's adjournment request made at 3:30 p.m. the day prior to trial, noting "[i]t simply beggars belief that so many purported 'emergencies' can occur right on the eve of trial in this case"); Dkt. #740 (December 5, 2022 order denying adjournment request made one day prior to trial, and discussing at least three other similar emergency requests from July 2022 through December 2022); *see also* Dkt. #642 (May 10, 2021 order seeking availability for bench trial in first quarter of

2022); Dkt. #660 (July 26, 2021 order seeking availability for bench trial in second quarter of 2022); Dkt. #662 (August 4, 2021 order scheduling bench trial to begin June 7, 2022)).

After adjourning the December 2022 trial date for nearly five months to May 2, 2023 — in part in order to permit Counterclaim Defendant "adequate time to retain new counsel if she so chooses" (Dkt. #755)[2] — the Court simply could not credit the factual representations made in her May 1, 2023 adjournment request. (Dkt. #759 ("[Counterclaim Defendant's] delay appears to lead to the inexorable conclusion that [she] intended to bring this motion at the last possible moment, and thus to obtain another trial adjournment.")). And rather than once again adjourn the one-day bench trial at Counterclaim Defendant's request, the Court instead charted a more pragmatic course. In her May 1, 2023 emergency motion, Counterclaim Defendant had claimed that she was experiencing "serious Covid related medical complications necessitating [her] medical care and recommended hospitalization in Los Angeles." (Dkt. #757; *see also* Dkt. #758 (further claiming that Counterclaim Defendant "necessitat[ed] current medical care in Los Angeles by her Los Angeles area physicians and cardiologists")). Consequently, the Court

---

[2]     To be clear, the Court ultimately adjourned the December 6, 2022 trial date in this case due to its own late-breaking Covid-19 diagnosis on the morning of trial. (Dkt. #759). This followed multiple orders that the Court issued denying Counterclaim Defendant's adjournment requests. (Dkt. #739, 740). That said, based on Counterclaim Defendant's conduct subsequent to that adjournment, the Court is confident that the December 6, 2022 trial would not have happened in any event. Put simply, the Court believes that Counterclaim Defendant would have engaged in the same dilatory conduct that prompted the OTSC, which conduct is discussed *infra*.

converted the May 2, 2023 trial to a virtual format and adjusted the trial start time to 11:00 a.m. E.D.T. in order to accommodate Counterclaim Defendant, who was located in California.  (Dkt. #759).

The Court's accommodations were, unfortunately, rendered nugatory by Counterclaim Defendant's actions.  The spectacle of the May 2, 2023 trial proceeding, as well as the lead-up to it, are discussed in the OTSC.  (OTSC 1-3).  The Court nonetheless briefly reviews what occurred at the trial.  As the clock struck 11:00 a.m., all participants were prepared to begin the trial, save for Counterclaim Defendant.  (*Id.*).  This included Counterclaim Plaintiff's expert witness.  (*Id.*).  At 11:06 a.m., the Court received an email from Counterclaim Defendant, stating that she was in the emergency room of Cedars-Sinai Hospital in Beverly Hills, California, and could not operate the Court-provided video link.  (*Id.*).  Of note, this issue was unique to Counterclaim Defendant; multiple court staff, including a court reporter, as well as multiple attorneys and a witness for Counterclaim Plaintiff, had no issue logging into the virtual courtroom.  For the next hour and a half, the Court attempted to engage with Counterclaim Defendant to chart a path forward and/or hold the much-anticipated trial proceeding.  (*Id.*).  In response, Counterclaim Defendant offered a shifting array of reasons as to why she could not participate in trial; why she was in the hospital in the first instance; and what kind of treatment she was receiving.  (*Id.*).  At 12:30 p.m. E.D.T., the "Court decided to adjourn the trial because [Counterclaim Defendant] made it clear — both in her oral representations and via numerous emails to the

4

Court — that she was undergoing continuing medical examinations and could not participate in the trial proceedings, even by phone." (*Id.*).

What followed was the Court's May 2, 2023 OTSC. (*See generally* OTSC). As just noted, the OTSC recounts the May 2, 2023 trial proceeding. But it also required Counterclaim Defendant to substantiate — "in the form of documentary evidence and/or sworn statements from relevant medical professionals or other witnesses" — fifteen separate representations that Counterclaim Defendant made immediately prior to and during the May 2, 2023 trial. (*Id.* at 5). Those representations concerned, *inter alia*, Counterclaim Defendant's Covid-19 diagnosis, her stated reasons for checking herself into the hospital, her travel plans in preparation for trial, and her medical treatment while at the hospital. (*Id.* at 4-5).

The Court originally provided Counterclaim Defendant with three weeks to respond to the OTSC. (OTSC 5). Following entry of the OTSC, Counterclaim Defendant filed an "emergency motion to disqualify" the Court along with multiple exhibits. (Dkt. #761-771). That motion accused the Court of engaging in *ex parte* discussions with a judge in an unrelated Florida probate action. (Dkt. #761). Indeed, Counterclaim Defendant breathtakingly asserted that the Court's conduct had resulted in "the intentional deprivation of [Counterclaim Defendant's mother's] necessary medical care causing her death." (*Id.*). The Court denied the motion on May 16, 2023, stating in part that "Plaintiff's motion accuses the Court of meddling in an unrelated Florida proceeding of which this Court was not aware, presided over by a judge this Court does not

know and has never contacted, concerning [Counterclaim Defendant's] mother's care." (Dkt. #774).  In denying the motion, the Court clarified that it still expected Counterclaim Defendant to adhere to the schedule set forth in the OTSC.  (*Id.*).

Three days later, on May 19, 2023, Counterclaim Defendant filed a "motion for new jury trial dates." (Dkt. #775).  The Court denied the motion the day it was filed.  (Dkt. #776).  Again, the Court eschewed the "majority of the factual allegations" in the motion — which were equal parts inflammatory and unfounded.  (*Id.*).  Moreover, the Court found it inappropriate to set a new trial date while awaiting Counterclaim Defendant's response to the OTSC, which response was due four days later.  (*Id.*).  Finally, the Court found Counterclaim Defendant's jury trial request meritless, as the Court had denied a request to the same effect in July 2021.  (*Id.* (citing Dkt. #657)).

On May 21, 2023, two days before her response to the OTSC was due, Counterclaim Defendant filed a motion for an extension of time.  (Dkt. #777).  That motion was again rife with misrepresentations of the record as well as bare accusations of grave misconduct by the Court.  (*Id.*).  Nonetheless, the Court granted Counterclaim Defendant a 30-day extension of time to respond.  (Dkt. #778).  In line with this extension, Counterclaim Defendant filed her response to the OTSC and supporting exhibits on June 21, 2023.  (Dkt. #779 ("Abraham Response"), 780-789 (exhibits)).  The Court then solicited a response from Counterclaim Plaintiff, due by July 10, 2023.  (Dkt. #790).

Counterclaim Plaintiff filed her response and supporting exhibits on June 29, 2023.  (Dkt. #791 ("Leigh Response"), 792 (exhibits)).

The Court requested a reply from Counterclaim Defendant, due by July 21, 2023.  (Dkt. #793).  In doing so, the Court advised Counterclaim Defendant that any reply should not exceed ten pages in length and should not contain additional exhibits.  (*Id.*).  True to form, on July 20, 2023, the day before her reply submission was due, Counterclaim Defendant submitted a request to file additional exhibits by July 28, 2023 — a full week after the reply deadline.  (Dkt. #794).  The Court denied this untimely request and ordered Counterclaim Defendant to comply with the clear directives of its prior order. (Dkt. #795).  Counterclaim Defendant filed her reply on July 21, 2023.  (Dkt. #797 ("Abraham Reply")).

Though briefing on the OTSC had closed, Counterclaim Defendant filed her fourth "motion to disqualify" the Court on July 24, 2023.  (Dkt. #798). Here, too, the motion "largely reiterate[d] [Counterclaim Defendant's] misstatements of the record in this case and her patently false allegations made in her third motion to disqualify, all of which the Court considered and rejected in its corresponding order denying that motion."  (Dkt. #799 at 1 (citing Dkt. #761-762, 774)).  With particular respect to Counterclaim Defendant's objections to the Court's ruling denying her leave to submit exhibits with her July 21, 2023 reply, the Court observed that Counterclaim Defendant had "provided the Court with no reasonable basis to believe that any purported exhibits actually existed," given her repeated representations that

7

there were *no* additional records to produce, as well as the ample time already afforded her to produce such records, if they existed.  (*Id.* at 2).  Ultimately, the Court denied Counterclaim Defendant's motion to disqualify, finding no reason to infer bias or prejudice by the Court, and noted that it considered the OTSC to be fully briefed.  (*Id.* at 3).

## DISCUSSION

### A.    Counterclaim Defendant Has Failed to Comply with the OTSC

The OTSC required substantiation of fifteen discrete representations Counterclaim Defendant made to the Court leading up to and during the May 2, 2023 trial.  (OTSC 4-5).  Even the most cursory review of the record in this case would confirm the advisability, if not the need, for such substantiation.  Counterclaim Defendant's history of eleventh-hour adjournment requests; her barrage of baseless attacks on this Court, Counterclaim Plaintiff, and even her own counsel; and her prior fabrication of documents and utterance of false statements to the Court (*see* Dkt. #409 at 58-59, 63-72 (October 22, 2019 transcript finding fabrication of documents and making of false statements); Dkt. #539 (Opinion and Order awarding sanctions based on Counterclaim Defendant's fabrication of documents and related false statements)), call into question the veracity of any representation she makes in this case.

Broadly speaking, the Court agrees with Counterclaim Plaintiff's categorization of the Court's requests for substantiation, whereby the fifteen requests are divided among: (i) Counterclaim Defendant's hospitalization,

medical treatment, and ability to participate in the May 2, 2023 trial (Leigh Response 3-5); (ii) her Covid-19 diagnosis and condition leading up to trial (*id.* at 5-7); and (iii) her preparation for the May 2, 2023 trial (*id.* at 7-9). Although Counterclaim Defendant purports to respond to the Court's requests for substantiation, much of her proffered support is either inapposite or inauthentic, such that the Court ultimately finds default judgment to be the only appropriate sanction.  In the following sections, the Court discusses the Court's categories of requests *seriatim*.  That said, it is the totality of Counterclaim Defendant's submission — the inconsistencies, the internal contradictions, and the lack of evidentiary support — that engenders the Court's outcome.

### 1. Counterclaim Defendant's Hospitalization and Inability to Participate at Trial

The Court's first set of requests for substantiation concerned Counterclaim Defendant's hospitalization and medical treatment on May 2, 2023.  Specifically, the Court required substantiation that:

- Counterclaim Defendant was experiencing "serious Covid related medical complications necessitating [her] medical care and recommended hospitalization in Los Angeles, California." (Dkt. #757 at 1).

- She "presently is and has been undergoing necessary medical care by Parto Cardiology in Los Angeles."  (*Id.*).

- Counterclaim Defendant "presently suffers from a serious cardiac condition which has been exacerbated due to Long Term Covid." (*Id.*).

- She was "unable to fly to New York and is physically unable to meaningfully participate in the May 2, 2023 trial" due to "serious medical conditions."  (*Id.* at 2).

- When Counterclaim Defendant filed her May 1, 2023 submissions, she was "presently … experiencing high fever and other serious Covid complications necessitating current medical care in Los Angeles by her Los Angeles area physicians and cardiologists." (Dkt. #785 at 1).

- A friend drove Counterclaim Defendant to Cedars-Sinai Hospital in Beverly Hills, California, at 4:00 a.m. on May 2, 2023. (Dkt. #772 at 8:16-8:21).

- Counterclaim Defendant checked herself into the hospital for cardiac-related issues. (*Id.* at 9:1-4).

- Because Counterclaim Defendant was "required to have pain medication" at the hospital, it was "not possible [for her] to participate" in the trial. (Leigh Response, Ex. E (Email from Counterclaim Defendant to the Court and Counterclaim Plaintiff, dated May 2, 2023, timed 9:03 a.m. P.D.T.)))

(OTSC 4-5).

As an initial matter, the Court credits Counterclaim Defendant's representation that a friend drove her to Cedars-Sinai Hospital at 4:00 a.m. on May 2, 2023. (Abraham Response 8; *id.*, Ex. P). As to the rest of the representations in this category, however, Counterclaim Defendant has failed to provide meaningful responses or the requisite evidentiary support.

At a high level, this first category of requests was designed to verify Counterclaim Defendant's representations concerning why she was at the hospital and, more importantly, why she could not meaningfully participate at a one-day virtual bench trial that had been scheduled five months earlier. Yet Counterclaim Defendant has merely repackaged general assertions concerning her cardiac condition that she has already presented to the Court. For instance, she submitted a letter dated June 14, 2023, from a manager at "Parto

10

Heart & Vascular" stating: "I am writing to confirm that Robin Abraham … has been and is being treated by our Los Angeles clinic for a congenital heart defect." (Abraham Response, Ex. B).  It continues: "[s]ince she is being treated for shortness of breath, chest pain and irregular heart palpitations, we advised her that if she is experiencing any symptoms and became worse to immediately go to the nearest hospital emergency room for treatment." (*Id.*).  Notably absent from the letter, however, is the date on which Counterclaim Defendant advised her cardiology practice that she had Covid-19 and that her heart condition was flaring up.  In other words, this letter, like other documents submitted by Counterclaim Defendant (*see, e.g.*, Abraham Response, Ex. I (doctor's note from July 2022; letter from August 30, 2022; and abstract from medical journal concerning adult congenital heart disease and Covid-19)), sheds no light on why Counterclaim Defendant went to the hospital on May 2, 2023, and why she was unable to participate in the virtual trial.

Counterclaim Defendant's decision not to produce contemporaneous medical records concerning her May 2, 2023 hospitalization is all the more suspect.  Such records would be the most probative evidence of why Counterclaim Defendant went to the hospital; her medical symptoms; her treatment; and whether she ever represented to hospital staff that she had recently tested positive for Covid-19.  (*See* OTSC 3 (noting that Counterclaim Defendant claimed to have checked herself into Cedars-Sinai on May 2, 2023, because of cardiac issues, despite predicating her May 1, 2023 motions for adjournment on Covid-related medical issues)).  To explain this deficit of

11

information, Counterclaim Defendant states merely that "Cedars Sinai Medical Records Specialist Stephen Lewis and Cedars Sinai Director of Health Information Michele Gomez confirmed that Cedars Sinai 'does not provide documentary evidence and/or sworn statements from relevant medical professionals or other witnesses.... [Counterclaim Defendant's] medical records are protected under California and federal law.'" (Abraham Response 12).  This statement is demonstrably false, because Counterclaim Defendant has always been entitled to her medical records.[3]  For Counterclaim Defendant to proffer such a disingenuous take on the law suggests that her medical records from

---

[3]      As explained on the Medical Board of California's website:

> Section 123110 of the Health & Safety Code specifically provides that any adult patient, or any minor patient who by law can consent to medical treatment (or certain patient representatives), is entitled to inspect patient records upon written request to a physician and upon payment of reasonable clerical costs to make such records available.  The physician must then permit the patient to view their records during business hours within five working days after receipt of the written request.  The patient or patient's representative may be accompanied by one other person of their choosing.  Prior to inspection or copying of records, physicians may require reasonable verification of identity, so long as this is not used oppressively or discriminatorily to frustrate or delay compliance with this law.

> The patient or patient's representative is entitled to copies of all or any portion of their records that he or she has a right to inspect, upon written request to the physician.  The physician may charge a fee to defray the cost of copying, not to exceed 25 cents per page or 50 cents per page for records that are copied from microfilm, along with reasonable clerical costs.  By law, a patient's records are defined as records relating to the health history, diagnosis, or condition of a patient, or relating to treatment provided or proposed to be provided to the patient.  Physicians must provide patients with copies within 15 days of receipt of the request.

Medical Board of California, *Patient Access to Medical Records*, https://www.mbc.ca.gov/Resources/Medical-Resources/Access-Records.aspx#:~:text=Physicians%20will%20require%20a%20patient,your%20written%20request(s) (last accessed October 13, 2023).

May 2, 2023, would contradict her representations to this Court.  After all, Counterclaim Defendant has frequently submitted her medical records to the Court when she believed them to be useful to her positions.  Indeed, Counterclaim Defendant submitted doctors' notes concerning pre- and post-trial medical care in her response to the OTSC.  (*See id.*, Ex. B, C, I).  The Court can only surmise that her decision to withhold her May 2, 2023 hospital records was a calculated one, and that her repeated representations that she could obtain such records, if only the Court would grant her just one more extension, were further attempts at delay.[4]

Finally, the Court finds that Counterclaim Defendant lied to the Court during the May 2, 2023 trial concerning her contemporaneous medical treatment.  As discussed above, Counterclaim Defendant represented to the Court that she had received painkillers from hospital staff and thus could not participate in the trial.  (Leigh Response, Ex. E (email from Counterclaim Defendant to the Court and opposing counsel stating, "[i]t is not possible to participate while I've been required to have pain medication," and, further, that "due to present medical emergency hospitalization for which I am now treated with painkillers, it is respectfully requested that today be adjourned and rescheduled please")).  These representations were plainly false, as

---

[4]     The Court's surmise is only confirmed by Counterclaim Defendant's reply submission in this case, filed July 21, 2023, in which she claims not to have received any medical records from the May 2 hospitalization, despite the passage of nearly three months, and despite producing medical records generated on even later dates.  (Abraham Reply 5 n.4).

Counterclaim Defendant was forced to admit when directed to provide substantiation.

Caught in the act, Counterclaim Defendant now seeks to "correct[ ]" her misrepresentations, claiming that she in fact "refused recommended IV Lidocaine so she could function at [b]ench [t]rial," and that the real reason for her inability to participate was that the court-provided video link did not work. (Abraham Response 8). To be clear, there was nothing ambiguous about Counterclaim Defendant's representations to the Court at trial. She either did or did not receive painkillers that would have inhibited her ability to participate at trial. She repeatedly told the Court at trial that she did receive such painkillers in order to obtain an adjournment, and now she says that she did not. And to the extent Counterclaim Defendant now seeks to rescind her representation and place blame on technical difficulties, her attempt is unavailing. Everyone but Counterclaim Defendant — all court staff, a court reporter, opposing counsel, and a witness — was able to operate the video link that was circulated by the Court.

### 2. Counterclaim Defendant's Covid-19 Diagnosis and Condition at the Time of Trial

The Court's second category of requests for substantiation concerned Counterclaim Defendant's representations that she had developed Covid-19 just a few days before the May 2, 2023 trial. Specifically, the Court required that Counterclaim Defendant substantiate that:

- Counterclaim Defendant had recently been on a "full flight to Los Angeles where passengers seated close to [her] were unmasked and coughing[.]" (Dkt. #757 at 4).

14

- Counterclaim Defendant "was diagnosed in Los Angeles as Covid Positive on April 29, 2023," but that "[d]ue to high fever, [she] was sleeping and not aware of the April 29[,] 2023 Covid [p]ositive notice until this morning [*i.e.*, May 1, 2023] California time." (*Id.* at 4).

- Her April 29, 2023 Covid test was conducted in the Los Angeles area and was an "officially administered PCR Covid [t]est which reported [Counterclaim Defendant] to be Covid positive." (Dkt. #758 at 1).

- Her Covid-positive test was "automatically" reported to the "California Department of Health." (*Id.*).

(OTSC 4).

As above, the Court begins with what Counterclaim Defendant has attempted to substantiate. She appears to have received a positive Covid-19 test result on April 29, 2023. (Abraham Response, Ex. C).[5] But Counterclaim Defendant has failed to substantiate the remainder of her representations in this category, and thus even were the Court to accept that she tested positive

---

[5] This exhibit was filed under seal and *ex parte*, and thus Counterclaim Plaintiff has been unable to view or authenticate it. (Leigh Response 5). That said, the Court's own close examination of this exhibit yields several concerns about its authenticity. Notably, the "Date Reported" field on the first page of the test result appears to contain inconsistent fonts in the same date entry (*i.e.*, the month and date are in a serif font, whereas the year is in a bold sans serif font). (Abraham Response, Ex. C at 2). The same is true on the next page in the "Patient Details" field, where Counterclaim Defendant's name is in a bold sans serif font, but her address is in a normal serif font. (*Id.* at 3). This difference is more pronounced given that the adjacent "Physician Details" field is in a consistent bold sans serif font. (*Id.*). Finally, in the right-hand section of that page, the characters in the "Date Collected" field appear to have been altered, and the time stamps in the various entries are in inconsistent formats. (*Id.*). The Court is understandably concerned, given the criticality of the dates on which the test was collected, received, and reported, coupled with the fact that there is no date on the Walgreens cover letter. (*Id.* at 1). Additionally, Counterclaim Defendant's withholding of the medical records from her May 2, 2023 hospitalization denies the Court and opposing counsel the best way to cross-check the authenticity of Exhibit C. That is, if Counterclaim Defendant were truly infected with Covid-19 to the degree that she could not participate in the bench trial, the Court would expect that she would have told as much to hospital staff and that this fact would be recorded in her discharge papers. Nonetheless, given the fact that Counterclaim Defendant has submitted more obviously altered and fabricated documents, the Court will take this exhibit at face value.

for Covid-19 immediately prior to trial, Counterclaim Defendant has not substantiated the severity of the symptoms she has claimed.

In this regard, it strains credulity that Counterclaim Defendant, even if Covid-19-positive, was asleep for two full days between April 29, 2023, when she represents that she received her positive Covid-19 test result, and May 1, 2023, when she filed her adjournment requests. As noted, Counterclaim Defendant did not file her lengthy adjournment request until 3:30 p.m. on May 1, 2023, the day prior to trial, and yet she was concerned enough to test for Covid-19 on April 28, and she ostensibly received her positive test result on April 29. Nothing explains this gap in time. As such, the Court can only assume that, as above, Counterclaim Defendant's conduct was calculated to yet again delay trial in this case.

More to the point, Counterclaim Defendant has failed to substantiate a variety of issues surrounding the Covid-19 test result. For instance, she has submitted no evidence that she notified *anyone* that she tested positive for Covid-19 prior to May 1, 2023, relying on her assertion that she was under doctor's orders to stay in bed. (Abraham Response 12 ("Per direct instructions by the Los Angeles County of Health and Plaintiff's physicians, [Counterclaim Defendant] was instructed to stay in bed.")). However, her substantiation for this representation is merely a screengrab from a County of Los Angeles webpage providing general Covid-19 guidance. (*Id.*, Ex. N). In the same vein, Counterclaim Defendant has submitted no evidence that she had a high fever or that her Covid-19 test results impeded her ability to participate in a virtual

16

trial.  Quite to the contrary, as the Court noted in its May 1, 2023 order

denying the adjournment request, if Counterclaim Defendant "was capable of

filing two submissions with detailed procedural history and argument sections,

and was capable of reaching out to opposing counsel to request an

adjournment of tomorrow's trial, she is capable of representing herself

tomorrow."  (Dkt. #759 at 3).

Finally, Counterclaim Defendant suggested in her May 1, 2023

submission that she contracted Covid-19 while on a plane ride to Los Angeles.

Sensibly, the Court requested that Counterclaim Defendant substantiate this

claim.  Though the Court understands that Counterclaim Defendant may not

have been able to track down other passengers on that flight, her evidence that

she was ever on this flight is suspect at best.  Exhibit L to her response

purports to document this flight.  (*See* Abraham Response, Ex. L).  Yet that

exhibit raises more questions than it answers.  It is a half-photocopied exhibit

of what looks like a partial flight confirmation from American Airlines.  It

includes no information about the passenger, and the date of the flight is

written in by hand.  (*Id.*).  Counterclaim Defendant has given the Court no

reason to trust that Exhibit L is what she purports it to be.

In sum, as to this category of materials, Counterclaim Defendant has

provided only partial substantiation.  The Court will give Counterclaim

Defendant the benefit of the doubt that she in fact tested positive for Covid-19.

But her actions following that positive test result, as well as her inability to

substantiate any of the Court's other requests, suggest that she was more than capable of participating in the bench trial.

### 3.   Counterclaim Defendant's Preparation for the May 2, 2023 Trial

The third and final category of requests from the Court concerned Counterclaim Defendant's preparation for — and, by extension, her intention to attend — the May 2, 2023 trial.  The Court requested that Counterclaim Defendant substantiate that she "reserved and confirmed a flight from Los Angeles to New York" and "reserved and confirmed hotel accommodations[.]" (Dkt. #758 at 2).

As evidentiary support for these two assertions, Counterclaim Defendant submitted Exhibit O, which contains a flight confirmation for an April 30, 2023 American Airlines flight and a hotel reservation confirmation through the website Agoda.  (*See* Abraham Response, Ex. O).  The Court's concerns regarding these documents are of a different nature than those discussed to this point in the Order.  Specifically, Counterclaim Plaintiff has contended that these documents exhibit "several indicia of inauthenticity" (Leigh Response 8-9), and the Court agrees.

Counterclaim Plaintiff presents a sample confirmation for a similar route (Leigh Response, Ex. A), as well as a meticulous list of discrepancies between the sample confirmation and Counterclaim Defendant's purported flight confirmation (Leigh Response 8-9).  Most noticeable is the "Sunday April 30, 2023" date on Counterclaim Defendant's document, which is incongruous in font, format, and substance with that in the sample confirmation, suggesting

that the document submitted by Counterclaim Defendant was doctored. (*Compare* Leigh Response, Ex. A, *with* Abraham Response, Ex. O). Similarly, with the Agoda reservation confirmation, Counterclaim Plaintiff identifies several discrepancies between a sample confirmation and Counterclaim Defendant's purported reservation confirmation, the most notable of which is the lack of the "Payment Details" section and the absence of a customer service number on the right-hand margin of the document. (Leigh Response 9; *compare id.*, Ex. B, *with* Abraham Response, Ex. O).[6]

Inexplicably, Counterclaim Defendant makes no effort in her reply to explain these discrepancies, authenticate the documents, or otherwise address Counterclaim Plaintiff's submission. (*See generally* Abraham Reply). Instead, Counterclaim Plaintiff chooses to repeat her unconvincing and, at this point, disingenuous arguments regarding the unavailability of her medical records and her inability to operate the Court-provided videoconference technology, as well as her false accusations regarding unrelated legal proceedings in California and Florida. (*Id.* at 2, 4-6). Accordingly, the Court disregards both the purported flight and hotel confirmations, as it has no basis to conclude

---

[6]     The Court also agrees with Counterclaim Plaintiff's assessment that certain of Counterclaim Defendant's statements about these confirmations are belied by the record. (Leigh Response 9). For instance, Counterclaim Defendant suggests that "[h]aving previously been advised not to travel, [she] canceled her flight to New York and hotel reservation" at or about the time of the submission of her May 1, 2023 adjournment request. (Abraham Response 9). If true, the action was imprudent, inasmuch as the Court had not then granted (and in fact would ultimately reject) her request. However, the Court has reason to disbelieve even this statement, because Counterclaim Defendant's flight was scheduled to depart for New York on April 30, 2023, and she now claims to have slept from April 29, 2023, straight through to May 1, 2023, on which date she first became aware of her Covid diagnosis. (Dkt. #757 at 4).

that they are authentic.  The Court therefore finds that Counterclaim
Defendant has not substantiated that she actually "reserved and confirmed" a
flight and hotel accommodations in advance of the May 2, 2023 trial.  (OTSC 5
(quoting Dkt. #758 at 2)).

In sum, the Court is left with virtually no substantiation for the majority
of the representations made by Counterclaim Defendant regarding her inability
to participate in the May 2, 2023 trial, despite providing Counterclaim
Defendant with plenty of time and opportunity to be heard on the issue.  Once
again, the Court has had to contend with Counterclaim Defendant's revival of
baseless and irrelevant allegations, coupled with a last-minute submission of
documents that are irrelevant at best, and fabricated at worst.  Unfortunately,
such conduct is consistent with Counterclaim Defendant's approach to this
litigation as a whole.

**B.    The Court Will Impose Sanctions for Counterclaim Defendant's Failure to Comply with the OTSC**

In the May 2, 2023 OTSC, the Court explained that it "will consider
entering a default judgment in favor of the Counterclaim Plaintiff in this case"
should Counterclaim "fail to substantiate the above-noted representations."
(OTSC 5-6).  In response to the OTSC, Counterclaim Plaintiff similarly
requested that "[g]iven the history of repeated delays of the bench trial caused
by [Counterclaim Defendant] and the history of falsified documents in this
case, [Counterclaim Plaintiff] respectfully requests that the Court enter
judgment in [her] favor on its counterclaim," and that the Court further award

20

Counterclaim Plaintiff the fees and costs incurred in addressing Counterclaim Defendant's deficient response to the OTSC.  (Leigh Response 9-10).

Courts have a variety of powers through which they may sanction litigation misconduct.  While Counterclaim Defendant is proceeding *pro se*, the fact remains that she is an attorney, and thus not entitled to the leniency afforded uncounseled litigants.  *See Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) ("[*P*]*ro se* attorneys ... typically cannot claim the special consideration which the courts customarily grant to *pro se* parties." (internal quotation marks omitted)).  (*See, e.g.*, Dkt. #455 at 2 ("Plaintiff is reminded that, as an attorney, she is not entitled to the solicitude generally accorded to *pro se* litigants." (citing *Tracy* v. *Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010))); Dkt. #505 at 15 ("However, where, as here, an attorney represents herself in a proceeding, she is entitled to no special solicitude." (citing *Tracy*, 623 F.3d at 102))).

A federal court may "exercise its inherent power to sanction a party or an attorney who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Ransmeier* v. *Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (internal quotation marks omitted); *accord Rossbach* v. *Montefiore Med. Ctr.*, 81 F.4th 124, 141 (2d Cir. 2023).  A "primary aspect" of the discretion that attends a federal court's inherent power "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. ...  [O]utright dismissal of a lawsuit ... is a particularly severe sanction, yet is within the court's discretion." *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 44-45 (1991).

A court's inherent power includes the power to sanction a party for a fraud on the court, which occurs where a party: (i) improperly influences the trier; (ii) unfairly hampers the presentation of the opposing party's claim or defense; (iii) lies to the court and her adversary intentionally, repeatedly, and about issues that are central to the truth-finding process; or (iv) knowingly submits fraudulent documents to the court. *S.E.C.* v. *Collector's Coffee Inc.*, No. 19 Civ. 4355 (VM) (GWG), 2021 WL 266284, at *12-13 (S.D.N.Y. Jan. 27, 2021) (quoting *Beverly Hills Teddy Bear Co.* v. *Best Brands Consumer Prods. Inc.*, No. 19 Civ. 3766 (GHW), 2020 WL 7342724, at *16 (S.D.N.Y. Dec. 11, 2020), and *Passlogix, Inc.* v. *2FA Tech., LLC*, 708 F. Supp. 2d 378, 395 (S.D.N.Y. 2010)); *see also McMunn* v. *Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) ("[W]hen a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process, it can fairly be said that he has forfeited his right to have his claim decided on the merits. This is the essence of a fraud upon the court."); *Skywark* v. *Isaacson*, No. 96 Civ. 2815 (JFK) (NRB), 1999 WL 1489038, at *14 (S.D.N.Y. Oct. 14, 1999) (noting that fraud on the court "occurs where a party has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action"), *report and recommendation adopted*, No. 96 Civ. 2815 (JFK), 2000 WL 145465 (S.D.N.Y. Feb. 9, 2000). "Sanctions for fraud are warranted if it is established by clear and convincing evidence that [a party] has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's

ability impartially to adjudicate the action." *Yukos Cap. S.A.R.L.* v. *Feldman*, 977 F.3d 216, 235 (2d Cir. 2020) (citation and quotation marks omitted).

"Where a court finds fraud on the court, a variety of sanctions are available, including an award of attorney's fees, an adverse jury instruction, or the entry of default judgment against the offending party." *LifeTree Trading Pte., Ltd.* v. *Washakie Renewable Energy, LLC*, No. 14 Civ. 9075 (JPO), 2017 WL 2414805, at *2 (S.D.N.Y. June 2, 2017) (citation omitted). "However, a sanction that has the effect of ending the case and granting judgment to one of the parties is so harsh a remedy that it should be imposed only in the most extreme of circumstances." *Id.* (citation and quotation marks omitted). Courts generally consider five factors in determining the appropriate sanction in this context:

> (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the injured party; (iii) whether there is a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future.

*Passlogix*, 708 F. Supp. 2d at 394 (citation omitted).

To impose sanctions under its inherent power, a court must find "clear evidence that the conduct at issue is [i] entirely without color and [ii] motivated by improper purposes." *Wolters Kluwer Fin. Servs., Inc.* v. *Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) (citation omitted); *see also Rossbach*, 81 F.4th at 142-43 (noting that imposition of sanctions under a court's inherent power almost always requires a showing of bad faith); *Yukos*, 977 F.3d at 235 ("[C]lear and

convincing evidence of bad faith is a prerequisite to an award of sanctions under the court's inherent power."); *see generally Doe 1* v. *E. Side Club, LLC.*, No. 18 Civ. 11324 (KPF), 2021 WL 2709346, at *19-20 (S.D.N.Y. July 1, 2021), *reconsideration denied*, No. 18 Civ. 11324 (KPF), 2021 WL 4711249 (S.D.N.Y. Oct. 8, 2021).

As detailed above and in numerous prior orders, Counterclaim Defendant has repeatedly lied to the Court and opposing counsel; fabricated documents; and engaged in a pattern of dilatory and obstructive behavior.  Going back to January 2019, Counterclaim Defendant produced approximately 33 altered and/or fabricated documents in discovery to support her key contractual allegations.  (Dkt. #143).  When her perfidy was uncovered, Counterclaim Defendant lied in open court about the fabrication.  (Dkt. #409 at 59:4-5 ("At no time did I modify or cause anyone else to modify any email at any time ever.")).  The evidence to the contrary, however, was overwhelming; even then, the Court imposed a modest sanction of precluding the use of the 33 documents and requiring Counterclaim Defendant to pay the attorneys' fees and costs incurred by Counterclaim Plaintiff to address the fabrication.  (*Id.* at 70:2-71:16).

As it happened, several of the fabricated documents were critical to Counterclaim Defendant's breach of contract claim, and after their preclusion, the Court granted summary judgment in favor of Counterclaim Plaintiff in July 2021.  (*See* Dkt. #505).  What remained in the case was Counterclaim Plaintiff's counterclaim — which, as discussed below, provided a second,

independent basis to reject Counterclaim Defendant's breach of contract claim. The counterclaim would be tried in less than one day, with only a single expert witness scheduled to testify.  And yet the Court struggled mightily, over a period of years, to schedule this bench trial, meeting resistance at every opportunity.  Counterclaim Defendant did all that she could to put off the day of reckoning, making a habit of eleventh-hour-and-fifty-ninth-minute adjournment requests.  For a while, the Court granted these requests, even though they had the effect of requiring the Court and Counterclaim Plaintiff to repeatedly prepare for a trial that would never take place.  Of perhaps greater concern was the fact that while Counterclaim Defendant continually claimed an inability to sit for trial, she found abundant time to litter the record with fantastical tales of coordinated judicial gaslighting, going so far as to accuse this Court of felony murder with respect to her mother's passing.

When this Court made clear that it would fall for Counterclaim Defendant's adjournment ploys no longer, she took more aggressive measures, checking herself into a hospital in order to avoid participating in the bench trial.  Even now, the *bona fides* of her hospitalization is unclear, given her contradictory explanations, her refusal to produce the relevant papers from the hospital, and her cherry-picked medical records.  Conversely, when asked to substantiate the efforts that she actually undertook to participate in the May 2 bench trial, Counterclaim Defendant again resorted to inconsistent explanations and fabricated documents.

On this record, the relevant factors favor entry of a default judgment. Counterclaim Defendant's conduct in connection with the May 2 bench trial is simply one chapter in a years-long saga of misconduct that earlier, lesser sanctions did nothing to abate. That conduct was the product of intentional bad faith, and it absolutely prejudiced Counterclaim Plaintiff in pursuing her counterclaim. More fundamentally, having presided over this matter for more than six years, this Court is confident that no matter the date to which it reschedules the bench trial, Counterclaim Defendant will engineer some other basis for delay. The Court has provided Counterclaim Defendant with abundant opportunities to be heard and to contest the counterclaim against her on the merits. But she has cast aside each of these opportunities, preferring to defy this Court's orders and to run up unnecessary costs — both in terms of time and money — on opposing counsel. As such, the Court finds it appropriate, based on the lengthy record in this case and the most recent instances of misconduct, to enter a default judgment against Counterclaim Defendant on Counterclaim Plaintiff's counterclaim.

The thrust of that counterclaim is that Counterclaim Defendant was acting in a legal representative capacity when Mitch Leigh, the decedent in this case, entered into the relevant contract with her. (Dkt. #105 ("Amended Counterclaim") ¶¶ 38-47). Pursuant to New York Rule of Professional Conduct 1.8,

> (a) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:

> [i] the transaction is fair and reasonable to the client
> and the terms of the transaction are fully disclosed and
> transmitted in writing in a manner that can be
> reasonably understood by the client; [ii] the client is
> advised in writing of the desirability of seeking, and is
> given a reasonable opportunity to seek, the advice of
> independent legal counsel on the transaction; and
> [iii] the client gives informed consent, in a writing signed
> by the client, to the essential terms of the transaction
> and the lawyer's role in the transaction, including
> whether the lawyer is representing the client in the
> transaction.

NY ST RPC Rule 1.8(a)(1-3) (McKinney); *see also* Simon's NY Rules of Prof.

Conduct § 1.8:1.  Under this rule,

> an attorney who seeks to avail himself of a contract
> made with his client, is bound to establish affirmatively
> that it was made by the client with full knowledge of all
> the material circumstances known to the attorney, and
> was in every respect free from fraud on his part, or
> misconception on the part of the client, and that a
> reasonable use was made by the attorney of the
> confidence reposed in him.

*Greene* v. *Greene*, 56 N.Y.2d 86, 92 (1982) (quoting *Whitehead* v. *Kennedy*,

69 N.Y. 462, 466 (1877)).

Where an attorney enters into a business contract with a client, she

must adhere to these disclosure provisions, or else the client may seek to hold

the contract unenforceable or rescind the contract.  *See, e.g.*, *Held & Hines LLP*

v. *Hussain*, No. 16 Civ. 5273 (JSR) (SN), 2018 WL 4233809, at *6 (S.D.N.Y.

July 31, 2018) (finding contract unenforceable where law firm had "not pointed

to any evidence to suggest that the firm advised [client] in writing regarding the

conflict of interest or the desirability of seeking independent legal counsel" or

"obtained [client's] informed consent to the conflict of interest"), *report and*

27

*recommendation adopted*, No. 16 Civ. 5273 (JSR), 2018 WL 4232912 (S.D.N.Y. Sept. 5, 2018); *Schlanger* v. *Flaton*, 631 N.Y.S.2d 293, 297 (1st Dep't 1995) (finding that client was entitled to rescission of contract where attorney failed to adhere to disclosure obligations); *see also Sotiriou* v. *Billis*, 782 N.Y.S.2d 917, 918 (2d Dep't 2004) ("[T]he [attorney] plaintiff's failure to provide full disclosure to [defendant] precludes the plaintiff from availing himself of the equitable remedy of foreclosure to enforce the contract.").

In her counterclaim, Counterclaim Plaintiff alleges that Counterclaim Defendant failed to adhere to her disclosure obligations or to advise Mr. Leigh of potential conflicts of interests and/or the desirability of obtaining independent counsel.  (Amended Counterclaim ¶¶ 33, 42-47).  In consequence, Counterclaim Plaintiff seeks to hold the contract concerning *Man of La Mancha* unenforceable.  (*Id.* at 10).  Having found a default judgment an appropriate sanction for Counterclaim Defendant's misconduct, the Court must determine if the well-pleaded allegations in the answer "provide a proper basis for liability and relief." *Rolls-Royce PLC* v. *Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010).  The Court has reviewed the allegations in the counterclaim in light of the law surrounding attorneys' disclosure and professional responsibility obligations, and finds that these factual allegations, accepted as true, "provide a proper basis for" Counterclaim Plaintiff's requested relief.  *Id.* As such, the Court finds that the contract at the heart of this dispute is unenforceable as a matter of law.

As it relates to fees, the Court also finds it appropriate for Counterclaim Plaintiff to receive the fees incurred in responding to Counterclaim Defendant's OTSC submission.  "[A]n assessment of attorney's fees is undoubtedly within a court's inherent power."  *Chambers*, 501 U.S. at 45 (citing *Roadway Express, Inc.* v. *Piper*, 447 U.S. 752, 765 (1980)).  "[A] court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Id.* at 45-46 (quoting *Alyeska Pipeline Serv. Co.* v. *Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)).  In awarding attorney's fees as a sanction, "'[b]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."  *Oliveri* v. *Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) (quoting *Hall* v. *Cole*, 412 U.S. 1, 15 (1973)).

Separately, 28 U.S.C. § 1927 authorizes a court to require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously … to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927; *see also Madison 92nd St. Assocs., LLC* v. *Marriott Int'l, Inc.*, No. 13 Civ. 291 (CM), 2013 WL 5913382, at *12 (S.D.N.Y. Oct. 31, 2013) ("The purpose of § 1927 is to ensure that those who create unnecessary costs also bear them." (citation and quotation marks omitted)), *aff'd sub nom. Boies, Schiller & Flexner LLP* v. *Host Hotels & Resorts, Inc.*, 603 F. App'x 19 (2d Cir. 2015) (summary order).

Counterclaim Defendant's conduct outlined above, in addition to constituting fraud on the Court, also vexatiously multiplied the proceedings in this case.  Accordingly, Counterclaim Plaintiff may seek to recover the fees

incurred in "responding to [Counterclaim Defendant's] deficient Response to the Court's Order to Show Cause. (Leigh Response 10).

## CONCLUSION

For the reasons discussed in this Order, the Court finds that Counterclaim Plaintiff is entitled to a default judgment on her counterclaim and to the recovery of fees. The Clerk of Court is directed to enter judgment on the counterclaim in favor of Counterclaim Plaintiff, and to close this case. Counterclaim Plaintiff is directed to submit an opening submission on her fee petition on or before **November 6, 2023.** Counterclaim Defendant may then submit an opposition submission to the fee petition on or before **November 27, 2023.** The Court will advise the parties if it believes a reply submission is warranted.[7]

SO ORDERED.

Dated:   October 16, 2023
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

[7]   The Court notes that Counterclaim Defendant remains liable to Counterclaim Plaintiff for previously-incurred fees pursuant to the Court's previous sanctions opinion. (Dkt. #371).